## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC MEDICAL DEVICE LIMITED, | ) ) ) ) | |
| | ) | C.A. No. 25-1035 (JLH) |
| Plaintiffs, | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| | ) | |
| ATRAVERSE MEDICAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT ATRAVERSE MEDICAL, INC.'S
## ANSWER TO THE AMENDED COMPLAINT AND COUNTERCLAIMS

OF COUNSEL:

W. Chad Shear (#5711)
Geoffrey D. Biegler  (*pro hac vice*)
Reem Gerais (*pro hac vice*)
Annie Beveridge (*pro hac vice*)
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 490-6000
cshear@cooley.com
gbiegler@cooley.com
rgerais@cooley.com
abeveridge@cooley.com

Elizabeth M. Flanagan (#5891)
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
bflanagan@cooley.com

November 10, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant Atraverse Medical, Inc.*

**ATRAVERSE'S COUNTERCLAIMS**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Atraverse Medical, Inc. ("Counterclaim Plaintiff" or "Atraverse"), by and through its attorneys, bring the following counterclaims against Boston Scientific Corporation ("BSC") and Boston Scientific Medical Device Limited ("BSMDL") (collectively, "Counterclaim Defendants" or "Boston Scientific"):

**FACTUAL BACKGROUND**

1. Boston Scientific's Amended Complaint against Atraverse is part of a calculated plan to attempt to impede a small, start-up medical device company from bringing its FDA-cleared HOTWIRE™ transseptal device to patients suffering from cardiovascular disease. Through this legal action and false and misleading commercial statements it has made about HOTWIRE™, Boston Scientific seeks to do something that it cannot do in the clinic or the marketplace on a level playing field: compete with Atraverse's HOTWIRE™ product on the merits.

2. Atraverse brings these Counterclaims in response to Boston Scientific's Amended Complaint and to ensure that physicians treating cardiovascular disease and their patients continue to have access to Atraverse's HOTWIRE™ and the clinically significant advantages it provides over existing left-heart access devices.

3. Atraverse asks this Court to declare that: (a) Atraverse has not infringed and does not infringe any valid claim of the Asserted Patents, either directly or

2

indirectly, literally or under the doctrine of equivalents; (b) the Asserted Claims of the Asserted Patents are invalid; (c) the Asserted Patents are unenforceable for inequitable conduct committed during the prosecution of each of those patents and other patents in the same family.

4. Atraverse further asks the Court to award Atraverse damages that it has sustained and will sustain in the future as a result of Boston's Scientific's false advertising related to Atraverse's HOTWIRE™ product in violation of § 1125(a) of the Lanham Act.

**A. Atraverse Is a Small Start-Up Medical Device Company That Has Received FDA Clearance for Multiple Products Using its Novel Guidewire, HOTWIRE™**

5. Founded in 2022, Atraverse is a small start-up medical device company principally located in Cardiff by the Sea, CA with less than 30 full-time employees.

6. Atraverse was co-founded by Dr. Steven Mickelsen, Eric Sauter, and John Slump with the goal of pioneering next-generation medical devices for use in minimally invasive cardiac procedures requiring access to the left heart chamber.

7. Atraverse's innovative HOTWIRE™ is a guidewire used to access the left chamber of the heart. The HOTWIRE™ is designed to be navigated through a patient's vasculature, to the heart, and once there, to pierce the septum (the dividing wall between the right and left chambers of the heart) to allow left-chamber access.

The HOTWIRE™ punctures the septum using radiofrequency (RF) technology instead of relying solely on mechanical force.

8.    On May 1, 2024, Atraverse received FDA clearance for its 510(k) premarket submission for its novel HOTWIRE™ RF guidewire (K240900).  On August 12, 2025, Atraverse received FDA clearance for its 510(k) premarket submission for the HOTWIRE™ System RF Generator, the first and only generator with impedance sensation and "auto-off" algorithms to prevent patient injuries by reducing total energy delivery (K252083).  And, on August 27, 2025, Atraverse received FDA clearance for its 510(k) premarket submission for the HOTWIRE™ RF Guidewire co-packaged with a custom activation handpiece (K252419) specifically designed for energizing the HOTWIRE™ RF Guidewire via the HOTWIRE™ RF Generator.

9.    The HOTWIRE™ delivers clinically significant advantages over existing left-heart access devices.  The HOTWIRE™ enhances procedural control and workflow efficiency by providing a solution that is both zero-exchange (meaning that there is no need to swap sheaths after septal puncture, thereby reducing steps and equipment used, and reducing the risk of stroke due to air embolism) and sheath-agnostic (meaning that physicians can use their preferred sheath to perform transseptal puncture).  Due to its 25% greater echogenicity, the HOTWIRE™ further enhances the physician's ability to visualize and locate the

4

guidewire the using echocardiography, while a thick core wire and robust polymer jacket provide two times greater rail stiffness, which facilitates advancing large-bore sheaths across the septum.  The HOTWIRE™ guidewire is designed to work with the HOTWIRE™ RF Generator, the first and only left-heart access system with impedance-sensing technology that automatically halts energy delivery upon transseptal crossing, minimizing unnecessary RF exposure and the risk of inadvertent left atrial perforation, and which also enables user-controlled RF activation in the sterile field.

10.    As of October 2025, the HOTWIRE™ had been used in over 1,300 successful minimally invasive cardiovascular procedures using ten different introducer sheaths as part of a limited market release with no reported patient complications or injuries.

**B.    Boston Scientific Is a Large Medical Device Company Attempting to Block Atraverse from the Market**

11.    Boston Scientific is a large medical device company with around 53,000 employees worldwide, boasting $16.7 billion in net sales in 2024.  (Ex. 1, Boston Scientific, About Us, https://www.bostonscientific.com/en-US/about-us.html (last visited Nov. 9, 2025).)

12.    In 2022, BSC acquired Baylis Medical Company ("Baylis Medical") for an upfront payment of $1.75 billion.  Baylis Medical was a company that offered "advanced transseptal access solutions as well as guidewires, sheaths and dilators

used to support catheter-based left-heart procedures." (Ex. 2, Boston Scientific, *Boston Scientific Closes Acquisition of Baylis Medical Inc.*, (Feb. 15, 2022), https://news.bostonscientific.com/2022-02-15-Boston-Scientific-Closes-Acquisition-of-Baylis-Medical-Company-Inc.)

13.     As part of the Baylis Medical acquisition, BSC acquired the VersaCross™ RF Transseptal Platform, which includes an insulated RF Wire (i.e., a radio frequency guidewire), reinforced shapeable dilator, transseptal sheath and dedicated RFP-100A RF Puncture Generator.  (Ex. 3, Boston Scientific, https://www.bostonscientific.com/us/en/healthcare-professionals/products/transseptal-access-devices/versacross-access-solution/fp00000300.html (last visited Nov. 9, 2025).)

14.     The VersaCross™ is now part of Boston Scientific's electrophysiology (EP) product line.  On information and belief, EP sales made up nearly $2 billion of Boston Scientific's $16.7 billion in total revenue in FY2024.  (Ex. 4, Boston Scientific 10-K, 2024, at Note N, 118.)  On information and belief, Baylis Medical generated net sales of over $125 million in fiscal year 2022 from sales of its radiofrequency (RF) NRG and VersaCross™ Transseptal Platforms, and Boston Scientific has generated increased sales from those platforms since the acquisition. (Ex. 25, Boston Scientific 10-K, 2022, at 41 and 59.)  Boston Scientific views the VersaCross™ RF Transseptal Platform as a key element of its EP offerings,

particularly because the VersaCross™ is designed to work with several of Boston Scientific's other EP products.    (*See* Ex. 5, Boston Scientific, https://www.bostonscientific.com/en-US/products/transseptal-access/dedicated-rf-transseptal-solutions.html (last visited Nov. 9, 2025).)    Indeed, whereas the HOTWIRE™ guidewire can be used with any sheath, Boston Scientific only sells the VersaCross™ RF guidewire as part of a bundle with a custom sheath and/or dilator in the United States.

16. Unlike the HOTWIRE™, which has no reported patient complications or injuries, a recent independent study found that the number of adverse events associated with transseptal puncture procedures has increased dramatically since 2021 due to "a rise in the rate of events related to VersaCross." (Ex. 24, AlleaBelle Bradshaw et al., *Adverse Events Associated With Transseptal Puncture: Insights From The Maude Database*, 85 J. Am. Coll. Cardiology 12 (Mar. 29, 2025).)  In the first eight months of 2024 alone, the study found that the VersaCross™ resulted in over 220 injuries or deaths.  (*Id.*)

16. The instant lawsuit is part of a coordinated plan by Boston Scientific to try to block Atraverse from coming to market with a superior RF guidewire and to improperly defend its investment in Baylis Medical and the VersaCross™ product.

**C.    Boston Scientific Procured the Asserted Patents Through Inequitable Conduct**

17.    On August 18, 2025, Boston Scientific filed a Complaint for Patent Infringement, asserting that Atraverse's HOTWIRE™ product infringes U.S. Patent No. 11,998,238 (the "'238 Patent").  (Compl., D.I. 1.)

18.    Prior to filing its Complaint, and despite Atraverse's HOTWIRE™ product first receiving FDA clearance in 2024, Boston Scientific never contacted Atraverse about the '238 Patent or any of Boston Scientific's other patents or intellectual property.

19.    On October 9, 2025, Boston Scientific filed an Amended Complaint for Patent Infringement, further asserting that Atraverse's HOTWIRE™ product infringes U.S. Patent No. 12,433,639 (the "'639 Patent").  (Am. Compl., D.I. 13.) The '639 Patent had issued two days earlier, on October 7, 2025.

20.    The '238 Patent and '639 Patents ("the Asserted Patents") are two of a series of patents and applications that all claim priority to an international patent application filed by Baylis Medical in November 2013 (PCT/IB2013/060287) ("the Asserted Patent Family").

21.    Over the first eight years of prosecution of the Asserted Patent Family, Baylis Medical obtained two issued U.S. patents, U.S. Patent No. 10,368,911 ("the '911 Patent") and U.S. Patent No. 11,154,324 (Ex. 6, "the '324 Patent").  The

8

Asserted Patent Family was subsequently transferred to Boston Scientific as part of the Baylis Medical acquisition.

22.    The '324 Patent claims a "medical device for puncturing tissue" with limitations very similar to those in the Asserted Patents. (*Compare*, e.g., '324 Patent, claim 1 and '238 Patent, claim 1.)  Despite the similarity, Boston Scientific has not sued Atraverse on the '324 Patent nor accused HOTWIRE™ of infringing that patent.

23.    On information and belief, prior to filing its Complaint, Boston Scientific determined that the '324 Patent was likely unenforceable for inequitable conduct based on the Applicant's failure to disclose material prior art with intent to deceive the Patent Office, as discussed below, and thus decided not to assert that patent.

24.    In fact, Boston Scientific, and particularly the prosecuting attorneys and named inventors, as identified below, procured at least the '324 Patent, the '238 Patent, and the '639 Patent through inequitable conduct.

### 1.    Boston Scientific Fraudulently Obtained the '324 Patent

25.    On June 19, 2019, Baylis Medical filed the application that led to the '324 Patent (U.S. Application No. 16,445,790) ("the '790 Application").  (*See* Ex. 7 ('324 File History) at Utility Patent Application Transmittal.)

9

26.    The '790 Application listed Baylis Medical as the Applicant and included a Power of Attorney granting Nir Lifshitz, Glenn Arnold, and Vincent Man ("The Baylis Prosecuting Attorneys") the right to prosecute the '790 Application. On information and belief, at the time of the prosecution of the '790 Application, the Baylis Prosecuting Attorneys were all employees of Baylis Medical.

27.    The '790 Application named Gareth Davies, John Paul Urbanski, Ferryl Alley, and Bogdan Beca as inventors ("the Named Inventors"). On information and belief, at the time of the prosecution of the '790 Application, the Named Inventors were all employees of Baylis Medical.

28.    As originally submitted, pending claim 1 of the '790 Application broadly claimed a "medical device for puncturing tissue" comprising an "elongate member" with a "proximal section," a "distal section," and a "rail section" between the proximal and distal sections, an "active tip" at a distal end of the distal section operable to deliver energy to create a puncture through the tissue, and with the "rail section" being "configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site." (*Id.* at June 19, 2019 Claims.)

29.    Pending claim 4, which depended from claim 1, further required that the "distal section defines a distal section curved portion configured to automatically

10

form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture." (*Id.*)

30.     Pending claim 8 depended from claim 4 (which depended from claim 1) and additionally required "the distal section further defines a distal section straight portion distal to the distal section curved portion . . . and a diameter of the elongate member at the distal section straight portion is greater than a diameter of the elongate member at a distal end of the distal section curved portion" (hereinafter, the "'324 Greater Diameter Feature"). (*Id.*)  In other words, the '324 Greater Diameter Feature merely required that some part of the distal section straight portion had to have a diameter greater than the distal end of the distal section curved portion.

31.     Although the features of the pending claims were all well known in the art, Baylis Medical did not submit an Information Disclosure Statement ("IDS") or otherwise identify a single prior art reference to the Patent Office when it submitted the '790 Application in June 2019 or any time before the first Patent Office action.

32.     On January 14, 2021, Examiner Michael F. Peffley issued a Non-Final Office Action.  (*Id.* at Jan. 14, 2021 Non-Final Rejection.)  Based on his own searching, Examiner Peffley identified eight prior art references, including U.S. Patent No. 5,366,443 ("Eggers"), 5,680,860 ("Imran"), 6,607,520 ("Keane"), 7,988,690 ("Chanduszko"), 8,021,359 ("Auth"), 7,165,552 ("Deem"), and 7,186,251 ("Malecki"), and U.S. Patent Publication 2009/0093802 ("Kulesa").

11

Examiner Peffley rejected most of the pending claims for anticipation and/or obviousness over Eggers and Kulesa but did not reject pending claim 8 because it required the '324 Greater Diameter Feature.

33.    The Applicant, including the Named Inventors and the Baylis Prosecuting Attorneys, knew that numerous prior art references, including  United States Patent Application No. 2005/0065507 ("Hartley"), United States Patent Nos. 9,510,900  ("Abou-Marie")  and  6,565,562  ("Shah"),  and  U.S.  Application Publication  No.  2014/0188108  ("Goodine"),  disclosed  a  medical  device  for puncturing tissue that has the '324 Greater Diameter Feature and/or renders it obvious but failed to disclose those references to the Patent Office.

34.    Goodine, for instance, discloses a medical device using RF energy for "punctur[ing] the atrial septum," including a "tissue piercing wire" with a reverse taper that results in an increased diameter from the distal end of the distal section curved portion to the distal section straight portion.  (*See* Ex. 23 (U.S. Application Publication No. 2014/0188108 (Goodine Patent)) at [0007], [0025], [0026], [0038], [0046], Fig. 7.)

35.    The Applicant, including the Named Inventors and the Baylis Prosecuting Attorneys, knew of each of the above prior art references.  For example, Hartley, Abou-Marie, and Shah were each owned by Baylis Medical, and Named Inventor Gareth Davies is also a named inventor on Abou-Marie.  Goodine had been

cited in other patent families assigned to Baylis Medical, including in an August 27, 2020 International Search Report for international patent application PCT/US2020/030264. (Ex. 8, (WO 2020/223230) at Aug. 27, 2020 Notification of Transmittal of the International Search Report.)

36.    On April 14, 2021, the Applicant, through Attorney Arnold, responded to the Non-Final Office Action. (Ex. 7 ('324 File History) at Apr. 14, 2021 Amendment/Request for Reconsideration.) The Applicant did not disclose any prior art references, much less the prior art references (including those identified above) that it knew taught the limitations of claim 8. Instead, the applicant rewrote pending claim 8 to include all of the limitations of pending claims 1 and 4, thereby incorporating the '324 Greater Diameter Feature into a new independent claim, and told the Examiner the claims were now allowable. (*Id.* at Apr. 14, 2021 Claims; Apr. 14, 2021 Applicant Arguments/Remarks Made in an Amendment.)

37.    Shortly after the Applicant's amendment, on April 29, 2021, the Applicant finally filed an Information Disclosure Statement ("IDS") but cited only *nine references* and did not include Hartley, Shah, Abou-Marie, or Goodine. (*Id.* at Apr. 29, 2021 IDS.)

38.    The Applicant, through the Baylis Prosecuting Attorneys, also failed to disclose multiple prior art references that patent offices across the world had identified as "particularly relevant" to foreign counterparts to the '790 application.

13

For example, on February 9, 2016, the International Searching Authority issued the International Search Report for PCT/IB2013/060287, the international application to which the '790 application claimed priority. The International Search Report identified three references (WO 2008/079828 ("Nance"), US 2003/0208220 ("Worley"), and US 2001/0044591 ("Stevens")) as "X references." (Ex. 9 (PCT/IB2013/060287), International Search Report at 3.) At least by May 11, 2018, the same three references (Nance, Worley, and Stevens) were identified as "X references" by IP Australia, the Australian patent office, during prosecution of Australian counterparts to the '790 Application.

39.    According to the MPEP, where a document cited in the international search report is particularly relevant, it is indicated by the letters "X" or "Y." (MPEP 1884.01.) Category "X" is applicable where a document is such that when taken alone, a claimed invention cannot be considered novel or where a document is such that when considered in light of common general knowledge, a claimed invention cannot be considered to involve an inventive step." MPEP 1884.01.

40.    Despite their clear relevance to the '790 Application, the Applicant, through the Baylis Prosecuting Attorneys, did not disclose Nance, Worley or Stevens during the prosecution of that application.

41.    On June 9, 2021, without the benefit of the relevant prior art, Examiner Peffley issued a Notice of Allowance. In his Reasons for Allowance, Examiner

14

Peffley indicated that the claims were allowed because "applicant has rewritten previously objected claims 8 and 9 into independent form to define over the prior art of record. The prior art fails to disclose the particular medical device having the specific configuration for the elongate member as recited in these claims." (Ex. 7 ('324 File History) at June 9, 2021 Notice of Allowance and Fees Due.)

42.    On information and belief, the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, knew that Examiner Peffley would not have allowed the claims if he had been aware of Hartley, Abou-Marie, Shah, and/or Goodine (at least because each discloses or renders obvious the '324 Greater Diameter Feature) and made a deliberate decision to withhold those material references from the Patent Office with the intent to deceive.

43.    The '324 Patent issued on October 26, 2021. (*Id.* at Oct. 6, 2021 Issue Notification.)

### 2.    Boston Scientific Fraudulently Obtained the '238 Patent

44.    On September 14, 2021, Baylis filed the application that led to the asserted '238 Patent (U.S. Patent Application No. 17,474,415 ("the '415 Application")). (Ex. 10 ('238 File History) at Sept. 14, 2021 Utility Patent Application Transmittal.)  The '415 Application was a continuation of the '790 Application.

45.    The '415 Application named the same four Named Inventors as the '790 Application (Gareth Davies, Bogdan Beca, Ferryl Alley, and John Paul Urbanski).

46.    When filed on September 14, 2021, the '415 Application identified Baylis Medical as the Applicant and included a Power of Attorney giving the same three Baylis Prosecuting Attorneys (Nir Lifshitz, Glenn Arnold, Vincent Man), plus additional Baylis Medical employee Samuel Tekie, authority to prosecute the '415 Application.

47.    Independent claim 1 of the '415 Application was identical to original claim 1 of the '790 Application.  It broadly claimed a "medical device for puncturing tissue" comprising an "elongate member" with a "proximal section," a "distal section," and a "rail section" between the proximal and distal sections, an "active tip" at a distal end of the distal section operable to deliver energy to create a puncture through the tissue, and the "rail section" being "configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site." (*Id.* at Sept. 14, 2021 Claims.)

48.    On October 6, 2021, BSC announced an agreement to acquire Baylis Medical, including its guidewire products and intellectual property.  (Ex. 21, *Boston Scientific Announces Agreement to Acquire Baylis Medical Company Inc.*, (Oct. 6,

16

2021), https://news.bostonscientific.com/.)  On February 15, 2022, BSC closed the acquisition of Bayliss Medical.  (Ex. 2.)

49.   On February 23, 2023, following the completion of the acquisition, a request was filed to change the Applicant for the '415 Application from Baylis Medical to BSMDL.  (Ex. 10 ('415 File History) at Feb. 23, 2023 Request To Correct Or Update The Name of The Applicant Under 37CFR1.46(c).)  On the same day, BSMDL filed an updated Power of Attorney granting Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") authority to prosecute the '415 Application going forward.  (*Id.* at Feb. 23, 2023 Power of Attorney.)  These documents were signed by Jason R. Kraus, a patent prosecution attorney at Nelson Mullins.

50.   On information and belief, Boston Scientific and/or the attorneys at Nelson Mullins prosecuting the '415 Application, including Jason R. Kraus ("the Nelson Mullins Prosecuting Attorneys"), realized that Baylis Medical had failed to disclose material prior art during the prosecution of the '324 Patent.

51.   On May 1, 2023, less than three months after the Applicant change, BSMDL, through its agent Attorney Kraus, submitted two IDSs in the '415 Application.  (*Id.* at May 1, 2023 IDS; May 1, 2023 IDS.)  The May 1, 2023 IDSs disclosed several of the prior art references intentionally withheld during prosecution of the '324 Patent, including Hartley, Shah, Nance, Worley, and Stevens.

17

52.     However, instead of highlighting those references for the Examiner, the Applicant, through the Nelson Mullins Prosecuting Attorneys, buried those references among a total of at least 360 prior art references.  (*See id.* at May 1, 2023 IDS; May 1, 2023 IDS.)  The first IDS submitted by the Applicant, through Attorney Kraus, included at least 42 references.  The second IDS submitted by the Applicant, through Attorney Kraus, included at least 318 references.  Combined, the two IDSs disclosed at least *360 references* that totaled approximately *7,500 pages* of material.

53.     The Applicant, through the Nelson Mullins Prosecuting Attorneys, did not explain the relevance of any of the 360 references to the pending claims of the '415 Application.  Nor did the Applicant explain how *360 references* were deemed relevant to the '415 Application when only *nine refences* had been disclosed to the Patent Office during the prosecution of the claims of the '324 Patent, which included an *identical* original claim 1.

54.     The IDSs, in fact, included a substantial number of references that were, at most, minimally relevant to the alleged invention covered by the pending claims at any point during prosecution of the '415 Application.  On information and belief, the Applicant, through the Nelson Mullins Prosecuting Attorneys, included the excessive number of references to obscure the truly relevant prior art.

55.     On September 7, 2023, Examiner Peffley (the same examiner who examined and allowed the claims of the '790 Application) issued a Non-Final Office

18

Action.  In the Office Action, Examiner Peffley told the Applicant that the number of references submitted in the IDSs was excessive.  Because of the large volume of cited references, Examiner Peffley further explained that he had only afforded the references "a cursory review, similar to what would be expected of a classification search of the prior art."  (Ex. 10 at Sept. 7, 2023 Non-Final Rejection, 2.)  A classification search is a cursory or browsing search of the prior art in an entire technology grouping and does not involve a detailed review of each reference. MPEP 719.05.

56.    Given the impossible task of substantively reviewing the at least 360 references totaling approximately 7,500 pages submitted by the Applicant, Examiner Peffley asked the Applicant to identify references of "particular relevance" to the pending claims:

> The numerous references filed with the Information Disclosure Statements have been afforded a cursory review, similar to what would be expected of a classification search of the prior art. Should there be any references of particular relevance to the instant application claims, applicant is respectfully requested to identify such references for further review by the examiner.

(*Id.*)

57.    As explained below, the Applicant, through the Nelson Mullins Prosecuting Attorneys, never responded to Examiner Peffley's request.

58.    In the September 7, 2023 Office Action, Examiner Peffley also rejected claims 1-20 for anticipation and obviousness under 35 U.S.C. §§ 102 and 103.  (*Id.*)

19

Likely given the difficulty of wading through the massive volume of references cited in Applicant's IDSs, Examiner Peffley did not rely on or cite to a single reference identified for the first time in the IDSs.  Instead, Examiner Peffley cited six references previously considered during the prosecution of the '790 Application (Eggers, Irman, Chanduszko, Kulesa, Auth, and Keane) and three additional references found through the Examiner's own additional searching (U.S. Patent Nos. 6,325,797 ("Stewart") and 6,123,718 ("Tu"), and U.S. Patent Publication No. 2015/0245882 ("Venkatraghavan")).

59.    On December 6, 2023, the Applicant responded to the September 7, 2023 Non-Final Office Action.  (*Id.* at Dec. 6, 2023 Amendment/Request for Reconsideration-After Non-Final Rejection.)  Despite the Examiner's plea that the Applicant identify any reference of "particular relevance" to the pending claims, the Applicant did not identify any references.  In fact, the Applicant, through the Nelson Mullins Prosecuting Attorneys, did not respond to Examiner Peffley's request at all.

60.    The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of numerous references of "particular relevance" to the pending claims buried in the at least 360 references included in the May 1, 2023 IDSs.  In fact, the Applicant's excessive disclosure included multiple prior art references that patent offices across the world had identified as of particular relevance to foreign counterparts to the '415 application.

20

61.    For instance, as discussed above in paragraphs 38-39, both the International Searching Authority and IP Australia had already identified three references (Nance, Worley and Stevens) as "X references" to the claims of foreign counterparts to the '415 Application, meaning that each of the references alone destroyed novelty or inventive step. *See* MPEP 1884.01. Despite the clear guidance from foreign patent offices, the Applicant, through the Nelson Mullins Prosecuting Attorneys, did not point Examiner Peffley to Nance, Worley, or Stevens.

62.    Numerous other references had been cited by foreign patent offices as "particularly relevant" (i.e., X or Y references) to or were applied by foreign examiners in rejecting the claims of foreign counterparts of the '415 Application, including U.S. Patent Publication Nos. 2009/105654 ("Kurth") and 2012/0109079 ("Asleson"), EP 465449 ("Auth"), JP S60-261465A ("Suzuki"), and WO 2008/066557 ("Gerber"). The Applicant, through the Nelson Mullins Attorneys, however, did not point Examiner Peffley to any of those references, buried among hundreds of other less relevant references.

63.    In its December 6, 2023 Amendment/Request for Reconsideration, instead of identifying any of the foregoing prior art, the Applicant amended the pending claims to try to overcome Examiner Peffley's rejection. (*Id.* at Dec. 6, 2023 Amendment/Request for Reconsideration-After Non-Final Rejection.) With respect to independent claim 1, the Applicant added two limitations, one of which specified

21

that the distal section straight portion of the device "has a reverse taper with an outer diameter of the distal section straight portion increases in a distal direction, such that a distal end of the distal section straight portion has a diameter greater than a proximal end of the distal section straight portion" (the "Reverse Taper Feature").

64.   The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew that the Reverse Taper Feature was well known in the prior art, described in numerous prior art references, including some buried in the Applicant's IDSs and others that the Applicant failed to disclose and bring to Examiner Peffley's attention.

65.   For example, the Applicant, through the Nelson Mullins Prosecuting Attorneys, included Hartley and Shah in its voluminous IDSs.   Hartley and Shah each disclose a medical device for puncturing tissue that has and/or renders obvious the Reverse Taper Feature.   Even though the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew about the relevance of Hartley and Shah, and despite Examiner Peffley's plea for help, they did not point the Examiner to those references.

66.   The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, also failed to disclose multiple prior art references that taught the Reverse Taper Feature.   For instance, as discussed above in paragraphs 33-34, Goodine discloses a medical device using RF energy for

22

"punctur[ing] the atrial septum," including a "tissue piercing wire" with a reverse taper in the distal section straight portion.  The Applicant, including the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of Goodine by at least August 27, 2020, when Goodine was cited in an International Search Report for PCT/US2020/030264 belonging to a family of patents assigned to Baylis Medical (and later acquired by Boston Scientific).  Moreover, prior to the issuance of the '238 Patent, Goodine was raised by the examiner during the prosecution of the U.S. national stage application of PCT/US2020/030264 (U.S. Patent Application No. 17/606,592 ("the '592 Application")), also owned by Baylis Medical.  (Ex. 11 ('592 File History) at Mar. 22, 2024 Non-Final Rejection.)   Like the '415 Application, Nelson Mullins Riley & Scarborough LLP, including Attorney Kraus, prosecuted the '592 Application after it was transferred from Baylis Medical to Boston Scientific.  The Named Inventors and the Nelson Mullins Prosecuting Attorneys thus knew about Goodine, and its materiality to the pending claims, but failed to disclose it to the Patent Office.

67.    The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, also failed to disclose several prior art references owned by Baylis Medical and/or Boston Scientific that disclosed the Reverse Taper Feature.  For instance, Abou-Marie and U.S. Patent Application Publication No. 2004/0167440 ("Sharrow") both disclose a guidewire that has or renders obvious the

Reverse Taper Feature. The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of Abou-Marie and Sharrow, and their materiality to the pending claims, but failed to disclose them to the Patent Office.

68. Instead of disclosing or bringing any of the above references to the Examiner's attention, and despite Examiner Peffley's plea for help, the Applicant, through the Nelson Mullins Prosecuting Attorneys, instead argued that the Reverse Taper Feature was "not disclose[d] or suggested by the references cited by the Office." (Ex. 10 ('415 File History) at Dec. 6, 2023 Amendment/Request for Reconsideration-After Non-Final Rejection.) The Applicant, through the Nelson Mullins Prosecuting Attorneys, went even further, arguing that the prior art "teaches away from the claimed reverse taper features." (*Id*.) The Applicant, through Attorney Kraus, concluded that "[c]laim 1, [which now included the Reverse Taper Feature,] along with the various claims depending therefrom, thus stand in allowable form." (*Id*.)

69. On January 31, 2024, without having been told about any of the art deemed "particularly relevant" by foreign patent offices or any of the art teaching or rendering obvious the Reverse Taper Feature, Examiner Peffley stated that "applicant's amendments and comments, filed with the response of December 6, 2023, are deemed to distinguish the claims from the prior art of record." (*Id.* at Jan.

24

31, 2024 Notice of Allowance and Fees Due.)  Examiner Peffley thus allowed the pending claims of the '415 Application.

70.    On information and belief, the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, knew that Examiner Peffley would not have allowed the claims if he had been aware of Hartley, Abou-Marie, Shah, Goodine, and/or Sharrow (at least because each discloses or renders obvious the Reverse Taper Feature) and made a deliberate decision to withhold those material references from the Patent Office, or to bury them in an excessive number of cited references and not identify them in response to the Examiner's explicit request, with the intent to deceive.

71.     The conduct of the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, also constituted affirmative egregious misconduct.

72.    The '238 Patent issued on June 4, 2024.

### 3.    Boston Scientific Fraudulently Obtained the '639 Patent

73.    On December 31, 2024, BSMDL filed the application that led to the asserted '639 Patent (U.S. Patent Application No. 19/007,196 ("the '196 Application")).  (Ex. 12 ('639 File History) at Dec. 31, 2024 Application Data Sheet.)  The '196 Application was a continuation of the '415 Application.

25

74. The '196 Application named the same four Named Inventors as the '790 and '415 Applications (Gareth Davies, Bogdan Beca, Ferryl Alley, and John Paul Urbanski).

75. The '196 Application identified BSMDL as the Applicant and included a Power of Attorney giving the Nelson Mullins Prosecuting Attorneys, including Attorney Kraus, authority to prosecute the '196 Application.

76. Claim 1 of the '196 Application recited a "medical device for puncturing a septum of a heart" comprising an "elongate member" with a "proximal section," a "distal section," and a "rail section" between the proximal and distal sections, an "electrode" coupled to the distal section to deliver energy to create a puncture through the septum, wherein the "rail section" is configured to "act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the septum." (*Id.* at Dec. 31, 2024 Claims.) Claim 1 further required "the distal section is configured to automatically form a J-shape in a deployed state for anchoring the distal section being advanced through the puncture." (*Id.*) Finally, similar to the '324 Patent, claim 1 required "an outer diameter of the distal section straight portion at a distal end of the distal section straight portion is greater than an outer diameter of the distal section curved portion at a distal end of the distal section curved portion" ("the '639 Greater Diameter Feature"). (*Id.*)

77.     On January 16, 2025, the Applicant, through Attorney Kraus, submitted two IDSs in the '196 Application.  The first IDS contained at least 318 references, and the second IDS contained at least an additional 71 references.  (Ex. 12 at Jan. 16, 2025 IDS; Jan. 16, 2025 IDS.)  In total, these two IDSs disclosed at least *389 references* totaling about *8,400 pages*.

78.     The Applicant, through the Nelson Mullins Prosecuting Attorneys, did not explain the relevance of any of these references to the Patent Office.  Nor did the Applicant, through the Nelson Mullins Prosecuting Attorneys, explain how *389 references* were purportedly relevant to the pending claims of the '196 Application, when the Applicant had only identified *nine references* during the prosecution of the similar claims of the '324 Patent.

79.     The IDSs, in fact, included a substantial number of references that were, at most, minimally relevant to the alleged invention covered by the pending claims at any point during prosecution of the '196 Application.  On information and belief, the Applicant, through the Nelson Mullins Prosecuting Attorneys, included the excessive number of references to obscure the truly relevant prior art.

80.     Buried among the at least 389 references were a number of the prior art references intentionally withheld during prosecution of the '790 and/or '415 Applications, including Hartley, Shah, Abou-Marie, Nance, Worley, and Stevens.

27

81.    On February 28, 2025, Examiner Peffley (the same examiner who examined the '790 and '415 Applications) issued a Non-Final Office Action.  As he did with the '415 Application, Examiner Peffley told the Applicant that the IDSs contained a "larger number" of references, and that, due to the excessive volume, he only "afforded [the references] a cursory review, similar to what would be expected of a classification search of the prior art."  (Ex. 12 at Feb 28, 2025 Non-Final Rejection, 2.)

82.    Just as he did with the '415 Application, given the impossible task of substantively reviewing the at least 389 references totaling approximately 8,400 pages submitted by the Applicant, Examiner Peffley asked the Applicant to identify references of "particular relevance" to the pending claims:

> The large number of references filed with the Information Disclosure Statements have been afforded a cursory review, similar to what would be expected of a classification search of the prior art. Should there be any references of particular relevance to the instant application claims, applicant is respectfully requested to identify such references for further review by the examiner.

(*Id.*)

83.    As explained below, the Applicant, through the Nelson Mullins Prosecuting Attorneys, never responded to Examiner Peffley's request.

84.    In the February 28, 2025 Office Action, Examiner Peffley did not rely on a single reference identified for the first time in Applicant's IDSs in making his rejections.  Instead, given similarities between the pending claims of the '196

Application and the issued claims of the '238 Patent, Examiner Peffley issued a nonstatutory double patenting rejection over the '238 Patent. (*Id.*)  As for prior art, Examiner Peffley again cited four references, Eggers, Stewart, Imran, and Chanduszko, which he had previously found through his own prior art searching during the prosecution of the '790 and/or '415 Applications and one additional prior art reference (U.S. Patent No. 9,597,146 ("Davies")) that he found through new searching.  He concluded that those five prior art references "all disclose various catheter devices having an elongate member with straight and curved portions, but ***none show the specific relationship for the relative diameters of the portions as required by the instant application claims***."  (*Id.* at 5 (emphasis added).)  The only feature in pending independent claim 1 related to "the relative diameters of the portions" was the '639 Greater Diameter Feature.

85.    On March 14, 2025, the Applicant responded to the Office Action by filing a Terminal Disclaimer to obviate the double patenting rejection.  (*Id.* at Mar. 14, 2025 Terminal Disclaimer-Filed.)   The Applicant did not respond to the Examiner's request to identify relevant prior art.   (*Id.* at Mar. 14, 2025 Amendment/Request for Reconsideration-After Non-Final Rejection.)  Nor did the Applicant, through the Nelson Mullins Prosecuting Attorneys, correct Examiner Peffley's misunderstanding that the prior art did not disclose or render obvious the '639 Greater Diameter Feature.

29

86.     As explained in paragraphs 32-36, the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of numerous references disclosing or rendering obvious the '639 Greater Diameter Feature. Several of those references, including Hartley, Shah, and Abou-Marie, were buried in the Applicant's excessive IDSs, but the Applicant, particularly the Named Inventors, and the Nelson Mullins Prosecuting Attorneys, failed to point Examiner Peffley to any of those references. Moreover, the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of Goodine and Sharrow but still did not disclose those references to the Patent Office.

87.     As explained in paragraphs 62-69, the Applicant, particularly the Nelson Mullins Prosecuting Attorneys, also knew of numerous references that patent offices across the world had identified as "particularly relevant" to, or had been applied against, the claims in foreign counterparts of the '196 Application, including Nance, Worley, Stevens, Kurth, Asleson, Auth, Suzuki, and Gerber. The Applicant, through the Nelson Mullins Prosecuting Attorneys, failed to point Examiner Peffley to any of those references, despite his request that the Applicant identify references of "particular relevance." (*See* paragraphs 81-82.)

88.     On March 31, 2025, without the benefit of any guidance from the Applicant, any way to sift through the thousands of pages of cited references, or any

30

disclosure of Goodine and Sharrow, Examiner Peffley issued a Notice of Allowance. (Ex. 12 ('639 File History) at Mar. 31, 2025 Notice of Allowance and Fees Due.)

89.    On June 30, 2025, the Applicant paid the issue fee.  (*Id.* at June 30, 2025 Issue Fee Payment.)

90.    On July 15, 2025, the Applicant submitted a Petition to Withdraw Application from Issue Pursuant to 37 C.F.R. § 1.313(c)(2) and a Request for Continued Examination.  The Applicant, through the Nelson Mullins Prosecuting Attorneys, and without any explanation, further amended several of the pending claims to remove the phrase "distal section" from multiple claim elements.  (*Id.* at July 15, 2025 Claims, 2-5.)

91.    The Applicant, through Attorney Kraus, also submitted another IDS citing thirteen additional references, without explaining their relevance to the Examiner. (*Id*. at July 15, 2025 IDS.)  With this latest IDS, the Applicant had now buried the Examiner in at least ***400 references*** totaling approximately ***8,800 pages of material***.  Most of the thirteen new references had little, if any, relevance to the pending claims of the '415 Application.  But, buried amongst those new references, in addition to the at least 389 other references cited previously by the Applicant, was the Goodine reference.  The Applicant, through the Nelson Mullins Prosecuting Attorneys, failed to point Examiner Peffley to Goodine or do anything to alert him

31

that Goodine disclosed a guidewire with the diameters recited in the pending claims, despite the Examiner's request for assistance.

92.   The Applicant, in particular the Named Inventors and the Nelson Mullins Prosecuting Attorneys, still did not disclose Sharrow.

93.   On August 12, 2025, Examiner Peffley again allowed the claims.  (*Id.* at Aug. 12, 2025 Notice of Allowance.)  In his Reasons for Allowance, Examiner Peffley stated that "the amendments [made by the Applicant] clarify the language of the claims but do not substantively change the scope of the limitations of the claims. Thus, the claims remain allowable over the prior art of record." (*Id.* at Aug. 12, 2025 Notice of Allowance, 2.)  Examiner Peffley said nothing about the new prior art cited by the Applicant in the July 15, 2025 IDS.

94.   On information and belief, the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, knew that Examiner Peffley would not have allowed the claims if he had been aware of Hartley, Abou-Marie, Shah, Goodine, and/or Sharrow (at least because each discloses or renders obvious the '639 Greater Diameter Feature) and made a deliberate decision to withhold those material references from the Patent Office, or to bury them in an excessive number of cited references and not identify them in response to the Examiner's request, with the intent to deceive.

95.    The conduct of the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, also constituted affirmative egregious misconduct.

96.    The '639 Patent issued on October 7, 2025.

**D.    Boston Scientific Falsely Attributed Data to Atraverse's HOTWIRE™ and Continues to Promote Misleading Information Regarding Its Safety, Efficacy, and Reliability**

97.    Boston Scientific has made false and misleading commercial statements based on a study that purportedly compared Boston Scientific's VersaCross™ guidewire with a guidewire that Boston Scientific falsely claims "mimicked" or "is representative of" Atraverse's HOTWIRE™ ("the Boston Scientific Study").  As explained below, the device used in the Boston Scientific Study did not "mimic" and was not "representative of" HOTWIRE™.

98.    As further explained below, Boston Scientific has made false and misleading commercial statements based on the data from the Boston Scientific Study that are designed to influence cardiovascular physicians not to use the HOTWIRE™, and Boston Scientific is likely to continue to make such statements.

99.    On information and belief, Boston Scientific has disseminated its false and misleading statements about the Boston Scientific Study to cardiovascular physicians.

100.    On information and belief, Boston Scientific's false and misleading statements regarding the Boston Scientific Study are having the intended effect of

dissuading cardiovascular physicians from using the HOTWIRE™ in cardiovascular procedures.

### 1.    The Boston Scientific Publication and Poster

101.    In January 2025, the 30th Annual Atrial Fibrillation (AF) Symposium (the "Symposium") was held in Boston, Massachusetts.  The Symposium was attended by cardiovascular physicians and, specifically, electrophysiologists who perform treatments for atrial fibrillation and are potential users of Atraverse's HOTWIRE™ product.

102.    At the Symposium, Boston Scientific sponsored the presentation of a poster that provided the results of the Boston Scientific Study and falsely attributed the data from that study to HOTWIRE™.  (Ex. 22 (the "Boston Scientific Poster").)

103.    The Boston Scientific Poster, titled "Comparison of a guidewire with large uninsulated electrode tip vs. dedicated RF wire with discrete electrode for energy-based transseptal puncture: a pre-clinical study," names several physicians including Amin Al-Amad (AA), Rodney Horton (RH), Christian Balkovec (CB), Rhodaba Ebady (RE), Saja Al-Dujaili (SA), and Andrea Natale (AN).  The Boston Scientific Poster notes that authors AA, RH, and AN were paid consultants of Boston Scientific and that CB, RE, and SA were employed by Boston Scientific.  (*Id.* at Disclosures.)

104.   The Boston Scientific Poster falsely claims that the Boston Scientific Study tested a guidewire "representative of" HOTWIRE™.  (*Id.* at Fig. 1.)  For instance, the Boston Scientific Poster states that the "EG" wire (hereinafter, "the Mimic Wire") used in the study was "[r]epresentative of commercially available wires (e.g. HOTWIRE™ radiofrequency guidewire system)."  (Ex. 22 at Fig. 1.)



(Ex. 22 at Fig. 1.)

105.   On information and belief, at the time the Boston Scientific Study was conducted, and the Boston Scientific Poster was written, none of the authors had access to an actual sample of the HOTWIRE™ device.  Despite this significant flaw, the Boston Scientific Poster represents that the Mimic Wire is "representative of" the HOTWIRE™.

35

106. The Boston Scientific Poster then uses the results of this fatally flawed study to criticize the safety, efficacy, and reliability of the HOTWIRE™, with the intent of deterring cardiovascular physicians from using the device. For instance, the poster reports that "EG displayed greater levels of thermal damage and larger septal defects compared to VC on both right (RA) and left atrial (LA) sides" (*id.* at Fig. 4), that "EG exhibited greater thermal damage (charring, coagulation) with higher power" (*id.* at Fig. 5), and that "EG puncture exhibited signs of coagulation along uninsulated length, even within the dilator" (*id.* at Fig. 6). The poster also notes that the "VC system required less cumulative energy to achieve TSP compared to EG at all power settings at 1s (A) and 300 ms (B) in *ex vivo* model (n=18), and 1s (C) in *in vivo* model (n=2)." (*Id.* at Fig. 7.)

107. The Boston Scientific Poster describes the results of a study conducted with significant methodological and factual inaccuracies that misrepresent Atraverse's HOTWIRE™ device and incorrectly describe it in comparison to Boston Scientific's VersaCross™. The unfounded conclusions presented in the Boston Scientific Poster are plainly intended to discredit the HOTWIRE™ device, based on data falsely attributed to HOTWIRE™, and dissuade cardiovascular physicians from using it.

108.   The results of the Boston Scientific Study were subsequently reported in a white paper (the "Boston Scientific White Paper") (Ex. 14), which references the Symposium and contains a link to Abstracts from the Symposium.

109.   The results of the Boston Scientific Study were later published, on or around September 6, 2025, in the Journal of Interventional Cardiac Electrophysiology in an article titled "Comparison of a guidewire with an uninsulated tip versus dedicated radiofrequency wire with discrete electrode for energy-based transseptal puncture: a pre-clinical study" (the "Boston Scientific Publication").   (Ex.   13   (Armin   Al-Ahmad   et   al.   (Sept.   6,   2025), pubmed.ncbi.nlm.nih.gov/40913695/).)

110.   The Boston Scientific Publication lists the same authors as the Boston Scientific Poster, with the addition of Pamela Horton Embrey (PHE) and Aravin Sukumar (AS), an employee of Boston Scientific.  In the "Conflict of interest" statement, the Boston Scientific Publication acknowledges various ties between the authors and Boston Scientific. Specifically, that AA, RH, and AN are paid consultants for Boston Scientific and that AS, CB, RE, and SA are employed by Boston Scientific.  (*Id.* at 10.)

111. Similar  to  the  Boston  Scientific  Poster,  the  Boston  Scientific Publication falsely claims that the Boston Scientific Study was able to "mimic" the HOTWIRE™  using  a  modified  Cordis  Emerald  wire.   The  Boston  Scientific

Publication states that the Boston Scientific Study was based on an "EG" guidewire (i.e., the Mimic Wire) that the article falsely says "mimics" the Atraverse HOTWIRE™.  For instance, in the Abstract, the Boston Scientific Publication states that the Boston Scientific Study "benchmarked TSP [transseptal puncture] performance between the dedicated VersaCross wire system (VC; Boston Scientific) and an electrified guidewire with an alternative electrode configuration similar to commercially available devices." (Ex. 13 at 1.)  Upon further reading, it becomes abundantly clear that what the Boston Scientific Publication refers to as the "commercially available devices" is a reference to Atraverse's HOTWIRE™.  For example, the Abstract further states that "[a] 0.025″ guidewire (Cordis) was modified to *mimic* the 15 cm 0.025″ distal uninsulated wire length of the *HOTWIRE (Atraverse) device* and electrified using a ValleyLab generator (*EG*; 30-50 W, 1 s and 300 ms)." (*Id.* (emphasis added).)  The Abstract goes on to state that "EG [i.e., the Mimic Wire] was extended 0-3.5 mm from the dilator tip *to mimic clinical use*." (*Id*. (emphasis added).)  The Boston Scientific Publication further states that "[s]ince other commercial wires (e.g., HOTWIRE, Atraverse Medical) were not available for direct comparison, a proxy was developed . . ." (*Id*. at 2.2.)  The Boston Scientific Publication additionally alleges that the study was meant to "recreate the HOTWIRE's long 0.025" uninsulated distal wire segment." (*Id*.)

112. The Boston Scientific Publication goes on to falsely and misleadingly conclude that its VersaCross™ product (abbreviated "VC") is clinically superior to the Mimic Wire ("EG") based on the study results. For instance, in the Abstract, the article further states that "VC had 100% TSP success with 1 attempt using 1 s (constant) and 300 ms (pulse) modes," while "EG [i.e., the Mimic Wire] demonstrated higher failure rates and less consistence at 30 W (78%) and 40 W (88%), requiring more [radiofrequency] applications, longer duration and energy output." (*Id*. at Abstract.) The publication further states that "EG crossings ex vivo and in vivo showed thermal damage on septa and device charring along the uninsulated distal end, unlike VC," and that "[s]uccessful TSP with EG (1 s, 30-50 W) in vivo demonstrated wire charring and thrombus along the uninsulated wire length within the dilator." (*Id.*)

113. As detailed herein, the Boston Scientific Poster and Boston Scientific Publication contain significant methodological and factual inaccuracies that misrepresent Atraverse's HOTWIRE™ device and incorrectly describe it in comparison to Boston Scientific's VersaCross™. The Boston Scientific Poster and Boston Scientific Publication's unfounded conclusions are plainly intended to discredit the HOTWIRE™ device, based on false data, and dissuade cardiovascular physicians from using it.

39

114.   On information and belief, the Boston Scientific Poster and the Boston Scientific Publication were authored at the direction of Boston Scientific and were intended to dissuade cardiovascular physicians from using the HOTWIRE™ in cardiovascular procedures by casting doubt on its safety, efficacy, and reliability—despite the absence of objective, comparative testing.  Thus, the Boston Scientific Poster and the Boston Scientific Publication have had and will have a deterrent effect, such that HOTWIRE™ will not be ordered, purchased, or paid for by healthcare entities.

115.   Both the Boston Scientific Publication and the Boston Scientific Poster falsely indicate that a device representative of the HOTWIRE™ device was tested for safety and efficacy against Boston Scientific's VersaCross™ solution.

116.   Boston Scientific has promoted, and continues to promote, the misleading Boston Scientific Publication, by linking the Boston Scientific White Paper in advertisements on various online platforms.  For example, BSC links the Boston Scientific White Paper on its website in an advertisement for VersaCross™.  (Boston Scientific, https://www.bostonscientific.com/en-US/products/transseptal-access/dedicated-rf-transseptal-solutions.html#clinical-data-tab (last visited Nov. 9, 2025).)  BSC has cited the Boston Scientific Study and linked the Boston Scientific White Paper in at least two posts made on the social media site X.  (Ex. 15 (BostonSci Cardiology (@BSCCardiology)), X (May 28,

2025               at               11:50               AM),

https://x.com/BSCCardiology/status/1927799534517899468/video/1;   Ex.   16

(BostonSci  Cardiology  (@BSCCardiology)),  X  (May  22,  2025  6:00  AM),

https://x.com/BSCCardiology/status/1925537309853634971/video/1.)   BSC   has

also cited and linked its White Paper in at least two advertisements on LinkedIn, a

platform that describes its vision as being designed to "create economic

opportunity."   (Ex.   17   (Boston   Scientific   Cardiology,   LinkedIn,

https://www.linkedin.com/ad-library/detail/702410164); Ex. 18. (Boston Scientific

Cardiology,   LinkedIn,   https://www.linkedin.com/ad-library/detail/702329364);

LinkedIn, About Us, https://about.linkedin.com/ (last visited Nov. 9, 2025).)

## 2.   Boston Scientific Falsely Attributes Its Study Data to the HOTWIRE™

117.   The Boston Scientific Study did not actually evaluate HOTWIRE™, a

device that "mimicked" HOTWIRE™, or a device that was "representative of" the

HOTWIRE™.   As explained below, the HOTWIRE™ has numerous differences

from the Mimic Wire that make the statements in the Boston Scientific Publication

and Boston Scientific Poster false and misleading.

### a. The Mimic Wire Does Not Have the Same Diameter as the HOTWIRE™

118. The Mimic Wire used in the Boston Scientific Study was made by modifying a 0.025-inch Cordis Emerald wire. (Ex. 13 at Section 2.2; Ex. 14 at Methods.)

119. By contrast, the HOTWIRE™ is either 0.032 or 0.035 inches for most of the device length, and tapers to 0.025 inches only near the distal tip. And yet, neither the Boston Scientific Poster nor the Boston Scientific Publications make any mention of this difference and instead appear to deliberately and misleadingly obscure it.

120. So that it can be used in a variety of sheaths, the HOTWIRE™ is available in two sizes, which are purpose-built for dilators with either 0.032 or 0.035 inch lumens. Introducing a 0.025 inch wire into a 0.035 inch dilator (e.g., FARADRIVE) would create excess annular space, which could act as a nidus for thrombus formation within the dilator, as observed in the Boston Scientific Publication and the Boston Scientific Poster. (Ex. 13 at Discussion and Conclusion; Ex. 14 at Results.)

121. This size mismatch alone shows that the device used in the Boston Scientific Study, the Mimic Wire, did not "mimic" and was not "representative" of the HOTWIRE™, as the Boston Scientific Publication and the Boston Scientific Poster falsely represent.

### b.    The HOTWIRE™ Does Not Have a PTFE Coating

122.   The HOTWIRE™ device features a thick polymer jacket over most of the device's working length.  In no part of the device does the HOTWIRE™ have a thin, spray-applied PTFE coating like the Mimic Wire that was used in the Boston Scientific Study.

123.   This difference in the presence or absence of a coating further demonstrates that the Mimic Wire used in the Boston Scientific Study does not "mimic" and is not "representative" of the HOTWIRE™, as the Boston Scientific Publication and the Boston Scientific Poster falsely represent.

### c.    Surface Alteration by Laser Ablation

124.   The Mimic Wire described in the Boston Scientific Publication and the Boston Scientific Poster was created by laser ablating its PTFE coating to expose stainless steel over 15–20 centimeters.  (*Id.* at Fig. 1.)  This process increases surface roughness, which has been shown in cardiovascular biomaterials to promote platelet adhesion and activation, thereby increasing thrombogenicity.

125.   Unlike the Mimic Wire, Atraverse's HOTWIRE™ uses a smooth stainless-steel coil electrode specifically engineered for consistent current density and low surface roughness.

43

126.   Therefore, the coagulum and thrombus reported for the Mimic Wire in the Boston Scientific Publication and the Boston Scientific Poster cannot truthfully be attributed to HOTWIRE™.

###  d.   Different RF Generator and Factual Error in RF Durations

127.   The Boston Scientific Study used a general-purpose ValleyLab generator instead of HOTWIRE's™ proprietary impedance-sensing generator. (*Id.* at Abstract, Methods.)  The Boston Scientific Study further indicates that the pulse duration used for both the Mimic Wire and the VersaCross™ in the study was 300 ms.  This pulse duration does not reflect the clinical use of either the HOTWIRE™ or VersaCross™, further rendering the results of the purported comparison between the two false and misleading.

128.   HOTWIRE's™ proprietary impedance-sensing generator automatically terminates RF after crossing.  In contrast, the Boston Scientific Study used a fixed pulse of 300 ms.  By stating that the Boston Scientific Study "mimics" the clinical use of the HOTWIRE™ device, but reporting results from the use of a generator that uses fixed length electrical pulses, the Boston Scientific Publication and the Boston Scientific Poster present a false conclusion as to the efficacy and safety of the HOTWIRE™ device.

129.   At the same time, the Boston Scientific Publication falsely represents that a 300 ms pulse is clinically relevant for its VersaCross™ product. (*Id.* at Section

2.2.)  This is factually incorrect.  The Baylis RFP-100A generator, used with the VersaCross™ in clinical practice, includes operator-set durations of 1–10 seconds (Pulse, 30% duty cycle) or 1–3 seconds (Constant, 100% duty cycle).  (Ex. 19 (Baylis Medical, RFP-100A RF Generator Operator's Manual, Document ID: DMR-00576C, Version 3.3, Rev V23) at Tbl. 9.2-1.)  As a result, the shortest pulse used with the VersaCross™ in clinical practice is 1 second (1000 ms), over three times more than the pulse used in the Boston Scientific Study.

130.  The Boston Scientific Study is thus not representative of the clinical use of either the HOTWIRE™ or the VersaCross™ and is false and misleading for this additional reason.

### e.    Procedural Deviations from Instructions for Use ("IFU")

131.  In the Boston Scientific Study, neither wire was advanced during RF application, contrary to the IFUs for both HOTWIRE™ and VersaCross™, which instruct the operator to apply firm pressure and advance the wire through tissue during RF delivery.  (Ex. 20 (Boston Scientific, VersaCross RF Wire Instructions for Use, DMR VXW 3.3 V-10) at 2.)

132.  Instead, in the Boston Scientific Study, the wire tips were fixed at 0–3.5 mm protrusion from the dilator tip.  (Ex. 13 at Abstract, Methods.)  No control or reporting was provided as to which wires were at 0 mm (unlikely to cross) versus 3.5 mm (almost certain to cross).

133.  This uncontrolled variable also makes the Boston Scientific Poster and Boston Scientific Publication's representations that the study was "representative of" or "mimicked" HOTWIRE™ false and misleading.

## NATURE OF THE ACTION

134.  These counterclaim actions are for declaratory judgment of invalidity, noninfringement, and unenforceability of the claims of U.S. Patent Nos. 11,998,238 (the "'238 Patent") and 12,433,639 (the "'639 Patent") (collectively, the "Asserted Patents").  These counterclaims also seek relief for Boston Scientific's violations of the Lanham Act.

## THE PARTIES

135.  Atraverse is a corporation organized and existing under the laws of Delaware, with its principal place of business at 2611 S Coast Hwy 101, Suite 204, Cardiff by the Sea, California 92007.

136.   According to allegations in Boston Scientific's Amended Complaint, BSC is a corporation organized and existing under Delaware law with its principal place of business at 300 Boston Scientific Way, Marlborough, Massachusetts 01752.

137.  According to allegations in Boston Scientific's Amended Complaint, BSMDL is a corporation organized and existing under the laws of Ireland with its principal place of business at Ballybrit Business Park, Galway, Ireland H91 Y868. BSMDL is a wholly owned subsidiary of BSC.

## JURISDICTION AND VENUE

138.   This Court has subject matter jurisdiction over this counterclaim action for declaratory judgment pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202 based on an actual controversy between Atraverse and Boston Scientific arising under the Patent Laws of the United States, 35 U.S.C. §§ 100 *et seq*.

139.   This Court has subject matter jurisdiction over this counterclaim action for declaratory judgment pursuant to 28 U.S.C. §§ 1331 and 1338 based on an actual controversy between Atraverse and Boston Scientific arising under the Trademark Laws of the United States, and 15 U.S.C. § 1051 *et seq.*

140.   This Court has personal jurisdiction over Boston Scientific based on the filing of this lawsuit in this District.

141.   Venue is proper is this district pursuant to 28 U.S.C. §§ 1391(b)-(d) and 1400(b).  As alleged above, Boston Scientific has consented to this venue based on its filing of this lawsuit in this District.

## COUNT I
**(Declaratory Judgment of Invalidity of the '238 Patent)**

142.   Atraverse repeats and incorporates by reference each of the preceding paragraphs of its counterclaims.

143.   The claims of the '238 Patent are invalid for failure to comply with and/or satisfy one or more conditions and requirements of patentability specified in

47

Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103 and/or 112, or under any of the judicially created doctrines of invalidity.

144. The claims of the '238 Patent are invalid under 35 U.S.C. § 102 as anticipated by the prior art because the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention or the claimed invention was described in a patent or in an application for a patent published or deemed published under section 122(b), in which the patent or application names another inventor and was effectively filed before the effective filing date of the claimed invention.

145. The claims of the '238 Patent are invalid as obvious under 35 U.S.C. § 103 in view of the prior art because any differences between the claims and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the relevant art. A person having ordinary skill in the relevant art would have had reason to combine the teachings of the prior art to achieve the claimed invention and would have had a reasonable expectation of success in doing so.

146. For example, at least Hartley, Shah, Abou-Marie, Goodine and/or Sharrow anticipate or render obvious (alone or in combination with one or more references and/or the knowledge of a person of skill in the art) one or more claims of the '238 Patent.

147.    The claims of the '238 Patent are invalid under 35 U.S.C. § 112 because the '238 Patent does not contain a written description of the claimed invention, and of the manner and process of making and using them, in such full, clear, concise, and exact terms as to demonstrate to a person of ordinary skill in the art that the alleged inventors were in possession of the full scope of the subject matter of the claims contained therein.

148.    The claims of the '238 Patent are invalid under 35 U.S.C. § 112 because one or more claims of the '238 Patent do not particularly point out and distinctly claim the subject matter that the inventors regard as the invention.

149.    As a result of Boston Scientific's allegations that Atraverse infringes the '238 Patent, an actual and justiciable controversy exists between Boston Scientific and Atraverse regarding the validity of the '238 Patent.

150.    Therefore, Atraverse is entitled to a judgment from this Court declaring that the '238 Patent is invalid.

## COUNT II
### (Declaratory Judgment of Invalidity of the '639 Patent)

151.    Atraverse repeats and incorporates by reference each of the preceding paragraphs of its counterclaims.

152.    The claims of the '639 Patent are invalid for failure to comply with and/or satisfy one or more conditions and requirements of patentability specified in

Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103 and/or 112, or under any of the judicially created doctrines of invalidity.

153. The claims of the '639 Patent are invalid under 35 U.S.C. § 102 as anticipated by the prior art because the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention or the claimed invention was described in a patent or in an application for a patent published or deemed published under section 122(b), in which the patent or application names another inventor and was effectively filed before the effective filing date of the claimed invention.

154. The claims of the '639 Patent are invalid under 35 U.S.C. § 103 as obvious in view of the prior art because any differences between the claims and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the relevant art. A person having ordinary skill in the relevant art would have had reason to combine the teachings of the prior art to achieve the claimed invention and would have had a reasonable expectation of success in doing so.

155. For example, at least Hartley, Shah, Abou-Marie, Goodine and/or Sharrow anticipate or render obvious (alone or in combination with one or more references and/or the knowledge of a person of skill in the art) one or more claims of the '639 Patent.

50

156.   The '639 Patent does not contain a written description of the claimed invention, and of the manner and process of making and using them, in such full, clear, concise, and exact terms as to demonstrate to a person of ordinary skill in the art that the alleged inventors were in possession of the full scope of the subject matter of the claims contained therein.

157.   One or more claims of the '639 Patent do not particularly point out and distinctly claim the subject matter that the inventors regard as the invention.

158.   As a result of Boston Scientific's allegations that Atraverse infringes the '639 Patent, an actual and justiciable controversy exists between Boston Scientific and Atraverse regarding the validity of the '639 Patent.

159.   Therefore, Atraverse is entitled to a judgment from this Court declaring that the '639 Patent is invalid.

## COUNT III
**(Declaratory Judgment of Noninfringement of the '238 Patent)**

160.   Atraverse repeats and incorporates by reference each of the preceding paragraphs of its counterclaims.

161.   Boston Scientific accuses Atraverse of infringing at least one claim of the '238 Patent.

162.    Atraverse has not and does not make, use, offer to sell, sell, or import any product which infringes any valid claim of the '238 Patent either literally or under the doctrine of equivalents.

163.    Atraverse has not and does not induce or contribute to the alleged infringement of the '238 Patent.

164.    As a result of Boston Scientific's allegations that Atraverse infringes the '238 Patent, an actual and justiciable controversy exists between Boston Scientific and Atraverse regarding Atraverse's noninfringement of the '238 Patent.

165.    Therefore, Atraverse is entitled to a judgment from this Court declaring Atraverse does not infringe any valid claim of the '238 Patent.

## COUNT IV
### (Declaratory Judgment of Noninfringement of the '639 Patent)

166.    Atraverse repeats and incorporates by reference each of the preceding paragraphs of its counterclaims.

167.    Boston Scientific accuses Atraverse of infringing at least one claim of the '639 Patent.

168.    Atraverse has not and does not make, use, offer to sell, sell, or import any product which infringes any valid claim of the '639 Patent either directly or through the doctrine of equivalents.

52

169. Atraverse has not and does not induce or contribute to the alleged infringement of the '639 Patent.

170. As a result of Boston Scientific's allegations that Atraverse infringes the '639 Patent, an actual and justiciable controversy exists between Boston scientific and Atraverse regarding Atraverse's noninfringement of the '639 Patent.

171. Therefore, Atraverse is entitled to a judgment from this Court declaring Atraverse does not infringe any valid claim of the '639 Patent.

## COUNT V

**(Declaratory Judgment of Unenforceability of the Asserted Patents)**

172. Atraverse incorporates the allegations contained in paragraphs 1-171 as if fully set forth herein.

173. Each of the Asserted Patents is unenforceable for inequitable conduct that occurred during the prosecution of the '790, '415 and '196 Applications.

174. Gareth Davies, Bogdan Beca, Ferryl Alley, and John Paul Urbanski are the named inventors of the '324 Patent and the Asserted Patents ("the Named Inventors"). The Named Inventors each owed "a duty of candor and good faith in dealing with the [Patent Office]…" 37 C.F.R. § 1.56(c).

175. In-house attorneys at Baylis Medical, including at least Nir Lifshitz, Glenn Arnold, Vincent Man ("the Baylis Medical Prosecuting Attorneys"), prosecuted the '790 application, which resulted in the '324 Patent. The Baylis

Medical Prosecuting Attorneys each owed a "duty of candor and good faith in dealing with the [Patent Office]…" *Id.*

176. Attorneys at Nelson Mullins Riley & Scarborough LLP, including at least Jason R. Kraus ("the Nelson Mullins Prosecuting Attorneys"), prosecuted the applications that issued as the Asserted Patents. The Nelson Mullins Prosecuting Attorneys each owed a "duty of candor and good faith in dealing with the [Patent Office]…" *Id.*

177. Upon information and belief, and as described in more detail below, at least the Named Inventors, the Baylis Medical Prosecuting Attorneys, and the Nelson Mullins Prosecuting Attorneys acted with specific intent to deceive the Patent Office in prosecuting the '324 Patent and/or the Asserted Patents in ways material to the patentability of the Asserted Patents because, but for the intentional and deliberate misrepresentations to the Patent Office, each of the '324 Patent and the Asserted Patents would not have issued.

**'324 Patent – Failure to Disclose Material Prior Art References with Intent to Deceive the Patent Office**

178. The '324 Patent is unenforceable for inequitable conduct that occurred during its prosecution, including, among other misconduct, failing to disclose material prior art references with intent to deceive the Patent Office.

179. As outlined in paragraphs 25-43, the Applicant, Baylis Medical, and the individuals involved in the prosecution of the '790 Application, including the Baylis

Prosecuting Attorneys and the Named Inventors, knew of material references that they failed to disclose during the prosecution of the '790 Application.

180. As explained above in paragraphs 41-43, Examiner Peffley allowed the claims of the '790 Application, and the '324 Patent issued, because the claims included the '324 Greater Diameter Feature.

181. As explained above in paragraphs 33-39, the Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, knew that numerous prior art references disclosed a medical device for puncturing tissue that has the '324 Greater Diameter Feature or renders it obvious.

182. For example, at least Hartley, Shah, Abou-Marie and Goodine disclose a medical device for puncturing tissue that has the '324 Greater Diameter Feature or renders it obvious.

183. The Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, knew of Hartley, Shah, and Abou-Marie at least because they were owned by the Applicant, Baylis Medical. Moreover, Named Inventor Gareth Davies is also a named inventor on Abou-Marie.

184. The Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, knew of Goodine at least because, on August 27, 2020, Goodine was cited in an International Search Report for international patent

application PCT/US2020/030264, belonging to a patent family assigned to Baylis Medical.

185.   The references which the Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, failed to disclose, including at least Hartley, Shah, Abou-Marie, and Goodine, would not have been cumulative of the other prior art relied on by the Examiner.

186.   On information and belief, Examiner Peffley would not have allowed the claims of the '324 Patent had he been aware of Hartley, Shah, Abou-Marie and/or Goodine.   But for the misleading conduct, and based on the materiality of these references, Examiner Peffley would have cited such references alone or in combination with other cited references to reject the claims that issued in the '324 patent as anticipated and/or obvious.

187.   The aforementioned individuals, acting as agents of Baylis Medical, knowingly and deliberately violated their duty of disclosure by failing to disclose these material references to Examiner Peffley.   This omission was not merely negligent—it was a calculated decision intended to mislead Examiner Peffley and secure allowance of claims that would otherwise have been rejected.

188.   The failure of the Named Inventors and the Baylis Medical Prosecuting Attorneys to disclose these material references is part of a pattern of deceptive conduct, as discussed above in, for instance, paragraphs 31-43.  For example, despite

56

the fact that the features of the claims of the '790 Application were well known in the art, the Applicant, through the Baylis Medical Prosecuting Attorneys, did not submit an IDS or otherwise identify a single prior art reference to the Patent Office when submitting the '790 Application in June 2019 or any time before the first office action.

189.   After Examiner Peffley issued his April 14, 2021 Non-Final Office Action, objecting to but not rejecting claims that included the '324 Greater Diameter Feature, the Applicant, particularly the Named Inventors and Baylis Medical Prosecuting Attorneys, still did not disclose any prior art references, much less the prior art references that it knew taught the limitations of the claim.   Instead, the Applicant, particularly the Named Inventors and Baylis Medical Prosecuting Attorneys, amended one of the independent claims to include the '324 Greater Diameter Feature and argued that the claims were in condition for allowance.

190.   Later, when it finally submitted an IDS, the Applicant, through the Baylis Medical Prosecuting Attorneys, only identified nine total prior art references, in comparison to the more than 400 references later identified as supposedly relevant to similar claims during the prosecution the '415 and '196 Applications.   The Applicant's sparse IDS did not disclose Hartley, Shah, Abou-Marie, or Goodine.

191.   Moreover, in its limited IDS, the Applicant failed to disclose multiple prior art references that patent offices across the world had identified as "particularly

57

relevant" to foreign counterparts of the '790 application. For example, as discussed above in paragraphs 38-39, Nance, Worley, and Stevens had been identified as "X references" by the International Searching Authority for the international application to which the '790 Application claimed priority and by IP Australia during the prosecution of Australian counterparts to the '790 Application but were not disclosed by the Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, during the prosecution of the '790 Application.

192. Based on this pattern of behavior, the most reasonable inference to be drawn is that the Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, acted with an intent to deceive the USPTO.

193. In summary, on information and belief, the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, knew that Examiner Peffley would not have allowed the claims if he had been aware of Hartley, Abou-Marie, Shah, and/or Goodine (at least because each discloses or renders obvious the '324 Greater Diameter Feature) and made a deliberate decision to withhold those material references from the Patent Office with the intent to deceive.

194. This misleading conduct and breach of duties owed to the Patent Office described above applies to all claims of the '324 Patent and infects other patents in the same family as the '324 Patent.

## '238 Patent – Infectious Unenforceability

195. The '238 Patent is unenforceable due to inequitable conduct by the Applicant during the prosecution of the '324 Patent.

196. The '415 Application is a continuation of the '324 Patent. The '415 Application ultimately issued as the '238 Patent.

197. As described above, the Applicant, particularly the Baylis Medical Prosecuting Attorneys and the Named Inventors, committed inequitable conduct during the prosecution of the '324 Patent that renders it unenforceable.

198. The inequitable conduct committed during the prosecution of the '324 Patent bears an immediate and necessary relation to the enforcement of the '238 Patent. For instance, the '324 Patent and the '238 Patent share substantively identical specifications. They also include substantively similar claims with many of the same claim elements. Moreover, the claims of each patent were allowed only because the Applicant included the '324 Greater Diameter Feature or the Reverse Taper Limitation, which each relate to the same portion of the claimed medical devices. Because of the similarity of the claims, the Applicant filed a terminal disclaimer for the '238 Patent over the '324 Patent to overcome the Examiner's obviousness-type double patenting rejection.

199. The Applicant's inequitable conduct in connection with the prosecution of the '324 Patent infects and renders at least the '238 Patent unenforceable under the doctrine of infectious unenforceability.

### '238 Patent – Failure to Disclose Material Prior Art References with Intent to Deceive the Patent Office

200. The '238 Patent is unenforceable for inequitable conduct occurring during its prosecution, including, among other misconduct, failing to disclose material prior art references with intent to deceive the Patent Office.

201. As outlined in paragraphs 44-72 the Applicant, BSMDL, and the individuals involved in the prosecution of the '415 Application, particularly the Nelson Mullins Prosecuting Attorneys and the Named Inventors, knew of material references that they failed to disclose during the prosecution of the '415 Application.

202. As explained above in paragraphs 69-70, Examiner Peffley allowed the claims of the '415 Application, and the '238 Patent issued, because the claims included the Reverse Taper Feature.

203. As explained above in paragraphs 64-70, the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew that numerous prior art references disclosed a medical device for puncturing tissue that has the Reverse Taper Feature or renders it obvious.

204. For example, at least Abou-Marie, Goodine, and Sharrow disclose a medical device for puncturing tissue that has the Reverse Taper Feature or renders it obvious.

205. The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of Abou-Marie and Sharrow at least because they were owned by BSC. Moreover, Named Inventor Gareth Davies is also a named inventor on Abou-Marie.

206. The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of Goodine at least because, on August 27, 2020, Goodine was cited in an International Search Report for international patent application PCT/US2020/030264, belonging to a patent family assigned to Baylis Medical.

207. The references which the Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, failed to disclose, including at least Abou-Marie, Sharrow, and Goodine, would not have been cumulative of the other prior art relied on by the Examiner.

208. On information and belief, Examiner Peffley would not have allowed the claims of the '238 Patent had he been aware of Abou-Marie, Goodine and/or Sharrow. But for the misleading conduct, and based on the materiality of these references, Examiner Peffley would have cited such references alone or in

combination with other cited references to reject the claims that issued in the '238 patent as anticipated and/or obvious.

209. The aforementioned individuals, acting as agents of BSMDL, knowingly and deliberately violated their duty of disclosure by failing to disclose these material references to Examiner Peffley. This omission was not merely negligent—it was a calculated decision intended to deceive Examiner Peffley and secure allowance of claims that would otherwise have been rejected.

210. The failure of the Named Inventors and the Baylis Medical Prosecuting Attorneys to disclose these material references is part of a pattern of deceptive conduct, as discussed above in, for instance, paragraphs 25-43 and 49-72.

211. For example, as described in paragraphs 25-43, the Applicant's predecessor, Baylis Medical, engaged in deceptive conduct and failed to disclose material references during the prosecution of the '790 Application.

212. During the prosecution of the '415 Application, the Applicant, through the Nelson Mullins Prosecuting Attorneys, submitted IDSs with at least 360 references totaling approximately 7,500 pages of material. The Applicant, through the Nelson Mullins Prosecuting Attorneys, provided no explanation why it disclosed such a large volume of references during the prosecution of the '415 Application, despite submitting only nine references during the prosecution of substantively similar claims in the '790 Application.

213. As explained in paragraphs 50-57, the IDSs included a substantial number of references that were, at most, minimally relevant to the alleged invention covered by the pending claims at any point during prosecution of the '415 Application.

214. As explained in paragraphs 58-71, the IDSs included several references that were improperly withheld during the prosecution of the '790 Application and/or disclosed key elements of the pending claims. But those references were buried in the at least 360 references totaling approximately 7,500 pages of material included in the IDSs, much of which was of minimal relevance.

215. Examiner Peffley told the Applicant in his September 7, 2023 Non-Final Rejection that the number of references cited in the IDSs was excessive and asked for help identifying relevant references from those disclosures. Examiner Peffley further told the Applicants that he was only giving the references in the IDSs a "cursory" review given their volume. The Applicant, through the Nelson Mullens Prosecuting Attorneys, did not identify any relevant prior art references in response to Examiner Peffley's request. In fact, they did not respond to his request at all.

216. In response to the Examiner's rejection, instead of identifying any of the relevant prior art, the Applicant, through the Nelson Mullins Prosecuting Attorneys, amended the claims to include the Reverse Taper Feature. The Applicant, through the Nelson Mullins Prosecuting Attorneys, argued that the Reverse Taper

63

Feature was "not disclose[d] or suggested by the references cited by the Office." The Applicant, through the Nelson Mullins Prosecuting Attorneys, went even further, arguing that the prior art "teaches away from the claimed reverse taper features."  The Applicant, through the Nelson Mullin Prosecuting Attorneys, concluded that "claim 1, [which now included the Reverse Taper Feature,] along with the various claims depending therefrom, thus stand in allowable form."

217.  As described in paragraphs 63-68, the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew that the Reverse Taper was a well-known feature in the prior art, described in numerous prior art references, including some buried in the Applicant's IDSs and others (including Abou-Marie, Goodine and Sharrow) that the Applicant failed to disclose.

218.  Based on this pattern of behavior, the most reasonable inference to be drawn is that the Applicant, including the Named Inventors and the Nelson Mullins Prosecuting Attorneys, acted with an intent to deceive the USPTO.

219.  In summary, on information and belief, the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, knew that Examiner Peffley would not have allowed the claims if he had been aware of Abou-Marie, Goodine and/or Sharrow (at least because each discloses or renders obvious the Reverse Taper Feature) and made a deliberate decision to withhold those material references from the Patent Office with the intent to deceive.

64

220.   This misleading conduct and breach of duties owed to the Patent Office described above applies to all claims of the '238 Patent and infects the other patents in the same family as the '238 Patent.

## '238 Patent – Burying of Material Prior Art and Lack of Candor with the Examiner

221.   The '238 Patent is also unenforceable for inequitable conduct during its prosecution, including, among other misconduct, burying of key material prior art and lack of candor with the Examiner.

222.   During the prosecution of the '415 Application, the Applicant, through the Nelson Mullins Prosecuting Attorneys, submitted IDSs with at least 360 references totaling approximately 7,500 pages of material.

223.   The Applicant provided no explanation why it disclosed such a large volume of references during the prosecution of the '415 Application, despite disclosing only nine references during the prosecution of substantively similar claims in the '790 Application.

224.   As explained in paragraphs 52-55, the IDSs included a substantial number of references that were, at most, minimally relevant to the alleged invention covered by the pending claims at any point during prosecution of the '415 Application.

225.   As explained in paragraphs 52-70, the IDSs included several references that were improperly withheld during the prosecution of the '790 Application and/or

65

disclosed key elements of the pending claims. But those references were buried in the at least 360 references totaling approximately 7,500 pages of material included in the IDSs, much of which was of minimal relevance.

226. Examiner Peffley told the Applicant in his September 7, 2023 Non-Final Rejection that the number of references cited with the IDSs was excessive. Because of the large volume of cited references, Examiner Peffley further explained that he had only afforded the references "a cursory review, similar to what would be expected of a classification search of the prior art." Given the impossible task of substantively reviewing the at least 360 references totaling approximately 7,500 pages submitted by the Applicant, Examiner Peffley further asked the Applicant to identify references of "particular relevance" to the pending claims.

227. The Applicant, particularly the Nelson Mullins Prosecuting Attorneys and the Named Inventors, did not identify any relevant prior art references in response to Examiner Peffley's request. In fact, they did not respond to his request at all.

228. Buried in the IDSs were multiple prior art references that patent offices across the world had identified as "particularly relevant" to foreign counterparts to the '415 application. For example, as discussed above in paragraphs 61-62, Nance, Worley, and Stevens had been identified as "X references" by the International Searching Authority for the international application to which the '415 Application

66

claimed priority and by IP Australia during the prosecution of Australian counterparts to the '415 Application. The Applicant, through the Nelson Mullins Prosecuting Attorneys, did not point Examiner Peffley to Nance, Worley, or Stevens.

229. Also buried in the IDSs were numerous other references had been cited by foreign patent offices as "particularly relevant" (i.e., X or Y references) to, or were applied by foreign examiners in rejecting, the claims of foreign counterparts of the '415 Application, including Kurth, Asleson, Auth, Suzuki, and Gerber. The Applicant, through the Nelson Mullins Prosecuting Attorneys, however, did not point Examiner Peffley to any of those references, buried among hundreds of other less relevant references.

230. Also buried in the IDSs were multiple prior art references (owned by Baylis Medical) that disclose a medical device for puncturing tissue that has the Reverse Taper Feature and/or renders it obvious, including Hartley and Shah. Even though the Applicant, particularly the Named Inventors, and the Nelson Mullins Prosecuting Attorneys knew Hartley and Shah were material to the pending claims, and despite Examiner Peffley's plea for help, they did not point the Examiner to those references.

231. In response to the Examiner's rejection, instead of identifying any of the relevant buried prior art, the Applicant, through the Nelson Mullins Prosecuting Attorneys, amended the pending claims to include the Reverse Taper Feature. The

67

Applicant, through the Nelson Mullins Prosecuting Attorneys, further argued that the Reverse Taper Feature was "not disclose[d] or suggested by the references cited by the Office." The Applicant, through the Nelson Mullins Prosecuting Attorneys, went even further, arguing that the prior art "teaches away from the claimed reverse taper features." The Applicant, through the Nelson Mullins Prosecuting Attorneys, concluded that "claim 1, [which now included the Reverse Taper Feature,] along with the various claims depending therefrom, thus stand in allowable form."

232. Following the Applicant's amendments and comments, Examiner Peffley allowed the pending claims. In the Reasons for Allowance, the Examiner explained that the Applicant's amendments and comments filed on December 6, 2023, were "deemed to distinguish the claims from the prior art of record."

233. On information and belief, Examiner Peffley would not have allowed the claims of the '238 Patent had the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, been forthcoming in response to Examiner Peffley's request to identify relevant prior art. But for the deceptive conduct, and based on the materiality of these references, Examiner Peffley would have cited at least Hartley and/or Shah alone or in combination with other cited references to reject the claims that issued in the '238 patent as anticipated and/or obvious.

234. Notably, despite their knowledge of the materiality and contents of the references cited above, the Applicant, and particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, failed to highlight these references or otherwise distinguish them in any way from the hundreds of other cited references at any point during the prosecution of the '238 Patent.

235. The buried references would not have been cumulative of the other prior art relied on by the Examiner.

236. The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, thus buried these references with other references of minimal relevance and failed to bring them to the Examiner's attention to intentionally mislead the Examiner in order to improperly procure the '238 Patent, notwithstanding that the Applicant was not entitled to such patent based under 35 U.S.C. §§ 102, 103.

237. The failure of the Named Inventors and the Nelson Mullins Prosecuting Attorneys to identify these material references is part of a pattern of deceptive conduct, as discussed above in, for instance, paragraphs 25-43 and 49-72.

238. Based on this pattern of behavior, the most reasonable inference to be drawn is that the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, acted with an intent to deceive the Patent Office.

239.   The conduct of the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, during the prosecution of the '238 Patent, as described above, also constitutes affirmative egregious misconduct.

240.   This misleading conduct and breach of duties owed to the Patent Office described above applies to all claims of the '238 Patent and infects other patents in the same family as the '238 Patent.

## '639 Patent – Infectious Unenforceability

241.   The '639 Patent is unenforceable due to inequitable conduct by the Applicant during the prosecution of the '324 and '238 Patents.

242.   The '196 Application is a continuation of the '238 Patent.  The '196 Application ultimately issued as the '639 Patent.

243.   As described above, the Applicant, particularly the Baylis Medical Prosecuting Attorneys and the Named Inventors, committed inequitable conduct during the prosecution of the '324 Patent that renders it unenforceable.

244.   As described above, the Applicant, particularly the Nelson Mullins Prosecuting Attorneys and the Named Inventors, committed inequitable conduct during the prosecution of the '238 Patent that renders it unenforceable.

245.   The inequitable conduct during the prosecution of the '324 and '238 Patents bears an immediate and necessary relation to the enforcement of the '639 Patent.   For instance, the '324 Patent, '238 Patent, and '639 Patent share

substantively identical specifications. They also include substantively similar claims with many of the same claim elements. Moreover, the claims of each patent were allowed only because they included the '324 Greater Diameter Feature, the Reverse Taper Limitation, or the '639 Greater Diameter Feature, which all relate to the same portion of the claimed medical devices. Because of the similarity of the claims, the Applicant filed a terminal disclaimer for the '639 Patent over the '324 Patent and the '238 Patent to overcome the Examiner's obviousness-type double patenting rejection.

246. The Applicant's inequitable conduct in connection with the prosecution of the '324 and '238 Patents infects and renders at least the '639 Patent unenforceable under the doctrine of infectious unenforceability.

### '639 Patent – Burying of Material Prior Art and Lack of Candor with the Examiner

247. The '639 Patent is also unenforceable for inequitable conduct committed during its prosecution, including, among other misconduct, burying of key material prior art and lack of candor with the Examiner.

248. During the prosecution of the '196 Application, the Applicant, through the Nelson Mullins Prosecuting Attorneys, submitted IDSs with at least 400 references totaling approximately 8,800 pages of material.

249. The Applicant, through the Nelson Mullins Prosecuting Attorneys, provided no explanation why it disclosed such a large volume of references during

the prosecution of the '196 Application, despite disclosing only nine references during the prosecution of substantively similar claims in the '790 Application.

250.  As explained in paragraphs 77-79 the IDSs included a substantial number of references that were, at most, minimally relevant to the alleged invention covered by the pending claims at any point during prosecution of the '196 Application.

251.  As explained in paragraphs 79-80, the IDSs included several references that were improperly withheld during the prosecution of the '790 Application and/or the '196 Application and/or disclosed key elements of the pending claims.  But those references were buried in the at least 400 references totaling approximately 8,800 pages of material included in the IDSs, much of which was of minimal relevance.

252.  In his February 8, 2025 Non-Final Rejection, Examiner Peffley told the Applicant that the number of references cited with the IDSs was excessive.  Because of the large volume of cited references, Examiner Peffley further explained that he had only afforded the references "a cursory review, similar to what would be expected of a classification search of the prior art."  Examiner Peffley further asked the Applicant to identify references of "particular relevance" to the pending claims.

253.  The Applicant, particularly the Nelson Mullens Prosecuting Attorneys and the Named Inventors, did not identify any relevant prior art references in

response to Examiner Peffley's request. In fact, they did not respond to his request at all.

254. Buried in the IDSs were multiple prior art references that patent offices across the world had identified as "particularly relevant" to foreign counterparts of the '196 Application. For example, as discussed above in paragraphs 61-62, Nance, Worley, and Stevens had been identified as "X references" by the International Searching Authority for the international application to which the '196 Application claimed priority and by IP Australia during the prosecution of Australian counterparts of the '196 Application. The Applicant, through the Nelson Mullins Prosecuting Attorneys, did not point Examiner Peffley to Nance, Worley, or Stevens.

255. Also buried in the IDSs were numerous other references had been cited by foreign patent offices as "particularly relevant" (i.e., X or Y references) to, or were applied by foreign examiners in rejecting, the claims of foreign counterparts of the '196 Application, including Kurth, Asleson, Auth, Suzuki, and Gerber. The Applicant, through the Nelson Mullins Prosecuting Attorneys, however, did not point Examiner Peffley to any of those references, buried among hundreds of other less relevant references.

256. Also buried in the IDSs were multiple prior art references (owned by Baylis Medical) that disclose a medical device for puncturing tissue that has the '639 Greater Diameter Feature and/or renders it obvious, including Hartley, Shah, and

Abou-Marie. Even though the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew that Hartley, Shah and Abou-Marie were material to the pending claims, and despite Examiner Peffley's plea for help, they did not point the Examiner to those references.

257. Without the benefit of any guidance from the Applicant, any way to sift through the thousands of pages of cited references, or any disclosure of Goodine and Sharrow, Examiner Peffley issued a Notice of Allowance. Examiner Peffley allowed the claims noting that while the prior art references "all disclose various catheter devices having an elongate member with straight and curved portions . . . *none show the specific relationship for the relative diameters of the portions as required by the instant application claims*." (Ex. 12 at Feb 28, 2025 Non-Final Rejection, 2.) The only feature in pending independent claim 1 related to "the relative diameters of the portions" was the '639 Greater Diameter Feature.

258. After the Notice of Allowance, the Applicant, through the Nelson Mullins Prosecuting Attorneys, submitted another IDS citing thirteen additional references, without explaining their relevance to the Examiner. Most of the thirteen references had little, if any, relevance to the pending claims of the '415 Application. Buried amongst those new references, in addition to the at least 389 other references cited previously by the Applicant, was the Goodine reference. The Applicant, through the Nelson Mullins Prosecuting Attorneys, failed to point Examiner Peffley

74

to Goodine or to do anything to alert him that Goodine disclosed a guidewire with the diameters recited in the pending claims.

259. On information and belief, Examiner Peffley would not have allowed the claims of the '639 Patent had the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, been forthcoming in response to Examiner Peffley's request to identify relevant prior art. But for the misleading conduct, and based on the materiality of these references, Examiner Peffley would have cited at least Hartley, Shah, Abou-Marie and/or Goodine, alone or in combination with other cited references, to reject the claims that issued in the '639 patent as anticipated and/or obvious.

260. Notably, despite their knowledge of the materiality and contents of the references cited above, the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, failed to highlight these references or otherwise distinguish them in any way from the hundreds of other cited references at any point during the prosecution of the '639 Patent.

261. The buried references would not have been cumulative of the other prior art relied on by the Examiner.

262. The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, thus buried these references and failed to bring them to the Examiner's attention to intentionally mislead the Examiner in order to

improperly procure the '639 Patent, notwithstanding that the Applicant was not entitled to such patent under 35 U.S.C. §§ 102, 103.

263. The failure of the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, to identify these material references is part of a pattern of deceptive conduct, as discussed above in, for instance, paragraphs 25-95.

264. Based on this pattern of behavior, the most reasonable inference to be drawn is that the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, acted with an intent to deceive the Patent Office.

265. The conduct of the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, during the prosecution of the '639 Patent, as described above, also constitutes affirmative egregious misconduct.

266. This misleading conduct and breach of duties owed to the Patent Office described above applies to all claims of the '639 Patent and infects other patents in the same family as the '639 Patent.

### '639 Patent – Failure to Disclose Material Prior Art References with Intent to Deceive the Patent Office

267. The '639 Patent is unenforceable for inequitable conduct occurring during its prosecution, including, among other misconduct, failing to disclose material prior art references with intent to deceive the Patent Office.

76

268. As outlined in paragraphs 73-95, the Applicant, BSMDL, and the individuals involved in the prosecution of the '196 Application, particularly the Nelson Mullins Prosecuting Attorneys and the Named Inventors, knew of material references that they failed to disclose during the prosecution of the '196 Application.

269. As explained above in paragraphs 93-94, Examiner Peffley allowed the claims of the '196 Application, and the '639 Patent issued, because the claims included the '639 Greater Diameter Feature.

270. As explained above in paragraphs 33-35 and 86, the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew that numerous prior art references disclosed a medical device for puncturing tissue that has the '639 Greater Diameter Feature or renders it obvious.

271. For example, at least Sharrow discloses a medical device for puncturing tissue that has the '639 Greater Diameter Feature or renders it obvious.

272. The Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew of Sharrow at least because it was owned by BSC.

273. Sharrow, which the Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, failed to disclose, would not have been cumulative of the other prior art relied on by the Examiner.

77

274. On information and belief, Examiner Peffley would not have allowed the claims of the '639 Patent had he been aware of Sharrow. But for the misleading conduct, and based on the materiality of that reference, Examiner Peffley would have cited Sharrow alone or in combination with other cited references to reject the claims that issued in the '639 patent as anticipated and/or obvious.

275. The aforementioned individuals, acting as agents of BSMDL, knowingly and deliberately violated their duty of disclosure by failing to notify Examiner Peffley of these material references. This omission was not merely negligent—it was a calculated decision intended to mislead Examiner Peffley and secure allowance of claims that would otherwise have been rejected.

276. The failure of the Applicant, particularly the Named Inventors and the Baylis Medical Prosecuting Attorneys, to disclose these material references is part of a pattern of deceptive conduct, as discussed above in, for instance, paragraphs 25-95.

277. In addition, during the prosecution of the '196 Application, the Applicant, through the Nelson Mullins Prosecuting Attorneys, submitted IDSs with at least 400 references totaling approximately 8,800 pages of material. The Applicant, through the Nelson Mullins Prosecuting Attorneys, provided no explanation why it disclosed such a large volume of references during the

78

prosecution of the '196 Application, despite submitting only nine references during the prosecution of substantively similar claims in the '790 Application.

278.    As explained in paragraphs 77-79, the IDSs included a substantial number of references that were, at most, minimally relevant to the alleged invention covered by the pending claims at any point during prosecution of the '196 Application.

279.    As explained in paragraphs 80-91, the IDSs included several references that were improperly withheld during the prosecution of the '790 Application and/or the '415 Application and/or disclosed key elements of the pending claims.  But those references were buried in the at least 400 references totaling approximately 8,800 pages of material included in the IDSs, much of which was of minimal relevance.

280.    Examiner Peffley told the Applicant in his February 28, 2025 Non-Final Rejection that the number of references cited with the IDSs was excessive and asked for help identifying relevant references from those disclosures.  Examiner Peffley further told the Applicants that he was only giving the references in the IDSs a "cursory" review given their volume.  The Applicant, through the Nelson Mullens Prosecuting Attorneys, did not identify any relevant prior art references in response to Examiner Peffley's request.  In fact, they did not respond to his request at all.

281.    As described in paragraphs 86-88, the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, knew that the '639

Greater Diameter Feature was a well-known feature in the prior art, described in numerous prior art references, including some buried in the Applicant's IDSs and others (including Sharrow) that the Applicant failed to disclose.

282. Based on this pattern of behavior, the most reasonable inference to be drawn is that the Applicant, particularly the Named Inventors and the Nelson Mullins Prosecuting Attorneys, acted with an intent to deceive the Patent Office.

283. In summary, on information and belief, the Applicant, particularly the Named Inventors and the Baylis Prosecuting Attorneys, knew that Examiner Peffley would not have allowed the claims if he had been aware of Sharrow (at least because it discloses or renders obvious the '639 Greater Diameter Feature) and made a deliberate decision to withhold that material reference from the Patent Office with the intent to deceive.

284. This misleading conduct and breach of duties owed to the Patent Office described above applies to all claims of the '639 Patent and any other patents in the same family as the '639 Patent.

## COUNT VI

### (Violation of Lanham Act)

285. Atraverse incorporates the allegations contained in paragraphs 1-283 as if fully set forth herein.

286. Boston Scientific conducted a study which used a guidewire that Boston Scientific falsely claims "mimics" and "is representative of" the guidewire used in Atraverse's HOTWIRE™ product.

287. In January 2025, Boston Scientific made false and misleading representations regarding the HOTWIRE™ and Boston Scientific's purported comparison between the HOTWIRE™ and VersaCross™, through the presentation of the Boston Scientific Poster at the Symposium attended by cardiovascular physicians and, specifically, electrophysiologists who perform treatments for atrial fibrillation and are potential users of Atraverse's HOTWIRE™ product.

288. Following the presentation of the Boston Scientific Poster, Boston Scientific promoted the results of the Boston Scientific Study in at least four advertisements that appeared, and continue to appear, on LinkedIn and X. Numerous physicians in the field have engaged with Boston Scientific's advertisements which link to the Boston Scientific White Paper, depicting the false and misleading data from the Boston Scientific Study.

289. In September 2025, Boston Scientific made false and misleading representations regarding the HOTWIRE™ and Boston Scientific's purported

comparison between the HOTWIRE™ and VersaCross™, through the publication of the Boston Scientific Publication in the Journal of Interventional Cardiac Electrophysiology. Boston Scientific's action were, and continue to be, aimed at influencing cardiovascular physicians, thereby affecting the purchasing decisions of healthcare entities.

290. Boston Scientific is the driving force behind the Boston Scientific Study, the Boston Scientific White Paper, the Boston Scientific Poster, and the Boston Scientific Publication (collectively, the "Boston Scientific Materials"), which were made intentionally and in bad faith and for the purpose of gaining a commercial advantage. Statements in the Boston Scientific Materials materially misrepresented the nature, characteristics, and qualities of the HOTWIRE™ with the purpose and effect of discouraging its use by cardiovascular physicians, thus deterring healthcare entities from purchasing HOTWIRE™.

291. Boston Scientific has promoted, and continues to promote, the misleading results of the Boston Scientific Study, captured in the Boston Scientific Publication and the Boston Scientific Poster, through various online advertising platforms.

292. On information and belief, Boston Scientific has also directly disseminated the Boston Scientific Publication and displayed the Boston Scientific Poster to practitioners and other market participants, thereby reinforcing and

82

amplifying the false and misleading claims about the HOTWIRE™ in a targeted effort to influence its adoption by cardiovascular physicians and thus adversely impacting the prescribing and purchasing decisions of healthcare entities.

293. Boston Scientific's false and misleading statements in the Boston Scientific Publication and the Boston Scientific Poster were made and used in bad faith and then used in the context of commercial advertising or promotions.

294. Specifically, Boston Scientific misrepresented the nature, characteristics, and qualities of the HOTWIRE™ products in the Boston Scientific Publication and the Boston Scientific Poster. Boston Scientific's statements in the Boston Scientific Publication, the Boston Scientific Poster, and afterwards, were designed and intended to, and in fact did, deceive a substantial segment of the intended target audience—namely, cardiovascular physicians and other decision-makers in the relevant market—regarding the performance, safety, and reliability of the HOTWIRE™.

295. Boston Scientific placed these false and misleading allegations in interstate commerce, including by publishing the Boston Scientific Publication and then disseminating the Publication through various channels to cardiovascular physicians and other decision-makers within the relevant purchasing public.

296. Boston Scientific also placed these false and misleading allegations in interstate commerce, including by presenting the Boston Scientific Poster to

cardiovascular physicians and other decision-makers within the relevant purchasing public.

297. This intentional deception by Boston Scientific to make misleading and false representations regarding the HOTWIRE™ product under the guise of a scientific journal publication and study poster, has caused, and continues to cause, significant and irreparable harm to the HOTWIRE's™ commercial reputation and market position by making cardiovascular physicians and other decision-makers in the relevant market far less likely to recommend and use the HOTWIRE™. On information and belief, Atraverse has lost sales due to Boston Scientific's misleading and false representations regarding the HOTWIRE™ product.

298. On information and belief, Boston Scientific did not prepare or disseminate the Boston Scientific Publication and the Boston Scientific Poster for the purpose of objective product testing or scientific inquiry. Rather, Boston Scientific engaged in this conduct as part of a broader, coordinated strategy to suppress competition from the entry of the HOTWIRE™ product and to maintain or expand market share for its competing product, VersaCross™. This strategy includes not only the dissemination of false and misleading information in the Boston Scientific Publication and Boston Scientific Poster, but also the initiation of patent infringement litigation against HOTWIRE™—further evidencing Boston

84

Scientific's intent to stifle competition through improper and anticompetitive means under the guise of a scientific journal publication and study poster.

299. As a result of Boston Scientific's conduct, Atraverse has suffered and will continue to suffer damage and irreparable harm to its business, market reputation, and goodwill, including due to potential customers (i.e., cardiovascular physicians and healthcare entities) who, because of the Boston Scientific Publication and Boston Scientific Poster, opt to limit or avoid altogether recommending and prescribing the HOTWIRE™ product, and thus are not doing business with Atraverse.

300. Atraverse will continue to suffer damage and irreparable harm unless Boston Scientific is enjoined from making further baseless claims, representations, communications, publications, or other statements relating to the HOTWIRE™ device's efficacy, including but not limited to circumstances such as the Boston Scientific Study, Boston Scientific Publication, and Boston Scientific Poster, when HOTWIRE™ is not actually the device being tested.

301. These wrongful acts by Boston Scientific constitute false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).

302. Atraverse is entitled to all damages that it has sustained and will sustain in the future as a result of Boston Scientific's conduct, as well as all gains, profits, and other advantages obtained by Boston Scientific as a result of its conduct, in

amounts to be proven at trial. Atraverse is also entitled to an award of attorney's fees and treble damages due to the exceptional nature of this case and Boston Scientific's willful conduct.

****** 

## ANSWER

Defendant Atraverse Medical, Inc. ("Defendant" or "Atraverse") by and through its undersigned attorneys, hereby respond to the allegations contained in the Amended Complaint for Patent Infringement ("Complaint") filed on October 9, 2025, by Plaintiffs Boston Scientific Corporation ("BSC") and Boston Scientific Medical Device Limited ("BSMDL") ("Plaintiffs" or "Boston Scientific") and state it defense to the Plaintiffs' claims.

Each of the numbered paragraphs below corresponds to the same numbered paragraph in the Amended Complaint. Atraverse denies all allegations in the Amended Complaint, whether express or implied, that are not specifically admitted below. Any admission herein is limited to the express language of the response and shall not be deemed an implied admission of additional facts. Atraverse further denies that Boston Scientific is entitled to the relief requested in the Complaint, or to any other relief.

## NATURE OF THE ACTION

1.      This is an action for infringement of United States Patent Nos. 11,998,238 (the "'238 Patent") and 12,433,639 (the "'369 Patent") (collectively, the "Asserted Patents") under 35 U.S.C. § 271.

**ANSWER:** Atraverse admits that this action purports to arise under 35 U.S.C. § 271, but Atraverse denies any allegation or implication that Atraverse has infringed any valid claim of the Asserted Patents.

## PARTIES

2.      Plaintiff BSC is a corporation organized and existing under Delaware law with its principal place of business at 300 Boston Scientific Way, Marlborough, Massachusetts 01752.  BSC is a leading developer, manufacturer, and supplier of medical devices, including an array of transseptal access devices to treat heart conditions.

**ANSWER:** Atraverse lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 2 and, on that basis, denies them.

3.      Plaintiff BSMDL is a corporation organized and existing under the laws of Ireland with its principal place of business at Ballybrit Business Park, Galway, Ireland H91 Y868.  BSMDL is a wholly owned subsidiary of BSC.

**ANSWER:** Atraverse lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3 and, on that basis, denies them.

4.      BSMDL is the owner by assignment of the Asserted Patents.

**ANSWER:** Atraverse admits that BSMDL is listed as the assignee on the face of the Asserted Patents but otherwise lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 4 and, on that basis, denies them.

5.      BSC is the exclusive seller within the United States of products that embody BSMDL patents, including the Asserted Patents, and has the right to sue for infringement by unauthorized third parties and recover damages due to lost sales.

**ANSWER:** To the extent Paragraph 5 states legal conclusions, no response is required.  To the extent a response is required, Atraverse lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 5 and, on that basis, denies them.

6.      Defendant Atraverse is an entity incorporated in the state of Delaware and having its principal place of business at 2611 S Coast Hwy 101, Suite 204, Cardiff by the Sea, California 92007.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

7.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100 et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:** To the extent Paragraph 7 states legal conclusions, no response is required.  To the extent a response is required, Atraverse admits that the Complaint purports to state a claim for infringement arising under the patent laws of the United States 35 U.S.C. § 1, et seq.  Atraverse further does not contest that this Court has subject matter jurisdiction over this action.  Atraverse denies that the allegations have any merit or that Plaintiffs are entitled to any relief.  All remaining allegations are denied.

8.      This Court has personal jurisdiction over Atraverse because Atraverse is incorporated in the state of Delaware.

88

**ANSWER:** To the extent Paragraph 8 states a legal conclusion, no response is required. To the extent a response is required, Atraverse does not contest personal jurisdiction for the purposes of this action only.

9. Venue is proper in this District under 28 U.S.C. § 1400(b).

**ANSWER:** To the extent Paragraph 9 states a legal conclusion, no response is required. To the extent a response is required, Atraverse does not contest that venue is proper for purposes of this action only.

## FACTUAL BACKGROUND

10. On June 4, 2024, the USPTO issued the '238 Patent to Gareth Davies, John Paul Urbanski, Ferryl Alley, and Bogdan Beca. The '238 Patent is entitled "Methods and Devices for Puncturing Tissue." A true and correct copy of the '238 Patent is attached to this Complaint as Exhibit A. The '238 Patent remains in force and is assigned to BSMDL. BSMDL has owned the '238 Patent since it issued and still owns the '238 Patent.

**ANSWER:** Atraverse states that the '238 Patent and its intrinsic record, including the claims, specification, and prosecution history, speak for themselves. Upon information and belief, Atraverse admits that Exhibit A to the Amended Complaint is a true and correct copy of the '238 Patent. Atraverse admits that the '238 Patent on its face is titled "Methods and Devices for Puncturing Tissue." Atraverse further admits that the '238 Patent on its face bears an issuance date of June 4, 2024, and lists Gareth Davies, John Paul Urbanski, Ferryl Alley, and Bogdan Beca as inventors. Atraverse admits that BSMDL is listed as the assignee on the face of the '238 Patent. To the extent a further response is required, Atraverse lacks

89

sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 10 and, on that basis, denies them.

11.    On October 7, 2025, the USPTO issued the '639 Patent to Gareth Davies, John Paul Urbanski, Ferryl Alley, and Bogdan Beca. The '639 Patent is entitled "Methods and Devices for Puncturing Tissue." A true and correct copy of the '639 Patent is attached to this Complaint as Exhibit C. The '639 Patent remains in force and is assigned to BSMDL. BSMDL has owned the '639 Patent since it issued and still owns the '639 Patent.

**ANSWER:** Atraverse states that the '639 Patent and its intrinsic record, including the claims, specification, and prosecution history, speak for themselves. Upon information and belief, Atraverse admits that Exhibit C to the Amended Complaint is a true and correct copy of the '639 Patent. Atraverse admits that the '639 Patent on its face is titled "Methods and Devices for Puncturing Tissue." Atraverse further admits that the '639 Patent on its face bears an issuance date of October 7, 2025, and lists Gareth Davies, John Paul Urbanski, Ferryl Alley, and Bogdan Beca as inventors. Atraverse admits that BSMDL is listed as the assignee on the face of the '639 Patent. To the extent a further response is required, Atraverse lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 11 and, on that basis, denies them.

12.    The Asserted Patents relate generally to medical devices for puncturing tissue at a tissue site, for example, a septum of the heart, permitting access to the left side of the heart. Electrical energy is used to aid the creation of a puncture through the tissue, improving efficacy and patient safety of, for example, a transseptal surgical procedure. The design of the patented medical device minimizes the need for exchanges during a transseptal surgical procedure also improving efficacy and patient safety.

**ANSWER:** Atraverse states that the Asserted Patents speak for themselves and denies the allegations in the paragraph 12 to the extent Plaintiffs' characterizations are inconsistent with them.  All remaining allegations are denied.

13.     Upon information and belief, Atraverse is currently making, using, offering for sale, selling, and/or importing into the U.S. a medical device for puncturing a tissue at a tissue site, including the septum of the heart, under the trade name "HOTWIRE™".  In its FDA 510(k) regulatory filings, Atraverse describes its device as follows: "The HOTWIRE™ is a sterile, single-use guidewire device that delivers radiofrequency (RF) power in a monopolar mode to a distal electrode segment for the creation of an atrial septal defect in the heart."

**ANSWER:** To the extent Paragraph 13 states legal conclusions, no response is required.  To the extent a response is required, Atraverse admits that it received clearance from FDA to sell a medical device in the U.S. under the trade name "HOTWIRE™."  Atraverse admits that its regulatory filings describes its device as follows: "The HOTWIRE™ is a sterile, single-use guidewire device that delivers radiofrequency (RF) power in a monopolar mode to a distal electrode segment for the creation of an atrial septal defect in the heart."  All remaining allegations are denied.

14.     In addition to making and using the HOTWIRE™, on information and belief, Atraverse has offered it for sale and sold it since receiving 510(k) clearance in May of 2024. Atraverse's CEO, John Slump, presented the HOTWIRE™ at the LSI Europe conference in September 2024 in Sintra, Portugal.  During his presentation, Mr. Slump explained that as of the conference in September 2024, "we actually are now in the clinic doing commercial clinical cases, as of today we have completed approximately 40 clinical cases."  Mr. Slump noted that Atraverse "already ha[s] initial revenue, about 80% gross profit margin."

**ANSWER:** To the extent Paragraph 14 states legal conclusions, no response is required.  To the extent a response is required, Atraverse admits that it received clearance from FDA to sell a medical device in the U.S. under the trade name "HOTWIRE™" in May 2024.  Atraverse admits that Atraverse's CEO, John Slump, presented at the LSI Europe conference in September 2024 in Sintra, Portugal.  To the extent a further response is required, Atraverse lacks sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 14 and, on that basis, denies them.

15.    As set forth below and in the claim charts attached hereto as Exhibits B and D, Atraverse's HOTWIRE™ device infringes at least one claim of each of the Asserted Patents.

**ANSWER:** Denied.

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 11,998,238

16.    Boston Scientific re-alleges each of the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Atraverse incorporates by reference its responses to each of the preceding paragraphs of the Complaint.

17.    Upon information and belief, Atraverse has directly infringed one or more claims of the '238 Patent, including at least claim 1, literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale, and/or selling its HOTWIRE™.  Attached to this Complaint as Exhibit B is a detailed claim chart, the entirety of which is incorporated herein by reference, explaining how the HOTWIRE™ meets each claim limitation of at least claim 1 of the '238 Patent.

**ANSWER:** Denied.

18.    Upon information and belief, Atraverse has indirectly infringed at least claim 1 of the '238 Patent by, among other things, actively inducing the direct infringement of others, such as physicians using the HOTWIRE™.  For example, Atraverse instructs and encourages physicians on the use of the HOTWIRE™ for transseptal procedures.  See Ex. B at 9 (Mr. Slump explaining, "instead of mechanically advancing your way across the septum, you just press the button, use a little blast of radiofrequency energy and/or electrocautery if you will, denature the tissue and gently advance across.").  On information and belief, Atraverse knew that the acts it induced constitute patent infringement.

**ANSWER:** Denied.

19.    Upon information and belief, Atraverse has been aware of the '238 Patent since at least its issuance on June 4, 2024.  For example, Mr. Slump explained during his LSI Europe presentation in September 2024: "Importantly, it's worth noting that there was a first mover in this space, Baylis Medical."  The accompanying slide from Atraverse's presentation also acknowledged: "Baylis acquired by Boston Scientific."  Further, Atraverse cited to the parent of the '238 Patent, U.S. Patent No. 10,368,911, during prosecution of its own U.S. Patent No. 12,343,074 in March 2024.  At least as of the time of trial, Atraverse will have known and intended that its continued actions would actively induce and contribute to actual infringement of at least claim 1 of the '238 Patent.

**ANSWER:** To the extent Paragraph 19 states legal conclusions, no response is required.  To the extent a response is required, Atraverse admits that Atraverse's CEO, John Slump, presented at the LSI Europe conference in September 2024 in Sintra, Portugal.  Atraverse also admits that Atraverse cited to the parent of the '238 Patent, U.S. Patent No. 10,368,911, during prosecution of its own U.S. Patent No. 12,343,074 in March 2024.  All remaining allegations are denied.

20.    Atraverse undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '238 Patent, which has been duly issued by the USPTO and is presumed valid.  Since at least June 4, 2024, Atraverse has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '238 Patent and that the

'238 Patent is valid.  On information and belief, Atraverse could not reasonably or subjectively believe that its actions do not constitute infringement of the '238 Patent, nor could it reasonably or subjectively believe that the patent is invalid.  Despite that, and despite the objectively high likelihood that its actions constitute infringement, Atraverse has continued its infringing activities.  As such, Atraverse has been and continues to willfully infringe the '238 Patent.

**ANSWER:** Denied.

21.    As a result of Atraverse's unlawful infringement of the '238 Patent, Boston Scientific has suffered and will continue to suffer damages.

**ANSWER:** Denied.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 12,433,639

22.    Boston Scientific re-alleges each of the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Atraverse incorporates by reference its responses to each of the preceding paragraphs of the Complaint.

23.    Upon information and belief, Atraverse has directly infringed one or more claims of the '639 Patent, including at least claims 1 and 20, literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale, and/or selling its HOTWIRE™. Attached to this Complaint as Exhibit D is a detailed claim chart, the entirety of which is incorporated herein by reference, explaining how the HOTWIRE™ meets each claim limitation of at least claims 1 and 20 of the '639 Patent.

**ANSWER:** Denied.

24.    Upon information and belief, Atraverse has indirectly infringed at least claims 1 and 20 of the '639 Patent by, among other things, actively inducing the direct infringement of others, such as physicians using the HOTWIRE™. For example, Atraverse instructs and encourages physicians on the use of the HOTWIRE™ for transseptal procedures. *See* Ex. D at 9 (Mr. Slump explaining, "instead of mechanically advancing your way across the septum, you just press the button, use a little blast of radiofrequency energy and/or electrocautery if you will,

denature the tissue and gently advance across."). On information and belief, Atraverse knew that the acts it induced constitute patent infringement.

**ANSWER:** Denied.

25.   Upon information and belief, Atraverse has been aware of the '639 Patent since at least its issuance on October 7, 2025. On August 18, 2025, Boston Scientific filed its initial complaint in this case against Atraverse asserting the '238 Patent, which is the parent of the '639 Patent. Boston Scientific followed its complaint by sending Mr. Slump a cease and desist letter on August 20, 2025, charging Atraverse with infringement of the '238 Patent and informing Atraverse that the HOTWIRE "will also infringe Boston Scientific's forthcoming patent based on the currently allowed claims of the '196 application," which later issued as the '639 Patent. Additionally, Mr. Slump explained during his LSI Europe presentation in September 2024: "Importantly, it's worth noting that there was a first mover in this space, Baylis Medical." The accompanying slide from Atraverse's presentation also acknowledged: "Baylis acquired by Boston Scientific." Further, Atraverse cited to the parent of the Asserted Patents, U.S. Patent No. 10,368,911, during prosecution of its own U.S. Patent No. 12,343,074 in March 2024. At least as of the time of trial, Atraverse will have known and intended that its continued actions would actively induce and contribute to actual infringement of at least claims 1 and 20 of the '639 Patent.

**ANSWER:** To the extent Paragraph 25 states legal conclusions, no response is required.  To the extent a response is required, Atraverse admits that Boston Scientific filed its initial complaint in this case against Atraverse asserting the '238 Patent, which is the parent of the '639 Patent.  Atraverse further admits that Atraverse received a letter on or around August 20, 2025, charging Atraverse with infringement of the '238 Patent and informing Atraverse that the HOTWIRE "will also infringe Boston Scientific's forthcoming patent based on the currently allowed claims of the '196 application," which later issued as the '639 Patent.  Atraverse denies that those allegations have any merit.  All remaining allegations are denied.

95

26.    Atraverse undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '639 Patent, which has been duly issued by the USPTO and is presumed valid. Since at least October 7, 2025, Atraverse has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '639 Patent and that the '639 Patent is valid. On information and belief, Atraverse could not reasonably or subjectively believe that its actions do not constitute infringement of the '639 Patent, nor could it reasonably or subjectively believe that the patent is invalid. Despite that, and despite the objectively high likelihood that its actions constitute infringement, Atraverse has continued its infringing activities. As such, Atraverse has been and continues to willfully infringe the '639 Patent.

**ANSWER:** Denied.

27.    As a result of Atraverse's unlawful infringement of the '639 Patent, Boston Scientific has suffered and will continue to suffer damages.

**ANSWER:** Denied.

## ANSWER TO PLAINTIFFS' REQUEST FOR RELIEF

28.    Boston Scientific's Prayer for Relief does not require a response.  To the extent a response is required, Atraverse denies that Boston Scientific is entitled to any relief whatsoever, whether as sought in its Prayer for Relief, or otherwise, in connection with this civil action.

## JURY TRIAL DEMAND

29.    Atraverse acknowledges that, pursuant to Federal Rule of Civil Procedure 38(b), Boston Scientific demands a trial by jury of all issues that are or may become triable.

96

**ATRAVERSE'S DEFENSES**

30.    Further answering the Complaint, Atraverse asserts the following defenses without assuming any burden that they would not otherwise have, including without admitting or acknowledging that they bear the burden of proof as to any of them.  All defenses are pled in the alternative and do not constitute an admission of liability or that Boston Scientific is somehow entitled to any relief whatsoever. Atraverse reserves the right to amend its answer with additional defenses as further information is obtained.

**FIRST DEFENSE**
**(NON-INFRINGEMENT OF THE '238 Patent)**

31.    Atraverse does not directly or indirectly infringe, either literally or under the doctrine of equivalents, and at all relevant times to this action has not infringed, any valid and enforceable claim of the '238 Patent.

**SECOND DEFENSE**
**(NON-INFRINGEMENT OF THE '639 Patent)**

32.    Atraverse does not directly or indirectly infringe, either literally or under the doctrine of equivalents, and at all relevant times to this action has not infringed, any valid and enforceable claim of the '639 Patent.

97

## THIRD DEFENSE
### (INVALIDITY OF THE '238 Patent)

33.     The '238 Patent is invalid for failure to satisfy one or more conditions and requirements of patentability set forth in 35 U.S.C. §§ 101 et seq.  Each and every claim of the '238 Patent is invalid for failing to meet one or more of the requisite conditions of patentability specified in 35 U.S.C. §§ 101, 102, 103 and/or 112, or under any of the judicially created doctrines of invalidity.

## FOURTH DEFENSE
### (INVALIDITY OF THE '639 Patent)

34.     The '639 Patent is invalid for failure to satisfy one or more conditions and requirements of patentability set forth in 35 U.S.C. §§ 101 et seq.  Each and every claim of the '639 Patent is invalid for failing to meet one or more of the requisite conditions of patentability specified in 35 U.S.C. §§ 101, 102, 103 and/or 112, or under any of the judicially created doctrines of invalidity.

## FIFTH DEFENSE
### (INEQUITABLE CONDUCT)

35.     Atraverse repeats and incorporates by reference the allegations in its Counterclaims related to Inequitable Conduct.  The Asserted Patents are unenforceable at least due to inequitable conduct before the Patent Office, for the same reasons as listed in Atraverse's Counterclaims, including at least failing to disclose of material prior art references, burying relevant prior art through

unreasonably large prior art disclosures, failure to make material prior art references known to the Examiner, and material omission by failure to respond, all with the intent to deceive the Patent Office.

36.    To resolve the legal and factual questions raised by Boston Scientific and to afford relief from the uncertainty and controversy which Boston Scientific accusations have precipitated, Atraverse is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201 that the claims of the Asserted Patents are unenforceable.

## SIXTH DEFENSE
### (NO WILLFUL INFRINGEMENT)

37.    Atraverse has not willfully infringed, and does not willfully infringe, any valid claim of the Asserted Patents.

## SEVENTH DEFENSE
### (FAILURE TO STATE A CLAIM)

38.    Boston Scientific's Complaint fails to state a claim on which relief can be granted.

## EIGHTH DEFENSE
### (NO EXCEPTIONAL CASE)

39.    Atraverse's actions in defending this case or otherwise do not give rise to an exceptional case in Plaintiffs' favor under 35 U.S.C. § 285.

## NINTH DEFENSE
### (PROSECUTION HISTORY DISCLAIMER AND ESTOPPEL)

40.    Boston Scientific is barred, based on statements, representations, and admissions made during prosecution of the patent applications resulting in the Asserted Patents or related patent applications, from asserting any interpretation of any valid claims of the Asserted Patents that would be broad enough to cover any accused product alleged to infringe the Asserted Patents, either literally or by application of the doctrine of equivalents, or under any theory of infringement.

## TENTH DEFENSE
### (ATTORNEYS' FEES)

41.    Boston Scientific is not entitled to recover attorneys' fees associated with this action, including without limitation under 35 U.S.C. § 285.

## ELEVENTH DEFENSE
### (ADDITIONAL DEFENSES)

42.    Atraverse reserves the right to assert further defenses in the event that discovery indicates such defenses would be appropriate.

## EXCEPTIONAL CASE

43.    This case is an exceptional one, and Atraverse is entitled to and seeks an award of its reasonable attorneys' fees and costs under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117.

100

## DEMAND FOR JURY TRIAL

44.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Atraverse respectfully demands a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

45.     WHEREFORE, Atraverse prays that the Court enter judgment in its favor and against Boston Scientific as follows:

a)      Dismissing the Complaint with prejudice and denying each request for relief made by Boston Scientific therein;

b)      Declaring the Asserted Claims of the Asserted Patents are invalid;

c)      Declaring that Atraverse has not infringed and does not infringe any valid claim Asserted Claim, if any, of the Asserted Patents, either directly or indirectly, literally or under the doctrine of equivalents;

d)      Granting Atraverse judgment in its favor on Boston Scientific's claims;

e)      Granting Atraverse judgment in its favor on its counterclaims;

f)      Declaring this case exceptional in favor of Atraverse pursuant to 35 U.S.C. § 285 and/or 15 U.S.C. § 1117;

g)      Awarding Atraverse all damages to which Atraverse is entitled under applicable law, including up to treble damages pursuant to 15 U.S.C. § 1117(a);

101

h)    Declaring that Atraverse is the prevailing party and awarding Atraverse its costs and attorneys' fees, as provided by applicable law;

i)    Ordering that Boston Scientific, and its officers, agents, employees, affiliates, representatives, and all persons acting in concert with them who receive actual notice of the injunction, be preliminarily and permanently enjoined, under 15 U.S.C. § 1116(a) and Rule 65(d), from disseminating, publishing, or otherwise using the Boston Scientific Materials or making, directly or indirectly, any false or misleading statements concerning Atraverse, its products, services, or commercial activities; requiring Boston Scientific to (i) cease dissemination of, retract, remove from all channels within its control, and deliver up for destruction all materials containing such statements; (ii) use best efforts to request removal of such materials from third-party platforms and repositories not within its control; and (iii) issue corrective statements, in form and content approved by the Court, to customers, distributors, sales representatives, healthcare providers, payors, and other relevant third parties to whom the false or misleading statements were disseminated, and to undertake reasonable corrective measures to mitigate ongoing confusion; and further directing Boston Scientific to

102

file within thirty (30) days of entry of the injunction a sworn report detailing its compliance with the foregoing; and

j)   Awarding Atraverse such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*
_____

OF COUNSEL:

W. Chad Shear (#5711)
Geoffrey D. Biegler  (*pro hac vice*)
Reem Gerais (*pro hac vice*)
Annie Beveridge (*pro hac vice*)
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 490-6000
cshear@cooley.com
gbiegler@cooley.com
rgerais@cooley.com
abeveridge@cooley.com

Elizabeth M. Flanagan (#5891)
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
bflanagan@cooley.com

November 10, 2025

Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant Atraverse Medical, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 10, 2025, upon the following in the manner indicated:

| | |
|---|---|
| Douglas Edward McCann<br>AnnaMartina Tyreus Hufnal<br>Nitika Gupta Fiorella<br>FISH & RICHARDSON, P.C.<br>222 Delaware Avenue, 17th Floor<br>P.O. Box 1114<br>Wilmington, DE 19899-1114<br>*Attorneys for Plaintiffs* | *VIA ELECTRONIC MAIL* |
| Todd Miller<br>Tyler Train<br>FISH & RICHARDSON P.C.<br>12860 El Camino Real, Suite 400<br>San Diego, CA 92130<br>Attorneys for Plaintiffs | *VIA ELECTRONIC MAIL* |
| Sarah Jack<br>Alexander Rafferty<br>FISH & RICHARDSON P.C.<br>60 South 6th Street, Suite 3200<br>Minneapolis, MN 55402<br>Attorneys for Plaintiffs | *VIA ELECTRONIC MAIL* |
| Meghan Thadani<br>FISH & RICHARDSON P.C.<br>7 Times Square, 20th Floor<br>New York, NY 10036<br>Attorneys for Plaintiffs | *VIA ELECTRONIC MAIL* |

*/s/ Karen Jacobs*

Karen Jacobs (#2881)