# EXHIBIT 1

**Boston Scientific**
*Advancing science for life™*

Q Search    ☰ Menu



## About Boston Scientific

Minimally invasive technologies that add more to patients' lives

## Get to know Boston Scientific

See how the relentless pursuit of innovation leads to life-changing medical solutions.

02:12

## We advance science for life

Boston Scientific innovations help address healthcare's greatest challenges, so patients can experience more of what truly matters: more time, more quality of life and more moments with the people they love.

1/3

01:39

# Our culture

Our work is guided by core values that define the Boston Scientific culture and empower our employees.

**Caring**

**High performance**

**Diversity**

**Meaningful innovation**

**Winning spirit**

**Global collaboration**



### Businesses

Find out how we're innovating across a wide range of medical conditions.

**Explore the businesses**

### Leadership

Meet the team that's dedicated to healthier patients and higher performance.

**Get to know the leadership team**





2/3

## Locations

Explore our locations in 40 countries around the world.

**See our facilities**

## Careers

Advance your career and make a meaningful impact on patients' lives.

**Search jobs**



# Boston Scientific highlights[1]

**53K**

employees worldwide

**44M+**

patients treated each year

**$1.6B**

invested in R&D[2]

**127**

countries with commercial representation

**$16.7B**

in net sales

**~100**  in

new products launched in 2024

**Boston Scientific is dedicated to transforming lives through innovative medical solutions that improve the health of patients around the world.**

1. All figures are 2024 data.
2. Represents GAAP R&D expense per Annual Report on Form 10-K.



3/3

# EXHIBIT 2

Boston Scientific

# Boston Scientific Closes Acquisition of Baylis Medical Company Inc.

MARLBOROUGH, Mass., Feb. 15, 2022 /PRNewswire/ -- Boston Scientific Corporation (NYSE: BSX) today announced the close of its acquisition of Baylis Medical Company Inc., a company that offers advanced transseptal access solutions as well as guidewires, sheaths and dilators used to support catheter-based left-heart procedures.

"The close of this acquisition allows Boston Scientific to integrate the Baylis platforms with our existing electrophysiology and structural heart offerings, further strengthening our position within the highest growth cardiology markets," said Joe Fitzgerald, executive vice president and president, Cardiology, Boston Scientific. "We are now the only company to pair a comprehensive access portfolio with existing left-heart therapies such as left atrial appendage closure and atrial fibrillation ablation, providing physicians with a complete toolbox to treat patients with safety, efficacy and efficiency."

The transaction consists of an upfront payment of $1.75 billion, and is expected to be approximately one cent accretive to adjusted earnings per share in 2022 and increasingly accretive thereafter. On a GAAP basis, the transaction is expected to be less accretive, or dilutive, in 2022 and less dilutive or increasingly accretive, as the case may be, thereafter, due to amortization expense and acquisition-related net charges.

Additional information about this transaction is available on the Events and Presentations section of the Boston Scientific investor relations website.

**About Boston Scientific**
Boston Scientific transforms lives through innovative medical solutions that improve the health of patients around the world. As a global medical technology leader for more than 40 years, we advance science for life by providing a broad range of high performance solutions that address unmet patient needs and reduce the cost of healthcare. For more information, visit www.bostonscientific.com and connect on Twitter and Facebook.

Cautionary Statement Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements may be identified by words like "anticipate," "expect," "project," "believe," "plan," "estimate," "intend" and similar words. These forward-looking statements are based on our beliefs, assumptions and estimates using information available to us at the time and are not intended to be guarantees of future events or performance. These forward-looking statements include, among other things, statements regarding our business plans, clinical trials and product performance and impact. If our underlying assumptions turn out to be incorrect, or if certain risks or uncertainties materialize, actual results could vary materially from the expectations and projections expressed or implied by our forward-looking statements. These factors, in some cases, have affected and in the future (together with other factors) could affect our ability to implement our business strategy and may cause actual results to differ materially from those contemplated by the statements expressed in this press release. As a result, readers are cautioned not to place undue reliance on any of our forward-looking statements.

Factors that may cause such differences include, among other things: future economic, competitive, reimbursement and regulatory conditions; new product introductions; demographic trends; intellectual property; litigation; financial market conditions; and future business decisions made by us and our competitors. All of these factors are difficult or impossible to predict accurately and many of them are beyond our control. For a further list and description of these and other important risks and uncertainties that may affect our future operations, see Part I, Item 1A – Risk Factors in our most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission, which we may update in Part II, Item 1A – Risk Factors in Quarterly Reports on Form 10-Q we have filed or will file hereafter. We disclaim any intention or obligation to publicly update or revise any forward-looking statements to reflect any change in our expectations or in events,

conditions or circumstances on which those expectations may be based, or that may affect the likelihood that actual results will differ from those contained in the forward-looking statements.  This cautionary statement is applicable to all forward-looking statements contained in this document.

CONTACTS:
Angela Mineo
Media Relations
(763) 955-8325 (office)
Angela.mineo@bsci.com

Lauren Tengler
Investor Relations
(508) 683-4479
BSXInvestorRelations@bsci.com


SOURCE Boston Scientific Corporation

---

https://news.bostonscientific.com/2022-02-15-Boston-Scientific-Closes-Acquisition-of-Baylis-Medical-Company-Inc

# EXHIBIT 3

Boston Scientific
*Advancing science for life™*

Q Search          Menu

Healthcare Professionals / Products / Transseptal access devices / **VersaCross™ Access Solution**



    



## VersaCross™ Access Solution

VersaCross Access Solution provides exchangeless access-to-delivery of left heart therapy devices.

**Explore product details**

---

**Request a sales rep**

| Product literature | ⌄ |
|---|---|

| Indications, safety, and warnings | ⌄ |

**Overview**     Clinical data     Technical specifications     Ordering information     Training     Resources



Transseptal reimagined



1/5

Exchangeless solution for access-to-delivery of left heart therapy devices



## How it works



01:45

The VersaCross RF Transseptal Platform includes an insulated RF Wire, reinforced shapeable dilator, and dedicated RFP-100A RF Puncture Generator* for predictable and efficient left heart access, with fewer and lower energy applications required to achieve successful transseptal puncture compared to electrified guidewires or needles.[1,2]

---

## Why choose the VersaCross Access Solution

# Three solutions, one device





**Eliminate exchanges**

Left heart access using a single solution from start to finish

**Access left atrium with precision**

Precision radiofrequency (RF) puncture technology to optimize transseptal location for any anatomy



**Secure effortless delivery**

Instantly gain and maintain access without exchanges

## Know where you are at all times

OMNIviz™ technology enhances visualization on fluoroscopy, ultrasound, and electrical anatomical mapping





## Radiopaque

Visualize your entire solution on fluoroscopy

## Echogenic

Reliably locate your devices on ultrasound to reduce reliance on fluoroscopy



## Mapping

Track and mark RF wire tip position on your mapping system

---

## What's included

The VersaCross Access Solution includes:

- VersaCross RF Wire (j-tip or pigtail)
- Single-use RFP-100A Connector Cable
- VersaCross Transseptal Sheath (8.5F)
- Dilator with TRUform™ shapeable technology

**You can also purchase the VersaCross Transseptal Sheath on its own.**

---

## Required product



## [RFP-100A RF Puncture Generator*](#)

Designed for controlled tissue puncture using radiofrequency energy

---

## Related products



**VersaCross™ Large Access Solution**

---

\* Baylis Medical Company Radiofrequency Puncture Generator RFP-100A. Baylis Medical Company is a wholly owned subsidiary of Boston Scientific Corporation.

† AcQCross™ Transseptal Access System, now rebranded as FlexCath Cross™ Transseptal Solution, Medtronic.

‡ The PASCAL™ Implant is part of the PASCAL Precision™ Transcatheter Valve Repair System.

 

**Boston Scientific is dedicated to transforming lives through innovative medical solutions that improve the health of patients around the world.**

...dicated RF wire versus a mechanical needle with and without electrification in an animal model. J

...nsseptal wires to electrified metal guidewires. J Cardiovasc Electrophysiol. 2022;33(3):371-379.

| Professionals | Patients |
|---|---|
| Medical Specialties | Patients and Caregivers - Support and Resources |
| Reimbursement | All Treatments and Conditions |
| EDUCARE – Medical Education and Training Courses | Patient and Caregiver Support |
| Investigator Sponsored Research | |

| Products | About |
|---|---|
| Products | About Us |
| Customer Support and Services | Corporate Responsibility |
| ImageReady™ - MRI Information | Careers |
| Product Security | |

| Compliance & Ethics | Privacy |
|---|---|
| Compliance and Ethics | Privacy Policy |
| Policy and Advocacy | Consumer Health Data Privacy Policy |
| Labor and Human Rights | Limit the use of my sensitive personal information |
| | Do not sell or share my personal information |

EP-1704406-AC

©2025 Boston Scientific Corporation or its affiliates. All rights reserved.

**Terms of Use**     **Copyright Notice**     **Site Map**

# EXHIBIT 4

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934, or**

**For the fiscal year ended December 31, 2024**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File No. 1-11083**

# BOSTON SCIENTIFIC CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **04-2695240** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **300 Boston Scientific Way**, **Marlborough**, **Massachusetts** | **01752-1234** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

**508 683-4000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, $0.01 par value | BSX | New York Stock Exchange |
| 0.625% Senior Notes due 2027 | BSX27 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
**NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes: ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes: ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes: ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorted period that the registrant was required to submit such files). Yes: ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☑ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes: ☐ No ☑

The aggregate market value of the registrant's common stock held by non-affiliates was approximately $113.1 billion based on the last reported sale price of $77.01 of the registrant's common stock on the New York Stock Exchange on June 30, 2024, the last business day of the registrant's most recently completed second fiscal quarter. (For this computation, the registrant has excluded the market value of all shares of common stock of the registrant reported as beneficially owned by executive officers, and directors of the registrant; such exclusion shall not be deemed to constitute an admission that any such person is an affiliate of the registrant.)

The number of shares outstanding of Common Stock, $0.01 par value per share, as of January 31, 2025 was 1,475,778,104.

Documents Incorporated by Reference

Portions of the registrant's definitive proxy statement to be filed within 120 days of December 31, 2024 with the Securities and Exchange Commission in connection with its 2025 Annual Meeting of Stockholders are incorporated by reference into Part III of this Form 10-K.

**TABLE OF CONTENTS**

PART I                                                                                                                                    3
  ITEM 1.    BUSINESS                                                                                          3
  ITEM 1A.   RISK FACTORS                                                                                     18
  ITEM 1B.   UNRESOLVED STAFF COMMENTS                                                            32
  ITEM 1C.   CYBERSECURITY                                                                                    32
  ITEM 2.    PROPERTIES                                                                                       33
  ITEM 3.    LEGAL PROCEEDINGS                                                                          33
  ITEM 4.    MINE SAFETY DISCLOSURES                                                                34

PART II                                                                                                                                  35
  ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES                                                                                                                              35
  ITEM 6.    RESERVED                                                                                          37
  ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS            38
  ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK                    63
  ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA                                    66
  ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE            123
  ITEM 9A.   CONTROLS AND PROCEDURES                                                                      123
  ITEM 9B.   OTHER INFORMATION                                                                              123
  ITEM 9C.   DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS            124

PART III                                                                                                                                 125
  ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE                        125
  ITEM 11.   EXECUTIVE COMPENSATION                                                                      125
  ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS            125
  ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE            125
  ITEM 14.   PRINCIPAL ACCOUNTANT FEES AND SERVICES                                              125

PART IV                                                                                                                                  126
  ITEM 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES                                          126
  ITEM 16.   FORM 10-K SUMMARY                                                                              133
SIGNATURES                                                                                                                               134

**NOTE N – REVENUE**

We generate revenue primarily from the sale of single-use medical devices and present revenue net of sales taxes within our consolidated statements of operations. Our business structure is organized into five operating segments. The following tables disaggregate our revenue from contracts with customers by business unit and geographic region (in millions). Generally, we allocate revenue from contracts with customers to geographic regions based on the location where the sale originated.

| | | Year Ended December 31, | | | | | | | | |
| | 2024 | | | 2023 | | | 2022 | | |
| **Businesses** | **U.S.** | **Int'l** | **Total** | **U.S.** | **Int'l** | **Total** | **U.S.** | **Int'l** | **Total** |
|---|---|---|---|---|---|---|---|---|---|
| Endoscopy | $ 1,651 | $ 1,036 | $ 2,687 | $ 1,511 | $ 970 | $ 2,482 | 1,341 | $ 880 | $ 2,221 |
| Urology | 1,557 | 643 | 2,200 | 1,369 | 595 | 1,964 | 1,257 | 516 | 1,773 |
| Neuromodulation | 847 | 259 | 1,106 | 736 | 240 | 976 | 715 | 202 | 917 |
| **MedSurg** | **4,054** | **1,939** | **5,993** | **3,617** | **1,805** | **5,422** | **3,312** | **1,599** | **4,911** |
| *Interventional Cardiology Therapies* | 824 | 1,820 | 2,645 | 743 | 1,674 | 2,417 | 744 | 1,485 | 2,228 |
| *Watchman* | 1,371 | 145 | 1,516 | 1,155 | 119 | 1,274 | 915 | 103 | 1,019 |
| *Cardiac Rhythm Management* | 1,403 | 876 | 2,279 | 1,405 | 813 | 2,218 | 1,337 | 763 | 2,100 |
| *Electrophysiology* | 1,256 | 648 | 1,904 | 370 | 430 | 800 | 275 | 310 | 585 |
| Cardiology | 4,855 | 3,490 | 8,344 | 3,673 | 3,036 | 6,709 | 3,271 | 2,662 | 5,932 |
| Peripheral Interventions | 1,301 | 1,109 | 2,410 | 1,135 | 975 | 2,110 | 1,048 | 850 | 1,899 |
| **Cardiovascular** | **6,156** | **4,599** | **10,755** | **4,808** | **4,011** | **8,819** | **4,319** | **3,512** | **7,831** |
| **Other**[1] | — | — | — | — | — | — | — | — | **(60)** |
| **Total Net Sales** | $ 10,210 | $ 6,538 | $ 16,747 | $ 8,425 | $ 5,816 | $ 14,240 | $ 7,632 | $ 5,111 | $ 12,682 |

[1] In 2022, amounts reflect sales reserves established for Italian government payback provisions, which are being disputed in the Italian court system. These amounts were not allocated to our reportable segments or considered by our CODM for resource allocation and decision-making purposes.

Refer to *Note M – Segment Reporting* for information on our reportable segments.

| | Year Ended December 31, | | |
| **Geographic Regions** | **2024** | **2023** | **2022** |
|---|---|---|---|
| U.S. | $ 10,210 | $ 8,425 | $ 7,632 |
| Europe, Middle East and Africa | 3,228 | 2,856 | 2,526 |
| Asia-Pacific | 2,686 | 2,400 | 2,116 |
| Latin America and Canada | 624 | 560 | 469 |
| Other[1] | — | — | (60) |
| **Total Net Sales** | $ 16,747 | $ 14,240 | $ 12,682 |
| | | | |
| Emerging Markets[2] | $ 2,680 | $ 2,310 | $ 1,968 |

[1] In 2022, amounts reflect sales reserves established for Italian government payback provisions, which are being disputed in the Italian court system. These amounts were not allocated to our reportable segments or considered by our CODM for resource allocation and decision-making purposes.

[2] Periodically, we assess our list of Emerging Markets countries, and effective January 1, 2023, modified our list to include all countries except the United States, Western and Central Europe, Japan, Australia, New Zealand and Canada.

Deferred Revenue

Contract liabilities are classified within *Other current liabilities* and *Other long-term liabilities* within our accompanying consolidated balance sheets. Our deferred revenue balance was $635 million as of December 31, 2024 and $577 million as of December 31, 2023. Our contract liabilities are primarily composed of deferred revenue related to the LATITUDE™ Patient Management System within our Cardiology business, for which revenue is recognized over the average service period based on device and patient longevity. Our contract liabilities also include deferred revenue related to the LUX-Dx™ Insertable Cardiac Monitor system, also within our Cardiology business, for which revenue is recognized over the average service period based on

# EXHIBIT 5



Products / **Dedicated RF Transseptal Solutions**



**DEDICATED RF TRANSSEPTAL SOLUTIONS**

# Over 2 million patients treated globally*

## With over a decade of experience in dedicated RF technology, we've redefined transseptal

01:45

The VersaCross™ RF Transseptal Platform was designed to simplify your workflow and improve puncture efficacy.[1] Every VersaCross Solution includes the 3-in-1 VersaCross RF Wire, with an optimized electrode design for precise crossing, and a reinforced dilator with TRUform™ Shapeable Technology to optimize handling and positioning for various anatomies. The RFP-100A RF Puncture Generator** facilitates controlled, targeted transseptal punctures via the delivery of proprietary RF energy waveforms, while OMNIviz™ Technology enhances visualization on fluoroscopy, ultrasound, and electrical anatomical mapping.

**Request a sales rep**

**Overview**    Clinical data    Product portfolio    Resources

1/5

# Sophisticated 3-in-1 RF wire





## Optimized electrode design

The VersaCross RF Wire has been shown to facilitate more consistent site-specific crossing of the interatrial septum, allowing the operator to optimize transseptal puncture location in any anatomy.[2,3,4,5,6] Optimized electrode design and generator settings may improve puncture efficacy, minimize thermal injury, and eliminate embolic coring risk, while the use of electrified guidewires for transseptal puncture has been associated with damage to the guidewire and dilator, as well as risks of thrombus, thermal injury and tissue scaring.[1,7]

**Published evidence**

## Reduced risk of complications associated with exchanges

The 3-in-1 VersaCross RF Wire has been shown to facilitate left heart access and therapy sheath delivery with fewer device exchanges than a mechanical or RF transseptal needle-based workflow by serving as a starter wire, RF puncture device, and exchange guidewire.[8,9,10] As a result, the risk of complications associated with exchanges, such as silent cerebral events, may be reduced.[2,8,9,11,12]

**Published evidence**

# Reinforced transseptal dilator





## TRUform Shapeable Technology

Reinforced with TRUform Shapeable technology, the VersaCross Transseptal Dilator facilitates a familiar handling experience to a needle-based transseptal system and retains your desired curve. Reshape the dilator within your sheath to optimize transseptal assembly positioning for various anatomies.[†,2]

## Smooth dilator-to-sheath transition

The VersaCross Transseptal Dilator was specially designed to provide a minimal, smooth dilator-to-sheath transition for sleek advancement into the left atrium. The smooth transition between VersaCross Connect™ Dilators and compatible therapy delivery sheaths may reduce snagging on the fossa ovalis during crossing.[†]

# Dedicated RF puncture generator





Ex vivo transseptal puncture

## Proprietary RF energy waveforms for targeted punctures

The RFP-100A RF Puncture Generator[**] was designed to create small, targeted transseptal punctures via the delivery of proprietary RF energy waveforms. The generator enables shorter RF activation time, while built-in safety features limit the voltage, current, and power. Use of the RFP-100A RF Puncture Generator[**] with the VersaCross RF Wire has been shown to result in smaller puncture sites and improved transseptal puncture consistency when compared to electrified guidewires or needles.[1,4,7]

**Published evidence**

## Fewer and lower energy applications required

Achieve successful transseptal puncture with fewer and lower energy applications required. In a comparison study, an electrified transseptal needle required 30 W to achieve 91% transseptal puncture success, failing to puncture at 10 W and 20 W, while the VersaCross Access Solution achieved 100% transseptal puncture success with only one energy application of approximately 10 W and zero incidence of tissue coring. Adversely, the electrified needles were associated with tissue charring, larger septal defects and tissue coring in 57% of punctures.[1]

**Published evidence**

# Enhanced visualization with OMNIviz Technology





## Radiopaque

The VersaCross Wire and Dilator are radiopaque so you can visualize your entire solution on fluoroscopy.

## Echogenic

Reliably locate your VersaCross Wire and Dilator on ultrasound to reduce or eliminate fluoroscopy time and radiation exposure.[9,10,13,14]



## Mapping

Connect to the DuoMode™ Cable to track and mark the VersaCross RF Wire's electrode tip on your preferred mapping system.[‡]

* Over two million patients globally have been treated using the VersaCross™ Transseptal Solutions and NRG™ Needles, inclusive of lifetime sales.

** Baylis Medical Company Radiofrequency Puncture Generator RFP-100A. Baylis Medical Company is a wholly owned subsidiary of Boston Scientific Corporation.

† Bench testing or pre-clinical study results may not necessarily be indicative of clinical performance. The testing was performed by or on behalf of Boston Scientific. Data on file.

†† AcQCross™ Transseptal Access System, now rebranded as FlexCath Cross™ Transseptal Solution, Medtronic.

‡ Consult your mapping system's user manual for connectivity and configuration instructions prior to DuoMode Cable use.

‡‡ The PASCAL™ Implant is part of the PASCAL Precision™ Transcatheter Valve Repair System.

§ The VersaCross Connect Transseptal Dilator is for use with a 13F (4.31 mm) ID FARADRIVE™ Steerable Sheath which is 74cm in length, specifically, model: M004PF21M402 (US).

‖ The VersaCross Connect Transseptal Dilator is for use with a 12F (4.09 mm) ID WATCHMAN Access Sheath that is 75 cm in length or the WATCHMAN TruSteer™ Access Sheath that is 67 cm in length, specifically: WATCHMAN Access System [Models: M635TU40060, M635TU10060, M635TU20060]; WATCHMAN TruSeal™ Access System [Models: M635TU70010, M635TU70040, M635TU70020]; WATCHMAN FXD Curve™ Access System [Models: M635TU80010, M635TU80020]; WATCHMAN TruSteer Access System [Model: M635TU90050].

† The VersaCross Connect Transseptal Dilator is for use with a 12F (4.04 mm) ID POLARSHEATH Steerable Sheath that is 68 cm in length, specifically, model: M004CRBS3150 (US).

All trademarks are the property of their respective owners.

**References:**

1. Knight BP, Wasserlauf J, Al-Dujaili S, Al-Ahmad A. Comparison of transseptal puncture using a dedicated RF wire versus a mechanical needle with and without electrification in an animal model. J Cardiovasc Electrophysiol. 2023. doi:10.1111/jce.16111

2. Sayah N, Simon F, Garceau P, et al. Initial clinical experience with VersaCross transseptal system for transcatheter mitral valve repair. Catheter Cardiovasc Interv. 2021;97(6):1230-1234. doi:10.1002/ccd.29365

3. Doshi SN, Savvoulidis P, Mechery A, et al. VersaCross Transseptal System for Mitral Transcatheter Edge-To-Edge Repair with the PASCAL Repair Platform. Struct Heart. 2023;In Press.

4. Berggren K, Lampert T, Janardhan AH. Improved left atrial catheterization efficiency and consistency using a novel steerable transseptal puncture sheath [published online ahead of print, 2023 Oct 5]. Indian Pacing Electrophysiol J. 2023;S0972-6292(23)00101-8. doi:10.1016/j.ipej.2023.10.001

5. Andrade JG, Macle L, Bennett MT, et al. Randomized trial of conventional versus radiofrequency needle transseptal puncture for cryoballoon ablation: the CRYO-LATS trial. J Interv Card Electrophysiol. 2022;65(2):481-489. doi:10.1007/s10840-022-01277-y

6. Smelley MP, Shah DP, Weisberg I, et al. Initial experience using a radiofrequency powered transseptal needle. J Cardiovasc Electrophysiol. 2010;21(4):423-427. doi:10.1111/j.1540-8167.2009.01656.x

7. Wasserlauf J, Knight BP. Comparing the safety and effectiveness of dedicated radiofrequency transseptal wires to electrified metal guidewires. J Cardiovasc Electrophysiol. 2022;33(3):371-379. doi:10.1111/jce.15341

8. Inohara T, Gilhofer T, Luong C, Tsang M, Saw J. VersaCross radiofrequency system reduces time to left atrial access versus conventional mechanical needle. J Interv Card Electrophysiol. 2022;63(1):9-12. doi:10.1007/s10840-020-00931-7

9. Dewland TA, Gerstenfeld EP, Moss JD, et al. Randomized Comparison of a Radiofrequency Wire Versus a Radiofrequency Needle System for Transseptal Puncture. JACC Clin Electrophysiol. 2023;9(5):611-619. doi:10.1016/j.jacep.2022.10.017

10. Whitler C, McClellan B, Patel H, et al. Improved left atrial appendage closure procedural efficiency using radiofrequency transseptal wire system [published online ahead of print, 2023 Jan 10]. Catheter Cardiovasc Interv. 2023;10.1002/ccd.30550. doi:10.1002/ccd.30550

11. Deneke T, Nentwich K, Schmitt R, et al. Exchanging Catheters Over a Single Transseptal Sheath During Left Atrial Ablation is Associated with a Higher Risk for Silent Cerebral Events. Indian Pacing Electrophysiol J. 2014;14(5):240-249. Published 2014 Oct 6. doi:10.1016/s0972-6292(16)30795-1

12. Harada M, Motoike Y, Nomura Y, et al. Factors associated with silent cerebral events during atrial fibrillation ablation in patients on uninterrupted oral anticoagulation. J Cardiovasc Electrophysiol. 2020;31(11):2889-2897. doi:10.1111/jce.14716

13. Demo H, Aranda C, Razminia M. Fluoroless left atrial access for radiofrequency and cryoballoon ablations using a novel radiofrequency transseptal wire [published correction appears in J Interv Card Electrophysiol. 2022 Mar 29;:]. J Interv Card Electrophysiol. 2022;64(1):183-190. doi:10.1007/s10840-022-01157-5

14. Salam T, Wilson L, Bohannan S, Morin M. Safety and Effectiveness of a Novel Fluoroless Transseptal Puncture Technique for Lead-free Catheter Ablation: A Case Series. J Innov Card Rhythm Manag. 2020;11(4):4079-4085. Published 2020 Apr 15. doi:10.19102/icrm.2020.110405

**Indications, Safety and Warnings:**

**VersaCross Connect Access Solution for FARADRIVE**

**VersaCross Connect LAAC Access Solution**

**VersaCross Connect Access Solution for POLARSHEATH**

  

**Boston Scientific is dedicated to transforming lives through innovative medical solutions that improve the health of patients around the world.**

# EXHIBIT 6

US011154324B2

(12) **United States Patent**
Davies et al.

(10) **Patent No.:** US 11,154,324 B2
(45) **Date of Patent:** Oct. 26, 2021

(54) **METHODS AND DEVICES FOR PUNCTURING TISSUE**

(71) Applicant: **Baylis Medical Company Inc.**, Montreal (CA)

(72) Inventors: **Gareth Davies**, Toronto (CA); **John Paul Urbanski**, Toronto (CA); **Ferryl Alley**, Burlington (CA); **Bogdan Beca**, Thornhill (CA)

(73) Assignee: **Baylis Medical Company Inc.**, Mississauga (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 109 days.

(21) Appl. No.: **16/445,790**

(22) Filed: **Jun. 19, 2019**

(65) **Prior Publication Data**

US 2019/0298411 A1      Oct. 3, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 14/910,525, filed as application No. PCT/IB2013/060287 on Nov. 20, 2013, now Pat. No. 10,368,911.

(Continued)

(51) **Int. Cl.**
 *A61B 18/14* (2006.01)
 *A61B 17/34* (2006.01)
(Continued)

(52) **U.S. Cl.**
 CPC ...... *A61B 17/3478* (2013.01); *A61B 18/1492* (2013.01); *A61B 90/39* (2016.02);
(Continued)

(58) **Field of Classification Search**
 CPC ............ A61B 18/1492; A61B 17/3478; A61B 2017/00247; A61B 2017/003;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,366,443 A * 11/1994 Eggers ................. A61B 18/149
 128/898
5,680,860 A * 10/1997 Imran ................ A61B 18/1492
 600/374

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0465449 A2 | 1/1992 |
| JP | 1985261465 A | 12/1985 |
| JP | 2007510458 Y2 | 4/2007 |

OTHER PUBLICATIONS

Search Report for corresponding European patent application EP19204215.

(Continued)

*Primary Examiner* — Michael F Peffley
(74) *Attorney, Agent, or Firm* — Glenn Arnold; Vincent Man; Samuel Tekie

(57) **ABSTRACT**

Novel and unique medical devices and associated methods are disclosed, for facilitating efficient and repeatable puncture of a tissue site while allowing vascular access from various access sites of a patient's body. Disclosed medical devices include dilators and wires usable alone or in combination and configured to facilitate tissue access and puncture at various anatomical locations from desired access sites. The medical devices each include one or more sections having sufficient flexibility for accessing the tissue site from the access site while retaining sufficient stiffness to perform one or more additional functions.

**18 Claims, 23 Drawing Sheets**



**US 11,154,324 B2**

Page 2

**Related U.S. Application Data**

(60) Provisional application No. 61/863,579, filed on Aug. 8, 2013, provisional application No. 61/863,265, filed on Aug. 7, 2013.

(51) **Int. Cl.**
| | |
|---|---|
| *A61B 90/00* | (2016.01) |
| *A61B 17/00* | (2006.01) |
| *A61B 17/22* | (2006.01) |
| *A61B 18/00* | (2006.01) |

(52) **U.S. Cl.**
CPC .................. *A61B 2017/003* (2013.01); *A61B 2017/00247* (2013.01); *A61B 2017/22042* (2013.01); *A61B 2017/3488* (2013.01); *A61B 2018/00351* (2013.01); *A61B 2090/3966* (2016.02)

(58) **Field of Classification Search**
CPC .......... A61B 2017/22042; A61B 2017/22044; A61B 2017/3488; A61B 2018/00351; A61B 2018/00363; A61B 2018/00601; A61B 2018/144; A61B 2090/3966; A61B 90/39; A61M 25/0041; A61M 25/09
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,607,520 B2* | 8/2003 | Keane ................ | A61B 18/1492 128/898 |
| 7,165,552 B2* | 1/2007 | Deem ................ | A61B 18/1492 128/898 |
| 7,186,251 B2* | 3/2007 | Malecki ............. | A61B 18/1492 606/213 |
| 7,988,690 B2* | 8/2011 | Chanduszko .... | A61B 17/12186 606/49 |
| 8,021,359 B2* | 9/2011 | Auth .................. | A61B 18/1492 606/28 |
| 2005/0101984 A1 | 5/2005 | Chanduszko | |
| 2009/0093802 A1* | 4/2009 | Kulesa .............. | A61B 18/1492 606/33 |
| 2009/0105654 A1 | 4/2009 | Kurth | |
| 2009/0182281 A1 | 7/2009 | Kurth | |
| 2012/0109079 A1 | 5/2012 | Asleson et al. | |

OTHER PUBLICATIONS

Search Report for corresponding Japanese patent application 2018211611.

\* cited by examiner

Case 1:25-cv-01035-JLH    Document 17-1    Filed 11/10/25    Page 27 of 466 PageID #: 408



Fig. 1

Fig. 1 (i)



Fig. 1A

Fig. 1B



Fig. 1C



Fig. 1D

Fig. 1E

Fig. 2A

Fig. 2B



Fig. 2C



Fig. 3B



Fig. 3A

U.S. Patent          Oct. 26, 2021          Sheet 8 of 23          US 11,154,324 B2



Fig. 3D



Fig.3C



Fig. 3E



Fig. 4

U.S. Patent    Oct. 26, 2021    Sheet 11 of 23    US 11,154,324 B2



Fig. 5a



Fig. 5b

U.S. Patent                Oct. 26, 2021        Sheet 13 of 23              US 11,154,324 B2



Fig. 5c

Fig. 5d



Fig. 5f



Fig. 5e



Fig. 6A



Fig. 6B



Fig. 6C



Fig. 6D



Fig. 7a



Fig. 7b (i)

Fig. 7b



Fig. 7c



Fig. 7e

Fig. 7d



Fig. 7g

Fig. 7f

US 11,154,324 B2

# METHODS AND DEVICES FOR PUNCTURING TISSUE

## TECHNICAL FIELD

The disclosure relates to devices, systems and methods used to gain access to various tissue sites from particular access sites, and in particular to devices and associated methods used to access the left side of a heart via puncturing tissue.

## SUMMARY OF THE DISCLOSURE

Novel and unique medical devices and associated methods are disclosed, for facilitating efficient and repeatable puncture of a tissue site while allowing vascular access from various access sites of a patient's body. Disclosed medical devices include dilators and wires usable alone or in combination and configured to facilitate tissue access and puncture at various anatomical locations from desired access sites. The medical devices each include one or more sections having sufficient flexibility for accessing the tissue site from the access site while retaining sufficient stiffness to perform one or more additional functions.

In one broad aspect, embodiments of the present invention comprise a dilator for use with an ancillary device such as a steerable sheath to access a region of tissue or tissue site within a patient's body, the steerable sheath defining a lumen therethrough for receiving the dilator and having a range of deflection angles, the dilator comprising: a rigid distal end region; and a flexible intermediate region terminating at the distal end region; the dilator being configured such that, when the dilator is inserted into the lumen of the steerable sheath, the location of the flexible intermediate region corresponds to a location of a region of the steerable sheath that is amenable to deflection (also referred to as a "curvature-imparting region" or an "articulating region"); and the rigid distal end region having a rigidity greater than the flexible intermediate region to enable the dilator to advance through tissue.

In the aforementioned embodiments, the dilator is structured such that, during use, the flexible intermediate region of the dilator is configured to provide minimal resistance to deflection so as to allow the deflectable region of the steerable sheath to deflect, thereby allowing the steerable sheath to reach a desired deflection angle from said range of deflection angles, to position the dilator rigid distal end region at a desired location within the region of tissue, allowing the dilator rigid distal end region to facilitate advancement of the dilator there-through.

In a further broad aspect, embodiments of the present invention include a kit comprising: a dilator comprising a flexible intermediate region terminating at a rigid distal end region; and a steerable sheath comprising a deflectable region and defining a lumen for receiving the dilator there-through, the sheath and dilator being configured to co-operate such that, in use, a location of the flexible intermediate region of the dilator within the lumen corresponds to a location of the deflectable region of the sheath, for allowing the steerable sheath to achieve a desired deflection angle to position the dilator distal end region at a desired location within a region of tissue within a patient's body.

In some embodiments, the dilator does not substantially exert a force to assist the sheath in obtaining its desired shape. Furthermore, in some embodiments, the dilator is passive and does not significantly obstruct the range of motion of the sheath. More specifically, the rigidity of the dilator does not prevent the sheath from attaining its desired curvature.

In still a further broad aspect, embodiments of the present invention comprise a sheath assembly comprising: a steerable sheath defining a lumen there-through and defining a sheath distal end; and a dilator comprising a flexible intermediate region terminating at a rigid distal end region, the dilator extending through said lumen with said dilator distal end region extending beyond said sheath distal end.

In an additional broad aspect, embodiments of the invention comprise a medical device for puncturing tissue at a tissue site, the medical device including: an elongate member having a proximal section, a distal section and a rail section between the proximal and distal sections; and an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue; where the rail section is configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site.

In a further broad aspect, embodiments of the present invention include a kit for puncturing tissue at a tissue site, the kit comprising: at least one medical device as described herein; and at least one steerable device for guiding the at least one medical device to the tissue site.

In an additional broad aspect, embodiments of the present invention include a system for puncturing tissue at a tissue site. In some such embodiments, the system comprises: at least one medical device as described hereinbelow; and an electrosurgical generator for coupling to the at least one medical device for delivering energy to puncture the tissue at the tissue site.

In yet another broad aspect, embodiments of the present invention comprise a method of accessing a chamber of a patient's heart using a superior access approach. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator to position the dilator substantially adjacent a tissue; and (c) advancing the dilator through a puncture in the tissue.

In still a further broad aspect, embodiments of the present invention comprise a method of puncturing tissue within a patient's heart using a superior access approach. Tn some such embodiments, the method comprises the steps of: (a) advancing a steerable sheath through a patient's vasculature, from a superior approach access site into a heart of a patient, the steerable sheath defining a lumen and containing a medical device, as described herein, within the lumen; (b) articulating the steerable sheath to guide a distal portion of the medical device for positioning an active tip of the medical device substantially adjacent a tissue within the heart; and (c) delivering energy through the active tip to create a puncture in the tissue and advancing the medical device therethrough.

In an additional broad aspect, embodiments of the present invention comprise a method of providing access to a left side of the heart, and providing support for advancing instrumentation thereto, using a superior access approach, the method comprising the steps of: (a) advancing a medical device as described herein, from an access site superior to a heart, through a superior vena cava and into a right atrium of the heart; (b) articulating a steerable sheath to position an active tip of the medical device substantially adjacent a

US 11,154,324 B2

**3**

septum of the heart; (c) delivering energy through the active tip of the medical device to puncture the septum; (d) advancing the medical device into a left atrium of the heart; and (e) advancing a dilator, as described herein, over the medical device for dilating the puncture.

In a further broad aspect, embodiments of the present invention include a method of using a steerable sheath assembly comprising the steps of: advancing a steerable sheath through vasculature to a region of tissue within a patient's body, the steerable sheath comprising a deflectable region; positioning a dilator within a lumen of the steerable sheath, said dilator comprising a flexible intermediate region and a rigid distal end region; actuating the steerable sheath to deflect the steerable sheath to a desired deflection angle enabling positioning of the dilator distal end region at a desired tissue site within said region of tissue; and advancing a portion of the dilator including the distal end region through said desired tissue site, said dilator distal end region having sufficient rigidity to enable advancement of the distal end region through the desired tissue site for dilating said tissue site; wherein said sheath and said dilator cooperate such that said flexible intermediate region of the dilator is aligned with said deflectable region of the steerable sheath prior to actuating the steerable sheath, and wherein said flexible intermediate region of the dilator is configured to allow the deflectable region of the steerable sheath to deflect.

### BRIEF DESCRIPTION OF THE DRAWINGS

In order that the invention may be readily understood, embodiments of the invention are illustrated by way of examples in the accompanying drawings, in which:

FIG. **1** is an illustration of a system in accordance with an embodiment of the present invention and FIG. **1**(*i*) is a magnified view of a portion of FIG. **1**;

FIG. **1A** is an illustration of a dilator in accordance an embodiment of the present invention;

FIG. **1B** is an illustration of a steerable sheath for use with a dilator in accordance with an embodiment of the present invention;

FIG. **1C** is an illustration of a dilator in accordance with an alternate embodiment of the present invention;

FIGS. **1D-1E** illustrate a dilator within a steerable sheath in accordance with various embodiments of the present invention;

FIGS. **2A-2C** illustrate a dilator in use with a steerable sheath, in accordance with various embodiments of the present invention;

FIGS. **3A-3E** illustrate various distal tip configurations of a dilator in accordance with an embodiment of the present invention;

FIG. **4** illustrates an embodiment of a steerable sheath suitable for use with an embodiment of a dilator of the present invention;

FIG. **5A** is a side view of an embodiment of a medical device, for example a multi-function guidewire of the present invention;

FIG. **5B** includes side views of an internal metal wire of a multi-function guidewire in a straight configuration and a corresponding coiled configuration;

FIG. **5C** is an exterior view of detail "A" of FIG. **5A**;

FIG. **5D** is a cross section view of detail "A" of FIG. **5A**;

FIG. **5E** is an exterior view of the distal section straight portion of a curved distal section;

FIG. **5F** is a cut-away view of section A-A of FIG. **5D**;

**4**

FIGS. **6A-6D** illustrate a wire and dilator used in conjunction with a steerable sheath, in accordance with embodiments of the present invention; and

FIGS. **7A-7G** illustrate a further embodiment of a method of using a system in accordance with embodiments of the present invention to perform a transseptal puncture from a superior access approach.

### DETAILED DESCRIPTION

In some medical applications, it may be desirable to reach a desired target tissue site within a region of tissue within a patient's body in order for example, to provide access to a particular cavity or space. In some applications access to the cavity or space may be provided through a puncture that is created within the desired tissue site. In order to initially reach the desired tissue site within the region of tissue, access may be provided into and/or through vasculature using a guidewire. A sheath and dilator assembly may then be advanced over the guide wire, and the sheath may be used to guide the dilator, as well as any other devices positioned through the assembly, to the desired target tissue site.

In some such applications, a particular access point into the patient's vasculature may be dictated by, for example, treatment requirements or anatomical considerations. For example, patients with occluded or stenosed vasculature may require an alternate access point. In addition, procedures such as lead placement dictate particular access points in order to allow implanted leads to be connected to a battery.

Thus, in certain procedures, a particular tissue puncture site is required while the access point into the vasculature is also restricted. In some such procedures, delivering treatment tools and assemblies from the access point to the tissue puncture site is difficult and/or may require many device exchanges due, for example, to the curvature and/or tortuosity of the vasculature within that region of the body.

For example, in some such applications, a very sharp or high curve or trajectory may be required to access the desired tissue site. In order to reach the desired tissue site, fixed curve sheaths or steerable sheaths may be utilized but both have drawbacks when used with current accessory devices.

In particular, where a fixed curve sheath is used, the fixed curve sheath may not be able to retain its curvature. This may be a result of a relatively stiff dilator and/or other devices inserted within the fixed curve sheath. As such, the sheath may not be able to position the dilator and/or any other device at the desired target tissue site.

In situations where a steerable sheath is utilized, upon actuation of the steerable sheath (in some such embodiments), the stiffness of the dilator, and/or any additional devices inserted through the steerable sheath, may limit or prevent the steerable sheath from reaching the intended or required curvature, thus preventing the steerable sheath from positioning the dilator and/or other devices at the target tissue site. Furthermore, stiffness of the dilator may result in breakage of the actuation mechanism of the steerable sheath upon actuation of the steerable sheath. In one particular example, the pull wires may separate from a distal joint within the sheath or may separate from the proximal lever or actuation mechanism of the steerable sheath. In other examples, the stiffness of the dilator may result in breakage of the pull wires upon actuation of the steerable sheath.

In addition, as mentioned above, puncturing certain tissue sites while being limited to particular access points also often requires exchanging devices multiple times, with each

US 11,154,324 B2

| 5 | 6 |

device performing a specific function during the course of the procedure. For example, current methods of accessing a heart chamber on the left side of the heart using a superior access approach require multiple device exchanges resulting in relatively inefficient and lengthy procedures. In a further example of procedural inefficiencies, existing techniques for gaining trannseptal access for delivery of cardiac leads generally require that the transseptal puncture and lead delivery be performed using different access points, necessitating, for example, either transferring the lead, or trying to re-locate the puncture site, and then installing the lead within the heart.

The present inventors have conceived and reduced to practice novel and unique devices (which may be referred to as "hybrid devices" in the description below) and associated methods to facilitate efficient and repeatable puncture of a plurality of tissue sites while allowing vascular access from various access points on a patient's body. These devices include dilators and wires, for example guidewires, usable alone or in combination to facilitate this tissue access and puncture at various anatomical locations from desired access points.

For example, the present inventors have conceived and reduced to practice a flexible dilator that is usable in combination with an ancillary medical device (which may include a catheter, a fixed curve sheath or a steerable sheath), the dilator being designed and configured so that it does not substantially affect the curvature of the ancillary device.

Embodiments of a dilator of the present invention are sufficiently flexible to allow the ancillary device to guide and position the dilator and/or additional devices in a wide array of patient anatomies. Embodiments of the dilator accomplish this function by providing a flexible intermediate region having reduced stiffness. The location of the flexible region, when the dilator is inserted into/through the ancillary device, corresponds to a region of the ancillary device that is amenable to deflection or has a particular shape or curve, whereby the flexibility of the dilator at that location helps to ensure that the dilator does not substantially impair the ability of the ancillary device to retain, maintain or reach its intended shape or curvature. In some embodiments, the dilator, while being sufficiently flexible along the intermediate region, has sufficient stiffness along a distal end region to allow the dilator to be tracked or advanced across tissue for dilating a perforation or puncture at the desired target tissue site.

Relatedly, the present inventors have discovered, and reduced to practice, guidewire-based medical devices for puncturing a septum of the heart and for providing reliable and robust guidewire rail support across the puncture even when accessing the heart via veins superior to the heart (such as the subclavian veins). Such medical devices are sufficiently flexible to be directed towards the appropriate puncture site from the desired access point, yet are also stiff enough to support insertion of additional devices thereupon. In addition, embodiments of such devices include features for maintaining the medical device in position across the puncture to maintain patency of the puncture and to ensure continued access to tissue across the puncture.

Furthermore, the present inventors have conceived and reduced to practice methods of treatment that employ one or more novel devices for puncturing tissue sites utilizing defined access points and for performing multiple steps of the procedure to thereby reduce and/or minimize the number of device exchanges. In addition to improving efficiencies

and reducing treatment procedure time, these methods allow for transseptal puncture and lead delivery to be performed using a single access point.

With specific reference now to the drawings in detail, it is stressed that the particulars shown are by way of example and for purposes of illustrative discussion of certain embodiments of the present invention only. Before explaining at least one embodiment of the invention in detail, it is to be understood that the invention is not limited in its application to the details of construction and the arrangement of the components set forth in the following description or illustrated in the drawings. The invention is capable of other embodiments or of being practiced or carried out in various ways. Also, it is to be understood that the phraseology and terminology employed herein is for the purpose of description and should not be regarded as limiting.

Systems

FIG. **1** is an illustration of a system **50** that incorporates embodiments of devices of the present invention and that may be utilized during the course of an inventive procedure as described further hereinbelow. As illustrated, system **50** includes a steerable device such as steerable sheath **300** with dilator **100** inserted therein, and wire **200** inserted into dilator **100**. Steerable sheath **300** and dilator **100** each defines a respective lumen through which devices may be inserted, and may therefore be referred to as "tubular members". Although a steerable sheath is discussed throughout this application, it will be evident to one of skill in the art that other steerable devices or articulating components may be used. For ease of explaining the fundamental principles of the invention, "Steerable Sheath" will be used throughout the specification as an example of a steerable or articulating device. Alternatively, in some embodiments, a fixed curve sheath may be utilized in place of an articulating sheath, depending on the access point and tissue puncture site chosen by a user.

Wire **200** is connected to a generator **500** by connector **502**. Steerable sheath **300** includes a steerable sheath handle **302**. In some embodiments, the steerable sheath is unidirectional i.e. it allows deflection in a single direction. In other embodiments, a bi-directional sheath may be used. In the exemplary applications disclosed below, an 8.5 French steerable sheath with a 40 cm usable length is typically used; procedures for larger patients may use a sheath with a 45 cm usable length or other lengths as may be appropriate. FIG. 1(*i*) shows an expanded view of a portion of heart **400** illustrating a distal portion of steerable sheath **300**, distal tip **106** of dilator **100**, and wire **200**, which may be a radiofrequency puncture wire.

Dilators

In accordance with one embodiment of the present invention, as shown in FIG. **1**A, a flexible dilator **100** is disclosed for use with a steerable sheath **300** (shown in FIG. 1B) to access a region of tissue within a patient's body. The steerable sheath **300** has a range of deflection angles and can achieve a range of curvatures upon actuation. Referring again to FIG. **1**A, the dilator **100** comprises a dilator hub **102** that is coupled to an elongate member **120** that comprises regions of varying flexibility including an intermediate region **100**b that terminates in a distal end region **100**a. In accordance with an embodiment of the present invention, the intermediate region **100**b is a substantially flexible or soft section that provides minimal resistance to deflection and is operable to be deflected under guidance to allow the dilator **100** to reach a desired site within a region of tissue within the patient's body to facilitate advancement of the distal end region **100**a there-through. The flexible interme-

US 11,154,324 B2

7

diate region **100***b* allows the dilator **100** to conform to the curvature of the steerable sheath **300** that is achieved through actuation of the steerable sheath **300**. Thus, in some embodiments, as outlined herein, the flexible intermediate region **100***b* does not inhibit the range of motion of the steerable sheath **300**.

Additionally, the elongate member **120** of the dilator **100** further comprises a distal end region **100***a* that is formed distally adjacent to the flexible intermediate region **100***b*, such that the flexible intermediate region **100***b* continues distally until (and terminates at) a proximal boundary or edge of the distal end region **100***a*. In other words the distal end region **100***a* extends proximally from the distal edge of the dilator **100** until a distal edge of the flexible intermediate region **100***b*. The distal end region **100***a* has a stiffness or rigidity that is greater than the flexible intermediate region **100***b* to facilitate advancement of the dilator **100** through the tissue once the dilator **100** has been positioned at the desired tissue site, such as a desired puncture site. The stiff or substantially rigid distal end region **100***a* provides enhanced pushability and may prevent deformation thereof during advancement of the distal end region **100***a* through the tissue (for example over a guide-wire or a puncturing device), for example at the puncture site in order to dilate the puncture site.

In one particular example, the elongate member **120** and the hub **102** may be formed, for example using techniques as may generally be known in the art, such as molding techniques. In some embodiments, the distal end region **100***a* is formed from a rigid polymer, and the intermediate region **100***b* is formed from a flexible polymer. In one particular embodiment, the rigid distal end region **100***a* is formed from High Density Polyethylene (HDPE) and the flexible or soft intermediate region **100***b* is formed from Low Density Polyethylene (LDPE). In some embodiments, the flexible intermediate region **100***b* may be formed from a material that exhibits sufficient flexibility to enable the flexible intermediate region **100***b* to conform to the curvature of a steerable sheath **300** and substantially does not impair, limit or inhibit the ability of the steerable sheath **300** to reach its intended curvature. Additionally, the rigid distal end region **100***a* is formed from a material that exhibits sufficient rigidity that to enable the rigid distal end region **100***a* to be advanced through a tissue site such as through a puncture site within a region of tissue. Thus, dilator **100** can be understood to be a hybrid device in that it is sufficiently flexible to be guided to the tissue site yet maintains sufficient rigidity to be advanced through the tissue site.

As outlined previously, in accordance with an embodiment of the present invention, a dilator **100** is provided that is usable with a steerable sheath **300** to access a region of tissue within a patient's body. The steerable sheath **300** may be of the type shown in FIG. **1B** comprising an articulating portion or deflectable region **200***b* that is amenable to deflection upon actuation of a steerable actuation mechanism for example such as a knob of a handle **302**. During use, the dilator **100** is inserted within the steerable sheath **300** for use therewith such that a location or position of the flexible intermediate region **100***b* of the dilator **100** corresponds to the articulating portion or deflectable region **200***b* of the steerable sheath. This enables the steerable sheath **300** to reach its allowable range of curvatures or deflection (as shown and discussed later with reference to FIGS. **2A-2C**), upon actuation, as minimal resistance is introduced by the dilator **100**. In other words, the flexible intermediate region **100***b* of the dilator does not impart rigidity to the steerable sheath **300** as the dilator **100** is being steered by the steerable

8

sheath **300**. This enables the steerable sheath **300** to position the distal end region **100***a* of the dilator **100** at a desired target location within a region of tissue such as at a desired puncture location or site to enable the distal end region **100***a* to subsequently advance there-through for example to dilate the puncture site.

In one particular embodiment, with reference to FIG. **1A**, dilator **100** further comprises a proximal region **100***c* that forms a part of elongate member **120** of dilator **100**. The proximal region **100***c* extends proximally from the flexible intermediate region **100***b*. More specifically, the proximal region **100***c* extends proximally from a proximal boundary of the flexible intermediate region **100***b* and may extend until the hub **102**. In some embodiments the proximal region **100***c* may also be formed from a flexible material and exhibits flexibility. Alternatively, in other embodiments, as shown in FIG. **1C**, the flexible intermediate region **100***b* may extend along the proximal region **100***c* and may include the proximal region **100***c*. In some such embodiments, the flexible intermediate region **100***b* may have varying regions of flexibility. In some examples, a proximal region **100***c* is provided that is flexible as this may be desirable in certain applications. In some examples, flexibility of the dilator **100** in the proximal region **100***c* may lead to buckling observed in segment **112** of the proximal region **100***c* of the dilator **100** as the dilator is inserted into the steerable sheath **300**, as shown in FIG. **1D**. In some such embodiments, it may be desirable to provide stiffness or rigidity to the device proximal region **100***c* in order to make the dilator **100** less susceptible to buckling.

Therefore, in some embodiments as shown in FIG. **1E**, a dilator **100** is provided where the proximal region **100***c* has a rigidity that is greater than that of the flexible intermediate region **100***b*. In some embodiments, the rigid proximal region **100***c* is formed from a material that exhibits sufficient rigidity to enable the rigid proximal **100***c* to be advanced through the steerable sheath **300** substantially without buckling or deforming. The rigidity of the dilator **100** in the proximal region **100***c* reduces the likelihood of the dilator bending or deforming as it is being inserted into the steerable sheath **300** during a procedure. In some embodiments, the distal end region **100***a* and the proximal region **100***c* have substantially the same rigidity. In a particular embodiment, the rigid distal end region **100***a* and the proximal region **100***c* are formed from a rigid polymer and the flexible intermediate region is formed from a flexible polymer. In one example, the rigid distal end region **100***a* and the proximal region **100***c* comprise substantially the same stiffness. In other embodiments, the rigidity of the rigid distal end region **100***a* and the proximal region **100***c* may differ. In one particular embodiment, the rigid distal end region **100***a* and the proximal region **100***c* are formed from High Density Polyethylene (HDPE) having a stiffness that is equal to about 0.8 GPa, whereas, the flexible intermediate region **100***b* is formed from Low Density Polyethylene (LDPE) having a stiffness of about 0.3 GPa. In other embodiments, the flexible and rigid regions of the dilator maybe formed from PEBAX® with different durometers of PEBAX® being used for the respective flexible and rigid regions.

In some embodiments, the dilator **100** has a usable length (i.e. the length of the elongate member **120**) that is between about 60 cm to about 100 cm. More specifically, in one example, the dilator has a usable length of between about 67 cm and 68 cm. In a specific example of this, the dilator has a usable length of about 67.6 cm. In another example, the

US 11,154,324 B2

9 10

dilator has a usable length of between about 70 cm to about 71 cm. In a specific example of this, the dilator has a usable length of about 70.6 cm.

In some such embodiments, the flexible intermediate region 100*b* has a length of between about 7 cm to about 15 cm. In one particular example, the flexible intermediate region has a length of about 15 cm.

In some embodiments, the distal end region 100*a* has a length of between about 0.4 cm to about 4.0 cm. In a specific embodiment, the distal end region 100*a* has a length of about 0.5 cm to about 1 cm. In a particular example of this, the distal end region 100*a* has a length of between about 0.6 cm to about 0.7 cm. In a specific example, the distal end region has a length equal to about 0.7 cm. In some embodiments, the rigid distal end region 100*a* has a length of between about 2.5% to about 60% of the length of the flexible intermediate region.

In some embodiments, the rigid proximal section 100*c* may have a length of between about 41 cm to about 92 cm. In one particular embodiment, the proximal end section 100*c* has a length of about 51 to about 52 cm. In a specific example of this, the proximal end section has a length of about 51.9 cm.

With reference now to FIGS. 2A-2C, various embodiments of a steerable sheath 300 are shown with the dilator 100 inserted there-through. In some embodiments, once the dilator 100 has been inserted through the steerable sheath 300, the dilator 100 extends by a distance, for example about 3 cm, distally beyond the distal end or tip of the steerable sheath 300 (more specifically, beyond the distal end/edge of the steerable sheath 300). In some embodiments, the dilator extends by between about 2 cm to about 4 cm beyond the distal edge of the steerable sheath 300. In some embodiments, the steerable sheath 300 has a usable length 201 that is between about 45 cm to about 71 cm.

In one specific example, with reference now to FIG. 2A, the steerable sheath 300 is an 8.5 French unidirectional steerable sheath, that has a deflectable region or articulating portion 200*b* operable to adopt a curve S having an angle of about 180 degrees and a having a radius of curvature of about 8.5 mm. Alternatively, in the example as shown in FIG. 2B, the deflectable region or articulating portion 200*b* of the steerable sheath 300 is operable to adopt a curve M having a radius of curvature of about 11 mm. In another example as shown in FIG. 2C, the deflectable region or articulating portion 200*b* of the steerable sheath 300 is operable to adopt a curve L, having a radius of curvature equal to about 25 mm.

With reference again to FIGS. 2A to 2C, in some embodiments, the usable length 201 of the steerable sheath 300 is equal to about 45 cm. In some such embodiments, the steerable sheath 300 is used with an 8.5 French flexible dilator 100 having a usable length of about 67 cm and comprising a flexible intermediate region 100*b* with a length of about 15 cm. Thus, in accordance with various embodiments of the present invention, a steerable sheath 300 and dilator 100 are provided that work in conjunction with each other, with the steerable sheath 300 and dilator 100 having suitable lengths and sizes (including inner and outer diameters) that are usable to reach a desired region of tissue when inserted through the vasculature.

With reference now to FIGS. 3A-3D, various dilator distal tip configurations are shown with alternative distal end regions 100*a*. In the particular example shown in FIG. 3A, the dilator 100 comprises a taper 122 along a distal end of the dilator 100, forming a tapered distal tip 106. In the example shown, the distal end region 100*a* extends partially along the length of the taper 122 and as such forms a part of the taper 122. In a specific example of this, the taper 122 has a length of about 1cm. In one such example the rigid distal end region 100*a* has a length of about 0.7 cm. In another such example, the rigid distal end region 100*a* has a length of between about 0.3 cm to about 0.5 cm.

FIGS. 3B, 3C and 3D illustrate alternative configurations for the tapered distal tip 106. As shown in FIG. 3B, in some embodiments, the distal end region 100*a* may extend along the entire length of the taper 122. In a further example of this, as shown in FIGS. 3C and 3D, the distal end region 100*a* may additionally extend further proximally along the elongate member 120, beyond the taper 122.

FIG. 3C illustrates a dilator 100 that is an 8.5 French dilator that tapers down to an outer diameter (OD) of about 0.046" (about 1.2 mm) and an inner diameter (ID) of about 0.036" (about 0.9 mm), along the tapered distal tip 106. In a specific example, the taper 122 has a length of about 2 cm. In some such embodiments, the distal end region 100*a* has a length of about 3 cm and is formed from HDPE, whereas the flexible intermediate region is formed from LDPE. The dilator 100 may be formed from a re-flow of the two polymers, HDPE and LDPE, in a glass die via lap joining.

Additionally, FIG. 3D illustrates a dilator 100 that has a distal tip 106 that comprises a double taper configuration. In one specific example, the dilator 100 is an 8.5 French dilator that tapers down to about 5.6 French along a first tapered region R1, with the first tapered region R1 having a length of about 1 cm. The dilator 100 then tapers from about 5.6 French to an outer diameter (OD) of about 0.046" and an inner diameter (ID) of about 0.036", along a second tapered region R2, with the second tapered region have a length of about 1 cm. In one specific example, the distance between the first and second tapered regions R1 and R2 is also equal to about 1 cm. In one such example, the distal end region has a length of about 4 cm. The dual taper configuration may provide greater feedback during dilation and may allow the user to feel the tactile feedback (in the form of a pop) associated with each of the first and second tapered regions R1 and R2. The dual taper configuration may be formed in a similar manner to above, using a glass tipping die via lap joining.

In some embodiments, the dual taper distal tip configuration shown in FIG. 3D may require less force to advance it through a tissue site (for example, through a puncture within a region of tissue) than a single taper distal tip configuration, as shown FIGS. 3B and 3C. Furthermore, in some examples, a longer taper length (as shown and discussed with respect to FIG. 3C) may require less force to be advanced through tissue than a shorter taper length (as shown in FIG. 3A). The longer taper provides a lower slope and hence a smoother transition. Additionally, the longer taper length may prevent high mechanical resistance when the dilator is advanced through a puncture site and may prevent the dilator from slipping away from the puncture site. Additionally, in examples where the dilator is used to dilate a puncture within a septum of the heart (where access is provided through the right atrium and an RF wire is used to create the puncture as described further below), the longer taper length may prevent the RF wire from being pulled hack into the right atrium of the heart and losing the puncture site and thus may help prevent the need to create a second puncture.

Furthermore, in some embodiments, the dilator 100 comprises a straight dilator that substantially lacks a curvature. In other words, the dilator 100 has a substantially straight configuration along each of the rigid proximal region 100*c*,

US 11,154,324 B2

**11**

the flexible intermediate flexible portion **100***b* and the rigid distal end region **100***a*. During use, the straight dilator **100** does not impart a curvature to the steerable sheath **300** to enable the steerable sheath **300** to reach its desired curvature upon actuation. This allows the steerable sheath **300** to position the distal end region **100***a* at a desired target location, for example at a desired puncture site to enable the distal end region **100***a* to advance there-through to dilate a puncture once it has been formed. Therefore, the straight dilator **100** does not interfere with or affect the intended curvature of the steerable sheath **300** and thus does not inhibit the desired range of motion of the steerable sheath **300**. In accordance with an embodiment of the present invention, the dilator **100** comprises both a straight configuration and a flexible or soft intermediate region **100***b*, and the combination provides a synergistic or combined effect preventing the dilator **100** from inhibiting the range of movement of the articulating portion or deflectable region **200***b* of the steerable sheath **300**. This may allow the steerable sheath **300** to guide the dilator **100** to access a region of tissue within a patient's body such as for example an area of the heart.

In a specific example, as shown in FIG. **3**E, a dilator **100** is provided that is an 8.5 French dilator. Along the proximal region **100***c* and flexible intermediate region **100***b* (not including the taper **122**), the dilator has an outer diameter (OD) that is equal to about 0.111"+/−0.002" and an inner diameter (ID) that is equal to about 0.058"+/−0.002", that tapers down along the tapered distal tip **106** to an outer diameter of about 0.044"+/−0.001" and an inner diameter of about 0.036"+/−0.001" at the distal boundary or edge of the distal tip **106**. This allows the dilator **100** to be compatible with a 0.035" OD guide-wire. Furthermore, the taper **122** along the tapered distal tip **106** has a length of about 1 cm and the rigid distal end region **100***a* has a length of about 0.7 cm. In one such example, the dilator **100** has a usable length of about 67.6 cm, with the flexible intermediate region **100***b* having a length of about 15 cm, with the rigid proximal region **100***c* having a length of about 51.9 cm. In one particular embodiment, the rigid distal end region **100***a* and the proximal region **100***c* are formed from High Density Polyethylene (HDPE) having a stiffness of 0.8 GPa, whereas, the flexible intermediate region **100***b* is formed from Low Density Polyethylene (LDPE) having a stiffness of about 0.3 GPa. In the example described herein, the dilator **100** comprises varying regions of flexibility (i.e. flexible and rigid regions), and since the dilator **100** comprises a fairly constant OD and ID, the behavior or various regions, in terms of rigidity, is governed by the stiffness of the materials used.

In embodiments described herein, the flexural rigidity value of the dilator **100** is the product of Young's modulus E (in Pa) [also known as the flexural modulus) which indicates stiffness of a material, and the second moment of area (or area moment of inertia I) (in $m^4$), having SI units of $Pa \cdot m^4$ which also equals $N \cdot m^2$. The area moment of inertia I may be calculated from the values of the inner diameter (ID) and the outer diameter (OD) by a person skilled in the art using the formula $[I=\pi/64(OD^4-ID^4)]$. In one particular example discussed herein, the flexural rigidity value is calculated to be 0.0023 $N \cdot m^2$ for the flexible intermediate region **100***b* comprising LDPE and 0.00086 $N \cdot m^2$ for the rigid proximal region **100***c* comprising HDPE. In some embodiments, the ID of the dilator **100** along the flexible intermediate region **100***b* and the rigid distal end **100***a* (not including the taper), ranges from between about 0.056" to about 0.06". In some such embodiments, the OD of the

**12**

dilator **100** along the flexible intermediate region **100***b* and the rigid distal end **100***a* (not including the taper), ranges from between about 0.109" to about 0.113". In some embodiments, the flexible intermediate region **100***b* comprising LDPF, has a rigidity that ranges from between about 0.00030 $N \cdot m^2$ to about 0.0014 $N \cdot m^2$, and the rigid distal end region **100***a* comprising HDPE has a rigidity that ranges from between about 0.0015 $N \cdot m^2$ to about 0.0046 $N \cdot m^2$.

In one particular example, the dilator **100** is usable with a steerable sheath **300** that is an 8.5 French unidirectional steerable sheath, as shown in FIG. **2**A, that has a deflectable region or articulating portion **200***b* that is operable to deflect with a curve S having an angle of about 180 degrees and with a radius of curvature of about 8.5 mm. The steerable sheath **300** has a length equal to about 45 cm. In one particular example, the steerable sheath **300** may be a SUREFLEX™ Steerable Sheath sold by Baylis Medical Company Inc., as shown in FIG. **4**. The steerable sheath **300** comprises a metal wire braid comprising a High Tensile **304***v* Stainless Steel 0.002"×0.006" with a polymer jacket disposed thereon, and an inner PINE liner. The polymer jacket comprises sections of PEBAX and Nylon with varying durometers (D) and lengths. The deflectable portion of the steerable sheath **300** is indicated by reference number **200***b*.

In one such embodiment, a steerable sheath assembly is described with the dilator **100** being inserted within the steerable sheath **300**. In a particular example of this, the steerable sheath **300** is actuated to reach an angle of about 90 degrees. In one such example, the actual observed deflection of the steerable sheath **300** is equal to about 80 degrees. Thus, the steerable sheath **300** is able to reach about 88.8% of its intended curvature. As such the dilator **100** allows the steerable sheath **300** to substantially reach its intended curvature. Conversely, unlike the embodiments of the present invention, when a rigid HDPE dilator with similar dimensions is used (i.e. a dilator with similar ID and OD that comprises entirely of HDPE) the steerable sheath **300** is only able to reach a 45 degree curvature which is about half of the intended curvature.

In an additional example, the steerable sheath **300** is actuated to reach a deflection angle of about 180 degrees, however, an actual deflection equal to about 140 degrees is observed. Thus, the steerable sheath **300** is able to reach 77.8% of its intended curvature. Contrary to this, when the steerable sheath **300** is used with a rigid HDPE dilator, the steerable sheath **300** is only able to reach a 90 degree curvature.

In still an additional example, the steerable sheath **300** is actuated to reach a deflection angle of about 250 degrees with the actual observed deflection being equal to about 180 degrees. Thus, the steerable sheath is able to reach about 72% of its intended curvature. On the other hand, when steerable sheath **300** is used with a rigid HDPE dilator, the steerable sheath **300** is only able to reach a curvature of about 110 degrees.

As such, in the examples outlined above, the flexible intermediate region **100***b* of dilator **100**, in accordance with an embodiment of the present invention, substantially does not inhibit the range of motion of the steerable sheath **300**, allowing the steerable sheath **300** to reach its intended shape or curvature in order to access a desired tissue site within a region of tissue within a patient's body. Thus, in some embodiments the dilator **100** allows the steerable sheath to reach a curvature that is equal to at least about 70% of its intended curvature. In other embodiments the dilator **100**

US 11,154,324 B2

13

allows the steerable sheath to reach a curvature that is equal to greater than about 50% of the intended curvature.

In one particular embodiment, the dilator **100** is usable with an ancillary device such that it allows the ancillary device to maintain or reach its intended shape or curvature in order to access a desired tissue site within a region of tissue within a patient's body. The dilator **100** may be of the type described herein above, that comprises a rigid distal end region **100**a and a flexible intermediate region **100**b terminating at the distal end region **100**a, with the rigid distal end region **100**a having a rigidity greater than the flexible intermediate region **100**b to enable the dilator **100** to advance through tissue. The dilator **100** is configured for use in conjunction with the ancillary device such that during use, the flexible intermediate region **100**b corresponds to a region of the ancillary device that is functional for imparting or providing a curvature. In one particular example, the dilator **100** is advanced over or through the ancillary device such that such that during use the flexible intermediate region **100**b of the dilator **100** does not affect the region of the ancillary device that is functional for imparting a curvature, allowing the ancillary device to substantially maintain or reach its intended position or shape in order to position the dilator rigid distal end region **100**a at a desired location within the region of tissue.

In one such example, the ancillary device comprises a steerable device such as a sheath, catheter or guide-wire that is steerable, where the ancillary device is functional for imparting a curvature by actuation of the ancillary device. When in use in conjunction with the dilator **100**, the flexible intermediate region **100**b of the dilator does not inhibit or prevent the ancillary device from reaching its intended curvature upon actuation to position the dilator distal end region **100**a at a desired location.

Alternatively in some embodiments, the ancillary device comprises a fixed curve device such as a fixed curve sheath that has a preformed curve. Similar to embodiments discussed previously herein, the fixed curve sheath is usable with the dilator **100** and during use the flexible intermediate region **100**b of the dilator **100** does not affect the preformed curvature of the sheath, thus allowing the sheath to position the rigid distal end **100**a of the dilator **100** at the desired location within the region of tissue. Furthermore, the use of the dilator **100**, in accordance with an embodiment of the present invention, may prevent the need for over curving the sheath in anticipation of a substantial decrease in curvature of the sheath once the dilator **100** there-through.

In one such example, a fixed curve sheath is described with the dilator **100** being inserted therein. The fixed curve sheath has a pre-formed curve with an angle of about 40 degrees. Once the dilator **100** is positioned through the fixed curve sheath, the curvature of the sheath is observed to be about 32 degrees. Thus, the fixed curve sheath is able to maintain its curvature at about 80% of the intended curvature. As such the dilator **100** allows the fixed curve sheath to substantially maintain its intended curvature. Contrary to this, if a rigid HDPE dilator is utilized, unlike embodiments of the present invention (as described previously herein above), the curvature of the fixed curve sheath is reduced to about 22.5 degrees.

Similarly in another example, a fixed curve sheath is described that has a pre-formed curvature with an angle of about 135 degrees. Once a dilator **100**, is inserted through the sheath in accordance with an embodiment of the present invention, the observed angle of curvature of the fixed curve sheath, is equal to about 112 degrees. Thus, the fixed curve sheath **300** is able to maintain a curvature that is equal to

14

about 77.8% of its intended curvature. Contrary to this, if a rigid HDPE dilator is utilized, unlike embodiments of the present invention, the curvature of the fixed curve sheath is reduced to about 78 degrees. Thus, in some such embodiments, the fixed curve sheath is able to maintain an angle of curvature that is greater than about 60% of its intended curvature. In other embodiments, the fixed curve sheath is able to maintain an angle of curvature that is equal to at least about 75% of its intended curvature.

As outlined above, in some embodiments described herein above, the dilator **100** comprises varying regions of flexibility (i.e. rigid and flexible regions) to define a hybrid medical device. Since the dilator **100** comprises a fairly constant OD and ID and thus fairly constant wall thickness along its length, the behavior of the various regions, in terms of rigidity, is governed by the stiffness of the materials used. For example, the higher the stiffness of a material, the greater the rigidity, and the lower the stiffness of the material the lower the rigidity. Alternatively, in other embodiments, a single material may be used to form the dilator where the varying regions of flexiblity are provided by varying the wall thickness along the respective regions. For example, an HDPE dilator may be provided with a relatively thin wall thickness along the flexible intermediate region and a relatively thicker wall thickness along the distal end region, in order to provide a dilator with the functionality described previously hereinabove.

Puncture Devices

In accordance with further embodiments of the present invention, as described hereinabove, FIGS. **5**A-**5**F illustrate embodiments of a medical device operable to be guided to a tissue site to puncture tissue and to function as a rail for installing devices thereupon. Such embodiments provide efficiencies to medical procedures in which they are utilized as they perform multiple functions and thereby reduce the amount of device exchanges that need to be performed. The "hybrid" medical devices described herein further facilitate the access and puncture of a tissue site upon insertion at a particular access site on a patient's body, as described hereinabove.

With reference to FIG. **5**A, an embodiment of a medical device, referred to herein as multi-function guidewire **200**, is shown. Multi-function guidewire **200** includes an elongate member which comprises a proximal section **206** which is typically curved, a rail section **204**, and a distal section **202** which is also typically curved. Multi-function guidewire **200** is sufficiently flexible to enable access to heart tissue, such as a septum, from, for example, an inferior approach or a superior approach. Thus, multi-function guidewire **200** allows access to a particular tissue site from one of several vascular access sites. While certain aspects and features of the multi-function guidewire **200** will be presently described with reference to one specific application, namely creating a puncture in a heart septum, it will be understood by those of skill in the art that the medical device described herein is usable in various applications and its utility is not limited to this particular procedure.

An active tip **208** (shown in detail in FIG. **5**E) at the distal end of the distal section **202** is operable to deliver energy for puncturing tissue such as a heart septum to create a puncture site through which distal section **202** and the distal part of rail section **204** can be advanced, for example to enter the left atrium. Once advanced through the puncture site, distal section **202** is biased to form a coil for anchoring multi-function guidewire **200** beyond the puncture site. Typically, when distal section **202** is advanced out of a dilator and beyond the septum to curl up into a coil in the left atrium,

US 11,154,324 B2

| 15 | 16 |

the distal end of the rail section will have been advanced into the left atrium i.e. in order for the distal section to form a coil, rail section **204** is typically advanced into the left atrium to define a rail thereto. In some embodiments, particularly for use in accessing the left atrium, the distal section **202** is sized such that when it forms a coil in the left atrium, the coil will not be accidentally advanced into openings adjacent the left atrium, such as a left pulmonary vein or a mitral valve. Once the guidewire is anchored, rail section **204** functions as a substantially stiff rail for supporting the installation of one or more tubular members thereupon and for advancing devices into the heart. In typical embodiments, rail section **204** includes a metal wire **212** (FIG. **5**B) which is fabricated of spring tempered steel. In some embodiments, for example when accessing the heart from a superior approach, the rail is sufficiently flexible to bend about 180° and yet maintains sufficient rigidity to function as a rail for advancing devices thereover. Additionally, the flexibility of rail section **204** enables it to be maneuvered (for example, by a steerable sheath) to access a tissue site. Thus, as described with respect to dilator **100** above, a medical device such as multi-function guidewire **200** can be understood to be a "hybrid" device, having sufficient flexibility to be positioned at a tissue site from a particular access site, while being sufficiently rigid to function as a rail for installation of other devices thereupon.

In some embodiments of the multi-function guidewire **200**, rail section **204** has a length of about 700 mm to about 1750 mm to enable access to the tissue site. In some embodiments, the rail section has a length of between about 1200 and 1300 mm, more particularly about 1240 mm. Typically, as shown in FIG. **5**B, the rail section has a constant diameter in maximum rail portion **234** and tapers distally in tapered rail portion **236**. In some examples, the rail section (including metal wire **12** and insulation **214**, described further hereinbelow) has an outer diameter of about 0.86 mm (0.034 inches) at its proximal end (i.e. at maximum rail portion **234**) and about 0.71 mm at its distal end (i.e. at the distal end of tapered rail portion **236**). In some such embodiments, the diameter of the guidewire elongate member is constant throughout maximum rail portion **234**. In some embodiments, the upper limit for the outer diameter of the proximal end of the rail section (including metal wire **12** and insulation **214**) is about 1.1 mm and the lower limit of the outer diameter of the distal end of rail section **204** (distal end of tapered rail portion **236**) is about 0.6 mm. In some alternative embodiments, the outer diameter tapers in maximum rail portion **234**.

The proximal section **206** is biased to a coiled configuration for improved handing of the medical device, for example to avoid interfering with users of the device such as doctors, nurses and other medical personnel. In some embodiments, the proximal section is biased to assume a spiral-shaped coil, while in other embodiments; it is biased to assume a constant diameter coil (i.e. the diameter across the entire coil is substantially constant). In some embodiments, proximal section **206** has a length of about 150 to about 600 mm. In one specific example, proximal section has a length of about 500 mm.

For ease of illustration of the primary sections of multi-function guidewire **200**, these sections are shown in FIG. **5**B, as follows: the lower part of the figure shows the wire **212** of guidewire **200** in a typical configuration in use, with both distal section **202** and proximal section **206** adopting a coil shape, while the upper portion of the figure shows the wire **212** in a straight configuration. The divisions between the different sections of multi-function guide-wire **200** are shown by construction lines between the top and bottom drawings, with the exception of the two end parts, proximal section straight portion **215** and distal section straight portion **216**.

Referring to the straight configuration wire shown in the upper part of FIG. **5**B, proximal section **206** includes proximal section straight portion **215** and proximal section curved portion **232**. Typically, wire **212** has a constant diameter in proximal section **206**. Transition portion **222** is located between proximal section **206** and rail section **204**. The diameter of wire **212** increases distally through transition portion **222**. Referring to the coiled configuration of wire **212**, shown in the lower part of FIG. **5**B, proximal section straight portion **215** is shown at the bottom of the coil formed by proximal section **206**. The proximal end of straight portion **215** includes an exposed portion **212**a of electrically conductive wire **212**.

Rail section **204** includes maximum (or 'constant-diameter') rail portion **234** and tapered rail portion **236**. Typically, maximum rail portion **234** has a constant diameter along its length which generally corresponds to the largest diameter of the wire. In some embodiments, the diameter of wire **212** tapers distally through tapered rail portion **236**.

Distal section **202** is distal of rail section **204** and includes distal section curved portion **226** and distal section straight portion **216**. Distal section straight portion **216** is shown, in the lower portion of FIG. **5**B, inside of the coil formed by distal section **202**.

Typically, wire **212** is comprised of spring tempered stainless steel.

In some embodiments, wire **212** of the rail section has an outer diameter of about 0.64 mm (more specifically, 0.6 mm) at maximum rail portion **234** and at a proximal end of the tapered rail portion **236** (i.e. the diameter is constant in maximum rail portion **234**); and an outer diameter of about 0.5 mm at a distal end of tapered rail portion **236** of the rail section **204**. More broadly, embodiments of the wire **212** of the rail section have an outer diameter ranging from about 0.89 mm and to about 0.36 mm, or about 0.9 mm to about 0.3 mm, with the diameter of wire **212** typically being constant in maximum rail portion **234**. In alternative embodiments, the outer diameter tapers in maximum rail portion **234**.

In some embodiments, the proximal end of rail section **204** (i.e. the proximal end of maximum rail portion **234**) of wire **212** has a stiffness of 2119 N/m or less. In some embodiments, the distal end of tapered rail portion **236** has a stiffness of 118 N/m or more. Typically, the stiffness is constant throughout the length of maximum rail **234**, but it may decrease distally in alternative embodiments. In one example, the proximal end of rail section **204** (the proximal end of maximum rail portion **234**) has a stiffness of about 550+/−5 N/m, more specifically 552 N/m, and the distal end of tapered rail **236** has a stiffness of about 200+/−5 N/m, more specifically 204 N/m, to enable the rail section to be bendable by at least 180 degrees and to function as a rail for supporting installation of one or more tubular members thereupon. In another embodiment, the rail section has a stiffness of between about 100 N/m to about 600 N/m. It should be noted that the stiffness values noted herein are derived using a 3-point bend test over a 50 mm span, as would be understood to those of skill in the art.

US 11,154,324 B2

17

For ease of understanding, a table of correspondence is included for converting certain of the stiffness measurements included herein to normalized flexural rigidity:

| Wire diameter (mm) | Stiffness in three point bending over span of 50 mm (N/m) | Flexural rigidity (N * m^2) |
|---|---|---|
| 0.635 | 552 | 1.4E−3 |
| 0.5 | 204 | 5.3E−4 |
| 0.89 | 2119 | 5.5E−3 |
| 0.43 | 118 | 3.1E−4 |
| 0.157 | 2.1 | 5.4E−6 |
| 0.127 | 0.88 | 2.0E−6 |

The diameter of wire **212** (and thereby multi-function guide-wire **200**) decreases distally along distal section curved portion **226** of the distal section, and alternately decreases and increases distally in distal section straight portion **216** (explained below, with reference to FIG. **5**F).

In typical embodiments, a layer of electrical insulation **214** (FIG. **5**D) covers electrically conductive wire **212**, with the exception of active tip **208** at the distal end of multi-function guide-wire **200** and an electrically exposed portion **212***a* at the proximal end of the guidewire, both of which remain electrically exposed. Exposed portion **212***a* is part of proximal section straight portion **215** and is operable to be electrically connected to an electrosurgical generator. Proximal section straight portion **215** facilitates loading/installation of over-the-wire devices (e.g. tubular members) onto the multi-function guidewire.

FIG. **5**C is an exterior view of detail "A" of FIG. **5**A showing distal section **202**. The distal section **202** includes a distal section straight portion **216** which is distal of a distal section curved portion **226**. Distal section straight portion includes active tip **208**. In some embodiments, a length of distal section **202** is about 30 mm to about 150+/−10 mm. In some embodiments, a length of the distal section is about 125 mm.

Distal section **202** is configured such that when it is advanced through a puncture site in tissue, such as cardiac structures, it assumes a coiled configuration whereby the active tip **208** is directed away from the tissue, and is positioned at a predetermined distanced from electrically insulated portions of distal section **202**. Distal section straight portion **216** of distal section **202** advances forward along a substantially straight path (the "axis of advancement") immediately after puncturing tissue and prevents the guidewire from immediately curling back on itself in order to potentially deliver energy a second time to the tissue site. When distal section straight portion **216** has been completely advanced out of a lumen (for example, the lumen of a dilator), distal section curved portion **226** is configured such that, upon deployment of distal section **202** from a confined state (inside the lumen) along an axis of advancement, active tip **208** curves away from the axis of advancement. For example, after puncturing a septum, the configuration of distal section **202** during and after deployment (FIG. **5**C) acts to prevent the electrode (active tip **208**) from directly contacting tissue on the left side of the heart, and from contacting the distal section curved portion **226** of the guidewire. Positioning the active tip **208** at a distance from distal section curved portion **226** helps to ensure that the guidewire will not be damaged if energy is delivered through active tip **208** once the coil configuration has been achieved.

The configuration of a coiled distal section **202** is shown in FIGS. **5**A, **5**C and **5**D, which illustrate examples of an approximately 630° generally spiral-shaped curve (also

18

known as a double pigtail curve). Distal section **202** (FIG. **5**C) has an inner curve diameter d**1** associated with an inner region of the 630° spiral-shaped curve and an outer curve diameter d**2** associated with an outer region of the curve. Distal curves of some alternative embodiments range from about 270° to about 630°, with a specific alternative embodiment having a 270° curve (a single pigtail curve). Other alternative embodiments have curves of about 360° and about 450°. Yet other alternative embodiments have distal section **202** curves of less than 270°.

In some embodiments of the multi-function guidewire, inner curve diameter d**1** is about 6 mm to about 30 mm, and in some embodiments is about 10 mm. In some embodiments of the multi-function guidewire, outer curve diameter d**2** is about 20 to about 40 mm, and in some specific embodiments is about 22 mm.

As previously mentioned and, distal section **202** is configured such that active tip **208** does not contact distal section curved portion **226**. **31**. FIG. **5**C illustrates an example of a distal curved section in a coiled configuration in which active tip **208** is spaced a pre-determined distance away from distal section curved portion **226**. In the illustrated embodiment, active tip **208** is orthogonal (at a 90° angle) to the point along distal section curved portion **226** to which it is closest. In some embodiments, the distance of the active tip **208** from the insulated portion of the distal section **202** to which it is orthogonal (i.e. closest to) ranges from about 0.8 mm to about 4 mm. In some embodiments, the pre-determined distance of the active tip from an insulated portion of the distal section which it is closest to, is about 2.8 mm.

The pre-determined distance of the active tip from the distal section curved portion **226** of distal section **202** can also be measured relative to the diameter of the active tip. Using this method of measurement, in some embodiments the pre-determined distance of the active tip from an insulated portion of the distal section is equivalent to about 1 to about 5 times a diameter of the active tip, and in a specific embodiment is equivalent to about 4.6 times a diameter of the active tip.

Distal section **202** is substantially atraumatic. It includes a rounded electrode (active tip **208**) for puncturing, not a sharp tip such as used for mechanical puncturing. Furthermore, distal section **202** is substantially flexible (i.e. floppy) so as to avoid exertion of traumatic forces on tissue (i.e. it acts as an atraumatic bumper) and distal section **202** (with the exception of the rounded electrode) is covered with a smooth layer insulation **214** (which may be anti-thrombogenic). In embodiments of the present invention, distal section **202** does not contain any sharp edges or rough surfaces.

FIG. **5**D is a cross section view of distal section **202** indicated by detail "A" in FIG. **5**A. Distal section **202** includes wire **212** with electrical insulation **214** thereupon, marker **210**, distal section straight portion **216**, and active tip **208** at the furthermost distal tip of the wire. Marker **210** surrounds a distal segment of wire **212** and electrical insulation **214** covers marker **210**. Typically, active tip **208** is an electrode operable to deliver electrical energy for puncturing tissue, and is radiopaque, whereby it also functions as a visibility marker under medical imaging. In some embodiments, active tip **208** is formed by welding together a radiopaque marker band with the distal end of wire **212** to form a rounded electrode which is devoid of the layer of electrical insulation. Marker coil **210** may also be radiopaque and may comprise a helical coil surrounding

US 11,154,324 B2

19

wire **212**. Marker coil **210** helps align the active tip with target tissue (e.g. a fossa ovalis) during tissue access and puncture procedures.

The outer layer of electrical insulation **214** covers wire **212** and marker **210**. In typical embodiments, electrical insulation layer **214** is comprised of PTFE (Polytetrafluoroethylene) heat shrink. When multi-function guidewire **200** is advanced through tissue, the friction of the tissue on insulation layer **214** creates a force that could possibly cause the insulation to slide proximally relative to wire **212**, but as illustrated more clearly in FIG. **5**F, electrical insulation layer **214** extends distal of the helical coil **210**, whereby the helical coil/marker helps to secure the layer of electrical insulation to the multi-function guidewire. Typically, marker coil **210** is welded, glued or otherwise suitably coupled to wire **212**. In some embodiments, the insulation layer has a smooth outer surface to reduce the risk of thrombosis, and in some examples is antithrombogenic.

The stiffness of distal section **202** enables it to provide anchorage to prevent multi-functional guidewire **200** from inadvertently slipping out to a position proximal of a puncture site. The stiffness of distal section curved portion **226** decreases distally (i.e. it "tapers"). In some embodiments of the multi-function guidewire, the proximal end of distal section curved portion **226** has a stiffness about 550+/−10 N/m or less, and the stiffness decreases distally, without abrupt changes, such that the distal end of distal section curved portion **226** has a stiffness of about 1+/−0.5 N/m or greater, more specifically 0.88 N/m. In one example, a distal section curved portion **226** of the distal section has a stiffness of about 200 N/m at its proximal end and a stiffness of about 2.0 N/m, or more specifically 2.1 N/m, at its distal end.

In some embodiments, the stiffness of multi-function guidewire is mostly provided by wire **212**, with electrical insulation **214** and marker **210** providing negligible stiffness relative to the wire. As known to one skilled in the art, the stiffness of multi-function guidewire **200** is related to (or a function of) the diameter of wire **212**. In some embodiments of the multi-function guidewire **200**, the wire **212** at the proximal end of the distal section curved portion **226** has an outer diameter of about 0.64 mm or less. In some examples, the wire at the distal end of distal section curved portion has an outer diameter of about 0.13 mm or more. In one example, the wire **212** of the distal section curved portion tapers distally from a proximal end outer diameter of about 0.5 mm to a distal end outer diameter of about 0.16 mm.

In typical embodiments, the elasticity and stiffness of distal section **202** make it possible for the multi-function guidewire to align with a curved lumen of a device, such as a dilator, containing the multi-function guidewire (i.e. to conform to a shape of a tubular member while positioned within a lumen of the tubular member). Marker **210** aids in positioning the distal end of the multi-function guidewire **200**, in particular, positioning active tip **208** before, during and after puncturing, and also in positioning devices that are advanced over the guidewire, such as pacemaker leads, thereby increasing the safety and efficacy of related medical procedures.

In some embodiments, marker/coil **210** is comprised of platinum and tungsten, and in one embodiment is comprised of platinum with about 8% tungsten. In most embodiments, the helical coil extends proximally from the active tip along a curve of about 180° to about 630°, and in one example along a curve of about 270°. Typically, the helical coil has length of about 15 to about 100 mm, and in one example has length of about 30 mm.

20

In some embodiments, the outer diameter of multi-purpose guidewire **200** (including wire **212**, insulation layer **214** and coil **210**, as applicable) at a proximal end of the distal section curved portion is about 0.86 mm or less, and a distal end of the distal section curved portion has an outer diameter which is about 0.59 mm or more. In one example, the outer diameter of the proximal end of distal section curved portion is about 0.72 mm and the outer diameter at the distal end of the distal section curved portion is about 0.59 mm.

FIG. **5**E illustrates an exterior view of distal section straight portion **216**. As shown in FIG. **5**C, distal section straight portion **216** is distal of distal section curved portion **226**. The distal section straight portion prevents distal section **202** from curving immediately upon exiting a lumen, for example, the lumen of a dilator. In some embodiments, distal section straight portion **216** has a larger diameter than a distal end of the distal section curved portion **226**. In most embodiments, distal section straight portion has a length of about 3 to about 10 mm, and in one example distal section straight portion has a length of about 6.5 mm.

FIG. **5**F shows a cross-sectional view of distal section straight portion **216** along the line A-A from FIG. **5**E. FIG. **5**F includes: distal section straight portion **216**, the distal end **228** of distal section curved portion **226**, wire **212**, minimum diameter portion **230**, constant diameter portion **224**, and active tip **208**.

Distal section straight portion **216** includes constant diameter portion **224**, which is a part of wire **212**, and which typically has an outer diameter ranging from about 0.13 mm to about 0.65 mm. In one particular example, the diameter at the constant diameter portion **224** is about 0.25 mm. The outer diameter of the constant diameter portion **224** is the largest diameter of wire **212** within the distal section straight portion **216**. Wire **212** is has a larger diameter adjacent active tip **208** in order to withstand the heat produced by active tip **208** without being damaged.

In some embodiments, the diameter of wire **212** at the minimum diameter portion **230** is the smallest diameter of wire **212** within distal section straight portion **216**, and is also the smallest diameter of wire **212** of the entire multi-function guidewire **200**. The diameter of wire **212** at minimum diameter portion **230** typically ranges from about 0.13 mm to about 0.64 mm, and in one example is about 0.16 mm, and is proximal of the constant diameter portion. The outer diameter of wire **212** increases distally from minimum diameter portion **230** to constant diameter portion **224**, i.e. wire **212** flares out distally (or has a reverse taper).

As previously described, active tip **208** is used for delivering energy, for example for puncturing tissue. In some embodiments, active tip **208** is comprised of platinum and iridium, and in one embodiment is comprised of platinum with 10% iridium. Typically, active tip is dome-shaped. In some embodiments of the multi-function guidewire, the active tip **208** has a diameter ranging from about 0.4 to about 0.7 mm, and in one example has a diameter of about 0.6 mm. Typically, active tip **208** has a length ranging from about 0.75 mm to about 1.5 mm, and in one embodiment has a length of about 0.8 mm.

Referring back to FIG. **5**B, proximal section **206** includes proximal section curved portion **232** and proximal section straight portion **215**, which includes exposed portion **212***a* of wire **212**.

While proximal section **206** is typically biased to a coiled configuration, it is also flexible which allows it to be uncoiled. Typically, wire **212** has a constant diameter throughout the proximal section **206**, with typical embodi-

US 11,154,324 B2

21

ments of the wire at proximal section curved portion **232** having an outer diameter ranging from about 0.13 min to about 0.64 mm, and in one example having an outer diameter of about 0.38 mm. In some embodiments, the proximal section of the guidewire/elongate member (i.e. wire **212** as well as insulation layer **214**) has an outer diameter of about 0.60 mm.

In some embodiments, proximal section **206** is curved in the same plane as distal section **202**, i.e. the curves are coplanar. Having coplanar proximal and distal curves is advantageous in that, for example, when the distal section extends out of a dilator within the body, the orientation of the proximal curve outside of the patient's body can be used to ascertain the orientation of the distal curve, which itself may not be directly visualized, in order to aid in positioning.

The configuration of proximal section straight portion **215** aids in loading over-the-wire devices onto the multi-function guidewire **200**. To assist in providing this functionality, the proximal section straight portion **215** is elongated and has a diameter less than or equal to the rail section. In some embodiments, proximal section straight portion **215** has a length of about 5 to about 50 mm, and in one embodiment, has a length of about 25 mm. To provide for greater user safety when loading devices onto the multi-function guidewire, proximal section straight portion **215** has a rounded tip.

An additional function of proximal section straight portion **215** is provided by its relatively small diameter. Due to its size, proximal section straight portion **215** is operable to puncture tissue mechanically (i.e. without the delivery of electrical energy). This allows a user the option to potentially attempt both mechanical and electrical punctures using a single device. For example, a user may attempt mechanical puncture using the proximal end of the device and, if unsuccessful, the user may withdraw the device and insert the distal end to attempt electrical puncture. In some embodiments, the elongate member/guidewire **200** at the proximal section, including wire **212** and insulation **214**, has an outer diameter of about 0.86 mm or less, with one embodiment having an outer diameter of about 0.60 mm or less.

Multi-function guidewire **200** includes exposed portion **212***a* of wire **212** to allow for coupling to a source of electrical energy, for example using a removable push-button connector placed over exposed portion **212***a*. In some embodiments, exposed portion **212***a* has a length ranging from about 5 to about 15 mm, and in one example, has a length of about 10 mm.

Some embodiments of multi-function guidewire **200** include transitional portion **222** between the proximal section **206** and rail section **204** to avoid having an abrupt change in diameter, for example to avoid structural weaknesses. In some embodiments, the transitional portion **222** defines a length ranging from about 15 mm to about 100 mm, with one embodiment defining a length of about 25 mm. The proximal end of transitional portion **222** has an outer diameter ranging from about 0.35 mm to about 0.86 mm and the distal end has an outer diameter of about 0.58 mm to about 1.12 mm. One particular embodiment has a minimum outer diameter of about 0.60 mm and a maximum outer diameter of 0.86 mm.

In a specific embodiment of multi-functional guidewire **200**, active tip **208** is primarily comprised of platinum, with 10% iridium; marker **210** is a helical coil primarily comprised of platinum, with 8% tungsten; and each of the proximal section **206**, rail section **204**, and distal section **202** are comprised of a 304V stainless steel wire **212** (spring

22

tempered) with PTFE heat shrink insulation (electrical insulation **214**) thereupon. Stainless steel wire **212** has adequate stiffness to provide pushability to multi-functional guidewire **200** and is also an efficient electrical conductor.

In this specific embodiment, active tip **208** has a length of about 0.8 mm and a diameter of about 0.024 inches (~0.61 mm); the wire **212** and active tip **208**, combined, extend 2 mm beyond the distal end of marker **210**; and marker **210** has a length of about 3 cm. Furthermore, distal section straight portion **216** has a length of about 6 to 10 mm and a diameter of about 0.018 to 0.0225 inches (0.45 to 0.57 mm)); distal section **202** has an inner curve diameter d**1** of about 1 to 3 cm and an outer curve diameter d**2** of about 2 to 4 cm (FIG. **5**C); the diameter of rail section **204** adjacent the distal section **202** is 0.029 to 0.035 inches (0.74 to 0.89 mm).

The specific embodiment further includes wire **212** of distal section **202** having a length of 15 cm and tapering over the 15 cm segment of the wire from 0.025 inches (0.64 mm) to 0.006 inches (0.15 mm) at the tip of wire **212**. The tip of wire **212** has a length of 5.5 mm and a diameter of 0.010 inches (0.25 mm) over the 5.5 mm length. The point along wire **212** that is 15 cm from the distal tip of distal section **202** (i.e. the part of distal section **202** with the largest diameter of wire **212**) has a proximal stiffness (force/displacement) of about 552 N/M. In this embodiment, active tip **208** is welded to wire **212**. The distal tip of marker coil **210** is 2 mm proximal from active tip **208** and has length of 30 mm. Electrical insulation **214** is comprised of PTFE heat shrink and has a wall thickness of 0.004 inches (0.10 mm).

Furthermore, in this specific embodiment, rail section **204** has a length of about 120 cm; and the wire **212** within the rail section has a diameter of about 0.635 mm±0.008 and stiffness of about 552 N/M. Proximal section **206** has a length of about 525 mm±1.5, including a tapered section of about 2.5 cm (tapering down from the rail section), and the wire **212** of proximal section **206** has a diameter of about 0.381 mm±0.008. The overall length of wire **212** is 1800 mm±2.

Some alternative embodiments of multi-functional guidewire **200** comprise a straight proximal section **206** and/or a J-shaped distal section **202**.

In alternative embodiments of the disclosed methods (described further hereinbelow), mechanical wires are used for puncturing. The mechanical wires typically have a distal part/portion/section that is J-shaped to prevent accidental punctures and trauma by a sharp distal tip. Some alternative mechanical wire embodiments have a distal part that is coiled, while others have a straight distal part.

Methods

A first broad aspect of a method of accessing a chamber of a patient's heart using a superior access approach comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator to position the dilator substantially adjacent a tissue; and (c) advancing the dilator through a puncture in the tissue. The procedure is performed using forms of imaging known to those skilled in the art.

With reference now to FIG. **6**A, in a particular embodiment, as described herein, the steerable sheath **300** may be used to guide the dilator **100** to reach an area of the heart **400**, in order for example to perform a transseptal puncture. In one such example, a guiding introducer or apparatus such as an introducer sheath may be advanced through the vasculature. A guide-wire may then be advanced through the

US 11,154,324 B2

23

introducer sheath and advanced through the vasculature, for example the superior vena cava **412**, to be positioned within the right atrium **410**. In some embodiments, the guide wire may be advanced without the use of an introducer sheath. A dilator **100**, in accordance with an embodiment of the present invention, may then be inserted through the steerable sheath **300** forming a dilator and sheath assembly, or in other words a steerable sheath assembly **300***a*.

Dilator **100** comprises a flexible intermediate region **100***b* terminating at a rigid distal end region **100***a*. In the specific example shown, the dilator **100** additionally has a rigid proximal region **100***c*, as described previously, that helps minimize the risk of the dilator buckling as it is inserted into the steerable sheath **300**. (Alternatively, a dilator **100** may be provided with a softer proximal portion **100***c*.) The dilator **100** is usable with a steerable sheath **300**, as described previously herein above. The steerable sheath **300** defines a lumen there-through for receiving the dilator **100** and further comprises an articulating portion or deflectable region **200***b* that terminates in a sheath distal end. In some embodiments, the steerable sheath **300** and dilator **100** may be provided as a steerable sheath kit.

Once the dilator **100** is inserted through the steerable sheath **300**, the dilator **100** extends through the sheath lumen with the distal end region **100***a* of the dilator extending beyond the sheath distal end. Thus, in some embodiments, the dilator **100** is inserted through the steerable sheath **300** prior to the step of inserting the steerable sheath **300** through the vasculature, and the steps of inserting and advancing the dilator **100** are performed substantially simultaneously with the steps of inserting and advancing the steerable sheath **300**. Once assembled, the dilator **100** and the steerable sheath **300** are configured to co-operate with one another such that the flexible intermediate region **100***b* of the dilator **100** corresponds to the articulating portion or deflectable region **200***b* of the steerable sheath **300** during use.

In alternative embodiments, the steps of inserting and advancing the steerable sheath **300** may be performed prior to the steps of inserting and advancing the dilator **100**. In a specific example, the steerable sheath **300** may initially be advanced into the right atrium **410**, with a catheter or any other dilator inserted there-through, such as a second dilator. The catheter or second dilator may then be swapped out with the flexible dilator **100**. That is the catheter or second dilator may be removed and the dilator **100** may be inserted through the sheath and advanced into the right atrium. In still further alternative embodiments, the steps of inserting and advancing said dilator **100** may be performed prior to the steps of inserting and advancing said steerable sheath **300**, which for example, may be advanced over the dilator **100**.

After positioning the steerable sheath assembly **300***a* within the right atrium **410**, the initial guide-wire is swapped out with an RF guide-wire or other energy delivery device (such as RF guidewire **200** visible in FIG. **6**C). Referring now to FIG. **6**B, the steerable sheath **300** is then actuated to allow the steerable sheath **300** to achieve a desired deflection angle to position the dilator distal end region **100***a* at a desired location within a region of tissue, within a patient's body, for example a desired location within the septum **422** of the heart **400** (in some examples, more specifically, at the fossa ovalis region of the septum **422**). The dilator **100** provides a flexible intermediate region **100***b* that does not hinder the ability of the steerable sheath **300** to curl or curve and as such allows the articulating portion or deflectable region **200***b* of the steerable sheath **300** to deflect upon actuation to position the dilator **100** and the RF guide-wire as desired. As such, the steerable sheath **300** is able to reach

24

its intended curvature, as shown by path **300***b*, upon actuation, to position the distal end region **100***a* of the dilator **100** as well as a distal end of the RF guide-wire at the septum **422**. Using a dilator lacking such a flexible intermediate region may result in the steerable sheath not being able to achieve the required or intended curvature, whereby the steerable sheath assembly may be limited to the curvature shown in FIG. **6**A.

Additionally, as outlined previously, the dilator **100** is essentially a straight dilator that is lacking a curve. As a result the dilator **100** does not interfere with the curvature of the steerable sheath **300** by imparting a curvature to the steerable sheath **300**. Thus, the lack of curvature in the dilator **100** in conjunction with the flexible intermediate region **100***b*, additionally aids in allowing the steerable sheath **300** to attain the required deflection angle or curvature to position the dilator distal end region **100***a* as well as the RF guide-wire at the septum **422**.

With reference now to FIG. **6**C, once the distal end region **100***a* of the dilator **100** has been positioned at the septum **422**, a transseptal puncture may then be performed, for example by using a puncturing device as described hereinabove. In one embodiment, as shown, the puncturing device comprises the RF guidewire **200** (that was previously positioned within the steerable sheath assembly **300***a*) which may then be activated to deliver RF and be advanced across the septum **422** to create the puncture. The guidewire **200** may then be advanced into the left atrium **408** of the heart **400**, as shown in FIG. **6**C. The dilator **100** may then be advanced over the guidewire **200** through the septum **422** in order to dilate the trans septal puncture site, as shown in FIG. **6**D, for example in order to facilitate tracking of other devices through the puncture site. The steerable sheath **300** and the dilator **100** may then be withdrawn and the other devices may be advanced over the guidewire **200**, for example, to perform a procedure within the heart.

FIGS. **7**A to **7**G illustrate the steps of an alternate embodiment of a method for gaining access to the left side of a heart. Anatomical features illustrated in FIG. **7**A include: heart **400**, left ventricle **402**, right ventricle **404**, mitral valve **406**, left atrium **408**, right atrium **410**, superior vena cava **412**, inferior vena cava **414**, aorta **416**, and brachiocephalic veins **418**.

FIG. **7**B(i) shows access being gained through the left subclavian vein **420**, which is superior (i.e. above) to heart **400**. In some alternative embodiments a large diameter, short length introducer (not shown in drawings), known to those skilled in the art, is secured at the left subclavian access site to accommodate the steerable sheath. In the embodiment of FIG. **7**B(i), steerable sheath **300** is advanced through left subclavian vein **420**. Steerable sheath **300** is controlled using steerable sheath handle **302**. Dilator **100**, which includes dilator hub **102**, is inserted into steerable sheath **300**. Typically dilator **100** and steerable sheath **300** are locked together before being advanced through the vasculature to form a steerable sheath assembly. FIG. **7**B(i) also shows that a wire **200** is inserted into dilator **100**.

As described above in the above embodiment of a method of the present invention, step (a) is for advancing a steerable device having a lumen and containing a dilator within the lumen, from a superior approach, into a heart of a patient. To arrive at the configuration of FIG. **7**A, a steerable device, steerable sheath **300**, is advanced through superior vena cava **412** and right atrium **410**, as indicated by sheath movement arrow **310**, and temporally positioned in inferior vena cava **414**. FIG. **7**A illustrates the position of apparatus upon a completion of step (a). From the position shown in FIG. **7**A,

US 11,154,324 B2

25

steerable sheath **300** and dilator **100** are slightly withdrawn to position the dilator's distal tip **106** in right atrium **410**. In alternative embodiments of the method, steerable sheath **300** is not advanced into inferior vena cava **414**, but instead, advancement is stopped when the distal tip of the steerable sheath is still in right atrium **410**. Steerable sheath **300** defines a lumen and contains a dilator **100** within the lumen. Typically, the physician selects the dilator and steerable sheath to match the outer diameter of dilator **100** with the inner diameter of steerable sheath **300** (i.e. so that the dilator fits snugly within the sheath or, put differently, that the dilator is cooperatively fitted to the sheath) so that the dilator may provide support for the sheath to prevent the sheath from buckling when making sharp turns, such as when, for example, steering the sheath towards the atrial septum after the sheath is advanced through the superior vena cava. Furthermore, matching the outer diameter of dilator **100** with the inner diameter of steerable sheath **300** facilitates smooth advancement through the vasculature by avoiding and/or reducing scraping of tissue.

Once the dilator's distal tip **106** is advanced into right atrium **410**, the tip is positioned within the right atrium using the steerable sheath. The portion of the dilator shaft **104** of dilator **100** inside of right atrium **410** (and within steerable sheath **300**) is flexible enough to be cooperatively steered by the sheath i.e. sheath **300** can manipulate dilator shaft **104** to the required angle to contact tissue without the dilator restricting the sheath's range of motion. Only the portion of dilator shaft **104** within the part of steerable sheath **300** that is being bent for the "U-turn" from the superior vena to contact the atrial septum needs such a high degree of flexibility: the disclosed method can still be performed even if other portions of dilator shaft **104** (not inside the right atrium) are relatively less flexible (i.e. more rigid) than the highly flexible portion.

Step (b) of the method is for the physician articulating the steerable device (steerable sheath **300**), in the direction indicated by sheath movement arrow **310**, to cooperatively manipulate a distal portion of the dilator **100** and thereby position the dilator substantially adjacent a tissue. The dilator is manipulated to arrive at the position shown in FIG. **7**B. For the sake of simplicity, some embodiments of the method use a unidirectional sheath: the direction of deflection is known before the procedure such that a bi-directional sheath is not required, although it may be used as well.

FIG. **7**B also shows dilator **100** slightly extended from steerable sheath **300** and touching a tissue site (atrial septum **422**). A flexible elongate puncture member (medical device/guidewire **200**) is located wihtin the dilator's lumen when the physician adjusts steerable sheath **300** to cooperatively position dilator **100**. Typically, the elongate puncture member **200** is positioned to be close to, but not contacting, the fossa ovalis of the atrial septum. The embodiment of guidewire **200** of FIG. **5**D has radiopaque active tip **208** and radiopaque helical marker **210**, which when positioned towards the front of the dilator aid in positioning dilator **100** under imaging.

Typical embodiments of a method of the invention comprise the dilator having a lumen (not shown in drawings) and containing an elongate puncture member therein, and the method including between steps (b) and (c), advancing the elongate puncture member and puncturing the tissue. While the method is not limited to any particular type of tissue, in the illustrated embodiment the tissue is a septum of the heart and the method comprises, between steps (b) and (c), advancing an elongate puncture member (wire **200**) and puncturing atrial septum **422**, as illustrated in FIGS. **7**C(i) to

26

**7**C(iii). In FIG. **7**C(i), the distal tip of dilator **100** is tenting the atrial septum **422** while the wire is advanced in the direction of wire movement arrow **220**. The steerable device (steerable sheath **300**) is used to position dilator **100** for tenting the septum dilator under imaging. Tenting ensures the dilator is properly positioned and in contact with the septum. FIG. **7**C(iv) shows wire being advanced from the proximal end (the end toward the physician) and indicates diagrammatically the use of RF energy. FIG. **7**C(ii) shows wire **200** having just punctured atrial septum **422**. The distal portion/part of the wire is comprised of a material with shape memory and it curves back as it is extended into left atrium **408**. FIG. **7**C(iii) shows the wire further extended and curving back approximately 270° into a "pig-tail" configuration (although, as described hereinabove, this coil may typically traverse between 270° and 630°). FIG. **7**C shows heart **400** with the wire **200** that has punctured the septum and is in the position of FIG. **7**C(iii). As previously noted, curved distal part **202** acts to prevent the electrode (active tip **208**) from directly contacting tissue on the left side of the heart.

In some embodiments of the method aspect of the present invention, the elongate puncture member is an energy delivery device, and puncturing tissue between steps (b) and (c) comprises delivering energy through the energy delivery device (e.g. a distal end of the energy delivery device) to puncture the tissue. In some such embodiments, the energy delivery device is operable to deliver electrical energy, and in some specific embodiments, the electrical energy is in the RF range.

In some other embodiments, the elongate puncture member is a mechanical wire with a sharp tip, and puncturing tissue between steps (b) and (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

After wire **200** has punctured the septum, the physician proceeds to step (c) of the method. Step (c) is for advancing the dilator through a puncture in the tissue. The first broad aspect of the method includes the use of a hybrid dilator having a flexible intermediate region **100**b that can be bent from a superior approach to approach the septum, a bend of about 180° (i.e. a U-shaped turn), with the hybrid dilator also having a distal tip that is sufficiently hard to provide for dilating tissue without deformation of the taper. The use of the hybrid dilator makes it unnecessary to use a soft dilator for steering and bending for the U-shaped turn, and then changing to a stiffer dilator for crossing the septum, whereby the hybrid dilator reduces the number of steps in the procedure by eliminating the steps of withdrawing a soft dilator and advancing a hard dilator.

FIG. **7**D shows a positioning of the dilator after completion of step (c) of the method (advancing the dilator through a puncture in the tissue). Distal tip **106** of dilator **100** is comprised of hard (shape retaining) material that pushes aside tissue as dilator **100** is advanced. A portion of flexible intermediate region **100**b is shown extended from steerable sheath **300** inside of right atrium **410** in FIG. **7**C. Typically, advancement of dilator **100** is stopped when maximum dilation is achieved; resulting in the dilator being positioned such that a distal portion of dilator's distal tip **106** is in left atrium **408** and a portion of distal tip is in right atrium **410**. In alternative embodiments of the method, the dilator is further advanced so that all of distal tip **106** is in the left atrium, such as, for example if the physician wants to ensure that maximum dilation has been achieved.

Some embodiments of the method aspects of the present invention further comprise a step (d) of withdrawing the

US 11,154,324 B2

27

elongate puncture member (and advancing an anchor wire until the anchor wire bridges (crosses) the septum and a right atrium to thereby provide a bridge between the superior vena cava and the left atrium (put differently, the anchor wire bridges the septum between the right and left atria). After an anchor wire is advanced, some embodiments further comprise a step (e) of withdrawing the dilator and sheath. FIG. 7E illustrates an installed anchor wire (wire 200) with the dilator and sheath withdrawn. As previously described, curved distal part 202 of wire 200 provides anchorage to prevent wire 200 from inadvertently slipping back into the right atrium. The anchor wire is sufficiently stiff that it may, by itself, provide a rail for advancing medical devices into the left atrium. Such medical devices are selected at the discretion of the physician and can include, at least, ablation catheters and pacing leads (e.g. for left ventricular endocardial pacing). As described hereinabove as well as hereinbelow, in an exemplary embodiment of a method of the present invention, a single wire may be utilized for both the puncturing step as well as for anchoring in the left atrium by using a hybrid medical device, such as multi-function guidewire 200, to puncture the tissue site and provide a rail (as well as an anchor) through the puncture site.

Some embodiments of the method aspect further comprise a step (f) of advancing a lead delivery catheter 350 (and possibly a lead delivery dilator, if dilator 100 may not be used for the stated purpose), configured for delivering leads (such as pacemaker leads), into the left atrium of the heart, as shown in FIG. 7F. As previously described, other medical devices are advanced/implanted in some alternative embodiments.

Some embodiments further include a step (g) of withdrawing the wire 200 (as well as any dilators, including a lead delivery dilator). Some such embodiments further comprise a step (h) of advancing the lead delivery catheter 350 as indicated by catheter movement arrow 360 (FIG. 7F), to thereby position the distal end of lead delivery catheter 350 in left ventricle 402, as shown in FIG. 7G.

For some embodiments of this method aspect, a stiff introductory wire (rather than a hybrid wire such as guidewire 200) is used. Such embodiments comprise: prior to step (a), advancing the stiff introductory wire into the right atrium; and step (a) includes advancing the steerable sheath and the dilator over the stiff introductory wire; and between steps (b) and (c), the stiff introductory wire is withdrawn and the elongate puncture member is advanced to puncture the septum. In some such embodiments, the stiff introductory wire is comprised of stainless steel. Typically, an introductory wire has an atraumatic tip that is generally J-shaped.

In some embodiments, as noted above, a stiff introductory wire is not utilized; rather, a hybrid wire such as described above may be utilized. Such embodiments comprise: prior to step (a), the wire/elongate puncture member is advanced into the right atrium; and step (a) includes advancing the steerable sheath and the dilator over the wire/elongate puncture member.

A further broad aspect of the method of accessing a chamber of a patient's heart using a superior access approach is described below. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing an elongate puncture member within the lumen; (b) articulating the steerable device to manipulate a distal portion of the elongate puncture member for positioning the puncture member substantially adjacent a tissue; (c) creating a punc-

28

ture in the tissue using the puncture member; and (d) advancing a dilator over the puncture member through the puncture.

This broad aspect relates to the concept of reducing or minimizing the number of steps in a procedure by using multifunctional or hybrid devices. First, embodiments of the second broad aspect include the elongate puncture member having a rail section that is stiff enough to provide rail for advancing devices, thereby eliminating (making unnecessary) using an anchor wire and the steps of withdrawing the puncture member and advancing the anchor wire. Second, the steerable device is advanced over the puncture member, thereby eliminating the use of a stiff introductory wire and the steps for exchanging the introductory wire and puncture member. Also, embodiments of the second broad aspect include the elongate puncture member being flexible enough to be cooperatively manipulated by the steerable device, steerable sheath 300.

Making reference to FIGS. 7A to 7D, in some embodiments of this broad aspect: step (a) includes advancing the steerable device (e.g. steerable sheath 300) into the right atrium 410 of a heart 400; step (b) includes articulating the steerable device (steerable sheath 300) to manipulate a distal portion of the elongate puncture member (wire 200) for positioning the puncture member; step (c) includes advancing the puncture member (wire 200) to create a puncture in the tissue (atrial septum 422); and step (d) includes advancing dilator 100 over the puncture member (wire 200) through the puncture in the tissue (atrial septum 422). In some embodiments, step (c) further comprises advancing the elongate puncture member into the left atrium. In some embodiments the method further includes a step (e) of withdrawing the steerable device and dilator, whereby the elongate puncture provides a rail for advancing medical devices into the left atrium.

In some embodiments of the second broad aspect, the elongate puncture member is an energy delivery device (e.g. a wire operable to deliver electricity) and puncturing tissue in step (c) comprises delivering energy through the distal end of the energy delivery device to puncture the tissue. In some other embodiments of the second broad aspect, the elongate puncture member is a mechanical wire with a sharp tip and puncturing tissue in step (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

A specific embodiment of this broad aspect comprises the steps of: (a) introducing a steerable sheath and a soft dilator into the right atrium; (b) positioning the steerable sheath and the soft dilator such as to be aimed towards the septum; (c) withdrawing the soft dilator and advancing a stiffer dilator; (d) adjusting the steerable sheath to position the stiffer dilator, and an energy delivery device inside the dilator's lumen, substantially adjacent the atrial septum; (e) delivering energy through the distal end of the energy delivery device to puncture the septum; (f) advancing the energy delivery device until a distal tip of the energy delivery device crosses the septum and enters the left atrium wherein the portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium; and (g) advancing the stiffer dilator to dilate the puncture.

Some embodiments of this broad aspect include using a soft and a hard dilator, while some alternative embodiments include using a hybrid dilator as described hereinabove.

Details regarding characteristics of the initial broad aspect of an embodiment of a method of the present invention, including (but not limited to) the description of tenting, the

US 11,154,324 B2

29

use of electricity and the dilator supporting the steerable sheath, also apply to the second broad aspect.

A further broad aspect of the method of accessing a chamber of a patient's heart using a superior access approach is described below. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator for positioning the dilator substantially adjacent a tissue; (c) advancing an elongate puncture member, from within a lumen of the dilator, to create a puncture in the tissue; and (d) advancing the dilator over the elongate puncture member through the puncture.

This broad aspect, similar to the first broad aspect mentioned above with respect to a method of the resent invention, also uses a hybrid dilator. The use of the hybrid dilator renders unnecessary the use of a soft dilator for steering and bending, and then changing to a stiffer dilator for crossing tissue, whereby the hybrid dilator reduces the number of steps in the procedure by eliminating the steps of withdrawing a soft dilator and advancing a stiffer (hard) dilator. Also, this broad aspect, similar to the second mentioned above, includes the elongate puncture member having a rail section that is stiff enough to provide rail for advancing devices, thereby eliminating (making unnecessary) the use of an anchor wire and the steps of exchanging the puncture member and anchor wire. Thus, this broad aspect includes embodiments of both hybrid devices described hereinabove.

Making reference again to FIGS. 7A-7D, some embodiments of the method comprises the steps of: (a) advancing a steerable sheath 300 containing dilator 100 within a lumen of steerable sheath 300, from a superior approach, into a heart 400 of a patient; (b) articulating the steerable sheath 300 to manipulate a distal portion of dilator 100 for positioning the dilator substantially adjacent atrial septum 422; (c) advancing an elongate puncture member (wire 200), from a lumen of dilator 100, to create a puncture in atrial septum 422; and (d) advancing dilator 100 over wire 200 and through the puncture.

Similar to the previous broad aspects, step (c) comprises advancing the elongate puncture member to enter into the left atrium. In some embodiments of the third broad aspect, the method further includes a step (e) of withdrawing the steerable device and dilator to thereby provide a rail for advancing medical devices into the left atrium.

In some embodiments of the third broad aspect, the elongate puncture member is an energy delivery device and puncturing the tissue in step (c) comprises delivering energy through a distal end of the energy delivery device to puncture the tissue. In some other embodiments of the third broad aspect, the elongate puncture member is a mechanical wire with a sharp tip and puncturing the tissue in step (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

A specific embodiment of this third broad aspect comprises the steps of: (a) introducing a steerable sheath and a dilator into the right atrium; (b) positioning the steerable sheath and the dilator such as to be aimed towards the septum wherein the portion of the dilator shaft within the steerable sheath is flexible enough to be cooperatively steered by the sheath; (c) adjusting the steerable sheath to cooperatively position the dilator, and an energy delivery device inside the dilator's lumen, substantially adjacent the atrial septum; (d) delivering energy through the distal end of the energy delivery device to puncture the septum; (e)

30

advancing the energy delivery device until a distal portion tip of the energy delivery device bridges (crosses) the septum and enters the left atrium wherein the distal portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium; and (f) advancing the dilator whereby a shape-retaining (i.e. hard) tip section of the dilator dilates the puncture.

Details regarding the earlier broad aspects, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to this third broad aspect.

A fourth broad aspect of the invention is described below. Making reference to FIGS. 7A to 7B, it is a method of accessing a chamber of a patient's heart using a superior access approach. The method comprises the steps of: (a) advancing an energy delivery device from an access site superior to the heart, through a superior vena cava and into a right atrium; (b) adjusting/articulating/manipulating a steerable device to position the energy delivery device substantially adjacent a septum of the heart; (c) delivering energy through a distal end of the energy delivery device to puncture the septum; (d) advancing the energy delivery device into a left atrium; and (e) advancing a dilator over the energy delivery device whereby the dilator dilates the puncture.

The fourth broad aspect also relates to the concept of reducing or minimizing the number of steps in a procedure by using hybrid devices. Embodiments of the fourth broad aspect include using an energy delivery device (wire 200) having a rail section that is stiff enough to provide rail for advancing devices, thereby making unnecessary using an anchor wire and eliminating the steps of withdrawing the energy delivery device and advancing the anchor wire.

Some embodiments of this aspect further comprise a step (f) of withdrawing the steerable device (steerable sheath 300) and the dilator 100, after which the portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium for advancing medical devices into the left atrium.

Some embodiments of the fourth broad aspect include using a soft and a hard dilator, while some alternative embodiments include using a hybrid dilator.

In some embodiments of the fourth broad aspect, the access site is at a left subclavian vein 420. In some other embodiments, the access site is at a right subclavian vein. In yet some further embodiments, the access site is at a jugular vein.

Details regarding the first broad aspect, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to the fourth broad aspect.

Thus, as described above, disclosed herein are several embodiments of a method of providing access for medical devices to a specified tissue site, such as the left side of the heart from a particular access site, such as superior access site. The method comprises using one or more hybrid devices for performing multiple steps of a medical procedure to thereby reduce and/or minimize the number of device exchanges. Some of the methods include puncturing the left side of the heart using an energy delivery device sufficiently flexible so as to be advanced from a superior approach and using the energy delivery device as a rail for advancing other instruments thereupon, thereby providing a means of support for advancing instrumentation through to the left side of the heart.

US 11,154,324 B2

31

## Further Examples

Example 1. A multi-function guidewire for a accessing a heart including a septum, the multi-function guidewire comprising: a rail section sufficiently stiff to act as rail and flexible enough to enable access to a septum from any approach; a distal section which is generally curved and distal of the rail section; and an active tip at a distal end of the distal section, the active tip operable to deliver energy for puncturing the septum to define a puncture site; the distal section being configured to form a coil whereby it anchors the multi-function guidewire beyond the puncture site when the distal section is advanced beyond the septum.

2. The multi-function guidewire of example 1, wherein the rail is sufficiently flexible to enable access to the septum from an inferior approach and/or a superior approach.

3. The multi-function guidewire of example 1, wherein the rail section has a maximum outer diameter of about 1.1 mm and a minimum outer diameter of about 0.58 mm, or more particularly, an outer diameter of about 0.86 mm at its proximal end and about 0.72 mm at its distal end.

4. The multi-function guidewire of example 1, further comprising a metal wire, wherein the metal wire of a proximal curved portion of the proximal section has an outer diameter of about 0.13 to about 0.64 mm or, more specifically, an outer diameter of about 0.38 mm.

5. The multi-function guidewire of example 1, wherein the distal section is sized and configured to anchor a distal end of the multi-function guidewire in an atrium without accidentally being advanced into openings adjacent the left atrium such as a left pulmonary vein or a mitral valve.

6. The multi-function guidewire of example 1, wherein the rail section has a maximum elasticity of about 2100 N/m and a minimum elasticity of about 100 N/m.

7. The multi-function guidewire of example 1, wherein a distal curved portion of the distal section has a maximum elasticity of about 550 N/in and a minimum elasticity of about 1 N/m.

8. The multi-function guidewire of example 1, wherein the distal section comprises a spiral-shaped coil traversing a curve of about 630°.

9. The multi-function guidewire of example 8, wherein a diameter of an inner curve of the coil is between about 6 mm to about 30 mm or, more specifically, about 10 mm.

10. The multi-function guidewire of example 8, wherein a diameter of an outer curve of the coil is between about 20 mm to about 40 mm or, more specifically, about 22 mm.

11. The multi-function guidewire of example 1, wherein a diameter of the guidewire decreases distally along a distal curved portion of the distal section.

12. The multi-function guidewire of example 11, wherein an outer diameter of the guidewire at a proximal end of the distal curved portion is between about 0.72 mm to about 0.86 mm, and an outer diameter at a distal end of the distal curved portion is between about 0.59 mm to about 0.72 mm.

13. The multi-function guidewire of example 1, wherein the distal section further comprises a helical coil, the helical coil having a length of between about 15 mm to about 100 mm or, more particularly, about 30 mm.

14. The multi-function guidewire of example 13, wherein the helical coil is comprised of platinum and tungsten or, more particularly, wherein the helical coil comprises about 8% tungsten.

15. The multi-function guidewire of example 1, wherein the active tip is comprised of platinum and iridium or, more particularly, wherein the active tip is comprised of platinum with 10% iridium.

32

16. The multi-function guidewire of example 1, wherein the proximal section is biased to a curved configuration, the curved configuration being selected from the group consisting of a spiral-shaped coil and a constant diameter coil.

17. The multi-function guidewire of example 1, wherein an outer diameter of the guidewire at the proximal section is between about 0.35 mm to about 0.86 mm or, more particularly, about 0.6 mm.

Example 18. A dilator for use with a steerable sheath to access a region of tissue within a patient's body, the steerable sheath defining a lumen there-through for receiving the dilator and having a range of deflection angles, the dilator comprising: a rigid distal end region; and a flexible intermediate region terminating at the distal end region; the dilator being configured for use in conjunction with the steerable sheath such that a location of the flexible intermediate region corresponds to a location of a region of the steerable sheath that is amenable to deflection; and the rigid distal end region having a rigidity greater than the flexible intermediate region to enable the dilator to advance through tissue.

19. The dilator of example 18, wherein the dilator comprises a substantially straight dilator.

20. The dilator of example 18, wherein the distal end region comprises a rigid polymer and the intermediate region comprises a flexible polymer.

21. The dilator of example 20, wherein the rigid distal end region is formed from High Density Polyethylene and the flexible intermediate region is formed from Low Density Polyethylene.

22. The dilator of example 18, wherein the flexible intermediate region has a length of between about 7 cm to about 17 cm or, more particularly, about 15 cm.

23. The dilator of example 18, wherein the rigid distal end region has a length of between about 0.4 cm to about 4.0 cm or, more particularly, between about 0.5 cm to about 1.0 cm or, even more particularly, between about 0.6 cm to about 0.7 cm.

24. The dilator of example 18, wherein the dilator defines a taper.

25. The dilator of example 24, wherein the rigid distal end region forms a part of the taper.

26. The dilator of example 25, wherein the taper has a length of about 1 cm.

27. The dilator of example 18, wherein the rigid distal end region has a length of between about 2.5% to about 60% of a length of said flexible intermediate region.

28. The dilator of example 18, wherein the dilator further comprises a proximal region extending proximally from the flexible intermediate region, the proximal region having a rigidity greater than the flexible intermediate region.

29. The dilator of example 28, wherein the distal end region and the proximal region have a rigidity that is substantially equal.

30. The dilator of example 29, wherein the distal end region and the proximal region are formed from a rigid polymer and wherein the intermediate region is formed from a flexible polymer.

31. The dilator of example 30, wherein the distal end region and the proximal region are formed from High Density Polyethylene, and wherein the flexible intermediate region is formed from Low Density Polyethylene.

32. The dilator of example 29, wherein the rigidity of each of the distal end region and the proximal region is equal to about 0.8 GPa and wherein the rigidity of the flexible intermediate region is equal to about 0.3 Gpa.

US 11,154,324 B2

33

33. The dilator of example 18, wherein the steerable sheath is actuatable to define a curve.

The embodiments of the invention described above are intended to be exemplary only. The scope of the invention is therefore intended to be limited solely by the scope of the appended claims.

It is appreciated that certain features of the invention, which are, for clarity, described in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features of the invention, which are, for brevity, described in the context of a single embodiment, may also be provided separately or in any suitable subcombination.

Although the invention has been described in conjunction with specific embodiments thereof, it is evident that many alternatives, modifications and variations will be apparent to those skilled in the art. Accordingly, it is intended to embrace all such alternatives, modifications and variations that fall within the broad scope of the appended claims. All publications, patents and patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual publication, patent or patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present invention.

We claim:

1. A medical device for puncturing a tissue at a tissue site, the medical device comprising:
   an elongate member having a proximal section, a distal section, and a rail section between the proximal section and the distal section;
   an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue;
   the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site;
   the distal section defining a distal section curved portion configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture; and
   wherein the distal section further defines a distal section straight portion distal to the distal section curved portion, the distal section straight portion including the active tip and a diameter of the elongate member at the distal section straight portion is greater than a diameter of the elongate member at a distal end of the distal section curved portion.

2. The medical device of claim 1, wherein the rail section is operable to bend at least 180 degrees for enabling access to the tissue site.

3. The medical device of claim 2, wherein a stiffness of the rail section is between about 150 N/m and about 600 N/m to enable the rail section to be bendable by at least 180 degrees and to function as a rail for supporting installation of one or more tubular members thereupon.

4. The medical device of claim 1, wherein the distal coil is configured such that, upon deployment from a confined state, along an axis of advancement, the active tip curves away from the axis of advancement.

5. The medical device of claim 4, wherein the active tip is positioned at a predetermined distance away from an electrically insulated portion of the elongate member

34

orthogonal to the active tip when the distal section curved portion is in the deployed state.

6. The medical device of claim 1, wherein a stiffness of the elongate member at the distal section curved portion is less than about 550 N/m to enable the distal section curved portion to conform to a shape of a tubular member while positioned within a lumen of the tubular member.

7. The medical device of claim 1, wherein the elongate member comprises an electrically conductive wire and the electrically conductive wire is substantially covered by a layer of electrical insulation, with a distal tip of the electrically conductive wire being devoid of the layer of electrical insulation to form the active tip.

8. A medical device for puncturing a tissue at a tissue site, the medical device comprising:
   an elongate member having a proximal section, a distal section, and a rail section between the proximal section and the distal section;
   an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue;
   the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site;
   the distal section defining a distal section curved portion configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture; and
   wherein the proximal section defines a proximal section curved portion configured to form a proximal coil for improved handling of the medical device.

9. The medical device of claim 8, wherein the proximal coil and distal coil are coplanar whereby an orientation of the proximal coil outside a patient's body can used to ascertain the orientation of the distal coil in order to aid in positioning.

10. The medical device of claim 8, wherein the proximal section further defines a proximal section straight portion proximal of the proximal section curved portion and a proximal end of the proximal section straight portion is operable to puncture tissue mechanically.

11. A system for puncturing a tissue at a tissue site, the system comprising:
   at least one medical device as claimed in claim 1; and
   an electrosurgical generator for coupling to the at least one medical device for delivering energy to puncture the tissue at the tissue site.

12. The system of claim 11, further comprising at least one steerable device for guiding the at least one medical device to the tissue site.

13. The system of claim 11, further comprising at least one dilator.

14. A method of puncturing tissue within a patient's heart using a superior access approach, the method comprising the steps of:
   (a) advancing a steerable sheath through a patient's vasculature, from a superior approach access site into a right atrium of a heart of a patient, the steerable sheath defining a lumen and containing a medical device, as claimed in claim 1, within the lumen;
   (b) articulating the steerable sheath to guide a distal portion of the medical device for positioning the active tip of the medical device substantially adjacent a septum of the heart; and

US 11,154,324 B2

35

36

(c) delivering energy through the active tip to create a puncture in the septum and advancing the medical device therethrough into a left atrium of the heart.

**15**. The method of claim **14**, further comprising a step of (d) advancing a dilator over the medical device through the puncture.

**16**. The method of claim **14**, further comprising a step of advancing at least one of a lead delivery dilator and a lead delivery catheter over the medical device into the left atrium of the heart.

**17**. The method of claim **16**, further comprising a step of advancing the lead delivery catheter into a left ventricle of the heart.

**18**. A method of providing access to a left side of a heart and providing support for advancing instrumentation thereto, using a superior access approach, the method comprising the steps of:

(a) advancing a medical device as claimed in claim **1**, from an access site superior to a heart, through a superior vena cava and into a right atrium of the heart;

(b) articulating a steerable sheath to position an active tip of the medical device substantially adjacent a septum of the heart;

(c) delivering energy through the active tip of the medical device to puncture the septum;

(d) advancing the medical device into a left atrium of the heart; and

(e) advancing a dilator over the medical device for dilating the puncture.

* * * * *

# EXHIBIT 7

PTO/AIA/15 (10-17)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| | |
|---|---|
| **UTILITY**<br>**PATENT APPLICATION**<br>**TRANSMITTAL**<br><br>*(Only for new nonprovisional applications under 37 CFR 1.53(b))* | *Attorney Docket No.* **RFP026027_US_CON** |
| | *First Named Inventor* **Gareth Davies** |
| | *Title* Methods and Devices for Puncturing Tissue |
| | *Priority Mail Express® Label No.* |

## APPLICATION ELEMENTS

*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:**

**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

1. ☐ **Fee Transmittal Form**
   (PTO/SB/17 or equivalent)

2. ☐ **Applicant asserts small entity status.**
   See 37 CFR 1.27

3. ☐ **Applicant certifies micro entity status.** See 37 CFR 1.29.
   Applicant must attach form PTO/SB/15A or B or equivalent.

4. ☑ **Specification**    [*Total Pages* 31 ]
   Both the claims and abstract must start on a new page.
   *(See MPEP § 608.01(a) for information on the preferred arrangement)*

5. ☑ **Drawing(s)** (35 U.S.C. 113)    [*Total Sheets* 23 ]

6. **Inventor's Oath or Declaration**    [*Total Pages* ]
   *(including substitute statements under 37 CFR 1.64 and assignments*
   *serving as an oath or declaration under 37 CFR 1.63(e))*

   a. ☐ Newly executed (original or copy)

   b. ☑ A copy from a prior application (37 CFR 1.63(d))

7. ☑ **Application Data Sheet**    * See note below.
   See 37 CFR 1.76 (PTO/AIA/14 or equivalent)

8. **CD-ROM or CD-R**
   in duplicate, large table, or Computer Program (*Appendix*)
   ☐ Landscape Table on CD

9. **Nucleotide and/or Amino Acid Sequence Submission**
   *(if applicable, items a. – c. are required)*

   a. ☐ Computer Readable Form (CRF)

   b. ☐ Specification Sequence Listing on:
      i. ☐ CD-ROM or CD-R (2 copies); or
      ii. ☐ Paper

   c. ☐ Statements verifying identity of above copies

## ACCOMPANYING APPLICATION PAPERS

10. ☐ **Assignment Papers**
    (cover sheet & document(s))
    Name of Assignee _____
    _____

11. ☐ **37 CFR 3.73(c) Statement**    ☐ **Power of Attorney**
    (*when there is an assignee*)

12. ☐ **English Translation Document**
    (*if applicable*)

13. ☐ **Information Disclosure Statement**
    (PTO/SB/08 or PTO-1449)
    ☐ Copies of citations attached

14. ☐ **Preliminary Amendment**

15. ☐ **Return Receipt Postcard**
    (*MPEP § 503*) (*Should be specifically itemized*)

16. ☐ **Certified Copy of Priority Document(s)**
    (*if foreign priority is claimed*)

17. ☐ **Nonpublication Request**
    Under 35 U.S.C. 122(b)(2)(B)(i). Applicant must attach form PTO/SB/35
    or equivalent.

18. ☐ **Other:** _____
    _____
    _____
    _____
    _____

*Note:  (1) Benefit claims under 37 CFR 1.78 and foreign priority claims under 1.55 **must** be included in an Application Data Sheet (ADS).
        (2) For applications filed under 35 U.S.C. 111, the application must contain an ADS specifying the applicant if the applicant is an
            assignee, person to whom the inventor is under an obligation to assign, or person who otherwise shows sufficient proprietary
            interest in the matter. See 37 CFR 1.46(b).*

## 19. CORRESPONDENCE ADDRESS

☑ The address associated with Customer Number: 48497    **OR**    ☐ Correspondence address below

| Name | |
|---|---|
| Address | |
| City | | State | | Zip Code | |
| Country | | Telephone | | Email | |

| Signature | /Vincent Man/ | Date | 19-Jun-2019 |
|---|---|---|---|
| Name (Print/Type) | Vincent Man | Registration No. (Attorney/Agent) | 72144 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.,* GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# Electronic Patent Application Fee Transmittal

| Application Number: | |
|---|---|
| Filing Date: | |
| Title of Invention: | Methods and Devices for Puncturing Tissue |
| First Named Inventor/Applicant Name: | Gareth Davies |
| Filer: | Nir Lifshitz/Melissa Clarke |
| Attorney Docket Number: | RFP026027_US_CON |

Filed as Large Entity

**Filing Fees for** **Utility under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| UTILITY APPLICATION FILING | 1011 | 1 | 300 | 300 |
| UTILITY SEARCH FEE | 1111 | 1 | 660 | 660 |
| UTILITY EXAMINATION FEE | 1311 | 1 | 760 | 760 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | 1720 |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 36346919 |
| **Application Number:** | 16445790 |
| **International Application Number:** | |
| **Confirmation Number:** | 9099 |
| **Title of Invention:** | Methods and Devices for Puncturing Tissue |
| **First Named Inventor/Applicant Name:** | Gareth  Davies |
| **Customer Number:** | 48497 |
| **Filer:** | Nir Lifshitz/Melissa Clarke |
| **Filer Authorized By:** | Nir Lifshitz |
| **Attorney Docket Number:** | RFP026027_US_CON |
| **Receipt Date:** | 19-JUN-2019 |
| **Filing Date:** | |
| **Time Stamp:** | 14:47:54 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | EFT |
| Payment was successfully received in RAM | $1720 |
| RAM confirmation Number | 062019INTEFSW14481900 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Application Data Sheet | RFP026027_US_CON_ADS_signed.pdf | 1256507 / 6b19666bae6485b9e5d02531d0de74fa6ceb97a1 | no | 10 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Claims | RFP026027_US_CON_CLAIMS.pdf | 74927 / 166d79c6ad90be95a3ff8897b83c2171a84d7792 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Abstract | RFP026027_US_CON_ABS.pdf | 11946 / 70d248d302bbba874c96bcf607ec3ae4998e4caa | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Drawings-only black and white line drawings | RFP026027_US_CON_DRAWINGS.pdf | 1520610 / 48b43ca23c34cd01d6923bef05a360544624b9eb | no | 23 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Oath or Declaration filed | RFP026027_US_CON-DEC_GDsigned.pdf | 120190 / 70c953896d7b4290bb999dac0c4d579bd4a449e2 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | Oath or Declaration filed | RFP026027_US_CON-DEC_JUsigned.pdf | 117145 / 473fed6bdfa1fa7d173a17d9c09053ea35dadb94 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

| | | | 121742 | | |
|---|---|---|---|---|---|
| 7 | Oath or Declaration filed | RFP026027_US_CON-DEC_FAsigned.pdf | 9f04d0012b30dabb7597b75887b0b9d7b49d0ab1 | no | 1 |

| **Warnings:** |
|---|

| **Information:** |
|---|

| | | | 94026 | | |
|---|---|---|---|---|---|
| 8 | Oath or Declaration filed | RFP026027_US_CON-DEC_BB-signed.pdf | 95685478578a14ed868a259b0c81134b01ce4a54 | no | 1 |

| **Warnings:** |
|---|

| **Information:** |
|---|

| | | | 4131723 | | |
|---|---|---|---|---|---|
| 9 | Specification | RFP026027_US_CON_SPEC.pdf | f8a74c5547c4879d5ca47b48b1181c06ab14765b | no | 31 |

| **Warnings:** |
|---|

| **Information:** |
|---|

| | | | 280244 | | |
|---|---|---|---|---|---|
| 10 | Transmittal of New Application | RFP026027_US_CON_transmittal_signed.pdf | b627d2ce5d209f48216e4fc943b067b6443868b7 | no | 2 |

| **Warnings:** |
|---|

| **Information:** |
|---|

| | | | 34686 | | |
|---|---|---|---|---|---|
| 11 | Fee Worksheet (SB06) | fee-info.pdf | 15aac04aeb6f03c700f421d6dfecf0c565e7446d | no | 2 |

| **Warnings:** |
|---|

| **Information:** |
|---|

| **Total Files Size (in bytes):** | 7763746 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027_US_CON |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2  (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

**Inventor** 1    [Remove]
**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Gareth | | Davies | |

**Residence Information (Select One)**    US Residency    ● Non US Residency    Active US Military Service

| City | Toronto | Country of Residence [i] | | CA |
|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 232 St. George St. | | |
|---|---|---|---|
| Address 2 | Suite 24 | | |
| City | Toronto | State/Province | ON |
| Postal Code | M5R 2N5 | Country [i] | CA |

**Inventor** 2    [Remove]
**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | John Paul | | Urbanski | |

**Residence Information (Select One)**    US Residency    ◉ Non US Residency    Active US Military Service

| City | Toronto | Country of Residence [i] | | CA |
|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 111 Hiltz Avenue | | |
|---|---|---|---|
| Address 2 | | | |
| City | Toronto | State/Province | ON |
| Postal Code | M4L 2N7 | Country [i] | CA |

**Inventor** 3    [Remove]
**Legal Name**

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027_US_CON |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| ▾ | Ferryl | | Alley | ▾ |

**Residence Information (Select One)**   US Residency   ◉ Non US Residency   Active US Military Service

| City | Burlington | Country of Residence [i] | CA |
|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 339 Johnston Drive | | |
|---|---|---|---|
| Address 2 | | | |
| City | Burlington | State/Province | ON |
| Postal Code | L7N 1V5 | Country [i] | CA |

**Inventor** 4                                          Remove

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| ▾ | Bogdan | | Beca | ▾ |

**Residence Information (Select One)**   US Residency   ◉ Non US Residency   Active US Military Service

| City | Thornhill | Country of Residence [i] | ON |
|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 156 Pleasant Ridge Avenue | | |
|---|---|---|---|
| Address 2 | | | |
| City | Thornhill | State/Province | ON |
| Postal Code | L4J 9H2 | Country [i] | CA |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.          Add

# Correspondence Information:

| **Enter either Customer Number or complete the Correspondence Information section below.** **For further information see 37 CFR 1.33(a).** |
|---|
| ☐ **An Address is being provided for the correspondence Information of this application.** |

| Customer Number | 48497 | | |
|---|---|---|---|
| Email Address | vman@baylismedical.com | Add Email | Remove Email |

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027_US_CON |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

# Application Information:

| Title of the Invention | Methods and Devices for Puncturing Tissue | |
|---|---|---|
| Attorney Docket Number | RFP026027_US_CON | **Small Entity Status Claimed** ☐ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| **Total Number of Drawing Sheets (if any)** | 23 | **Suggested Figure for Publication (if any)** |

# Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

# Publication Information:

| ☐ | Request Early Publication (Fee required at time of Request 37 CFR 1.219) |
|---|---|
| ☐ | **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing. |

# Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ● Customer Number | US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 48497 | | |

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027_US_CON |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

# Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | Pending ▼ | | Remove |
|---|---|---|---|
| **Application Number** | **Continuity Type** | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| | Continuation of ▼ | 14910525 | 2016-02-05 |
| Prior Application Status | Pending ▼ | | Remove |
| **Application Number** | **Continuity Type** | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| 14910525 | a 371 of international ▼ | PCTIB2013060287 | 2013-11-20 |
| Prior Application Status | Expired ▼ | | Remove |
| **Application Number** | **Continuity Type** | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| PCTIB2013060287 | Claims benefit of provisional ▼ | 61863579 | 2013-08-08 |
| Prior Application Status | Expired ▼ | | Remove |
| **Application Number** | **Continuity Type** | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| PCTIB2013060287 | Claims benefit of provisional ▼ | 61863265 | 2013-08-07 |

| Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button. | Add |
|---|---|

# Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application.  Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55.  When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2).  Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| | | | Remove |
|---|---|---|---|
| **Application Number** | **Country**[i] | **Filing Date (YYYY-MM-DD)** | **Access Code**[i] (if applicable) |
| | | | |

| Additional Foreign Priority Data may be generated within this form by selecting the **Add** button. | Add |
|---|---|

EFS Web 2.2.13

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027_US_CON |
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |

# Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.

NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027_US_CON |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

# Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**: This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐ A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐ B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027_US_CON |
| --- | --- | --- |
| | Application Number | |
| Title of Invention | Methods and Devices for Puncturing Tissue | |

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

| Applicant | 1 | Remove |
| --- | --- | --- |

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| Assignee | Legal Representative under 35 U.S.C. 117 | Joint Inventor |
| --- | --- | --- |
| Person to whom the inventor is obligated to assign. | Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here.  ☒

| Organization Name | Baylis Medical Company Inc. |
| --- | --- |

**Mailing Address Information For Applicant:**

| Address 1 | 5959 Trans-Canada Highway | | |
| --- | --- | --- | --- |
| Address 2 | | | |
| City | Montreal | State/Province | QC |
| Country | CA | Postal Code | H4T 1A1 |
| Phone Number | 5144889801 | Fax Number | 5144887209 |
| Email Address | vman@baylismedical.com | | |

Additional Applicant Data may be generated within this form by selecting the Add button.   Add

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027_US_CON |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

**Assignee**  1

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

Remove

If the Assignee or Non-Applicant Assignee is an Organization check here. ☐

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| **Address 1** | |
|---|---|
| Address 2 | |

| **City** | | **State/Province** | |
|---|---|---|---|
| **Country** i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.   Add

**Signature:**   Remove

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the INITIAL filing of the application and either box A or B is not checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| **Signature** | /Vincent Man/ | | | Date  (YYYY-MM-DD) | 2019-06-19 |
|---|---|---|---|---|---|
| First Name | Vincent | Last Name | Man | Registration Number | 72144 |

Additional Signature may be generated within this form by selecting the Add button.   Add

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027_US_CON |
|---|---|---|
|  | Application Number |  |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent CooperationTreaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.2.13

32

**Methods and Devices for Puncturing Tissue**

**We Claim:**

1. A medical device for puncturing tissue at a tissue site, the medical device comprising:

   - an elongate member having a proximal section, a distal section, and a rail section between the proximal section and the distal section;

   - an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue; and

   - the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site.

2. The medical device of claim 1, wherein the rail section is operable to bend at least 180 degrees for enabling access to the tissue site.

3. The medical device of claim 2, wherein a stiffness of the rail section is between about 150 N/m and about 600 N/m to enable the rail section to be bendable by at least 180 degrees and to function as a rail for supporting installation of one or more tubular members thereupon.

4. The medical device of claim 1, wherein the distal section defines a distal section curved portion configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture.

5. The medical device of claim 4, wherein the distal coil is configured such that, upon deployment from a confined state, along an axis of advancement, the active tip curves away from the axis of advancement.

6. The medical device of claim 5, wherein the active tip is positioned at a predetermined distance away from an electrically insulated portion of the elongate member orthogonal to the active tip when the distal section curved portion is in the deployed state.

7. The medical device of claim 4, wherein a stiffness of the elongate member at the distal section curved portion is less than about 550 N/m to enable the distal section curved portion to conform to a shape of a tubular member while positioned within a lumen of the tubular member.

8. The medical device of claim 4, wherein the distal section further defines a distal section straight portion distal to the distal section curved portion, the distal section straight portion including the active tip and a diameter of the elongate member at the distal section straight portion is greater than a diameter of the elongate member at a distal end of the distal section curved portion.

9. The medical device of claim 4, wherein the proximal section defines a proximal section curved portion configured to form a proximal coil for improved handling of the medical device.

10. The medical device of claim 9, wherein the proximal coil and distal coil are coplanar whereby the orientation of the proximal coil outside a patient's body can used to ascertain the orientation of the distal coil in order to aid in positioning.

11. The medical device of claim 9, wherein the proximal section further defines a proximal section straight portion proximal of the proximal section curved portion and a proximal end of the proximal section straight portion is operable to puncture tissue mechanically.

33

12. The medical device of claim 1, wherein the elongate member comprises an electrically conductive wire and the conductive wire is substantially covered by a layer of electrical insulation, with a distal tip of the conductive wire being devoid of the layer of electrical insulation to form the active tip.

13. A system for puncturing tissue at a tissue site, the system comprising:

- at least one medical device as claimed in claim 1; and

- an electrosurgical generator for coupling to the at least one medical device for delivering energy to puncture the tissue at the tissue site.

14. The system of claim 13, further comprising at least one steerable device for guiding the at least one medical device to the tissue site.

15. The system of claim 13, further comprising at least one dilator.

16. A method of puncturing tissue within a patient's heart using a superior access approach, the method comprising the steps of:

(a) advancing a steerable sheath through a patient's vasculature, from a superior approach access site into a right atrium of a heart of a patient, the steerable sheath defining a lumen and containing a medical device, as claimed in claim 1, within the lumen;

(b) articulating the steerable sheath to guide a distal portion of the medical device for positioning the active tip of the medical device substantially adjacent a septum of the heart; and

(c) delivering energy through the active tip to create a puncture in the septum and advancing the medical device therethrough into a left atrium of the heart.

17. The method of claim 16, further comprising a step of (d) advancing a dilator over the medical device through the puncture.

18. The method of claim 16, further comprising a step of advancing at least one of a lead delivery dilator and a lead delivery catheter over the medical device into the left atrium of the heart.

19. The method of claim 18, further comprising a step of advancing the lead delivery catheter into a left ventricle of the heart.

20. A method of providing access to a left side of a heart and providing support for advancing instrumentation thereto, using a superior access approach, the method comprising the steps of:

(a) advancing a medical device as claimed in claim 1, from an access site superior to a heart, through a superior vena cava and into a right atrium of the heart;

(b) articulating a steerable sheath to position an active tip of the medical device substantially adjacent a septum of the heart;

(c) delivering energy through the active tip of the medical device to puncture the septum;

(d) advancing the medical device into a left atrium of the heart; and

(e) advancing a dilator over the medical device for dilating the puncture.

38

**ABSTRACT OF THE DISCLOSURE:**

Novel and unique medical devices and associated methods are disclosed, for facilitating efficient and repeatable puncture of a tissue site while allowing vascular access from various access sites of a patient's body. Disclosed medical devices include dilators and wires usable alone or in combination and configured to facilitate tissue access and puncture at various anatomical locations from desired access sites. The medical devices each include one or more sections having sufficient flexibility for accessing the tissue site from the access site while retaining sufficient stiffness to perform one or more additional functions.

WO 2015/019132

PCT/IB2013/060287

1/23



Fig. 1 (i)

Fig. 1



WO 2015/019132

PCT/IB2013/060287

3/23



Fig. 1C



Fig. 1D

Fig. 1E

5/23



Fig. 2A

Fig. 2B

WO 2015/019132    PCT/IB2013/060287

6/23



Fig. 2C

WO 2015/019132

PCT/IB2013/060287

7/23



Fig. 3B



Fig. 3A

WO 2015/019132

8/23

PCT/IB2013/060287



Fig. 3D



Fig.3C

WO 2015/019132  PCT/IB2013/060287

9/23

Fig. 3E

WO 2015/019132

PCT/IB2013/060287

10/23



Fig. 4

WO 2015/019132

PCT/IB2013/060287



Fig. 5a

WO 2015/019132 PCT/IB2013/060287

12/23

Fig. 5b

WO 2015/019132                                                                      PCT/IB2013/060287

13/23



Fig. 5c

Fig. 5d

WO 2015/019132    PCT/IB2013/060287

14/23



Fig. 5f



Fig. 5e



Fig. 6A

WO 2015/019132

16/23

PCT/IB2013/060287



Fig. 6B

WO 2015/019132

17/23

PCT/IB2013/060287



Fig. 6C

WO 2015/019132

PCT/IB2013/060287

18/23



Fig. 6D

WO 2015/019132

PCT/IB2013/060287



Fig. 7a

WO 2015/019132

20/23

PCT/IB2013/060287



Fig. 7b (i)

Fig. 7b

WO 2015/019132

21/23

PCT/IB2013/060287



Fig. 7c (iv)

Fig. 7c (i)

Fig. 7c (ii)

Fig. 7c (iii)

Fig. 7c

WO 2015/019132

22/23

PCT/IB2013/060287



Fig. 7e

Fig. 7d

WO 2015/019132

23/23

PCT/IB2013/060287



Fig. 7f

Fig. 7g

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number  PCT/IB2013/060287

filed on  20-Nov-2013

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor:  Gareth Davies                                    Date (Optional):

Signature:

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number **PCT/IB2013/060287**

filed on **20-Nov-2013**

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: John Paul Urbanski _____    Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number  PCT/IB2013/060287

filed on  20-Nov-2013

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application.  If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14).  Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor:  Ferryl Alley                                          Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed.  Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number **PCT/IB2013/060287**

filed on **20-Nov-2013**

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Bogdan Beca                                     Date (Optional): 01-Feb-2016

Signature:

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

WO 2015/019132                                                          PCT/IB2013/060287

1

**Methods and Devices for Puncturing Tissue**

**TECHNICAL FIELD**

[0001] The disclosure relates to devices, systems and methods used to gain access to various tissue sites from particular access sites, and in particular to devices and associated methods used to access the left side of a heart via puncturing tissue.

**SUMMARY OF THE DISCLOSURE**

[0002] Novel and unique medical devices and associated methods are disclosed, for facilitating efficient and repeatable puncture of a tissue site while allowing vascular access from various access sites of a patient's body. Disclosed medical devices include dilators and wires usable alone or in combination and configured to facilitate tissue access and puncture at various anatomical locations from desired access sites. The medical devices each include one or more sections having sufficient flexibility for accessing the tissue site from the access site while retaining sufficient stiffness to perform one or more additional functions.

[0003] In one broad aspect, embodiments of the present invention comprise a dilator for use with an ancillary device such as a steerable sheath to access a region of tissue or tissue site within a patient's body, the steerable sheath defining a lumen therethrough for receiving the dilator and having a range of deflection angles, the dilator comprising: a rigid distal end region; and a flexible intermediate region terminating at the distal end region; the dilator being configured such that, when the dilator is inserted into the lumen of the steerable sheath, the location of the flexible intermediate region corresponds to a location of a region of the steerable sheath that is amenable to deflection (also referred to as a "curvature-imparting region" or an "articulating region"); and the rigid distal end region having a rigidity greater than the flexible intermediate region to enable the dilator to advance through tissue.

[0004] In the aforementioned embodiments, the dilator is structured such that, during use, the flexible intermediate region of the dilator is configured to provide minimal resistance to deflection so as to allow the deflectable region of the steerable sheath to deflect, thereby allowing the steerable sheath to reach a desired deflection angle from said range of deflection angles, to position the dilator rigid distal end region at a desired location within the region of tissue, allowing the dilator rigid distal end region to facilitate advancement of the dilator there-through.

[0005] In a further broad aspect, embodiments of the present invention include a kit comprising: a dilator comprising a flexible intermediate region terminating at a rigid distal end region; and a steerable sheath comprising a deflectable region and defining a lumen for receiving the dilator therethrough, the sheath and dilator being configured to co-operate such that, in use, a location of the flexible intermediate region of the dilator within the lumen corresponds to a location of the deflectable region of the sheath, for allowing the steerable sheath to achieve a desired deflection angle to position the dilator distal end region at a desired location within a region of tissue within a patient's body.

[0006] In some embodiments, the dilator does not substantially exert a force to assist the sheath in obtaining its desired shape. Furthermore, in some embodiments, the dilator is passive and does not significantly obstruct the range of motion of the sheath. More specifically, the rigidity of the dilator does not prevent the sheath from attaining its desired curvature.

WO 2015/019132                                                                  PCT/IB2013/060287

2

[0007]   In still a further broad aspect, embodiments of the present invention comprise a sheath assembly comprising: a steerable sheath defining a lumen there-through and defining a sheath distal end; and a dilator comprising a flexible intermediate region terminating at a rigid distal end region, the dilator extending through said lumen with said dilator distal end region extending beyond said sheath distal end.

[0008]   In an additional broad aspect, embodiments of the invention comprise a medical device for puncturing tissue at a tissue site, the medical device including: an elongate member having a proximal section, a distal section and a rail section between the proximal and distal sections; and an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue; where the rail section is configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site.

[0009]   In a further broad aspect, embodiments of the present invention include a kit for puncturing tissue at a tissue site, the kit comprising: at least one medical device as described herein; and at least one steerable device for guiding the at least one medical device to the tissue site.

[0010]   In an additional broad aspect, embodiments of the present invention include a system for puncturing tissue at a tissue site.  In some such embodiments, the system comprises: at least one medical device as described hereinbelow; and an electrosurgical generator for coupling to the at least one medical device for delivering energy to puncture the tissue at the tissue site.

[0011]   In yet another broad aspect, embodiments of the present invention comprise a method of accessing a chamber of a patient's heart using a superior access approach. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator to position the dilator substantially adjacent a tissue; and (c) advancing the dilator through a puncture in the tissue.

[0012]   In still a further broad aspect, embodiments of the present invention comprise a method of puncturing tissue within a patient's heart using a superior access approach.  In some such embodiments, the method comprises the steps of: (a) advancing a steerable sheath through a patient's vasculature, from a superior approach access site into a heart of a patient, the steerable sheath defining a lumen and containing a medical device, as described herein, within the lumen; (b) articulating the steerable sheath to guide a distal portion of the medical device for positioning an active tip of the medical device substantially adjacent a tissue within the heart; and (c) delivering energy through the active tip to create a puncture in the tissue and advancing the medical device therethrough.

[0013]   In an additional broad aspect, embodiments of the present invention comprise a method of providing access to a left side of the heart, and providing support for advancing instrumentation thereto, using a superior access approach, the method comprising the steps of: (a) advancing a medical device as described herein, from an access site superior to a heart, through a superior vena cava and into a right atrium of the heart; (b) articulating a steerable sheath to position an active tip of the medical device substantially adjacent a septum of the heart; (c) delivering energy through the active tip of the medical device to puncture the septum; (d) advancing the medical device into a left atrium of the heart; and (e) advancing a dilator, as described herein, over the medical device for dilating the puncture.

3

[0014]   In a further broad aspect, embodiments of the present invention include a method of using a steerable sheath assembly comprising the steps of: advancing a steerable sheath through vasculature to a region of tissue within a patient's body, the steerable sheath comprising a deflectable region; positioning a dilator within a lumen of the steerable sheath, said dilator comprising a flexible intermediate region and a rigid distal end region; actuating the steerable sheath to deflect the steerable sheath to a desired deflection angle enabling positioning of the dilator distal end region at a desired tissue site within said region of tissue; and advancing a portion of the dilator including the distal end region through said desired tissue site, said dilator distal end region having sufficient rigidity to enable advancement of the distal end region through the desired tissue site for dilating said tissue site; wherein said sheath and said dilator cooperate such that said flexible intermediate region of the dilator is aligned with said deflectable region of the steerable sheath prior to actuating the steerable sheath, and wherein said flexible intermediate region of the dilator is configured to allow the deflectable region of the steerable sheath to deflect.

**BRIEF DESCRIPTION OF THE DRAWINGS**

[0015] In order that the invention may be readily understood, embodiments of the invention are illustrated by way of examples in the accompanying drawings, in which:

[0016] Fig. 1 is an illustration of a system in accordance with an embodiment of the present invention;

[0017] Fig. 1A is an illustration of a dilator in accordance an embodiment of the present invention;

[0018] Fig. 1B is an illustration of a steerable sheath for use with a dilator in accordance with an embodiment of the present invention;

[0019] Fig. 1C is an illustration of a dilator in accordance with an alternate embodiment of the present invention;

[0020] Figs. 1D-1E illustrate a dilator within a steerable sheath in accordance with various embodiments of the present invention;

[0021] Figs. 2A-2C illustrate a dilator in use with a steerable sheath, in accordance with various embodiments of the present invention;

[0022] Figs. 3A-3E illustrate various distal tip configurations of a dilator in accordance with an embodiment of the present invention;

[0023] Fig. 4 illustrates an embodiment of a steerable sheath suitable for use with an embodiment of a dilator of the present invention;

[0024] Fig. 5A is a side view of an embodiment of a medical device, for example a multi-function guidewire of the present invention;

[0025] Fig. 5B includes side views of an internal metal wire of a multi-function guidewire in a straight configuration and a corresponding coiled configuration;

[0026] Fig. 5C is an exterior view of detail "A" of Fig. 5A;

[0027] Fig. 5D is a cross section view of detail "A" of Fig. 5A;

[0028] Fig. 5E is an exterior view of the distal section straight portion of a curved distal section;

[0029] Fig. 5F is a cut-away view of section A-A of Fig. 5D;

4

[0030] Figs. 6A-6D illustrate a wire and dilator used in conjunction with a steerable sheath, in accordance with embodiments of the present invention; and

[0031] Figs. 7A-7G illustrate a further embodiment of a method of using a system in accordance with embodiments of the present invention to perform a transseptal puncture from a superior access approach.

**DETAILED DESCRIPTION**

[0032] In some medical applications, it may be desirable to reach a desired target tissue site within a region of tissue within a patient's body in order for example, to provide access to a particular cavity or space. In some applications access to the cavity or space may be provided through a puncture that is created within the desired tissue site. In order to initially reach the desired tissue site within the region of tissue, access may be provided into and/or through vasculature using a guidewire. A sheath and dilator assembly may then be advanced over the guide wire, and the sheath may be used to guide the dilator, as well as any other devices positioned through the assembly, to the desired target tissue site.

[0033] In some such applications, a particular access point into the patient's vasculature may be dictated by, for example, treatment requirements or anatomical considerations. For example, patients with occluded or stenosed vasculature may require an alternate access point. In addition, procedures such as lead placement dictate particular access points in order to allow implanted leads to be connected to a battery.

[0034] Thus, in certain procedures, a particular tissue puncture site is required while the access point into the vasculature is also restricted. In some such procedures, delivering treatment tools and assemblies from the access point to the tissue puncture site is difficult and/or may require many device exchanges due, for example, to the curvature and/or tortuosity of the vasculature within that region of the body.

[0035] For example, in some such applications, a very sharp or high curve or trajectory may be required to access the desired tissue site. In order to reach the desired tissue site, fixed curve sheaths or steerable sheaths may be utilized but both have drawbacks when used with current accessory devices.

[0036] In particular, where a fixed curve sheath is used, the fixed curve sheath may not be able to retain its curvature. This may be a result of a relatively stiff dilator and/or other devices inserted within the fixed curve sheath. As such, the sheath may not be able to position the dilator and/or any other device at the desired target tissue site.

[0037] In situations where a steerable sheath is utilized, upon actuation of the steerable sheath (in some such embodiments), the stiffness of the dilator, and/or any additional devices inserted through the steerable sheath, may limit or prevent the steerable sheath from reaching the intended or required curvature, thus preventing the steerable sheath from positioning the dilator and/or other devices at the target tissue site. Furthermore, stiffness of the dilator may result in breakage of the actuation mechanism of the steerable sheath upon actuation of the steerable sheath. In one particular example, the pull wires may separate from a distal joint within the sheath or may separate from the proximal lever or actuation mechanism of the steerable sheath. In other examples, the stiffness of the dilator may result in breakage of the pull wires upon actuation of the steerable sheath.

[0038] In addition, as mentioned above, puncturing certain tissue sites while being limited to particular access points also often requires exchanging devices multiple times, with each device performing a specific function during the course of the procedure. For example, current methods of accessing a heart chamber on the left side of

5

the heart using a superior access approach require multiple device exchanges resulting in relatively inefficient and lengthy procedures. In a further example of procedural inefficiencies, existing techniques for gaining trannseptal access for delivery of cardiac leads generally require that the transseptal puncture and lead delivery be performed using different access points, necessitating, for example, either transferring the lead, or trying to re-locate the puncture site, and then installing the lead within the heart.

[0039] The present inventors have conceived and reduced to practice novel and unique devices (which may be referred to as "hybrid devices" in the description below) and associated methods to facilitate efficient and repeatable puncture of a plurality of tissue sites while allowing vascular access from various access points on a patient's body. These devices include dilators and wires, for example guidewires, usable alone or in combination to facilitate this tissue access and puncture at various anatomical locations from desired access points.

[0040] For example, the present inventors have conceived and reduced to practice a flexible dilator that is usable in combination with an ancillary medical device (which may include a catheter, a fixed curve sheath or a steerable sheath), the dilator being designed and configured so that it does not substantially affect the curvature of the ancillary device.

[0041] Embodiments of a dilator of the present invention are sufficiently flexible to allow the ancillary device to guide and position the dilator and/or additional devices in a wide array of patient anatomies. Embodiments of the dilator accomplish this function by providing a flexible intermediate region having reduced stiffness. The location of the flexible region, when the dilator is inserted into/through the ancillary device, corresponds to a region of the ancillary device that is amenable to deflection or has a particular shape or curve, whereby the flexibility of the dilator at that location helps to ensure that the dilator does not substantially impair the ability of the ancillary device to retain, maintain or reach its intended shape or curvature. In some embodiments, the dilator, while being sufficiently flexible along the intermediate region, has sufficient stiffness along a distal end region to allow the dilator to be tracked or advanced across tissue for dilating a perforation or puncture at the desired target tissue site.

[0042] Relatedly, the present inventors have discovered, and reduced to practice, guidewire-based medical devices for puncturing a septum of the heart and for providing reliable and robust guidewire rail support across the puncture even when accessing the heart via veins superior to the heart (such as the subclavian veins). Such medical devices are sufficiently flexible to be directed towards the appropriate puncture site from the desired access point, yet are also stiff enough to support insertion of additional devices thereupon. In addition, embodiments of such devices include features for maintaining the medical device in position across the puncture to maintain patency of the puncture and to ensure continued access to tissue across the puncture.

[0043] Furthermore, the present inventors have conceived and reduced to practice methods of treatment that employ one or more novel devices for puncturing tissue sites utilizing defined access points and for performing multiple steps of the procedure to thereby reduce and/or minimize the number of device exchanges. In addition to improving efficiencies and reducing treatment procedure time, these methods allow for transseptal puncture and lead delivery to be performed using a single access point.

[0044] With specific reference now to the drawings in detail, it is stressed that the particulars shown are by way of example and for purposes of illustrative discussion of certain embodiments of the present invention only. Before explaining at least one embodiment of the invention in detail, it is to be understood that the invention is not limited in its application to the details of construction and the arrangement of the components set forth in the following

6

description or illustrated in the drawings. The invention is capable of other embodiments or of being practiced or carried out in various ways. Also, it is to be understood that the phraseology and terminology employed herein is for the purpose of description and should not be regarded as limiting.

**[0045]** Systems

**[0046]** Fig. 1 is an illustration of a system 50 that incorporates embodiments of devices of the present invention and that may be utilized during the course of an inventive procedure as described further hereinbelow. As illustrated, system 50 includes a steerable device such as steerable sheath 300 with dilator 100 inserted therein, and wire 200 inserted into dilator 100. Steerable sheath 300 and dilator 100 each defines a respective lumen through which devices may be inserted, and may therefore be referred to as "tubular members". Although a steerable sheath is discussed throughout this application, it will be evident to one of skill in the art that other steerable devices or articulating components may be used. For ease of explaining the fundamental principles of the invention, "Steerable Sheath" will be used throughout the specification as an example of a steerable or articulating device. Alternatively, in some embodiments, a fixed curve sheath may be utilized in place of an articulating sheath, depending on the access point and tissue puncture site chosen by a user.

**[0047]** Wire 200 is connected to a generator 500 by connector 502. Steerable sheath 300 includes a steerable sheath handle 302. In some embodiments, the steerable sheath is unidirectional i.e. it allows deflection in a single direction. In other embodiments, a bi-directional sheath may be used. In the exemplary applications disclosed below, an 8.5 French steerable sheath with a 40 cm usable length is typically used; procedures for larger patients may use a sheath with a 45 cm usable length or other lengths as may be appropriate. Fig. 1(i) shows an expanded view of a portion of heart 400 illustrating a distal portion of steerable sheath 300, distal tip 106 of dilator 100, and wire 200, which may be a radiofrequency puncture wire.

**[0048]** Dilators

**[0049]** In accordance with one embodiment of the present invention, as shown in Fig.1A, a flexible dilator 100 is disclosed for use with a steerable sheath 300 (shown in Fig. 1B) to access a region of tissue within a patient's body. The steerable sheath 300 has a range of deflection angles and can achieve a range of curvatures upon actuation. Referring again to Fig. 1A, the dilator 100 comprises a dilator hub 102 that is coupled to an elongate member 120 that comprises regions of varying flexibility including an intermediate region 100b that terminates in a distal end region 100a. In accordance with an embodiment of the present invention, the intermediate region 100b is a substantially flexible or soft section that provides minimal resistance to deflection and is operable to be deflected under guidance to allow the dilator 100 to reach a desired site within a region of tissue within the patient's body to facilitate advancement of the distal end region 100a there-through. The flexible intermediate region 100b allows the dilator 100 to conform to the curvature of the steerable sheath 300 that is achieved through actuation of the steerable sheath 300. Thus, in some embodiments, as outlined herein, the flexible intermediate region 100b does not inhibit the range of motion of the steerable sheath 300.

**[0050]** Additionally, the elongate member 120 of the dilator 100 further comprises a distal end region 100a that is formed distally adjacent to the flexible intermediate region 100b, such that the flexible intermediate region 100b continues distally until (and terminates at) a proximal boundary or edge of the distal end region 100a. In other words the distal end region 100a extends proximally from the distal edge of the dilator 100 until a distal edge of the flexible intermediate region 100b. The distal end region 100a has a stiffness or rigidity that is greater than the

7

flexible intermediate region 100b to facilitate advancement of the dilator 100 through the tissue once the dilator 100 has been positioned at the desired tissue site, such as a desired puncture site. The stiff or substantially rigid distal end region 100a provides enhanced pushability and may prevent deformation thereof during advancement of the distal end region 100a through the tissue (for example over a guide-wire or a puncturing device), for example at the puncture site in order to dilate the puncture site.

[0051] In one particular example, the elongate member 120 and the hub 102 may be formed, for example using techniques as may generally be known in the art, such as molding techniques. In some embodiments, the distal end region 100a is formed from a rigid polymer, and the intermediate region 100b is formed from a flexible polymer. In one particular embodiment, the rigid distal end region 100a is formed from High Density Polyethylene (HDPE) and the flexible or soft intermediate region 100b is formed from Low Density Polyethylene (LDPE). In some embodiments, the flexible intermediate region 100b may be formed from a material that exhibits sufficient flexibility to enable the flexible intermediate region 100b to conform to the curvature of a steerable sheath 300 and substantially does not impair, limit or inhibit the ability of the steerable sheath 300 to reach its intended curvature. Additionally, the rigid distal end region 100a is formed from a material that exhibits sufficient rigidity that to enable the rigid distal end region 100a to be advanced through a tissue site such as through a puncture site within a region of tissue. Thus, dilator 100 can be understood to be a hybrid device in that it is sufficiently flexible to be guided to the tissue site yet maintains sufficient rigidity to be advanced through the tissue site.

[0052] As outlined previously, in accordance with an embodiment of the present invention, a dilator 100 is provided that is usable with a steerable sheath 300 to access a region of tissue within a patient's body. The steerable sheath 300 may be of the type shown in Fig. 1B comprising an articulating portion or deflectable region 200b that is amenable to deflection upon actuation of a steerable actuation mechanism for example such as a knob of a handle 302. During use, the dilator 100 is inserted within the steerable sheath 300 for use therewith such that a location or position of the flexible intermediate region 100b of the dilator 100 corresponds to the articulating portion or deflectable region 200b of the steerable sheath. This enables the steerable sheath 300 to reach its allowable range of curvatures or deflection (as shown and discussed later with reference to Figs. 2A-2C), upon actuation, as minimal resistance is introduced by the dilator 100. In other words, the flexible intermediate region 100b of the dilator does not impart rigidity to the steerable sheath 300 as the dilator 100 is being steered by the steerable sheath 300. This enables the steerable sheath 300 to position the distal end region 100a of the dilator 100 at a desired target location within a region of tissue such as at a desired puncture location or site to enable the distal end region 100a to subsequently advance there-through for example to dilate the puncture site.

[0053] In one particular embodiment, with reference to Fig.1A, dilator 100 further comprises a proximal region 100c that forms a part of elongate member 120 of dilator 100. The proximal region 100c extends proximally from the flexible intermediate region 100b. More specifically, the proximal region 100c extends proximally from a proximal boundary of the flexible intermediate region 100b and may extend until the hub 102. In some embodiments the proximal region 100c may also be formed from a flexible material and exhibits flexibility. Alternatively, in other embodiments, as shown in Fig. 1C, the flexible intermediate region 100b may extend along the proximal region 100c and may include the proximal region 100c. In some such embodiments, the flexible intermediate region 100b may have varying regions of flexibility. In some examples, a proximal region 100c is provided that is flexible as this may be desirable in certain applications. In some examples, flexibility of the dilator 100 in the proximal region 100c may lead to buckling observed in segment 112 of the proximal region 100c of the

8

dilator 100 as the dilator is inserted into the steerable sheath 300, as shown in Fig. 1D. In some such embodiments, it may be desirable to provide stiffness or rigidity to the device proximal region 100c in order to make the dilator 100 less susceptible to buckling.

[0054] Therefore, in some embodiments as shown in Fig. 1E, a dilator 100 is provided where the proximal region 100c has a rigidity that is greater than that of the flexible intermediate region 100b. In some embodiments, the rigid proximal region 100c is formed from a material that exhibits sufficient rigidity to enable the rigid proximal 100c to be advanced through the steerable sheath 300 substantially without buckling or deforming. The rigidity of the dilator 100 in the proximal region 100c reduces the likelihood of the dilator bending or deforming as it is being inserted into the steerable sheath 300 during a procedure. In some embodiments, the distal end region 100a and the proximal region 100c have substantially the same rigidity. In a particular embodiment, the rigid distal end region 100a and the proximal region 100c are formed from a rigid polymer and the flexible intermediate region is formed from a flexible polymer. In one example, the rigid distal end region 100a and the proximal region 100c comprise substantially the same stiffness. In other embodiments, the rigidity of the rigid distal end region 100a and the proximal region 100c may differ. In one particular embodiment, the rigid distal end region 100a and the proximal region 100c are formed from High Density Polyethylene (HDPE ) having a stiffness that is equal to about 0.8 GPa, whereas, the flexible intermediate region 100b is formed from Low Density Polyethylene (LDPE) having a stiffness of about 0.3 GPa. In other embodiments, the flexible and rigid regions of the dilator maybe formed from PEBAX® with different durometers of PEBAX® being used for the respective flexible and rigid regions.

[0055] In some embodiments, the dilator 100 has a usable length (i.e. the length of the elongate member 120) that is between about 60 cm to about 100 cm. More specifically, in one example, the dilator has a usable length of between about 67 cm and 68 cm.  In a specific example of this, the dilator has a usable length of about 67.6 cm. In another example, the dilator has a usable length of between about 70 cm to about 71 cm. In a specific example of this, the dilator has a usable length of about 70.6 cm.

[0056] In some such embodiments, the flexible intermediate region 100b has a length of between about 7 cm to about 15 cm. In one particular example, the flexible intermediate region has a length of about 15 cm.

[0057] In some embodiments, the distal end region 100a has a length of between about 0.4 cm to about 4.0 cm. In a specific embodiment, the distal end region 100a has a length of about 0.5 cm to about 1 cm. In a particular example of this, the distal end region 100a has a length of between about 0.6 cm to about 0.7 cm. In a specific example, the distal end region has a length equal to about 0.7 cm. In some embodiments, the rigid distal end region 100a has a length of between about 2.5 % to about 60% of the length of the flexible intermediate region.

[0058] In some embodiments, the rigid proximal section 100c may have a length of between about 41 cm to about 92 cm. In one particular embodiment, the proximal end section 100c has a length of about 51 to about 52 cm. In a specific example of this, the proximal end section has a length of about 51.9 cm.

[0059] With reference now to Figs. 2A-2C, various embodiments of a steerable sheath 300 are shown with the dilator 100 inserted there-through.  In some embodiments, once the dilator 100 has been inserted through the steerable sheath 300, the dilator 100 extends by a distance, for example about 3 cm, distally beyond the distal end or tip of the steerable sheath 300 (more specifically, beyond the distal end/edge of the steerable sheath 300). In some embodiments, the dilator extends by between about 2 cm to about 4 cm beyond the distal edge of the steerable

9

sheath 300. In some embodiments, the steerable sheath 300 has a usable length 201 that is between about 45 cm to about 71 cm.

[0060] In one specific example, with reference now to Fig. 2A, the steerable sheath 300 is an 8.5 French unidirectional steerable sheath, that has a deflectable region or articulating portion 200b operable to adopt a curve S having an angle of about 180 degrees and a having a radius of curvature of about 8.5 mm. Alternatively, in the example as shown in Fig. 2B, the deflectable region or articulating portion 200b of the steerable sheath 300 is operable to adopt a curve M having a radius of curvature of about 11 mm. In another example as shown in Fig. 2C, the deflectable region or articulating portion 200b of the steerable sheath 300 is operable to adopt a curve L, having a radius of curvature equal to about 25 mm.

[0061] With reference again to Figs. 2A to 2C, in some embodiments, the usable length 201 of the steerable sheath 300 is equal to about 45 cm. In some such embodiments, the steerable sheath 300 is used with an 8.5 French flexible dilator 100 having a usable length of about 67 cm and comprising a flexible intermediate region 100b with a length of about 15 cm. Thus, in accordance with various embodiments of the present invention, a steerable sheath 300 and dilator 100 are provided that work in conjunction with each other, with the steerable sheath 300 and dilator 100 having suitable lengths and sizes (including inner and outer diameters) that are usable to reach a desired region of tissue when inserted through the vasculature.

[0062] With reference now to Figs. 3A-3D, various dilator distal tip configurations are shown with alternative distal end regions 100a. In the particular example shown in Fig. 3A, the dilator 100 comprises a taper 122 along a distal end of the dilator 100, forming a tapered distal tip 106. In the example shown, the distal end region 100a extends partially along the length of the taper 122 and as such forms a part of the taper 122. In a specific example of this, the taper 122 has a length of about 1cm. In one such example the rigid distal end region 100a has a length of about 0.7 cm. In another such example, the rigid distal end region 100a has a length of between about 0.3 cm to about 0.5 cm.

[0063] Figs. 3B, 3C and 3D illustrate alternative configurations for the tapered distal tip 106. As shown in Fig. 3B, in some embodiments, the distal end region 100a may extend along the entire length of the taper 122.  In a further example of this, as shown in Figs. 3C and 3D, the distal end region 100a may additionally extend further proximally along the elongate member 120, beyond the taper 122.

[0064] Fig. 3C illustrates a dilator 100 that is an 8.5 French dilator that tapers down to an outer diameter (OD) of about 0.046" (about 1.2 mm) and an inner diameter (ID) of about 0.036" (about 0.9 mm), along the tapered distal tip 106. In a specific example, the taper 122 has a length of about 2 cm. In some such embodiments, the distal end region 100a has a length of about 3cm and is formed from HDPE, whereas the flexible intermediate region is formed from LDPE. The dilator 100 may be formed from a re-flow of the two polymers, HDPE and LDPE, in a glass die via lap joining.

[0065] Additionally, Fig. 3D illustrates a dilator 100 that has a distal tip 106 that comprises a double taper configuration. In one specific example, the dilator 100 is an 8.5 French dilator that tapers down to about 5.6 French along a first tapered region R1, with the first tapered region R1 having a length of about 1 cm.  The dilator 100 then tapers from about 5.6 French to an outer diameter (OD) of about 0.046" and an inner diameter (ID) of about 0.036", along a second tapered region R2, with the second tapered region have a length of about 1 cm. In one specific example, the distance between the first and second tapered regions R1 and R2 is also equal to about 1 cm. In one

10

such example, the distal end region has a length of about 4 cm. The dual taper configuration may provide greater feedback during dilation and may allow the user to feel the tactile feedback (in the form of a pop) associated with each of the first and second tapered regions R1 and R2. The dual taper configuration may be formed in a similar manner to above, using a glass tipping die via lap joining.

[0066] In some embodiments, the dual taper distal tip configuration shown in Fig. 3D may require less force to advance it through a tissue site (for example, through a puncture within a region of tissue) than a single taper distal tip configuration, as shown Figs. 3B and 3C. Furthermore, in some examples, a longer taper length (as shown and discussed with respect to Fig. 3C) may require less force to be advanced through tissue than a shorter taper length (as shown in Fig. 3A). The longer taper provides a lower slope and hence a smoother transition. Additionally, the longer taper length may prevent high mechanical resistance when the dilator is advanced through a puncture site and may prevent the dilator from slipping away from the puncture site. Additionally, in examples where the dilator is used to dilate a puncture within a septum of the heart (where access is provided through the right atrium and an RF wire is used to create the puncture as described further below), the longer taper length may prevent the RF wire from being pulled back into the right atrium of the heart and losing the puncture site and thus may help prevent the need to create a second puncture.

[0067] Furthermore, in some embodiments, the dilator 100 comprises a straight dilator that substantially lacks a curvature. In other words, the dilator 100 has a substantially straight configuration along each of the rigid proximal region 100c, the flexible intermediate flexible portion 100b and the rigid distal end region 100a. During use, the straight dilator 100 does not impart a curvature to the steerable sheath 300 to enable the steerable sheath 300 to reach its desired curvature upon actuation. This allows the steerable sheath 300 to position the distal end region 100a at a desired target location, for example at a desired puncture site to enable the distal end region 100a to advance there-through to dilate a puncture once it has been formed. Therefore, the straight dilator 100 does not interfere with or affect the intended curvature of the steerable sheath 300 and thus does not inhibit the desired range of motion of the steerable sheath 300. In accordance with an embodiment of the present invention, the dilator 100 comprises both a straight configuration and a flexible or soft intermediate region 100b, and the combination provides a synergistic or combined effect preventing the dilator 100 from inhibiting the range of movement of the articulating portion or deflectable region 200b of the steerable sheath 300. This may allow the steerable sheath 300 to guide the dilator 100 to access a region of tissue within a patient's body such as for example an area of the heart.

[0068] In a specific example, as shown in Fig. 3E, a dilator 100 is provided that is an 8.5 French dilator. Along the proximal region 100c and flexible intermediate region 100b (not including the taper 122), the dilator has an outer diameter (OD) that is equal to about 0.111" +/- 0.002" and an inner diameter (ID) that is equal to about 0.058" +/- 0.002", that tapers down along the tapered distal tip 106 to an outer diameter of about 0.044" +/- 0.001" and an inner diameter of about 0.036" +/- 0.001" at the distal boundary or edge of the distal tip 106. This allows the dilator 100 to be compatible with a 0.035" OD guide-wire. Furthermore, the taper 122 along the tapered distal tip 106 has a length of about 1cm and the rigid distal end region 100a has a length of about 0.7cm. In one such example, the dilator 100 has a usable length of about 67.6 cm, with the flexible intermediate region 100b having a length of about 15 cm, with the rigid proximal region 100c having a length of about 51.9 cm. In one particular embodiment, the rigid distal end region 100a and the proximal region 100c are formed from High Density Polyethylene (HDPE) having a stiffness of 0.8 GPa, whereas, the flexible intermediate region 100b is formed from Low Density Polyethylene (LDPE) having a stiffness of about 0.3 GPa. In the example described herein, the dilator 100

11

comprises varying regions of flexibility (i.e. flexible and rigid regions), and since the dilator 100 comprises a fairly constant OD and ID, the behavior or various regions, in terms of rigidity, is governed by the stiffness of the materials used.

[0069] In embodiments described herein, the flexural rigidity value of the dilator 100 is the product of Young's modulus $E$ (in Pa) [also known as the flexural modulus) which indicates stiffness of a material, and the second moment of area (or area moment of inertia I) (in $m^4$), having SI units of $Pa \cdot m^4$ which also equals $N \cdot m^2$. The area moment of inertia I may be calculated from the values of the inner diameter (ID) and the outer diameter (OD) by a person skilled in the art using the formula $[I=\pi/64(OD^4-ID^4)]$. In one particular example discussed herein, the flexural rigidity value is calculated to be 0.0023 $N \cdot m^2$ for the flexible intermediate region 100b comprising LDPE and 0.00086$N \cdot m^2$ for the rigid proximal region 100c comprising HDPE. In some embodiments, the ID of the dilator 100 along the flexible intermediate region 100b and the rigid distal end 100a (not including the taper), ranges from between about 0.056" to about 0.06". In some such embodiments, the OD of the dilator 100 along the flexible intermediate region 100b and the rigid distal end 100a (not including the taper), ranges from between about 0.109" to about 0.113". In some embodiments, the flexible intermediate region 100b comprising LDPE, has a rigidity that ranges from between about 0.00030 $N \cdot m^2$ to about 0.0014 $N.m^2$, and the rigid distal end region 100a comprising HDPE has a rigidity that ranges from between about 0.0015 $N.m^2$ to about 0.0046 $N.m^2$.

[0070] In one particular example, the dilator 100 is usable with a steerable sheath 300 that is an 8.5 French unidirectional steerable sheath, as shown in Fig. 2A, that has a deflectable region or articulating portion 200b that is operable to deflect with a curve S having an angle of about 180 degrees and with a radius of curvature of about 8.5mm. The steerable sheath 300 has a length equal to about 45 cm. In one particular example, the steerable sheath 300 may be a SUREFLEX™ Steerable Sheath sold by Baylis Medical Company Inc., as shown in Figure 4. The steerable sheath 300 comprises a metal wire braid comprising a High Tensile 304v Stainless Steel 0.002" x 0.006" with a polymer jacket disposed thereon, and an inner PTFE liner. The polymer jacket comprises sections of PEBAX and Nylon with varying durometers (D) and lengths. The deflectable portion of the steerable sheath 300 is indicated by reference number 200b.

[0071] In one such embodiment, a steerable sheath assembly is described with the dilator 100 being inserted within the steerable sheath 300. In a particular example of this, the steerable sheath 300 is actuated to reach an angle of about 90 degrees. In one such example, the actual observed deflection of the steerable sheath 300 is equal to about 80 degrees. Thus, the steerable sheath 300 is able to reach about 88.8% of its intended curvature. As such the dilator 100 allows the steerable sheath 300 to substantially reach its intended curvature. Conversely, unlike the embodiments of the present invention, when a rigid HDPE dilator with similar dimensions is used (i.e. a dilator with similar ID and OD that comprises entirely of HDPE) the steerable sheath 300 is only able to reach a 45 degree curvature which is about half of the intended curvature.

[0072] In an additional example, the steerable sheath 300 is actuated to reach a deflection angle of about 180 degrees, however, an actual deflection equal to about 140 degrees is observed. Thus, the steerable sheath 300 is able to reach 77.8% of its intended curvature. Contrary to this, when the steerable sheath 300 is used with a rigid HDPE dilator, the steerable sheath 300 is only able to reach a 90 degree curvature.

[0073] In still an additional example, the steerable sheath 300 is actuated to reach a deflection angle of about 250 degrees with the actual observed deflection being equal to about 180 degrees. Thus, the steerable sheath is able to

12

reach about 72% of its intended curvature. On the other hand, when the steerable sheath 300 is used with a rigid HDPE dilator, the steerable sheath 300 is only able to reach a curvature of about 110 degrees.

[0074] As such, in the examples outlined above, the flexible intermediate region 100b of dilator 100, in accordance with an embodiment of the present invention, substantially does not inhibit the range of motion of the steerable sheath 300, allowing the steerable sheath 300 to reach its intended shape or curvature in order to access a desired tissue site within a region of tissue within a patient's body. Thus, in some embodiments the dilator 100 allows the steerable sheath to reach a curvature that is equal to at least about 70% of its intended curvature. In other embodiments the dilator 100 allows the steerable sheath to reach a curvature that is equal to greater than about 50% of the intended curvature.

[0075] In one particular embodiment, the dilator 100 is usable with an ancillary device such that it allows the ancillary device to maintain or reach its intended shape or curvature in order to access a desired tissue site within a region of tissue within a patient's body. The dilator 100 may be of the type described herein above, that comprises a rigid distal end region 100a and a flexible intermediate region 100b terminating at the distal end region 100a, with the rigid distal end region 100a having a rigidity greater than the flexible intermediate region 100b to enable the dilator 100 to advance through tissue. The dilator 100 is configured for use in conjunction with the ancillary device such that during use, the flexible intermediate region 100b corresponds to a region of the ancillary device that is functional for imparting or providing a curvature. In one particular example, the dilator 100 is advanced over or through the ancillary device such that such that during use the flexible intermediate region 100b of the dilator 100 does not affect the region of the ancillary device that is functional for imparting a curvature, allowing the ancillary device to substantially maintain or reach its intended position or shape in order to position the dilator rigid distal end region 100a at a desired location within the region of tissue.

[0076] In one such example, the ancillary device comprises a steerable device such as a sheath, catheter or guide-wire that is steerable, where the ancillary device is functional for imparting a curvature by actuation of the ancillary device. When in use in conjunction with the dilator 100, the flexible intermediate region 100b of the dilator does not inhibit or prevent the ancillary device from reaching its intended curvature upon actuation to position the dilator distal end region 100a at a desired location.

[0077] Alternatively in some embodiments, the ancillary device comprises a fixed curve device such as a fixed curve sheath that has a preformed curve. Similar to embodiments discussed previously herein, the fixed curve sheath is usable with the dilator 100 and during use the flexible intermediate region 100b of the dilator 100 does not affect the preformed curvature of the sheath, thus allowing the sheath to position the rigid distal end 100a of the dilator 100 at the desired location within the region of tissue. Furthermore, the use of the dilator 100, in accordance with an embodiment of the present invention, may prevent the need for over curving the sheath in anticipation of a substantial decrease in curvature of the sheath once the dilator 100 there-through.

[0078] In one such example, a fixed curve sheath is described with the dilator 100 being inserted therein. The fixed curve sheath has a pre-formed curve with an angle of about 40 degrees. Once the dilator 100 is positioned through the fixed curve sheath, the curvature of the sheath is observed to be about 32 degrees. Thus, the fixed curve sheath is able to maintain its curvature at about 80% of the intended curvature. As such the dilator 100 allows the fixed curve sheath to substantially maintain its intended curvature. Contrary to this, if a rigid HDPE dilator is utilized,

13

unlike embodiments of the present invention (as described previously herein above), the curvature of the fixed curve sheath is reduced to about 22.5 degrees.

[0079] Similarly in another example, a fixed curve sheath is described that has a pre-formed curvature with an angle of about 135 degrees. Once a dilator 100, is inserted through the sheath in accordance with an embodiment of the present invention, the observed angle of curvature of the fixed curve sheath, is equal to about 112 degrees. Thus, the fixed curve sheath 300 is able to maintain a curvature that is equal to about 77.8 % of its intended curvature. Contrary to this, if a rigid HDPE dilator is utilized, unlike embodiments of the present invention, the curvature of the fixed curve sheath is reduced to about 78 degrees. Thus, in some such embodiments, the fixed curve sheath is able to maintain an angle of curvature that is greater than about 60% of its intended curvature. In other embodiments, the fixed curve sheath is able to maintain an angle of curvature that is equal to at least about 75% of its intended curvature.

[0080] As outlined above, in some embodiments described herein above, the dilator 100 comprises varying regions of flexibility (i.e. rigid and flexible regions) to define a hybrid medical device. Since the dilator 100 comprises a fairly constant OD and ID and thus fairly constant wall thickness along its length, the behavior of the various regions, in terms of rigidity, is governed by the stiffness of the materials used. For example, the higher the stiffness of a material, the greater the rigidity, and the lower the stiffness of the material the lower the rigidity. Alternatively, in other embodiments, a single material may be used to form the dilator where the varying regions of flexiblity are provided by varying the wall thickness along the respective regions. For example, an HDPE dilator may be provided with a relatively thin wall thickness along the flexible intermediate region and a relatively thicker wall thickness along the distal end region, in order to provide a dilator with the functionality described previously hereinabove.

[0081] Puncture devices

[0082] In accordance with further embodiments of the present invention, as described hereinabove, Figures 5A-5F illustrate embodiments of a medical device operable to be guided to a tissue site to puncture tissue and to function as a rail for installing devices thereupon. Such embodiments provide efficiencies to medical procedures in which they are utilized as they perform multiple functions and thereby reduce the amount of device exchanges that need to be performed. The "hybrid" medical devices described herein further facilitate the access and puncture of a tissue site upon insertion at a particular access site on a patient's body, as described hereinabove.

[0083] With reference to Fig. 5A, an embodiment of a medical device, referred to herein as multi-function guidewire 200, is shown. Multi-function guidewire 200 includes an elongate member which comprises a proximal section 206 which is typically curved, a rail section 204, and a distal section 202 which is also typically curved. Multi-function guidewire 200 is sufficiently flexible to enable access to heart tissue, such as a septum, from, for example, an inferior approach or a superior approach. Thus, multi-function guidewire 200 allows access to a particular tissue site from one of several vascular access sites. While certain aspects and features of the multi-function guidewire 200 will be presently described with reference to one specific application, namely creating a puncture in a heart septum, it will be understood by those of skill in the art that the medical device described herein is usable in various applications and its utility is not limited to this particular procedure.

[0084] An active tip 208 (shown in detail in Fig. 5E) at the distal end of the distal section 202 is operable to deliver energy for puncturing tissue such as a heart septum to create a puncture site through which distal section 202 and

14

the distal part of rail section 204 can be advanced, for example to enter the left atrium. Once advanced through the puncture site, distal section 202 is biased to form a coil for anchoring multi-function guidewire 200 beyond the puncture site. Typically, when distal section 202 is advanced out of a dilator and beyond the septum to curl up into a coil in the left atrium, the distal end of the rail section will have been advanced into the left atrium i.e. in order for the distal section to form a coil, rail section 204 is typically advanced into the left atrium to define a rail thereto. In some embodiments, particularly for use in accessing the left atrium, the distal section 202 is sized such that when it forms a coil in the left atrium, the coil will not be accidentally advanced into openings adjacent the left atrium, such as a left pulmonary vein or a mitral valve. Once the guidewire is anchored, rail section 204 functions as a substantially stiff rail for supporting the installation of one or more tubular members thereupon and for advancing devices into the heart. In typical embodiments, rail section 204 includes a metal wire 212 (Fig. 5B) which is fabricated of spring tempered steel. In some embodiments, for example when accessing the heart from a superior approach, the rail is sufficiently flexible to bend about 180° and yet maintains sufficient rigidity to function as a rail for advancing devices thereover. Additionally, the flexibility of rail section 204 enables it to be maneuvered (for example, by a steerable sheath) to access a tissue site. Thus, as described with respect to dilator 100 above, a medical device such as multi-function guidewire 200 can be understood to be a "hybrid" device, having sufficient flexibility to be positioned at a tissue site from a particular access site, while being sufficiently rigid to function as a rail for installation of other devices thereupon.

[0085] In some embodiments of the multi-function guidewire 200, rail section 204 has a length of about 700 mm to about 1750 mm to enable access to the tissue site. In some embodiments, the rail section has a length of between about 1200 and 1300 mm, more particularly about 1240 mm. Typically, as shown in Fig. 5B, the rail section has a constant diameter in maximum rail portion 234 and tapers distally in tapered rail portion 236. In some examples, the rail section (including metal wire 12 and insulation 214, described further hereinbelow) has an outer diameter of about 0.86 mm (0.034 inches) at its proximal end (i.e. at maximum rail portion 234) and about 0.71 mm at its distal end (i.e. at the distal end of tapered rail portion 236). In some such embodiments, the diameter of the guidewire elongate member is constant throughout maximum rail portion 234. In some embodiments, the upper limit for the outer diameter of the proximal end of the rail section (including metal wire 12 and insulation 214) is about 1.1 mm and the lower limit of the outer diameter of the distal end of rail section 204 (distal end of tapered rail portion 236) is about 0.6 mm. In some alternative embodiments, the outer diameter tapers in maximum rail portion 234.

[0086] The proximal section 206 is biased to a coiled configuration for improved handing of the medical device, for example to avoid interfering with users of the device such as doctors, nurses and other medical personnel. In some embodiments, the proximal section is biased to assume a spiral-shaped coil, while in other embodiments; it is biased to assume a constant diameter coil (i.e. the diameter across the entire coil is substantially constant). In some embodiments, proximal section 206 has a length of about 150 to about 600 mm. In one specific example, proximal section has a length of about 500 mm.

[0087] For ease of illustration of the primary sections of multi-function guidewire 200, these sections are shown in Fig. 5B, as follows: the lower part of the figure shows the wire 212 of guidewire 200 in a typical configuration in use, with both distal section 202 and proximal section 206 adopting a coil shape, while the upper portion of the figure shows the wire 212 in a straight configuration. The divisions between the different sections of multi-function guide-wire 200 are shown by construction lines between the top and bottom drawings, with the exception of the two end parts, proximal section straight portion 215 and distal section straight portion 216.

WO 2015/019132        PCT/IB2013/060287

15

[0088] Referring to the straight configuration wire shown in the upper part of Fig. 5B, proximal section 206 includes proximal section straight portion 215 and proximal section curved portion 232. Typically, wire 212 has a constant diameter in proximal section 206. Transition portion 222 is located between proximal section 206 and rail section 204. The diameter of wire 212 increases distally through transition portion 222. Referring to the coiled configuration of wire 212, shown in the lower part of Fig. 5B, proximal section straight portion 215 is shown at the bottom of the coil formed by proximal section 206. The proximal end of straight portion 215 includes an exposed portion 212a of electrically conductive wire 212.

[0089] Rail section 204 includes maximum (or 'constant-diameter') rail portion 234 and tapered rail portion 236. Typically, maximum rail portion 234 has a constant diameter along its length which generally corresponds to the largest diameter of the wire. In some embodiments, the diameter of wire 212 tapers distally through tapered rail portion 236.

[0090] Distal section 202 is distal of rail section 204 and includes distal section curved portion 226 and distal section straight portion 216. Distal section straight portion 216 is shown, in the lower portion of Fig. 5B, inside of the coil formed by distal section 202.

[0091] Typically, wire 212 is comprised of spring tempered stainless steel.

[0092] In some embodiments, wire 212 of the rail section has an outer diameter of about 0.64 mm (more specifically, 0.6 mm) at maximum rail portion 234 and at a proximal end of the tapered rail portion 236 (i.e. the diameter is constant in maximum rail portion 234); and an outer diameter of about 0.5 mm at a distal end of tapered rail portion 236 of the rail section 204. More broadly, embodiments of the wire 212 of the rail section have an outer diameter ranging from about 0.89 mm and to about 0.36 mm, or about 0.9 mm to about 0.3 mm, with the diameter of wire 212 typically being constant in maximum rail portion 234. In alternative embodiments, the outer diameter tapers in maximum rail portion 234.

[0093] In some embodiments, the proximal end of rail section 204 (i.e. the proximal end of maximum rail portion 234) of wire 212 has a stiffness of 2119 N/m or less. In some embodiments, the distal end of tapered rail portion 236 has a stiffness of 118 N/m or more. Typically, the stiffness is constant throughout the length of maximum rail 234, but it may decrease distally in alternative embodiments. In one example, the proximal end of rail section 204 (the proximal end of maximum rail portion 234) has a stiffness of about 550 +/- 5 N/m, more specifically 552 N/m, and the distal end of tapered rail 236 has a stiffness of about 200 +/- 5 N/m, more specifically 204 N/m, to enable the rail section to be bendable by at least 180 degrees and to function as a rail for supporting installation of one or more tubular members thereupon. In another embodiment, the rail section has a stiffness of between about 100 N/m to about 600 N/m. It should be noted that the stiffness values noted herein are derived using a 3-point bend test over a 50 mm span, as would be understood to those of skill in the art.

[0094] For ease of understanding, a table of correspondence is included for converting certain of the stiffness measurements included herein to normalized flexural rigidity:

| Wire diameter (mm) | Stiffness in three point bending over span of 50 mm (N/m) | Flexural rigidity (N*m^2) |
|---|---|---|
| 0.635 | 552 | 1.4E-3 |
| 0.5 | 204 | 5.3E-4 |

16

| 0.89 | 2119 | 5.5E-3 |
|------|------|--------|
| 0.43 | 118 | 3.1E-4 |
| 0.157 | 2.1 | 5.4E-6 |
| 0.127 | 0.88 | 2.0E-6 |

[0095]

[0096] The diameter of wire 212 (and thereby multi-function guide-wire 200) decreases distally along distal section curved portion 226 of the distal section, and alternately decreases and increases distally in distal section straight portion 216 (explained below, with reference to Fig. 5F).

[0097] In typical embodiments, a layer of electrical insulation 214 (Fig. 5D) covers electrically conductive wire 212, with the exception of active tip 208 at the distal end of multi-function guide-wire 200 and an electrically exposed portion 212a at the proximal end of the guidewire, both of which remain electrically exposed. Exposed portion 212a is part of proximal section straight portion 215 and is operable to be electrically connected to an electrosurgical generator. Proximal section straight portion 215 facilitates loading/installation of over-the-wire devices (e.g. tubular members) onto the multi-function guidewire.

[0098] Fig. 5C is an exterior view of detail "A" of Fig. 5A showing distal section 202. The distal section 202 includes a distal section straight portion 216 which is distal of a distal section curved portion 226. Distal section straight portion includes active tip 208. In some embodiments, a length of distal section 202 is about 30 mm to about 150 +/- 10 mm. In some embodiments, a length of the distal section is about 125 mm.

[0099] Distal section 202 is configured such that when it is advanced through a puncture site in tissue, such as cardiac structures, it assumes a coiled configuration whereby the active tip 208 is directed away from the tissue, and is positioned at a predetermined distanced from electrically insulated portions of distal section 202. Distal section straight portion 216 of distal section 202 advances forward along a substantially straight path (the "axis of advancement") immediately after puncturing tissue and prevents the guidewire from immediately curling back on itself in order to potentially deliver energy a second time to the tissue site. When distal section straight portion 216 has been completely advanced out of a lumen (for example, the lumen of a dilator), distal section curved portion 226 is configured such that, upon deployment of distal section 202 from a confined state (inside the lumen) along an axis of advancement, active tip 208 curves away from the axis of advancement. For example, after puncturing a septum, the configuration of distal section 202 during and after deployment (Fig. 5C) acts to prevent the electrode (active tip 208) from directly contacting tissue on the left side of the heart, and from contacting the distal section curved portion 226 of the guidewire. Positioning the active tip 208 at a distance from distal section curved portion 226 helps to ensure that the guidewire will not be damaged if energy is delivered through active tip 208 once the coil configuration has been achieved.

[00100] The configuration of a coiled distal section 202 is shown in Figs. 5A, 5C and 5D, which illustrate examples of an approximately 630° generally spiral-shaped curve (also known as a double pigtail curve). Distal section 202 (Fig. 5C) has an inner curve diameter d1 associated with an inner region of the 630° spiral-shaped curve and an outer curve diameter d2 associated with an outer region of the curve. Distal curves of some alternative embodiments range from about 270° to about 630°, with a specific alternative embodiment having a 270° curve (a single pigtail

17

curve). Other alternative embodiments have curves of about 360° and about 450°. Yet other alternative embodiments have distal section 202 curves of less than 270°.

[00101] In some embodiments of the multi-function guidewire, inner curve diameter d1 is about 6 mm to about 30 mm, and in some embodiments is about 10 mm. In some embodiments of the multi-function guidewire, outer curve diameter d2 is about 20 to about 40 mm, and in some specific embodiments is about 22 mm.

[00102] As previously mentioned and, distal section 202 is configured such that active tip 208 does not contact distal section curved portion 226. 31. Fig. 5C illustrates an example of a distal curved section in a coiled configuration in which active tip 208 is spaced a pre-determined distance away from distal section curved portion 226. In the illustrated embodiment, active tip 208 is orthogonal (at a 90° angle) to the point along distal section curved portion 226 to which it is closest. In some embodiments, the distance of the active tip 208 from the insulated portion of the distal section 202 to which it is orthogonal (i.e. closest to) ranges from about 0.8 mm to about 4 mm. In some embodiments, the pre-determined distance of the active tip from an insulated portion of the distal section which it is closest to, is about 2.8 mm.

[00103] The pre-determined distance of the active tip from the distal section curved portion 226 of distal section 202 can also be measured relative to the diameter of the active tip. Using this method of measurement, in some embodiments the pre-determined distance of the active tip from an insulated portion of the distal section is equivalent to about 1 to about 5 times a diameter of the active tip, and in a specific embodiment is equivalent to about 4.6 times a diameter of the active tip.

[00104] Distal section 202 is substantially atraumatic. It includes a rounded electrode (active tip 208) for puncturing, not a sharp tip such as used for mechanical puncturing. Furthermore, distal section 202 is substantially flexible (i.e. floppy) so as to avoid exertion of traumatic forces on tissue (i.e. it acts as an atraumatic bumper) and distal section 202 (with the exception of the rounded electrode) is covered with a smooth layer insulation 214 (which may be anti-thrombogenic). In embodiments of the present invention, distal section 202 does not contain any sharp edges or rough surfaces.

[00105] Fig. 5D is a cross section view of distal section 202 indicated by detail "A" in Fig. 5A. Distal section 202 includes wire 212 with electrical insulation 214 thereupon, marker 210, distal section straight portion 216, and active tip 208 at the furthermost distal tip of the wire. Marker 210 surrounds a distal segment of wire 212 and electrical insulation 214 covers marker 210. Typically, active tip 208 is an electrode operable to deliver electrical energy for puncturing tissue, and is radiopaque, whereby it also functions as a visibility marker under medical imaging. In some embodiments, active tip 208 is formed by welding together a radiopaque marker band with the distal end of wire 212 to form a rounded electrode which is devoid of the layer of electrical insulation. Marker coil 210 may also be radiopaque and may comprise a helical coil surrounding wire 212. Marker coil 210 helps align the active tip with target tissue (e.g. a fossa ovalis) during tissue access and puncture procedures.

[00106] The outer layer of electrical insulation 214 covers wire 212 and marker 210. In typical embodiments, electrical insulation layer 214 is comprised of PTFE (Polytetrafluoroethylene) heat shrink. When multi-function guidewire 200 is advanced through tissue, the friction of the tissue on insulation layer 214 creates a force that could possibly cause the insulation to slide proximally relative to wire 212, but as illustrated more clearly in Fig. 5F, electrical insulation layer 214 extends distal of the helical coil 210, whereby the helical coil/marker helps to secure the layer of electrical insulation to the multi-function guidewire. Typically, marker coil 210 is welded, glued or

WO 2015/019132                                                                              PCT/IB2013/060287

18

otherwise suitably coupled to wire 212. In some embodiments, the insulation layer has a smooth outer surface to reduce the risk of thrombosis, and in some examples is antithrombogenic.

[00107] The stiffness of distal section 202 enables it to provide anchorage to prevent multi-functional guidewire 200 from inadvertently slipping out to a position proximal of a puncture site. The stiffness of distal section curved portion 226 decreases distally (i.e. it "tapers"). In some embodiments of the multi-function guidewire, the proximal end of distal section curved portion 226 has a stiffness about 550 +/- 10 N/m or less, and the stiffness decreases distally, without abrupt changes, such that the distal end of distal section curved portion 226 has a stiffness of about 1 +/- 0.5 N/m or greater, more specifically 0.88 N/m. In one example, a distal section curved portion 226 of the distal section has a stiffness of about 200 N/m at its proximal end and a stiffness of about 2.0 N/m, or more specifically 2.1 N/m, at its distal end.

[00108] In some embodiments, the stiffness of multi-function guidewire is mostly provided by wire 212, with electrical insulation 214 and marker 210 providing negligible stiffness relative to the wire. As known to one skilled in the art, the stiffness of multi-function guidewire 200 is related to (or a function of) the diameter of wire 212. In some embodiments of the multi-function guidewire 200, the wire 212 at the proximal end of the distal section curved portion 226 has an outer diameter of about 0.64 mm or less. In some examples, the wire at the distal end of distal section curved portion has an outer diameter of about 0.13 mm or more. In one example, the wire 212 of the distal section curved portion tapers distally from a proximal end outer diameter of about 0.5 mm to a distal end outer diameter of about 0.16 mm.

[00109] In typical embodiments, the elasticity and stiffness of distal section 202 make it possible for the multi-function guidewire to align with a curved lumen of a device, such as a dilator, containing the multi-function guidewire (i.e. to conform to a shape of a tubular member while positioned within a lumen of the tubular member).

[00110] Marker 210 aids in positioning the distal end of the multi-function guidewire 200, in particular, positioning active tip 208 before, during and after puncturing, and also in positioning devices that are advanced over the guidewire, such as pacemaker leads, thereby increasing the safety and efficacy of related medical procedures.

[00111] In some embodiments, marker/coil 210 is comprised of platinum and tungsten, and in one embodiment is comprised of platinum with about 8% tungsten. In most embodiments, the helical coil extends proximally from the active tip along a curve of about 180° to about 630°, and in one example along a curve of about 270°. Typically, the helical coil has length of about 15 to about 100 mm, and in one example has length of about 30 mm.

[00112] In some embodiments, the outer diameter of multi-purpose guidewire 200 (including wire 212, insulation layer 214 and coil 210, as applicable) at a proximal end of the distal section curved portion is about 0.86 mm or less, and a distal end of the distal section curved portion has an outer diameter which is about 0.59 mm or more. In one example, the outer diameter of the proximal end of distal section curved portion is about 0.72 mm and the outer diameter at the distal end of the distal section curved portion is about 0.59 mm.

[00113] Fig. 5E illustrates an exterior view of distal section straight portion 216. As shown in Fig. 5C, distal section straight portion 216 is distal of distal section curved portion 226. The distal section straight portion prevents distal section 202 from curving immediately upon exiting a lumen, for example, the lumen of a dilator. In some embodiments, distal section straight portion 216 has a larger diameter than a distal end of the distal section curved portion 226. In most embodiments, distal section straight portion has a length of about 3 to about 10 mm, and in one example distal section straight portion has a length of about 6.5 mm.

WO 2015/019132                                                                    PCT/IB2013/060287

19

[00114] Fig. 5F shows a cross-sectional view of distal section straight portion 216 along the line A-A from Fig. 5E. Fig. 5F includes: distal section straight portion 216, the distal end 228 of distal section curved portion 226, wire 212, minimum diameter portion 230, constant diameter portion 224, and active tip 208.

[00115] Distal section straight portion 216 includes constant diameter portion 224, which is a part of wire 212, and which typically has an outer diameter ranging from about 0.13 mm to about 0.65 mm.  In one paritcular example, the diameter at the constant diameter portion 224 is about 0.25 mm.  The outer diameter of the constant diameter portion 224 is the largest diameter of wire 212 within the distal section straight portion 216. Wire 212 is has a larger diameter adjacent active tip 208 in order to withstand the heat produced by active tip 208 without being damaged.

[00116] In some embodiments, the diameter of wire 212 at the minimum diameter portion 230 is the smallest diameter of wire 212 within distal section straight portion 216, and is also the smallest diameter of wire 212 of the entire multi-function guidewire 200. The diameter of wire 212 at minimum diameter portion 230 typically ranges from about 0.13 mm to about 0.64 mm, and in one example is about 0.16 mm, and is proximal of the constant diameter portion. The outer diameter of wire 212 increases distally from minimum diameter portion 230 to constant diameter portion 224, i.e. wire 212 flares out distally (or has a reverse taper).

[00117] As previously described, active tip 208 is used for delivering energy, for example for puncturing tissue. In some embodiments, active tip 208 is comprised of platinum and iridium, and in one embodiment is comprised of platinum with 10% iridium. Typically, active tip is dome-shaped. In some embodiments of the multi-function guidewire, the active tip 208 has a diameter ranging from about 0.4 to about 0.7 mm, and in one example has a diameter of about 0.6 mm. Typically, active tip 208 has a length ranging from about 0.75 mm to about 1.5 mm, and in one embodiment has a length of about 0.8 mm.

[00118] Referring back to Fig. 5B, proximal section 206 includes proximal section curved portion 232 and proximal section straight portion 215, which includes exposed portion 212a of wire 212.

[00119] While proximal section 206 is typically biased to a coiled configuration, it is also flexible which allows it to be uncoiled. Typically, wire 212 has a constant diameter throughout the proximal section 206, with typical embodiments of the wire at proximal section curved portion 232 having an outer diameter ranging from about 0.13 mm to about 0.64 mm, and in one example having an outer diameter of about 0.38 mm. In some embodiments, the proximal section of the guidewire/elongate member (i.e. wire 212 as well as insulation layer 214) has an outer diameter of about 0.60 mm.

[00120] In some embodiments, proximal section 206 is curved in the same plane as distal section 202, i.e. the curves are coplanar. Having coplanar proximal and distal curves is advantageous in that, for example, when the distal section extends out of a dilator within the body, the orientation of the proximal curve outside of the patient's body can be used to ascertain the orientation of the distal curve, which itself may not be directly visualized, in order to aid in positioning.

[00121] The configuration of proximal section straight portion 215 aids in loading over-the-wire devices onto the multi-function guidewire 200.  To assist in providing this functionality, the proximal section straight portion 215 is elongated and has a diameter less than or equal to the rail section. In some embodiments, proximal section straight portion 215 has a length of about 5 to about 50 mm, and in one embodiment, has a length of about 25 mm. To provide for greater user safety when loading devices onto the multi-function guidewire, proximal section straight portion 215 has a rounded tip.

20

[00122] An additional function of proximal section straight portion 215 is provided by its relatively small diameter. Due to its size, proximal section straight portion 215 is operable to puncture tissue mechanically (i.e. without the delivery of electrical energy). This allows a user the option to potentially attempt both mechanical and electrical punctures using a single device. For example, a user may attempt mechanical puncture using the proximal end of the device and, if unsuccessful, the user may withdraw the device and insert the distal end to attempt electrical puncture. In some embodiments, the elongate member/guidewire 200 at the proximal section, including wire 212 and insulation 214, has an outer diameter of about 0.86 mm or less, with one embodiment having an outer diameter of about 0.60 mm or less.

[00123] Multi-function guidewire 200 includes exposed portion 212a of wire 212 to allow for coupling to a source of electrical energy, for example using a removable push-button connector placed over exposed portion 212a. In some embodiments, exposed portion 212a has a length ranging from about 5 to about 15 mm, and in one example, has a length of about 10 mm.

[00124] Some embodiments of multi-function guidewire 200 include transitional portion 222 between the proximal section 206 and rail section 204 to avoid having an abrupt change in diameter, for example to avoid structural weaknesses. In some embodiments, the transitional portion 222 defines a length ranging from about 15 mm to about 100 mm, with one embodiment defining a length of about 25 mm. The proximal end of transitional portion 222 has an outer diameter ranging from about 0.35 mm to about 0.86 mm and the distal end has an outer diameter of about 0.58 mm to about 1.12 mm. One particular embodiment has a minimum outer diameter of about 0.60 mm and a maximum outer diameter of 0.86 mm.

[00125] In a specific embodiment of multi-functional guidewire 200, active tip 208 is primarily comprised of platinum, with 10% iridium; marker 210 is a helical coil primarily comprised of platinum, with 8% tungsten; and each of the proximal section 206, rail section 204, and distal section 202 are comprised of a 304V stainless steel wire 212 (spring tempered) with PTFE heat shrink insulation (electrical insulation 214) thereupon. Stainless steel wire 212 has adequate stiffness to provide pushability to multi-functional guidewire 200 and is also an efficient electrical conductor.

[00126] In this specific embodiment, active tip 208 has a length of about 0.8 mm and a diameter of about 0.024 inches (~0.61 mm); the wire 212 and active tip 208, combined, extend 2 mm beyond the distal end of marker 210; and marker 210 has a length of about 3 cm. Furthermore, distal section straight portion 216 has a length of about 6 to 10 mm and a diameter of about 0.018 to 0.0225 inches (0.45 to 0.57 mm)); distal section 202 has an inner curve diameter d1 of about 1 to 3 cm and an outer curve diameter d2 of about 2 to 4 cm (Fig. 5C); the diameter of rail section 204 adjacent the distal section 202 is 0.029 to 0.035 inches (0.74 to 0.89 mm).

[00127] The specific embodiment further includes wire 212 of distal section 202 having a length of 15 cm and tapering over the 15 cm segment of the wire from 0.025 inches (0.64 mm) to 0.006 inches (0.15 mm) at the tip of wire 212. The tip of wire 212 has a length of 5.5 mm and a diameter of 0.010 inches (0.25 mm) over the 5.5 mm length. The point along wire 212 that is 15 cm from the distal tip of distal section 202 (i.e. the part of distal section 202 with the largest diameter of wire 212) has a proximal stiffness (force/displacement) of about 552 N/M. In this embodiment, active tip 208 is welded to wire 212. The distal tip of marker coil 210 is 2 mm proximal from active tip 208 and has length of 30 mm. Electrical insulation 214 is comprised of PTFE heat shrink and has a wall thickness of 0.004 inches (0.10 mm).

21

[00128] Furthermore, in this specific embodiment, rail section 204 has a length of about 120 cm; and the wire 212 within the rail section has a diameter of about 0.635 mm ± 0.008 and stiffness of about 552 N/M. Proximal section 206 has a length of about 525 mm ± 1.5, including a tapered section of about 2.5 cm (tapering down from the rail section), and the wire 212 of proximal section 206 has a diameter of about 0.381 mm ± 0.008. The overall length of wire 212 is 1800 mm ± 2.

[00129] Some alternative embodiments of multi-functional guidewire 200 comprise a straight proximal section 206 and/or a J-shaped distal section 202.

[00130] In alternative embodiments of the disclosed methods (described further hereinbelow), mechanical wires are used for puncturing. The mechanical wires typically have a distal part/portion/section that is J-shaped to prevent accidental punctures and trauma by a sharp distal tip. Some alternative mechanical wire embodiments have a distal part that is coiled, while others have a straight distal part.

[00131] Methods

[00132] A first broad aspect of a method of accessing a chamber of a patient's heart using a superior access approach comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator to position the dilator substantially adjacent a tissue; and (c) advancing the dilator through a puncture in the tissue. The procedure is performed using forms of imaging known to those skilled in the art.

[00133] With reference now to Fig. 6A, in a particular embodiment, as described herein, the steerable sheath 300 may be used to guide the dilator 100 to reach an area of the heart 400, in order for example to perform a transseptal puncture. In one such example, a guiding introducer or apparatus such as an introducer sheath may be advanced through the vasculature. A guide-wire may then be advanced through the introducer sheath and advanced through the vasculature, for example the superior vena cava 412, to be positioned within the right atrium 410. In some embodiments, the guide wire may be advanced without the use of an introducer sheath. A dilator 100, in accordance with an embodiment of the present invention, may then be inserted through the steerable sheath 300 forming a dilator and sheath assembly, or in other words a steerable sheath assembly 300a.

[00134] Dilator 100 comprises a flexible intermediate region 100b terminating at a rigid distal end region 100a. In the specific example shown, the dilator 100 additionally has a rigid proximal region 100c, as described previously, that helps minimize the risk of the dilator buckling as it is inserted into the steerable sheath 300. (Alternatively, a dilator 100 may be provided with a softer proximal portion 100c.) The dilator 100 is usable with a steerable sheath 300, as described previously herein above. The steerable sheath 300 defines a lumen there-through for receiving the dilator 100 and further comprises an articulating portion or deflectable region 200b that terminates in a sheath distal end. In some embodiments, the steerable sheath 300 and dilator 100 may be provided as a steerable sheath kit.

[00135] Once the dilator 100 is inserted through the steerable sheath 300, the dilator 100 extends through the sheath lumen with the distal end region 100a of the dilator extending beyond the sheath distal end. Thus, in some embodiments, the dilator 100 is inserted through the steerable sheath 300 prior to the step of inserting the steerable sheath 300 through the vasculature, and the steps of inserting and advancing the dilator 100 are performed substantially simultaneously with the steps of inserting and advancing the steerable sheath 300. Once assembled, the dilator 100 and the steerable sheath 300 are configured to co-operate with one another such that the flexible

22

intermediate region 100b of the dilator 100 corresponds to the articulating portion or deflectable region 200b of the steerable sheath 300 during use.

[00136] In alternative embodiments, the steps of inserting and advancing the steerable sheath 300 may be performed prior to the steps of inserting and advancing the dilator 100. In a specific example, the steerable sheath 300 may initially be advanced into the right atrium 410, with a catheter or any other dilator inserted there-through, such as a second dilator. The catheter or second dilator may then be swapped out with the flexible dilator 100. That is the catheter or second dilator may be removed and the dilator 100 may be inserted through the sheath and advanced into the right atrium. In still further alternative embodiments, the steps of inserting and advancing said dilator 100 may be performed prior to the steps of inserting and advancing said steerable sheath 300, which for example, may be advanced over the dilator 100.

[00137] After positioning the steerable sheath assembly 300a within the right atrium 410, the initial guide-wire is swapped out with an RF guide-wire or other energy delivery device (such as RF guidewire 200 visible in Fig. 6C). Referring now to Fig. 6B, the steerable sheath 300 is then actuated to allow the steerable sheath 300 to achieve a desired deflection angle to position the dilator distal end region 100a at a desired location within a region of tissue, within a patient's body, for example a desired location within the septum 422 of the heart 400 (in some examples, more specifically, at the fossa ovalis region of the septum 422). The dilator 100 provides a flexible intermediate region 100b that does not hinder the ability of the steerable sheath 300 to curl or curve and as such allows the articulating portion or deflectable region 200b of the steerable sheath 300 to deflect upon actuation to position the dilator 100 and the RF guide-wire as desired. As such, the steerable sheath 300 is able to reach its intended curvature, as shown by path 300b, upon actuation, to position the distal end region 100a of the dilator 100 as well as a distal end of the RF guide-wire at the septum 422. Using a dilator lacking such a flexible intermediate region may result in the steerable sheath not being able to achieve the required or intended curvature, whereby the steerable sheath assembly may be limited to the curvature shown in Fig. 6A.

[00138] Additionally, as outlined previously, the dilator 100 is essentially a straight dilator that is lacking a curve. As a result the dilator 100 does not interfere with the curvature of the steerable sheath 300 by imparting a curvature to the steerable sheath 300. Thus, the lack of curvature in the dilator 100 in conjunction with the flexible intermediate region 100b, additionally aids in allowing the steerable sheath 300 to attain the required deflection angle or curvature to position the dilator distal end region 100a as well as the RF guide-wire at the septum 422.

[00139] With reference now to Fig. 6C, once the distal end region 100a of the dilator 100 has been positioned at the septum 422, a transseptal puncture may then be performed, for example by using a puncturing device as described hereinabove. In one embodiment, as shown, the puncturing device comprises the RF guidewire 200 (that was previously positioned within the steerable sheath assembly 300a) which may then be activated to deliver RF and be advanced across the septum 422 to create the puncture. The guidewire 200 may then be advanced into the left atrium 408 of the heart 400, as shown in Fig. 6C. The dilator 100 may then be advanced over the guidewire 200 through the septum 422 in order to dilate the transseptal puncture site, as shown in Fig. 6D, for example in order to facilitate tracking of other devices through the puncture site. The steerable sheath 300 and the dilator 100 may then be withdrawn and the other devices may be advanced over the guidewire 200, for example, to perform a procedure within the heart.

WO 2015/019132                                                                                                    PCT/IB2013/060287

23

[00140] Figs. 7A to 7G illustrate the steps of an alternate embodiment of a method for gaining access to the left side of a heart. Anatomical features illustrated in Fig. 7A include: heart 400, left ventricle 402, right ventricle 404, mitral valve 406, left atrium 408, right atrium 410, superior vena cava 412, inferior vena cava 414, aorta 416, and brachiocephalic veins 418.

[00141] Fig. 7B(i) shows access being gained through the left subclavian vein 420, which is superior (i.e. above) to heart 400.  In some alternative embodiments a large diameter, short length introducer (not shown in drawings), known to those skilled in the art, is secured at the left subclavian access site to accommodate the steerable sheath. In the embodiment of Fig. 7B(i), steerable sheath 300 is advanced through left subclavian vein 420. Steerable sheath 300 is controlled using steerable sheath handle 302.  Dilator 100, which includes dilator hub 102, is inserted into steerable sheath 300. Typically dilator 100 and steerable sheath 300 are locked together before being advanced through the vasculature to form a steerable sheath assembly. Fig. 7B(i) also shows that a wire 200 is inserted into dilator 100.

[00142] As described above in the above embodiment of a method of the present invention, step (a) is for advancing a steerable device having a lumen and containing a dilator within the lumen, from a superior approach, into a heart of a patient. To arrive at the configuration of Fig. 7A, a steerable device, steerable sheath 300, is advanced through superior vena cava 412 and right atrium 410, as indicated by sheath movement arrow 310, and temporally positioned in inferior vena cava 414. Fig. 7A illustrates the position of apparatus upon a completion of step (a). From the position shown in Fig. 7A, steerable sheath 300 and dilator 100 are slightly withdrawn to position the dilator's distal tip 106 in right atrium 410. In alternative embodiments of the method, steerable sheath 300 is not advanced into inferior vena cava 414, but instead, advancement is stopped when the distal tip of the steerable sheath is still in right atrium 410.  Steerable sheath 300 defines a lumen and contains a dilator 100 within the lumen. Typically, the physician selects the dilator and steerable sheath to match the outer diameter of dilator 100 with the inner diameter of steerable sheath 300 (i.e. so that the dilator fits snugly within the sheath or, put differently, that the dilator is cooperatively fitted to the sheath) so that the dilator may provide support for the sheath to prevent the sheath from buckling when making sharp turns, such as when, for example, steering the sheath towards the atrial septum after the sheath is advanced through the superior vena cava. Furthermore, matching the outer diameter of dilator 100 with the inner diameter of steerable sheath 300 facilitates smooth advancement through the vasculature by avoiding and/or reducing scraping of tissue.

[00143] Once the dilator's distal tip 106 is advanced into right atrium 410, the tip is positioned within the right atrium using the steerable sheath. The portion of the dilator shaft 104 of dilator 100 inside of right atrium 410 (and within steerable sheath 300) is flexible enough to be cooperatively steered by the sheath i.e. sheath 300 can manipulate dilator shaft 104 to the required angle to contact tissue without the dilator restricting the sheath's range of motion. Only the portion of dilator shaft 104 within the part of steerable sheath 300 that is being bent for the "U-turn" from the superior vena to contact the atrial septum needs such a high degree of flexibility: the disclosed method can still be performed even if other portions of dilator shaft 104 (not inside the right atrium) are relatively less flexible (i.e. more rigid) than the highly flexible portion.

[00144] Step (b) of the method is for the physician articulating the steerable device (steerable sheath 300), in the direction indicated by sheath movement arrow 310, to cooperatively manipulate a distal portion of the dilator 100 and thereby position the dilator substantially adjacent a tissue. The dilator is manipulated to arrive at the position shown in Fig. 7B. For the sake of simplicity, some embodiments of the method use a unidirectional sheath: the

24

direction of deflection is known before the procedure such that a bi-directional sheath is not required, although it may be used as well.

[00145] Fig. 7B also shows dilator 100 slightly extended from steerable sheath 300 and touching a tissue site (atrial septum 422). A flexible elongate puncture member (medical device/guidewire 200) is located wihtin the dilator's lumen when the physician adjusts steerable sheath 300 to cooperatively position dilator 100. Typically, the elongate puncture member 200 is positioned to be close to, but not contacting, the fossa ovalis of the atrial septum. The embodiment of guidewire 200 of Fig. 5D has radiopaque active tip 208 and radiopaque helical marker 210, which when positioned towards the front of the dilator aid in positioning dilator 100 under imaging.

[00146] Typical embodiments of a method of the invention comprise the dilator having a lumen (not shown in drawings) and containing an elongate puncture member therein, and the method including between steps (b) and (c), advancing the elongate puncture member and puncturing the tissue. While the method is not limited to any particular type of tissue, in the illustrated embodiment the tissue is a septum of the heart and the method comprises, between steps (b) and (c), advancing an elongate puncture member (wire 200) and puncturing atrial septum 422, as illustrated in Figs. 7C(i) to 7C(iii). In Fig. 7C(i), the distal tip of dilator 100 is tenting the atrial septum 422 while the wire is advanced in the direction of wire movement arrow 220. The steerable device (steerable sheath 300) is used to position dilator 100 for tenting the septum dilator under imaging. Tenting ensures the dilator is properly positioned and in contact with the septum. Fig. 7C(iv) shows wire being advanced from the proximal end (the end toward the physician) and indicates diagrammatically the use of RF energy. Fig. 7C(ii) shows wire 200 having just punctured atrial septum 422. The distal portion/part of the wire is comprised of a material with shape memory and it curves back as it is extended into left atrium 408. Fig. 7C(iii) shows the wire further extended and curving back approximately 270° into a "pig-tail" configuration (although, as described hereinabove, this coil may typically traverse between 270° and 630°). Fig. 7C shows heart 400 with the wire 200 that has punctured the septum and is in the position of Fig. 7C(iii). As previously noted, curved distal part 202 acts to prevent the electrode (active tip 208) from directly contacting tissue on the left side of the heart.

[00147] In some embodiments of the method aspect of the present invention, the elongate puncture member is an energy delivery device, and puncturing tissue between steps (b) and (c) comprises delivering energy through the energy delivery device (e.g. a distal end of the energy delivery device) to puncture the tissue. In some such embodiments, the energy delivery device is operable to deliver electrical energy, and in some specific embodiments, the electrical energy is in the RF range.

[00148] In some other embodiments, the elongate puncture member is a mechanical wire with a sharp tip, and puncturing tissue between steps (b) and (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

[00149] After wire 200 has punctured the septum, the physician proceeds to step (c) of the method. Step (c) is for advancing the dilator through a puncture in the tissue. The first broad aspect of the method includes the use of a hybrid dilator having a flexible intermediate region 100b that can be bent from a superior approach to approach the septum, a bend of about 180° (i.e. a U-shaped turn), with the hybrid dilator also having a distal tip that is sufficiently hard to provide for dilating tissue without deformation of the taper. The use of the hybrid dilator makes it unnecessary to use a soft dilator for steering and bending for the U-shaped turn, and then changing to a stiffer

25

dilator for crossing the septum, whereby the hybrid dilator reduces the number of steps in the procedure by eliminating the steps of withdrawing a soft dilator and advancing a hard dilator.

[00150] Fig. 7D shows a positioning of the dilator after completion of step (c) of the method (advancing the dilator through a puncture in the tissue). Distal tip 106 of dilator 100 is comprised of hard (shape retaining) material that pushes aside tissue as dilator 100 is advanced. A portion of flexible intermediate region 100b is shown extended from steerable sheath 300 inside of right atrium 410 in Fig. 7C. Typically, advancement of dilator 100 is stopped when maximum dilation is achieved; resulting in the dilator being positioned such that a distal portion of dilator's distal tip 106 is in left atrium 408 and a portion of distal tip is in right atrium 410. In alternative embodiments of the method, the dilator is further advanced so that all of distal tip 106 is in the left atrium, such as, for example if the physician wants to ensure that maximum dilation has been achieved.

[00151] Some embodiments of the method aspects of the present invention further comprise a step (d) of withdrawing the elongate puncture member (and advancing an anchor wire until the anchor wire bridges (crosses) the septum and a right atrium to thereby provide a bridge between the superior vena cava and the left atrium (put differently, the anchor wire bridges the septum between the right and left atria). After an anchor wire is advanced, some embodiments further comprise a step (e) of withdrawing the dilator and sheath. Fig. 7E illustrates an installed anchor wire (wire 200) with the dilator and sheath withdrawn. As previously described, curved distal part 202 of wire 200 provides anchorage to prevent wire 200 from inadvertently slipping back into the right atrium. The anchor wire is sufficiently stiff that it may, by itself, provide a rail for advancing medical devices into the left atrium. Such medical devices are selected at the discretion of the physician and can include, at least, ablation catheters and pacing leads (e.g. for left ventricular endocardial pacing). As described hereinabove as well as hereinbelow, in an exemplary embodiment of a method of the present invention, a single wire may be utilized for both the puncturing step as well as for anchoring in the left atrium by using a hybrid medical device, such as multi-function guidewire 200, to puncture the tissue site and provide a rail (as well as an anchor) through the puncture site.

[00152] Some embodiments of the method aspect further comprise a step (f) of advancing a lead delivery catheter 350 (and possibly a lead delivery dilator, if dilator 100 may not be used for the stated purpose), configured for delivering leads (such as pacemaker leads), into the left atrium of the heart, as shown in Fig. 7F. As previously described, other medical devices are advanced/implanted in some alternative embodiments.

[00153] Some embodiments further include a step (g) of withdrawing the wire 200 (as well as any dilators, including a lead delivery dilator). Some such embodiments further comprise a step (h) of advancing the lead delivery catheter 350 as indicated by catheter movement arrow 360 (Fig. 7F), to thereby position the distal end of lead delivery catheter 350 in left ventricle 402, as shown in Fig. 7G.

[00154] For some embodiments of this method aspect, a stiff introductory wire (rather than a hybrid wire such as guidewire 200) is used. Such embodiments comprise: prior to step (a), advancing the stiff introductory wire into the right atrium; and step (a) includes advancing the steerable sheath and the dilator over the stiff introductory wire; and between steps (b) and (c), the stiff introductory wire is withdrawn and the elongate puncture member is advanced to puncture the septum. In some such embodiments, the stiff introductory wire is comprised of stainless steel. Typically, an introductory wire has an atraumatic tip that is generally J-shaped.

[00155] In some embodiments, as noted above, a stiff introductory wire is not utilized; rather, a hybrid wire such as described above may be utilized. Such embodiments comprise: prior to step (a), the wire/elongate puncture

WO 2015/019132                                                                                          PCT/IB2013/060287

26

member is advanced into the right atrium; and step (a) includes advancing the steerable sheath and the dilator over the wire/elongate puncture member.

[00156] A further broad aspect of the method of accessing a chamber of a patient's heart using a superior access approach is described below. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing an elongate puncture member within the lumen; (b) articulating the steerable device to manipulate a distal portion of the elongate puncture member for positioning the puncture member substantially adjacent a tissue; (c) creating a puncture in the tissue using the puncture member; and (d) advancing a dilator over the puncture member through the puncture.

[00157] This broad aspect relates to the concept of reducing or minimizing the number of steps in a procedure by using multifunctional or hybrid devices. First, embodiments of the second broad aspect include the elongate puncture member having a rail section that is stiff enough to provide rail for advancing devices, thereby eliminating (making unnecessary) using an anchor wire and the steps of withdrawing the puncture member and advancing the anchor wire. Second, the steerable device is advanced over the puncture member, thereby eliminating the use of a stiff introductory wire and the steps for exchanging the introductory wire and puncture member. Also, embodiments of the second broad aspect include the elongate puncture member being flexible enough to be cooperatively manipulated by the steerable device, steerable sheath 300.

[00158] Making reference to Figs. 7A to 7D, in some embodiments of this broad aspect: step (a) includes advancing the steerable device (e.g. steerable sheath 300) into the right atrium 410 of a heart 400; step (b) includes articulating the steerable device (steerable sheath 300) to manipulate a distal portion of the elongate puncture member (wire 200) for positioning the puncture member; step (c) includes advancing the puncture member (wire 200) to create a puncture in the tissue (atrial septum 422); and step (d) includes advancing dilator 100 over the puncture member (wire 200) through the puncture in the tissue (atrial septum 422). In some embodiments, step (c) further comprises advancing the elongate puncture member into the left atrium. In some embodiments the method further includes a step (e) of withdrawing the steerable device and dilator, whereby the elongate puncture provides a rail for advancing medical devices into the left atrium.

[00159] In some embodiments of the second broad aspect, the elongate puncture member is an energy delivery device (e.g. a wire operable to deliver electricity) and puncturing tissue in step (c) comprises delivering energy through the distal end of the energy delivery device to puncture the tissue. In some other embodiments of the second broad aspect, the elongate puncture member is a mechanical wire with a sharp tip and puncturing tissue in step (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

[00160] A specific embodiment of this broad aspect comprises the steps of: (a) introducing a steerable sheath and a soft dilator into the right atrium; (b) positioning the steerable sheath and the soft dilator such as to be aimed towards the septum; (c) withdrawing the soft dilator and advancing a stiffer dilator; (d) adjusting the steerable sheath to position the stiffer dilator, and an energy delivery device inside the dilator's lumen, substantially adjacent the atrial septum; (e) delivering energy through the distal end of the energy delivery device to puncture the septum; (f) advancing the energy delivery device until a distal tip of the energy delivery device crosses the septum and enters

WO 2015/019132                                                                PCT/IB2013/060287

27

the left atrium wherein the portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium; and (g) advancing the stiffer dilator to dilate the puncture.

[00161] Some embodiments of this broad aspect include using a soft and a hard dilator, while some alternative embodiments include using a hybrid dilator as described hereinabove.

[00162] Details regarding characteristics of the initial broad aspect of an embodiment of a method of the present invention, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to the second broad aspect.

[00163] A further broad aspect of the method of accessing a chamber of a patient's heart using a superior access approach is described below. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator for positioning the dilator substantially adjacent a tissue; (c) advancing an elongate puncture member, from within a lumen of the dilator, to create a puncture in the tissue; and (d) advancing the dilator over the elongate puncture member through the puncture.

[00164] This broad aspect, similar to the first broad aspect mentioned above with respect to a method of the resent invention, also uses a hybrid dilator. The use of the hybrid dilator renders unnecessary the use of a soft dilator for steering and bending, and then changing to a stiffer dilator for crossing tissue, whereby the hybrid dilator reduces the number of steps in the procedure by eliminating the steps of withdrawing a soft dilator and advancing a stiffer (hard) dilator. Also, this broad aspect, similar to the second mentioned above, includes the elongate puncture member having a rail section that is stiff enough to provide rail for advancing devices, thereby eliminating (making unnecessary) the use of an anchor wire and the steps of exchanging the puncture member and anchor wire. Thus, this broad aspect includes embodiments of both hybrid devices described hereinabove.

[00165] Making reference again to Figs. 7A-7D, some embodiments of the method comprises the steps of: (a) advancing a steerable sheath 300 containing dilator 100 within a lumen of steerable sheath 300, from a superior approach, into a heart 400 of a patient; (b) articulating the steerable sheath 300 to manipulate a distal portion of dilator 100 for positioning the dilator substantially adjacent atrial septum 422; (c) advancing an elongate puncture member (wire 200), from a lumen of dilator 100, to create a puncture in atrial septum 422; and (d) advancing dilator 100 over wire 200 and through the puncture.

[00166] Similar to the previous broad aspects, step (c) comprises advancing the elongate puncture member to enter into the left atrium. In some embodiments of the third broad aspect, the method further includes a step (e) of withdrawing the steerable device and dilator to thereby provide a rail for advancing medical devices into the left atrium.

[00167] In some embodiments of the third broad aspect, the elongate puncture member is an energy delivery device and puncturing the tissue in step (c) comprises delivering energy through a distal end of the energy delivery device to puncture the tissue. In some other embodiments of the third broad aspect, the elongate puncture member is a mechanical wire with a sharp tip and puncturing the tissue in step (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

WO 2015/019132                                                          PCT/IB2013/060287

28

[00168] A specific embodiment of this third broad aspect comprises the steps of: (a) introducing a steerable sheath and a dilator into the right atrium; (b) positioning the steerable sheath and the dilator such as to be aimed towards the septum wherein the portion of the dilator shaft within the steerable sheath is flexible enough to be cooperatively steered by the sheath; (c) adjusting the steerable sheath to cooperatively position the dilator, and an energy delivery device inside the dilator's lumen, substantially adjacent the atrial septum; (d) delivering energy through the distal end of the energy delivery device to puncture the septum; (e) advancing the energy delivery device until a distal portion tip of the energy delivery device bridges (crosses) the septum and enters the left atrium wherein the distal portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium; and (f) advancing the dilator whereby a shape-retaining (i.e. hard) tip section of the dilator dilates the puncture.

[00169] Details regarding the earlier broad aspects, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to this third broad aspect.

[00170] A fourth broad aspect of the invention is described below. Making reference to Figs. 7A to 7B, it is a method of accessing a chamber of a patient's heart using a superior access approach. The method comprises the steps of: (a) advancing an energy delivery device from an access site superior to the heart, through a superior vena cava and into a right atrium; (b) adjusting/articulating/manipulating a steerable device to position the energy delivery device substantially adjacent a septum of the heart; (c) delivering energy through a distal end of the energy delivery device to puncture the septum; (d) advancing the energy delivery device into a left atrium; and (e) advancing a dilator over the energy delivery device whereby the dilator dilates the puncture.

[00171] The fourth broad aspect also relates to the concept of reducing or minimizing the number of steps in a procedure by using hybrid devices. Embodiments of the fourth broad aspect include using an energy delivery device (wire 200) having a rail section that is stiff enough to provide rail for advancing devices, thereby making unnecessary using an anchor wire and eliminating the steps of withdrawing the energy delivery device and advancing the anchor wire.

[00172] Some embodiments of this aspect further comprise a step (f) of withdrawing the steerable device (steerable sheath 300) and the dilator 100, after which the portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium for advancing medical devices into the left atrium.

[00173] Some embodiments of the fourth broad aspect include using a soft and a hard dilator, while some alternative embodiments include using a hybrid dilator.

[00174] In some embodiments of the fourth broad aspect, the access site is at a left subclavian vein 420. In some other embodiments, the access site is at a right subclavian vein. In yet some further embodiments, the access site is at a jugular vein.

[00175] Details regarding the first broad aspect, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to the fourth broad aspect.

[00176] Thus, as described above, disclosed herein are several embodiments of a method of providing access for medical devices to a specified tissue site, such as the left side of the heart from a particular access site, such as superior access site. The method comprises using one or more hybrid devices for performing multiple steps of a

WO 2015/019132                                                                                          PCT/IB2013/060287

29

medical procedure to thereby reduce and/or minimize the number of device exchanges. Some of the methods include puncturing the left side of the heart using an energy delivery device sufficiently flexible so as to be advanced from a superior approach and using the energy delivery device as a rail for advancing other instruments thereupon, thereby providing a means of support for advancing instrumentation through to the left side of the heart.

[00177] FURTHER EXAMPLES

[00178] Example 1. A multi-function guidewire for a accessing a heart including a septum, the multi-function guidewire comprising: a rail section sufficiently stiff to act as rail and flexible enough to enable access to a septum from any approach; a distal section which is generally curved and distal of the rail section; and an active tip at a distal end of the distal section, the active tip operable to deliver energy for puncturing the septum to define a puncture site; the distal section being configured to form a coil whereby it anchors the multi-function guidewire beyond the puncture site when the distal section is advanced beyond the septum.

[00179] 2. The multi-function guidewire of example 1, wherein the rail is sufficiently flexible to enable access to the septum from an inferior approach and/or a superior approach.

[00180] 3. The multi-function guidewire of example 1, wherein the rail section has a maximum outer diameter of about 1.1 mm and a minimum outer diameter of about 0.58 mm, or more particularly, an outer diameter of about 0.86 mm at its proximal end and about 0.72 mm at its distal end.

[00181] 4. The multi-function guidewire of example 1, further comprising a metal wire, wherein the metal wire of a proximal curved portion of the proximal section has an outer diameter of about 0.13 to about 0.64 mm or, more specifically, an outer diameter of about 0.38 mm.

[00182] 5. The multi-function guidewire of example 1, wherein the distal section is sized and configured to anchor a distal end of the multi-function guidewire in an atrium without accidentally being advanced into openings adjacent the left atrium such as a left pulmonary vein or a mitral valve.

[00183] 6. The multi-function guidewire of example 1, wherein the rail section has a maximum elasticity of about 2100 N/m and a minimum elasticity of about 100 N/m.

[00184] 7. The multi-function guidewire of example 1, wherein a distal curved portion of the distal section has a maximum elasticity of about 550 N/m and a minimum elasticity of about 1 N/m.

[00185] 8. The multi-function guidewire of example 1, wherein the distal section comprises a spiral-shaped coil traversing a curve of about 630°.

[00186] 9. The multi-function guidewire of example 8, wherein a diameter of an inner curve of the coil is between about 6 mm to about 30 mm or, more specifically, about 10 mm.

[00187] 10. The multi-function guidewire of example 8, wherein a diameter of an outer curve of the coil is between about 20 mm to about 40 mm or, more specifically, about 22 mm.

[00188] 11. The multi-function guidewire of example 1, wherein a diameter of the guidewire decreases distally along a distal curved portion of the distal section.

[00189] 12. The multi-function guidewire of example 11, wherein an outer diameter of the guidewire at a proximal end of the distal curved portion is between about 0.72 mm to about 0.86 mm, and an outer diameter at a distal end of the distal curved portion is between about 0.59 mm to about 0.72 mm.

WO 2015/019132                                                                                                    PCT/IB2013/060287

30

[00190] 13. The multi-function guidewire of example 1, wherein the distal section further comprises a helical coil, the helical coil having a length of between about 15 mm to about 100 mm or, more particularly, about 30 mm.

[00191] 14. The multi-function guidewire of example 13, wherein the helical coil is comprised of platinum and tungsten or, more particularly, wherein the helical coil comprises about 8% tungsten.

[00192] 15. The multi-function guidewire of example 1, wherein the active tip is comprised of platinum and iridium or, more particularly, wherein the active tip is comprised of platinum with 10% iridium.

[00193] 16. The multi-function guidewire of example 1, wherein the proximal section is biased to a curved configuration, the curved configuration being selected from the group consisting of a spiral-shaped coil and a constant diameter coil.

[00194] 17. The multi-function guidewire of example 1, wherein an outer diameter of the guidewire at the proximal section is between about 0.35 mm to about 0.86 mm or, more particularly, about 0.6 mm.

[00195] Example 18. A dilator for use with a steerable sheath to access a region of tissue within a patient's body, the steerable sheath defining a lumen there-through for receiving the dilator and having a range of deflection angles, the dilator comprising: a rigid distal end region; and a flexible intermediate region terminating at the distal end region; the dilator being configured for use in conjunction with the steerable sheath such that a location of the flexible intermediate region corresponds to a location of a region of the steerable sheath that is amenable to deflection; and the rigid distal end region having a rigidity greater than the flexible intermediate region to enable the dilator to advance through tissue.

[00196] 19. The dilator of example 18, wherein the dilator comprises a substantially straight dilator.

[00197] 20. The dilator of example 18, wherein the distal end region comprises a rigid polymer and the intermediate region comprises a flexible polymer.

[00198] 21. The dilator of example 20, wherein the rigid distal end region is formed from High Density Polyethylene and the flexible intermediate region is formed from Low Density Polyethylene.

[00199] 22. The dilator of example 18, wherein the flexible intermediate region has a length of between about 7 cm to about 17 cm or, more particularly, about 15 cm.

[00200] 23. The dilator of example 18, wherein the rigid distal end region has a length of between about 0.4 cm to about 4.0 cm or, more particularly, between about 0.5 cm to about 1.0 cm or, even more particularly, between about 0.6 cm to about 0.7 cm.

[00201] 24. The dilator of example 18, wherein the dilator defines a taper.

[00202] 25. The dilator of example 24, wherein the rigid distal end region forms a part of the taper.

[00203] 26. The dilator of example 25, wherein the taper has a length of about 1 cm.

[00204] 27. The dilator of example 18, wherein the rigid distal end region has a length of between about 2.5% to about 60% of a length of said flexible intermediate region.

[00205] 28. The dilator of example 18, wherein the dilator further comprises a proximal region extending proximally from the flexible intermediate region, the proximal region having a rigidity greater than the flexible intermediate region.

31

[00206] 29. The dilator of example 28, wherein the distal end region and the proximal region have a rigidity that is substantially equal.

[00207] 30. The dilator of example 29, wherein the distal end region and the proximal region are formed from a rigid polymer and wherein the intermediate region is formed from a flexible polymer.

[00208] 31. The dilator of example 30, wherein the distal end region and the proximal region are formed from High Density Polyethylene, and wherein the flexible intermediate region is formed from Low Density Polyethylene.

[00209] 32. The dilator of example 29, wherein the rigidity of each of the distal end region and the proximal region is equal to about 0.8 GPa and wherein the rigidity of the flexible intermediate region is equal to about 0.3 Gpa.

[00210] 33. The dilator of example 18, wherein the steerable sheath is actuatable to define a curve.

[00211] The embodiments of the invention described above are intended to be exemplary only. The scope of the invention is therefore intended to be limited solely by the scope of the appended claims.

[00212]  It is appreciated that certain features of the invention, which are, for clarity, described in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features of the invention, which are, for brevity, described in the context of a single embodiment, may also be provided separately or in any suitable subcombination.

[00213]  Although the invention has been described in conjunction with specific embodiments thereof, it is evident that many alternatives, modifications and variations will be apparent to those skilled in the art. Accordingly, it is intended to embrace all such alternatives, modifications and variations that fall within the broad scope of the appended claims.  All publications, patents and patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual publication, patent or patent application was specifically and individually indicated to be incorporated herein by reference.  In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present invention.

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/445,790 | 06/19/2019 | Gareth Davies | RFP026027_US_CON | 9099 |

48497       7590       01/14/2021
BAYLIS MEDICAL COMPANY INC
5825 Explorer Drive
MISSISSAUGA, ONTARIO L4W 5P6
CANADA

| EXAMINER |
|---|
| PEFFLEY, MICHAEL F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3794 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/14/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

NLIFSHITZ@BAYLISMEDICAL.COM
VMAN@BAYLISMEDICAL.COM
ipdocket@baylismedical.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 16/445,790 | Applicant(s) Davies et al. |
|---|---|---|
| | Examiner MICHAEL PEFFLEY | Art Unit 3794 | AIA (FITF) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on 6/19/2019.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL.**    2b) ☑ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) 1-20 is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) 1-7 and 12-20 is/are rejected.

8) ☑ Claim(s) 8-11 is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☑ The specification is objected to by the Examiner.

11)☑ The drawing(s) filed on 6/19/2019 is/are: a)☑ accepted or  b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All    b)☐ Some**    c)☐ None of the:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. _____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
  Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

Application/Control Number: 16/445,790                                    Page 2
Art Unit: 3794

### Notice of Pre-AIA or AIA Status

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

### Priority

This application makes reference to or appears to claim subject matter disclosed

in Application No. 14/910,525, filed February 5, 2016. If applicant desires to claim the

benefit of a prior-filed application under 35 U.S.C. 119(e), 120, 121, 365(c)  or 386(c),

the instant application must contain, or be amended to contain, a specific reference to

the prior-filed application in compliance with  37 CFR 1.78. If the application was filed

before September 16, 2012, the specific reference must be included in the first

sentence(s) of the specification following the title or in an application data sheet (ADS)

in compliance with pre-AIA 37 CFR 1.76; if the application was filed on or after

September 16, 2012, the specific reference must be included in an ADS in compliance

with 37 CFR 1.76. For benefit claims under 35 U.S.C. 120, 121, 365(c), or 386(c), the

reference must include the relationship (i.e., continuation, divisional, or continuation-in-

part) of the applications.

If the instant application is a utility or plant application filed under  35 U.S.C.

111(a), the specific reference must be submitted during the pendency of the application

and within the later of four months from the actual filing date of the application or sixteen

months from the filing date of the prior application. If the application is a national stage

application under 35 U.S.C. 371, the specific reference must be submitted during the

pendency of the application and within the later of four months from the date on which

the national stage commenced under 35 U.S.C. 371(b) or (f), four months from the date

Application/Control Number: 16/445,790                                          Page 3
Art Unit: 3794

of the initial submission under 35 U.S.C. 371 to enter the national stage, or sixteen

months from the filing date of the prior application. See 37 CFR 1.78(a)(4) for benefit

claims under 35 U.S.C. 119(e) and 37 CFR 1.78(d)(3) for benefit claims under 35

U.S.C. 120, 121, 365(c), or 386(c). This time period is not extendable and a failure to

submit the reference required by 35 U.S.C. 119(e) and/or 120, where applicable, within

this time period is considered a waiver of any benefit of such prior application(s) under

35 U.S.C. 119(e), 120, 121, 365(c), and 386(c). A benefit claim filed after the required

time period may be accepted if it is accompanied by a grantable petition to accept an

unintentionally delayed benefit claim under 35 U.S.C. 119(e)  (see 37 CFR 1.78(c)) or

under  35 U.S.C. 120, 121, 365(c), or 386(c) (see 37 CFR 1.78(e)). The petition must be

accompanied by (1) the reference required by 35 U.S.C. 120 or 119(e) and by 37 CFR

1.78 to the prior application (unless previously submitted), (2) the petition fee under 37

CFR 1.17(m), and (3) a statement that the entire delay between the date the benefit

claim was due under 37 CFR 1.78 and the date the claim was filed was unintentional.

The Director may require additional information where there is a question whether the

delay was unintentional. The petition should be addressed to: Mail Stop Petition,

Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

        If the reference to the prior application was previously submitted within the time

period set forth in  37 CFR 1.78  but was not included in the location in the application

required by the rule (e.g., if the reference was submitted in an oath or declaration or the

application transmittal letter), and the information concerning the benefit claim was

recognized by the Office as shown by its inclusion on the first filing receipt, the petition

under  37 CFR 1.78 and the petition fee under  37 CFR 1.17(m)  are not required.

Application/Control Number: 16/445,790                                          Page 4
Art Unit: 3794

Applicant is still required to submit the reference in compliance with 37 CFR 1.78 by

filing an ADS in compliance with 37 CFR 1.76 with the reference (or, if the application

was filed before September 16, 2012, by filing either an amendment to the first

sentence(s) of the specification or an ADS in compliance with pre-AIA 37 CFR 1.76).

See MPEP § 211.02.

### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(1) the claimed invention was patented, described in a printed publication, or in public use,
> on sale, or otherwise available to the public before the effective filing date of the claimed
> invention.

Claims 1, 2 and 12-15 are rejected under 35 U.S.C. 102(a)(1) as being

anticipated by Eggers et al (5,366,443).

Eggers et al provide a device comprising an elongate member (16) having a

proximal section, a distal section (distal of catheter 10) and a rail section (which

supports the catheter 10). The distal section has an active tip operable to deliver

energy to create a puncture through tissue (see Figure 6 and associated description, for

example) and to support the advancement of the catheter through the tissue along the

"rail" section of the guidewire.

Regarding claim 2, Figure 1 shows the guidewire bending 180 degrees.

Regarding claim 12, the elongate member is a conductive wire covered by a layer of

insulation (46 and 14) with a distal exposed tip being devoid of any insulation for form

an active tip.

Application/Control Number: 16/445,790                                              Page 5
Art Unit: 3794

Regarding claim 13, Eggers et al provides the device of claim 1 as addressed above, as well as an electrosurgical generator (32) for delivering energy to tissue. Regarding claim 14, the guidewire is steerable through the vasculature of the patient, and the system further comprises at least one dilator (balloon 20).

Claims 1, 2, 4-6 and 12-20 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by Kulesa et al (20090093802).

Kulesa et al provides a medical device comprising an elongate member (i.e. guidewire) having a proximal section, a distal section (beyond the catheter) and a rail section between the proximal and distal sections.  There is an active tip at a distal end of the distal section which is operable to deliver energy to create a puncture through a septal wall (Abstract), and the rail section is then configured to support a tubular member (i.e. catheter) thereupon as well as to be maneuverable for enabling access to a tissue site.

Regarding claim 2, the rail section (and catheter) are flexible enough to bend at least 180 degrees (Figure 3G, for example).  Regarding claims 4-6, the distal section of the device has a curved portion that may automatically take a coil configuration (Figures 17A and 17B, for example).  Regarding claim 12, the elongate member (i.e. guidewire) is an electrically conductive wire having a distal tip free of insulation to form an active tip (see, for example, para. [0095]).

Regarding claim 13, Kulesa et al provides the device of claim 1 as well as an electrosurgical generator (Figure 2, for example) for delivering energy to puncture

Application/Control Number: 16/445,790                                           Page 6
Art Unit: 3794

tissue.  Regarding claims 14 and 15, Kulesa et al disclose a steerable device as well as a dilator for expanding the puncture (para. [0047], for example).

Regarding claim 16, Kulesa et al disclose a method comprising advancing a steerable sheath (230b – Figure 3F, for example) through a patient's vasculature into the right atrium of the heart.  The steerable sheath has a lumen and contains a medical device (250) as described with respect to claim 1 above.  The steerable sheath (230b) is articulated to position the active tip (253) of the medical device (i.e. guidewire 250d) adjacent the septum of the heart (Figure 3F), and then delivering energy  to the active tip to puncture the septum and advancing the medical device into the left atrium (102) of the heart.  See also paragraphs [0046-0048], for example.

Regarding claim 17, Kulesa discloses the step of advancing a dilator (270) over the medical device (i.e. guidewire) and through the puncture (Figure 3F, for example). Regarding claim 18, a lead delivery dilator (270) and a lead delivery catheter (230c) are delivered through the puncture into the left atrium of the heart (Figures 3F and 3G, for example).  Regarding claim 19, Kulesa et al disclose the catheter may be delivered to any chamber of the heart.

Regarding claim 20, Kulesa et al disclose a method of advancing the medical device of claim 1 (as addressed above) through a superior vena cava into the right atrium of the heart (paragraph [0038], for example).  A steerable sheath (230b) is articulated to position an active tip of the medical device (i.e. guidewire 250) adjacent the septum (108) of the heart (Figures 3E and 3F, for example).  Energy is delivered from the tip (253) of the medical device to puncture the septum, and the medical device is advanced into the left atrium, and then a dilator (270) is advanced over the medical

Application/Control Number: 16/445,790                                                    Page 7
Art Unit: 3794

device to dilate the puncture (Figure 3F and 3G and associated description in the

specification).

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have
> been obvious before the effective filing date of the claimed invention to a person having
> ordinary skill in the art to which the claimed invention pertains. Patentability shall not be
> negated by the manner in which the invention was made.

Claims 3 and 7 are rejected under 35 U.S.C. 103 as being unpatentable over

Kulesa et al ('802).

Kulesa et al fails to disclose the specific stiffness of the rail section of the

guidewire.  The examiner maintains that the general range of stiffness values for

guidewires is known to those of ordinary skill in the art.  Moreover, in as much as the

Kulesa et al guidewire is used in the same general procedure, it would necessarily

require stiffness values capable of articulating to the heart and of supporting the

advancement of the catheter as fully described by Kulesa et al.  As such, the examiner

maintains that one of ordinary skill in the art would recognize the necessary stiffness

value necessary for the Kulesa et al catheter and would obviously employ such a

stiffness value within applicant's claimed range to afford the capability of advancing the

medical device to the heart and supporting the advancement of a catheter over the

medical device (i.e. guidewire) as disclosed.

Application/Control Number: 16/445,790                                           Page 8
Art Unit: 3794

### *Allowable Subject Matter*

Claims 8-11 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

### *Conclusion*

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. Imran (5,680,860) and Keane (6,607,520) disclose other devices having an energy delivery medical instrument that assumes a coiled shaped when advanced through tissue. Deem et al (7,165,552), Malecki et al (7,186,251), Chanduszko et al (7,988,690) and Auth et al (8,021,359) disclose various other devices for penetrating a septum of the heart.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to MICHAEL PEFFLEY whose telephone number is (571)272-4770. The examiner can normally be reached on Mon-Fri 8 am-5 pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Linda Dvorak can be reached on (571) 272-4764. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 16/445,790                                           Page 9
Art Unit: 3794

     Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see https://ppair-

my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

If you would like assistance from a USPTO Customer Service Representative or access

to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.


                                     **/MICHAEL F PEFFLEY/**
                                     **Primary Examiner, Art Unit 3794**


/M.F.P/
Primary Examiner, Art Unit 3794

| | Notice of References Cited | Application/Control No. 16/445,790 | | Applicant(s)/Patent Under Reexamination Davies et al. | |
|---|---|---|---|---|---|
| | | Examiner MICHAEL PEFFLEY | | Art Unit 3794 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-5366443-A | 11-1994 | Eggers; Philip E. | A61B18/149 | 128/898 |
| * | B | US-20090093802-A1 | 04-2009 | Kulesa; Larry B. | A61B18/1492 | 606/33 |
| * | C | US-5680860-A | 10-1997 | Imran; Mir A. | A61B18/1492 | 600/374 |
| * | D | US-6607520-B2 | 08-2003 | Keane; David | A61B18/1492 | 128/898 |
| * | E | US-7165552-B2 | 01-2007 | Deem; Mark E. | A61B18/1492 | 128/898 |
| * | F | US-7186251-B2 | 03-2007 | Malecki; William | A61B18/1492 | 606/213 |
| * | G | US-7988690-B2 | 08-2011 | Chanduszko; Andrzej J. | A61B17/12186 | 606/49 |
| * | H | US-8021359-B2 | 09-2011 | Auth; David C. | A61B18/1492 | 606/28 |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

Application No.:   16/445,790

Filing Date:      19-June-2019

Applicant:  Baylis Medical Company Inc.

First Named Inventor:     Gareth Davies

Title:            Methods and Devices
                  for Puncturing Tissue

# RESPONSE

In response to the Official Action
Dated: 14-January-2021

Examiner:         PEFFLEY, MICHAEL F

Attorney's Ref.:  RFP026027_US_CON

Commissioner for Patents
U.S. Patent and Trademark Office
Customer Service Window, **Mail Stop Amendment**
Randolph Building
401 Dulany Street
Alexandria, VA 22314
U.S.A.

Dear Sir:

Amendments to the claims begin on page 2 of this Response.

Remarks begin on page 7 of this Response.

Application No. 16/445,790                                    - 2 -                                    April 14, 2021

## IN THE CLAIMS

**We Claim:**

1. (Cancelled)

2. (Currently amended) The medical device of claim [[1]] 9, wherein the rail section is operable to bend at least 180 degrees for enabling access to the tissue site.

3. (Original) The medical device of claim 2, wherein a stiffness of the rail section is between about 150 N/m and about 600 N/m to enable the rail section to be bendable by at least 180 degrees and to function as a rail for supporting installation of one or more tubular members thereupon.

4. (Cancelled)

5. (Currently amended) The medical device of claim [[4]] 9, wherein the distal coil is configured such that, upon deployment from a confined state, along an axis of advancement, the active tip curves away from the axis of advancement.

6. (Original) The medical device of claim 5, wherein the active tip is positioned at a predetermined distance away from an electrically insulated portion of the elongate member orthogonal to the active tip when the distal section curved portion is in the deployed state.

7. (Currently amended) The medical device of claim [[4]] 9, wherein a stiffness of the elongate member at the distal section curved portion is less than about 550 N/m to enable the distal section curved portion to conform to a shape of a tubular member while positioned within a lumen of the tubular member.

8.  (Currently amended) ~~The medical device of claim 4,~~ A medical device for puncturing a tissue at a tissue site, the medical device comprising:

    - an elongate member having a proximal section, a distal section, and a rail section between the proximal section and the distal section;

    - an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue;

    - the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site;

    - the distal section defining a distal section curved portion configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture; and

    wherein the distal section further defines a distal section straight portion distal to the distal section curved portion, the distal section straight portion including the active tip and a diameter of the elongate member at the distal section straight portion is greater than a diameter of the elongate member at a distal end of the distal section curved portion.

9.  (Currently amended) ~~The medical device of claim 4,~~ A medical device for puncturing a tissue at a tissue site, the medical device comprising:

    - an elongate member having a proximal section, a distal section, and a rail section between the proximal section and the distal section;

    - an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue;

- the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be maneuverable for enabling access to the tissue site;

- the distal section defining a distal section curved portion configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture; and

wherein the proximal section defines a proximal section curved portion configured to form a proximal coil for improved handling of the medical device.

10. (Currently amended) The medical device of claim 9, wherein the proximal coil and distal coil are coplanar whereby [[the]] an orientation of the proximal coil outside a patient's body can used to ascertain the orientation of the distal coil in order to aid in positioning.

11. (Original) The medical device of claim 9, wherein the proximal section further defines a proximal section straight portion proximal of the proximal section curved portion and a proximal end of the proximal section straight portion is operable to puncture tissue mechanically.

12. (Currently amended) The medical device of claim [[1]] 9, wherein the elongate member comprises an electrically conductive wire and the electrically conductive wire is substantially covered by a layer of electrical insulation, with a distal tip of the electrically conductive wire being devoid of the layer of electrical insulation to form the active tip.

13. (Currently amended) A system for puncturing a tissue at a tissue site, the system comprising:

    - at least one medical device as claimed in claim [[1]] 9; and

- an electrosurgical generator for coupling to the at least one medical device for delivering energy to puncture the tissue at the tissue site.

14. (Original) The system of claim 13, further comprising at least one steerable device for guiding the at least one medical device to the tissue site.

15. (Original) The system of claim 13, further comprising at least one dilator.

16. (Currently amended) A method of puncturing tissue within a patient's heart using a superior access approach, the method comprising the steps of:

(a) advancing a steerable sheath through a patient's vasculature, from a superior approach access site into a right atrium of a heart of a patient, the steerable sheath defining a lumen and containing a medical device, as claimed in claim [[1]] 9, within the lumen;

(b) articulating the steerable sheath to guide a distal portion of the medical device for positioning the active tip of the medical device substantially adjacent a septum of the heart; and

(c) delivering energy through the active tip to create a puncture in the septum and advancing the medical device therethrough into a left atrium of the heart.

17. (Original) The method of claim 16, further comprising a step of (d) advancing a dilator over the medical device through the puncture.

18. (Original) The method of claim 16, further comprising a step of advancing at least one of a lead delivery dilator and a lead delivery catheter over the medical device into the left atrium of the heart.

19. (Original) The method of claim 18, further comprising a step of advancing the lead delivery catheter into a left ventricle of the heart.

Application No. 16/445,790                        - 6 -                        April 14, 2021

20. (Currently amended) A method of providing access to a left side of a heart and providing support for advancing instrumentation thereto, using a superior access approach, the method comprising the steps of:

(a) advancing a medical device as claimed in claim [[1]] 9, from an access site superior to a heart, through a superior vena cava and into a right atrium of the heart;

(b) articulating a steerable sheath to position an active tip of the medical device substantially adjacent a septum of the heart;

(c) delivering energy through the active tip of the medical device to puncture the septum;

(d) advancing the medical device into a left atrium of the heart; and

(e) advancing a dilator over the medical device for dilating the puncture.

## REMARKS

Applicant notes page 8 of the Office Action, under *Allowable Subject Matter*, states "Claims 8-11 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in dependent form including all the limitations of the base claim and any intervening claims."

According, the claims have been amended to include the subject matter of independent claim 1 and intervening claim 4.

## EXAMINER PHONECALL

The Examiner is thanked for the courtesy shown to applicant's representative during the phone call held on April 7, 2021 regarding the priority data.

## CLAIM STATUS

Claims 2, 3, and 5-20 remain in this application. Claims 1 and 4 have been cancelled. Claims 3, 6, 11, 14, 15, 17, 18 and 19 are in their original state. Claims 2, 5, 7-10, 12, 13, 16 and 20 have been amended in this response. All amendments are supported by the specification as originally filed and no new matter has been introduced by these amendments.

Claims 10, 12 and 13 have been amended to correct antecedence.

Reconsideration of the application in view of the amendments to the claims as well as the following remarks is respectfully requested.

## Priority

Page 2 of the Office Action includes "This application makes reference to or appears to claim subject matter disclosed in Application No. 14/910,525, filed

February 5, 2016. If applicant desires to claim the benefit of a prior-filed application under 35 U.S.C. 119(e), 120, 121, 365(c) or 386(c), the instant application must contain, or be amended to contain, a specific reference to the prior-filed application in compliance with 37 CFR 1.78...if the application was filed on or after September 16, 2012, the specific reference must be included in an ADS in compliance with 37 CFR 1.76."

The Applicant notes that since the instant application was filed on June 19, 2019, which is after September 16, 2012, the specific reference only needs to be included in an ADS. An ADS was filed for the instant application on June 19, 2019 (the filing date of the application) wherein Application No. 14/910,525 is listed in the "Domestic Benefit/National Stage Information" section on page 4 of the ADS. More specifically, the "Domestic Benefit/National Stage Information" section indicates the instant application is a Continuation of Application No. 14/910,525. The ADS can be accessed using the USPTO PAIR system.

Accordingly, the Applicant respectfully submits the specific reference to Application No. 14/910,525 is included in a timely filed ADS such as to address the issue of priority and allow the Applicant to claim the benefit of said prior-filed application.

## §102 and §103

In the Office Action, claims 1, 2 and 12-15 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by Eggers et al (5,366,443), claims 1, 2, 4-6 and 12-20 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by Kulesa et al (20090093802), and claims 3 and 7 are rejected under 35 U.S.C. 103 as being unpatentable over Kulesa et al ('802).

As previously mentioned in the Remarks, page 8 of the Office Action, under *Allowable Subject Matter*, includes "Claims 8-11 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in dependent form including all the limitations of the base claim and any intervening claims." Accordingly, the claims have been amended to include the subject matter of independent claim 1, intervening claim 4, and dependent claim 8 or 9 as explained below.

The subject matter of independent claim 1 and intervening claim 4 has been incorporated into claims 8 and 9 of the previous claim set as suggested in the Office Action to result in amended claims 8 and 9. Making reference to the previously quoted text from page 8 of the Office Action, the Applicant respectfully submits amended claims 8 and 9 are allowable.

Claims 10 and 11 depend on claim 9 and therefore include the limitations of amended claim 9. In view of the proposed allowability of amended claim 9, Applicant respectfully submits claims 10 and 11 are also allowable. Also, claim 10 and 11 now depend upon an allowable base claim.

The claim dependencies of claims 2, 5, 7 and 12 have been amended to depend on amended claim 9 whereby by device claims 2, 3, 5-7, and 12 all depend on claim 9, directly or indirectly, and therefore include the limitations of amended claim 9. In view of the proposed allowability of amended claim 9, Applicant respectfully submits claims 2, 3, 5-7, and 12 are also allowable.

System claim 13 has been amended to include the claim limitations of amended claim 9 by defining "at least one medical device as claimed in claim 9". Since claims 14 and 15 depend on claim 13, system claims 13-15 all include the limitations of amended claim 9. In view of the proposed allowability of amended

Application No. 16/445,790                          - 10 -                          April 14, 2021

claim 9, Applicant respectfully submits system claims 13-15 are also allowable.

Method claims 16 and 20 has been amended to include the claim limitations of amended claim 9 by defining for the use of a medical device "as claimed in claim 9". Since claims 17-19 depend on claim 16, method claims 17-19 all include the limitations of amended claim 9. Consequently, all of method claims 16-20 include the claim limitations of amended claim 9. In view of the proposed allowability of amended claim 9, Applicant respectfully submits method claims 16-20 are allowable.

In conclusion, the Applicant respectfully submits amended claims 2, 3, and 5-20 are all allowable.

Any remaining claims that have not been discussed independently include the limitations of one of amended claims 8 or 9. In view of the proposed allowability of amended claims 8 and 9, Applicant respectfully submits any such claims are also allowable.

In view of the above, favorable reconsideration and allowance of the subject application are respectfully requested.

Executed at Toronto, Ontario, Canada, on April 14, 2021.

For Davies et al.

/Glenn Arnold/
Glenn Arnold, Reg. No. 65,997
+1 905.602.4875 x. 308
**Customer Number: 48497**

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 42447753 |
| **Application Number:** | 16445790 |
| **International Application Number:** | |
| **Confirmation Number:** | 9099 |
| **Title of Invention:** | Methods and Devices for Puncturing Tissue |
| **First Named Inventor/Applicant Name:** | Gareth Davies |
| **Customer Number:** | 48497 |
| **Filer:** | Nir Lifshitz/Sabrina Mohess |
| **Filer Authorized By:** | Nir Lifshitz |
| **Attorney Docket Number:** | RFP026027_US_CON |
| **Receipt Date:** | 14-APR-2021 |
| **Filing Date:** | 19-JUN-2019 |
| **Time Stamp:** | 09:34:33 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | 140421_RFP026027USCON_coverpage_flat.pdf | 29865 <br><br> 3d4816005c629e499266a2ebfd8b9223228d1c54 | no | 1 |

**Warnings:**

**Information:**

| 2 | Claims | 140421_RFP026027USCON_claims_flat.pdf | 45868 | no | 5 |
| | | | e6d9884801330c4c1460e05ba7e50d11c998a2c9 | | |

**Warnings:**

**Information:**

| 3 | Applicant Arguments/Remarks Made in an Amendment | 140421_RFP026027USCON_remarks_flat.pdf | 60286 | no | 4 |
| | | | 2db6470b4f9de919ed541f9a4babe2318e89eba9 | | |

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 136019 |
| --- | --- | --- |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 16445790 |
| Filing Date | | 2019-06-19 |
| First Named Inventor | | Gareth Davies |
| Art Unit | | 3794 |
| Examiner Name | | PEFFLEY, MICHAEL F |
| Attorney Docket Number | | RFP026027_US_CON |

### U.S.PATENTS                                                              Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.   Add

### U.S.PATENT APPLICATION PUBLICATIONS                                      Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20050101984 | A1 | 2005-05-12 | Chanduszko | |
| | 2 | 20120109079 | A1 | 2012-05-03 | Asleson | |
| | 3 | 20090105654 | A1 | 2009-04-23 | Kurth | |
| | 4 | 20090182281 | A1 | 2009-07-16 | Kurth | |

If you wish to add additional U.S. Published Application citation information please click the Add button.   Add

### FOREIGN PATENT DOCUMENTS                                                 Remove

| Examiner Initial* | Cite No | Foreign Document Number³ | Country Code²i | Kind Code⁴ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T⁵ |
|---|---|---|---|---|---|---|---|---|

EFS Web 2.1.18

<table>
<tr><td rowspan="3"><strong>INFORMATION DISCLOSURE STATEMENT BY APPLICANT</strong><br>( Not for submission under 37 CFR 1.99)</td><td>Application Number</td><td>16445790</td></tr>
<tr><td>Filing Date</td><td>2019-06-19</td></tr>
<tr><td>First Named Inventor</td><td>Gareth Davies</td></tr>
</table>

| | | |
|---|---|---|
| Art Unit | | 3794 |
| Examiner Name | | PEFFLEY, MICHAEL F |
| Attorney Docket Number | | RFP026027_US_CON |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 0465449 | EP | A2 | 1992-01-08 | Heart Technology Inc | | |
| 2 | 2007510458 | JP | Y2 | 2007-04-26 | NMT Medical Treatment Incorporated | | ✕ |
| 3 | 1985261465 | JP | A | 1985-12-24 | TERUMO CORPORATION | | ⊠ |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |

## NON-PATENT LITERATURE DOCUMENTS     | Remove |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | Search Report for corresponding European patent application EP19204215 | |
| | 2 | Search Report for corresponding Japanese patent application 2018211611 | ✕ |

If you wish to add additional non-patent literature document citation information please click the Add button | Add |

## EXAMINER SIGNATURE

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16445790 |
|---|---|---|
| | Filing Date | 2019-06-19 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | 3794 |
| | Examiner Name | PEFFLEY, MICHAEL F |
| | Attorney Docket Number | RFP026027_US_CON |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Glenn Arnold/ | Date (YYYY-MM-DD) | 2021-04-28 |
|---|---|---|---|
| Name/Print | Glenn Arnold | Registration Number | 65997 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

48497        7590        06/09/2021

BAYLIS MEDICAL COMPANY INC
5825 Explorer Drive
MISSISSAUGA, ONTARIO L4W 5P6
CANADA

| EXAMINER |
| --- |
| PEFFLEY, MICHAEL F |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 3794 | |

DATE MAILED: 06/09/2021

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 16/445,790 | 06/19/2019 | Gareth Davies | RFP026027_US_CON | 9099 |

TITLE OF INVENTION: METHODS AND DEVICES FOR PUNCTURING TISSUE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 09/09/2021 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

## PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to:    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

By fax, send to:    (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 48497 | 7590 | 06/09/2021 |

BAYLIS MEDICAL COMPANY INC
5825 Explorer Drive
MISSISSAUGA, ONTARIO L4W 5P6
CANADA

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

|  | (Typed or printed name) |
|  | (Signature) |
|  | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/445,790 | 06/19/2019 | Gareth Davies | RFP026027_US_CON | 9099 |

TITLE OF INVENTION: METHODS AND DEVICES FOR PUNCTURING TISSUE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 09/09/2021 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PEFFLEY, MICHAEL F | 3794 | 606-045000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

❏ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

❏ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ❏ Individual ❏ Corporation or other private group entity ❏ Government

4a. Fees submitted:    ❏ Issue Fee    ❏ Publication Fee (if required)    ❏ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

❏ Electronic Payment via EFS-Web    ❏ Enclosed check    ❏ Non-electronic payment by credit card (Attach form PTO-2038)

❏ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status**  (from status indicated above)

❏ Applicant certifying micro entity status. See 37 CFR 1.29

❏ Applicant asserting small entity status. See 37 CFR 1.27

❏ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

Page 2 of 3

PTOL-85 Part B (08-18) Approved for use through 01/31/2020    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/445,790 | 06/19/2019 | Gareth Davies | RFP026027_US_CON | 9099 |

| 48497        7590        06/09/2021 |
|---|
| BAYLIS MEDICAL COMPANY INC |
| 5825 Explorer Drive |
| MISSISSAUGA, ONTARIO L4W 5P6 |
| CANADA |

| EXAMINER |
|---|
| PEFFLEY, MICHAEL F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3794 | |

DATE MAILED: 06/09/2021

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 16/445,790 | Applicant(s) Davies et al. | |
|---|---|---|---|
| | Examiner MICHAEL PEFFLEY | Art Unit 3794 | AIA (FITF) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the amendment filed 4/14/2021.

   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 2-3 and 5-20 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   **Certified copies:**

   a) ☐ All      b) ☐ Some      *c) ☐ None of the:

   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____ .
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /MICHAEL F PEFFLEY/ Primary Examiner, Art Unit 3794 | |
|---|---|

Application/Control Number: 16/445,790                                              Page 2
Art Unit: 3794

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance: applicant has

rewritten previously objected claims 8 and 9 into independent form to define over the

prior art of record.  The prior art fails to disclose the particular medical device having the

specific configuration for the elongate member as recited in these claims.

Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MICHAEL PEFFLEY whose telephone number is

(571)272-4770.  The examiner can normally be reached on Mon-Fri 8 am-5 pm.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Linda Dvorak can be reached on (571) 272-4764.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 16/445,790                                          Page 3
Art Unit: 3794

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see https://ppair-

my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

If you would like assistance from a USPTO Customer Service Representative or access

to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.


/MICHAEL F PEFFLEY/
**Primary Examiner, Art Unit 3794**


/M.F.P/
June 1, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/445,790 | 10/26/2021 | 11154324 | RFP026027_US_CON | 9099 |

48497        7590        10/06/2021
BAYLIS MEDICAL COMPANY INC
5825 Explorer Drive
MISSISSAUGA, ONTARIO L4W 5P6
CANADA

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 109 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s)  (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Baylis Medical Company Inc., Montreal, CANADA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

# EXHIBIT 8

# PCT

## GENERAL POWER OF ATTORNEY

*(for several international applications filed under the Patent Cooperation Treaty)*

(PCT Rule 90.5)

The undersigned person(s):
*(Family name followed by given name; for a legal entity, full official designation. The address must include postal code and name of country.)*

SORAJJA; Paul
2700 West Lake of the Isles Parkway
Minneapolis, MN, 55416
United States of America

hereby appoint(s) the following person as:   ☒ agent   ☐ common representative

**Name and address**
*(Family name followed by given name; for a legal entity, full official designation. The address must include postal code and name of country.)*

SMOCK, Gregory W.
TELEFLEX INCORPORATED
Intellectual Property Department
6464 Sycamore Court North
Minneapolis, MN 55369
US

to represent the undersigned before   ☒ all the competent International Authorities

☐ the International Searching Authority only

☐ the Authority specified for supplementary search only: _____
*(please indicate the Authority(ies) specified for supplementary search)*

☐ the International Preliminary Examining Authority only

in connection with any and all international applications filed by the undersigned with the following Office:

United States Patent and Trademark Office _____ as receiving Office
and to make or receive payments on behalf of the undersigned.

**Signature(s)** *(where there are several persons, each of them must sign; next to each signature, indicate the name of the person signing and the capacity in which the person signs, if such capacity is not obvious from reading this power):*

Paul SORAJJA

Date: 7/6/19

Form PCT/Model of general power of attorney (for several international applications) (January 2009)

# PCT

## GENERAL POWER OF ATTORNEY

*(for several international applications filed under the Patent Cooperation Treaty)*

(PCT Rule 90.5)

---

The undersigned person(s):
*(Family name followed by given name; for a legal entity, full official designation. The address must include postal code and name of country.)*

PEDERSEN; Wesley, Robert
4814 Russell Avenue South
Minneapolis, MN, 55410
United States of America

hereby appoint(s) the following person as:      ☒ agent      ☐ common representative

**Name and address**
*(Family name followed by given name; for a legal entity, full official designation. The address must include postal code and name of country.)*

SMOCK, Gregory W.
TELEFLEX INCORPORATED
Intellectual Property Department
6464 Sycamore Court North
Minneapolis, MN 55369
US

to represent the undersigned before      ☒ all the competent International Authorities

☐ the International Searching Authority only

☐ the Authority specified for supplementary search only: _____
*(please indicate the Authority(ies) specified for supplementary search)*

☐ the International Preliminary Examining Authority only

in connection with any and all international applications filed by the undersigned with the following Office:

United States Patent and Trademark Office _____ as receiving Office
and to make or receive payments on behalf of the undersigned.

**Signature(s)** *(where there are several persons, each of them must sign; next to each signature, indicate the name of the person signing and the capacity in which the person signs, if such capacity is not obvious from reading this power):*

_____
Wesley Robert PEDERSEN

Date: _____July /11/2019_____

Form PCT/Model of general power of attorney (for several international applications) (January 2009)

# PCT

## GENERAL POWER OF ATTORNEY

*(for several international applications filed under the Patent Cooperation Treaty)*

(PCT Rule 90.5)

---

The undersigned person(s):
*(Family name followed by given name; for a legal entity, full official designation. The address must include postal code and name of country.)*

DRASLER, William Joseph
4100 Dynasty Drive
Minnetonka, MN 55345
US

hereby appoint(s) the following person as:    ☒ agent    ☐ common representative

**Name and address**
*(Family name followed by given name; for a legal entity, full official designation. The address must include postal code and name of country.)*

SMOCK, Gregory W.
TELEFLEX INCORPORATED
Intellectual Property Department
6464 Sycamore Court North
Minneapolis, MN 55369
US

to represent the undersigned before    ☒ all the competent International Authorities

☐ the International Searching Authority only

☐ the Authority specified for supplementary search only: _____
*(please indicate the Authority(ies) specified for supplementary search)*

☐ the International Preliminary Examining Authority only

in connection with any and all international applications filed by the undersigned with the following Office:

United States Patent and Trademark Office                                              as receiving Office

and to make or receive payments on behalf of the undersigned.

**Signature(s)** *(where there are several persons, each of them must sign; next to each signature, indicate the name of the person signing and the capacity in which the person signs, if such capacity is not obvious from reading this power):*

Signature: _____
William Joseph DRASLER

Date: 23 APRIL 2020

Form PCT/Model of general power of attorney (for several international applications) (January 2009)

Dkt. No. TEL-2004-WO01

# TRANSSEPTAL SYSTEMS, DEVICES AND METHODS

## CLAIM OF PRIORITY

Benefit of priority is hereby claimed to U.S. Provisional Patent Application Serial No. 62/840,062, entitled "TRANSSEPTAL GUIDEWIRE NEEDLE TIP" and filed on April 29, 2019, which is herein incorporated by reference in its entirety.

## TECHNICAL FIELD

The present subject matter relates to, among other things, medical devices for accessing left heart structures by way of crossing a septum of a heart.

## BACKGROUND

Transseptal punctures can be used to access the left atrium (LA) of a heart by way of the right atrium (RA). Access to the LA is commonly required for atrial fibrillation ablation treatment and, more recently, treatment of valvular and other structural heart diseases, for example.

## ABBREVIATIONS

Unless otherwise noted, the following abbreviations apply throughout this disclosure:

- FO:  fossa ovalis 202
- Fr: French (increments for catheter sizing diameter)
- GW: guidewire 10
- LA: left atrium 208
- LAA: left atrial appendage 210
- MRI: magnetic resonance imaging
- MV: mitral valve 212
- RA right atrium 206
- TEE: transesophageal echocardiography
- TTE: transthoracic echocardiography

1

## OVERVIEW

The present inventors recognize that transseptal puncture systems and devices should be able to locate specific locations on the fossa ovalis (FO)—a depression on the right side of the atrial septum between the RA and LA of a heart—reliably to safely and accurately puncture the septal wall for a given procedure. Inadvertent puncturing of structures such as the aorta, left or right atrial free wall or pulmonary vein can result in cardiac perforation and tamponade. In addition, some left heart procedures require that highly specific septal wall sites associated with the FO be traversed to pinpoint specific targets for diagnostic or therapeutic device positioning.

The present inventors further recognize that existing transseptal puncture systems and devices suffer from drawbacks, including but not limited to: (1) difficulty engaging with precision and stability on specific locations of the FO; (2) difficulty with needle advancement across the septal wall; (3) difficulty dealing with a redundant or aneurysmal septum leaving the apex of a tented needle on the FO, adjacent to the LA free wall and thus at risk for perforation and pericardial tamponade; and (4) difficulty dealing with prior septal occluder placement necessitating alternative puncture locations on the native septum or direct occluder puncture.

The present subject matter is directed to, among other things, achieving transseptal puncture in a highly efficient and safe manner both to gain access to the LA by way of a guidewire (GW) including a distal needle segment, a mid-looped or coiled left-atrial segment, and one or more linear elongated proximal segments, and to serve as a platform for structural or other device delivery to the LA of the heart. Specifically, the present subject matter is directed in part to a transseptal GW 10 incorporated with a transseptal puncture needle 12. The GW 10 can comprise a relatively stiff proximal segment end 16 and a middle loop segment 14, wherein the distal end 22 comprises the junction with the transseptal needle 12. One or more mid-segment GW loops 24, 26 can come to rest in the LA 208. The middle loop segment 14 can be formed of a shape memory material to form at least two looped segments, for example—a second more distal, usually outer, broad coil 24 and a first more proximal, inner coil 26, wherein the middle segment 14 can be in continuity with the elongated linear stiff GW segment 16 at proximal end 25, which eventually

2

Dkt. No. TEL-2004-WO01

rests externally for exchanges.

The present subject matter is further directed to a transseptal GW puncture system that can traverse the FO 202, comprising a GW 10, a transseptal dilator 108, and a sheath 100. The distal end of the GW 10 can comprise a transseptal needle 12 attached to the looped GW segment 14 at its distal end 22 and in turn can be positioned in continuity with the distal end 17 of the linear, stiff GW segment 16. The transseptal needle 12 can have shape memory at the point of attachment to the looped GW segment 14, wherein the shape memory is sufficient to have the transseptal needle 12 retain a pre-specified angle with respect to the looped GW segment 14 to maintain atraumatic stability within and central to the loops 24, 26. One or more of the loops 24, 26 can be positioned and stabilized in the LA 208 resting adjacent to an inner surface of the LA 208. The middle looped segment 14 can be formed of a shape memory material to form the two loops 24, 26, wherein the proximal end 25 of the more proximal coil 24 is in continuity with the proximal elongated stiff segment of the GW 16, and wherein a secondary bend 29 can be positioned in the RA 206 transitioning into the elongated, linear proximal most segment of the GW 10.

The transseptal dilator 108 can comprise an elongated catheter 109 which rests within the sheath 100, tapering down to a narrowed dilator distal segment 110, wherein the catheter lumen 111 throughout remains compatible with the GW 10, which may have a full spectrum of diameters ranging from 0.021-0.035in, inclusive, or more. At some point along the distal segment 106 can be a radiopaque marker 122 positioned to be overlapped with a radiopaque tip marker 123 on the sheath 100 when at that point the transseptal dilator 108 and sheath 100 are of equivalent external diameters. The dilator 108 can be advanced forward into a precise position on the FO 202 for "tenting" the FO 202 by way of a series of forward movements of the actuator 112 adjacent to the distal end of the handle 104. Steerable maneuvers on the proximal sheath handle 104 can permit antegrade and retrograde flexion, and torqueing anterior or posterior of the entire sheath 100 can be carried out to position the distal end 124 of the sheath and the retained dilator tip 110 adjacent to the specific FO site for a specific procedure. Advancement and retraction movements of the dilator distal segment 110 relative to a stabilized sheath 100 with the use of the actuator 112 on the proximal sheath 100 can interact with the proximal end 119

3

Dkt. No. TEL-2004-WO01

of the dilator 108.

Once the FO 202 is tented with the dilator 108 which contains the transseptal needle 12, the needle 12 can be advanced, puncturing the FO septum 202 and crossing into the LA 208. The transseptal needle 12 can fold or bend from shape memory at a discrete angle at the hinge point 20 on the coiled GW segment 14 to which it is connected after being advanced across the FO 202. It can form an angle which may range from about 45–140 degrees, inclusive. Further advancement of the transseptal GW 10 can position the looped section 14 coils of the GW 10 within the LA chamber 208 aiding also in preserving the needle position atraumatically in the central LA 208 by way of remaining central to the loops. Preferably, the GW coils 24, 26 have a small inner diameter coil 26 and larger outer diameter coil 24 aiding in preserving the needle 12 central to the LA 208. The smaller in diameter inner coil can prevent needle 12 damage to the tissue in the LA wall. In another embodiment, the coils 24, 26 may be of equal diameters.

In another embodiment, the coils 24, 26 can be offset, as illustrated in FIGS. 3 and 4, to further aid in preserving a central location of the needle 12 which can also be folded in a third dimension, an additional feature making it less susceptible to perforating LA 208 structures when the folded distal transseptal needle 12 is advanced and deflected medially further aiding in maintaining a central needle 12 position within the offset but equal spaced loops 14. Coils 24, 26 can be offset by approximately 0.75–2cm, inclusive. The coils 24, 26 can be intermediate in stiffness allowing for less traumatic interaction with the LA free walls. A secondary bend 29 in the right atrial GW segment can aid in preserving a perpendicular trajectory across the FO 202 and co-axially in the IVC 215. The elongated, proximal stiff GW segment 16 can have a length of 260cm, for example, but may be significantly longer for purposes of catheter or device exchange.

The forward positioning of the system of the present subject matter allows for precise positioning of the distal sheath for precise device positioning thereby establishing ideal LA 208 positioning ultimately dictated by the specific left heart target for a given device, i.e., LAA 210, MV 212. The system is intuitive and simple to accurately position on a specific FO 202 target by using iterative dilator advancement under echo or other imagining guidance. After the coils have been

4

Dkt. No. TEL-2004-WO01

advanced across the FO 202 and secured in the LA 208, the dilator 108 can then be advanced over the coiled GW 10 into the LA 208 preserving the overlapping radiopaque segments in place until the sheath 100 has crossed into the LA 208. Overlapping radiopaque markers 122, 123 on the distal dilator end 106 and sheath tip 124 can be used to confirm that they are at equivalent diameters for smooth simultaneous advancement of the dilator 108 and sheath 100 across the FO 202.

The deflectable and steerable nature of the sheath 100 can permit the sheath 100 to obtain the directionality, angulation and reach using a single size forward looking catheter system for the variety of RA 206 sizes and FO 202 angles in various patient-specific anatomy.

The collective system preferably includes a needled GW 10 delivered by the "one size fits all" catheter system for iteratively advancing the dilator 108, containing the retracted needle 12, into a precise tenting position on the FO 202. An actuator 112 on the sheath 100 adjacent to the handle 104 can permit highly controlled advancement of the distal segment 110 for "tenting" the FO membrane prior to needle puncture. The actuator 112 can be advanced or retracted with the operator's thumb without removing the operator's hand from the rotatable handle 104. The dilator 108 may have a more flexible distal segment to permit smooth tracking over the coiled GW segment in the LA 208. The deflectable sheath tip 124 may have monopolar or bipolar directionality. The deflectable sheath 100 can, for example, have a distal fixed 2 degree bend within the RA 206 which may range from 2–20 degrees, inclusive, to more easily establish perpendicularity to the FO 202. Standard, commercially available sheath dilator catheters may also be used in combination with the previously described novel needle GW.

Advantageously, the present subject matter provides a system and device that satisfy the following: (1) improved ease of use; (2) intuitive manipulation for precise distal control; (3) improved device and procedural efficacy; (4) increased device safety across a wide range of operator skills; (5) enhanced workflow and decreased procedural times; and (6) decreased procedural costs secondary to a combined needle GW.

These and other examples and features of the present subject matter will be set forth, at least in part, in the following Detailed Description. This

5

Dkt. No. TEL-2004-WO01

Overview is intended to provide non-limiting examples of the present subject matter—it is not intended to provide an exclusive or exhaustive explanation. The Detailed Description below is included to provide further information about the present subject matter.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like numerals can be used to describe similar features and components throughout the several views. The drawings illustrate generally, by way of example but not by way of limitation, various embodiments discussed in the present patent document.

FIG. 1 is a side plan view of a first embodiment of the present subject matter of the combined transseptal needle and GW.

FIG. 2 is a side plan view of a second embodiment of the combined transseptal needle and GW of the present subject matter.

FIG. 3 is a side plan view of a third embodiment of the present subject matter of the combined transseptal needle and GW with offset loops.

FIG. 4 is a front plan view of the transseptal needle of FIG. 3, which has been rotated ninety degrees.

FIG. 5 is a side plan view illustrating a representative deflectable sheath for use with the needle-GW of the present subject matter.

FIG. 6 is a side plan view illustrating a dilator for use with the deflectable sheath of FIG. 5.

FIG. 7 is a front view schematic representation of the human central venous circulatory system including the heart and venous system with a deflectable sheath of the present subject matter.

FIG. 8 is a front view schematic representation of a cross-section of the human heart with the deflectable sheath positioned across the atrial septum and positioned in the LA with the distal needle GW loops in the LA.

FIG. 9A is a sectional view of a dilator distal region and having a guidewire distal end and needle contained within the dilator lumen.

FIG. 9B is a sectional view of a dilator distal region extending around a radius of curvature with a needle body and needle tip contained with the dilator lumen.

6

Dkt. No. TEL-2004-WO01

FIG. 10A is a side view of a guidewire distal end and needle with a hinge point located therebetween.

FIG. 10B is a side view of a guidewire distal end forming a needle-guidewire angle with a needle body.

FIG. 10C is a side view of a smaller diameter cylindrical hinge point located between a larger diameter guidewire distal end and a needle body.

FIG. 10D is a side view of a rectangular hinge point located between a cylindrical guidewire distal end and a needle body.

FIG. 10E is a side view of a rectangular hinge point bent to a needle-guidewire angle along a hinge bending axis.

FIG. 11A is a sectional view of a dilator distal region with a guidewire needle surrounded by a tip sheath contained within the dilator lumen.

FIG. 11B is a side view of a releasable tip sheath.

FIG. 11C is a sectional view of a releasable tip sheath contained within the dilator lumen.

FIG. 12 is a side view of a transseptal guidewire having a proximal guidewire segment, a guidewire loop segment, and a needle.

FIG. 13 is a sectional view of dilator having a dilator nose, a dilator alignment zone, a dilator waist, and a dilator lumen that extends to a dilator proximal port located on a dilator manifold.

FIG. 14A is a sectional view of a transseptal guidewire located within a dilator which is located within a deflectable sheath, the dilator nose forming a tenting of the FO.

FIG. 14B is a sectional view of a needle partially contained within a dilator nose and extending across the FO wall.

FIG. 14C is a sectional view of a dilator nose being advanced across the FO wall while a guidewire and needle remain fixed in position within a deflectable sheath.

FIG. 14D is a sectional view of a needle being advanced across the FO wall and a guidewire-needle bend angle occurring at a hinge point.

FIG. 14E is a sectional view of a guidewire being advanced further across the FO wall and forming a guidewire loop segment within the LA.

Dkt. No. TEL-2004-WO01

FIG. 14F is a sectional view of a deflectable sheath and dilator being advanced over a transseptal guidewire to place a portion of a sheath into the LA.

FIG. 15 is a sectional view of an advancement method for small advancement of a guidewire followed by small advancement of the dilator to cross a thickened FO.

The drawing figures are not necessarily to scale. Certain features and components may be shown exaggerated in scale or in schematic form and some details may not be shown in the interest of clarity and conciseness.


DETAILED DESCRIPTION

With reference to the guide number in the drawings, the transseptal puncture system of the present subject matter is preferably, but not limited to, a "one size fits all" system whereby a single-sized system may be used in a variety of anatomical configurations and atrial sizes. The system includes specialized components, including an exchange GW with a distal transseptal needle and adjacent coils or loops for GW securement in the LA 206. In addition, the system may include a dilator which interacts with an actuator on a proximal sheath handle for controlled positioning on the FO aided by the deflectable sheath.


Guidewire 10

Reference is now made to FIGS. 1–4 illustrating a transseptal needle-GW 10. The transseptal needle-GW 10 can be an integrated component that can avoid the need for a separate transseptal needle and multiple GW exchanges, lengths and curves to treat various anatomies. The transseptal needle-GW 10 can have at least three defined segments: (1) a distal transseptal needle 12; (2) a middle or looped LA segment 14; and (3) a proximal elongated linear, stiff segment 16.


Needle 12

The transseptal needle 12 can be positioned in continuity with the distal end 22 of the GW loop segment 14. The transseptal needle 12 is preferably relatively short, with a length between about 0.75–2.0cm, inclusive. The needle 12 can have an ultra-low profile tip 18. The proximal end 20 of the needle 12 can be in continuity with the adjacent distal loop segment 14, which can be configured to be

8

linear when retained in the central lumen 111 of a dilator tip prior to advancement.

The transseptal needle 12 can have a lubricious coating to minimize resistance and a sharply tapered tip 18 to puncture and easily transition across the FO 202 (illustrated in FIG. 8), including those that may be densely scarred or aneurysmal. Inadvertent needle lurching across the FO membrane and loss of a preferred puncture site can be avoided by the extra-fine point on the needle tip 18 and slow iterative delivery of the forward-looking tapered transseptal dilator 108 into the FO 202 for stable positioning and "tenting" of the membrane by the dilator tip 18 which is in turn supported by a deflectable transseptal sheath 100. With this forward looking system, unintended anterior or posterior torqueing forces resulting in sliding across the FO 202 can be greatly minimized.

The transseptal needle 12 can preferably be composed of a metallic material, such as stainless steel or alloy including Nitinol with shape memory, and can be attached to the GW loop segment 14, for example, with a weld or possibly interdigitating slots which interact to form a more stable, yet flexible, union allowing the needle to fold on itself thereby avoiding puncturing the LA free wall, the pulmonary vein, etc. Other means of creating a pre-shaped angle between the needle 12 and loop segment 14 can also be conceived and utilized.

The transseptal needle 12 can sharply angle at a proximal end/hinge point 20 where it connects to the distal end 22 of the looped GW segment 14, having retained a pre-specified angle central to the LA loop segment 14, thus maintaining atraumatic stability within the central LA loop segment 14 and preventing contact and possible perforation of LA 208 structures including a pulmonary vein, LA free wall and LAA 210.

Following the GW advancement and transseptal puncture, the needle 12 can abruptly flex centrally, preferably at an acute angle with the adjoined looped GW segment 14, as illustrated in FIGS. 1–4. The needle 12 can remain linear after entering the LA 208 but flexes inward, preferably at an angle of about 45–140 degrees, inclusive, relative to the distal looped GW segment 14. The diameter of the transseptal needle tip 18 can be ground down to an ultra-low profile and tapered back to conjoin the distal loop segment 14, most likely transitioning to a profile in the range of 0.021–0.035in, inclusive, or greater.

9

Dkt. No. TEL-2004-WO01

Guidewire Loop Segment 14

The looped GW segment 14 can be designed to stabilize the GW 10 position atraumatically in the LA 208 and, in addition, assists in protecting the left atrial free wall from unwanted needle puncture. Two or more looped segments 24, 26 may typically range between about 2.5–4.0cm, inclusive, in diameter and be formed by shape memory as it exits from a transseptal dilator 108 into the LA 208. The distal GW looped segment 14 in one embodiment can be formed by two roughly equal in size circular or non-circular loops in a plurality of shapes which are again formed upon deployment in the LA chamber, as illustrated in FIGS. 3–4.

The coils provide at least four useful functions:

1. The coils can confirm the correct LA chamber positioning by taking on the unconstrained, known shape within the LA 208.

2. The coils 14 can maintain stable positioning in the LA 208 to avoid inadvertent withdrawal of the GW 10 into the RA 206 or forceful needle tip 12 advancement into the LA free wall or pulmonary vein.

3. The outer broad coil 24 can provide a longer GW support ramp over which the dilator 108 and sheath 100 can be advanced with less resistance into the LA 208 around the curve to facilitate catheter support.

4. The coils can form an outer protective shield in which the centrally positioned needle 12 is kept at a safe distance from penetrating LA 208 structures.

In another embodiment, there are at least two circular coils, the inner coil 26 diameter being smaller than the outer coil 24 diameter, as illustrated in FIGS. 1–4, the inner coil thus central to the outer coil 24. In this embodiment, the larger, outer coil 24 can be compressed by LA 208 structures in the absence of any conformational change of the inner coil 26 thus further protecting deformity of the distal needle 12 and preserving its central location. As an example, the inner coil 26 of the GW 10 may have a diameter between about 1.5–3.0cm, inclusive, such as about 2.5cm. The outer coil 24 can have a diameter between about 3.0–4.0cm, inclusive, such as about 3.5cm.

10

In a third embodiment, the two coils 24, 26 can have parallel portions 24a and 26a, be unequal in diameter, and be offset by about 0.75–2.0cm, inclusive. Further, a second preformed bend at the junction of the distal transseptal needle 12 and the GW loop segment 14 in the third dimension central to the two offset wire coils 24, 26 can be incorporated, as illustrated in FIG. 5. Its purpose is to further aid in preventing needle perforation of the LA 208 by allowing the needle 12 to not only be centered circumferentially in two dimensions upon flexion with this embodiment but the needle 12 can be directed centrally in a third dimension between the breadth of two offset loops 24, 26. The distance between the parallel portions 24a and 26a of coils 24, 26, as illustrated by dotted line 25, can be about 1cm, for example, and may range from about 0.75– 2.0cm.

Proximal Guidewire Segment 16

The proximal GW segment 16 can be in continuity with the adjacent coil segment 14 at the distal end 17 of the segment 16. The proximal GW segment 16 can include a proximal free end 28, which is externalized with adequate length to permit catheter or device exchange while preserving the distal GW loop segment 14 positioned in the LA. The distal end 17 of the proximal GW segment can transition linearly across the atrial septum into the LA 208. There can then be a shallow fixed second degree bend 29 roughly in the mid-RA 206, retaining a preferable angle of 2° to 20°, inclusive. The elongated proximal stiff GW segment 16 extends from most distal end of the long proximal segment 17 to the most proximal end 28 having a preferred diameter of 0.021–0.035in, inclusive. The long proximal stiff GW segment 16 may extend from 240–300cm, inclusive, preferably 260cm in length. This long, stiff GW segment 16 can serve as a supportive rail for exchanging an array of catheters and devices for delivery to left heart targets.

Sheath 100

Referring to FIG. 5, the transseptal delivery sheath 100 can be a unipolar or bipolar, for example, deflectable sheath actuated with a rotatable proximal ergonomic handle 104 for superior/inferior flexion, and one-to-one sheath torque control for optimal anterior/posterior positioning. Advancement or retracting of the transseptal

11

Dkt. No. TEL-2004-WO01

sheath 100 can permit superior and inferior positioning for controlled, atraumatic guidance in all planes.  The sheath 100 can have a proximal end 102 located adjacent the actuator 112 and a distal segment 107.  Current transseptal systems designed for commercial use are brought into the FO 202 using a clockwise torque of the sheath/dilator system generally from a femoral vein access sight that may be overly aggressive (excessive in length) which may in turn result in inadvertent "stored up" torque if the over-reaching dilator 108 momentarily "catches" distally on an atrial septum prominent ridge.  Further efforts to position the dilator distal segment 110 within the FO 202 may result in perforation of the RA 206 free wall or appendage.  Conversely, a dilator 108 of insufficient length or "reach" and inability to engage the membrane across the FO 202 results in an inability to puncture the FO 202.

The sheath 100 can have an ergonomic two-way rotatable handle 104 for superior and inferior distal sheath flexion, illustrated by arrow 125 and reach at the tip 124 of the sheath 100.  In addition, 1:1 torque transfer distally in an anterior to posterior position can be accomplished through wire braid reinforcement (not illustrated) of the sheath 100, which can also improve back up support for enhanced device delivery.  The sheath 100 can initially be positioned adjacent to but without engagement of the atrial septum using fluoroscopic and TEE guidance and when available, possibly real time MRI and computer tomography.

Once the sheath 100 is accurately positioned at the appropriate short distance from the FO 202 (e.g., about 0.5–2.0cm) in the RA 206 under imaging guidance, the dilator 108 can be advanced while keeping the sheath 100 stationary. The sheath handle 104 and adjacent actuator 112 for the dilator can permit system (sheath and dilator) manipulation with one hand kept in position without need for use of the operator's contralateral hand.  The actuator 112 for the dilator 108 can be manipulated by the operator's thumb or other digit for iterative forward advancement or retraction by interacting with the frictional elements 121 on the dilator 108.  The wire-braid, reinforced sheath 100 can provide strong backup, kink-resistant support for advancing the distal segment 110 of the dilator 108 and subsequently the dilator 108 into a precisely controlled specific location of the FO 202 for "tenting" of the membrane.

12

Dkt. No. TEL-2004-WO01

The sheath 100 preferably includes but does not necessitate a dilatable shaft to accommodate highly variable device profiles; on the other hand, a series of fixed diameter sheaths may be used to accommodate a variety of device profiles. Ideally expandable or dilatable sheaths, ranging from about 8.5 Fr to potentially up to 30 Fr, inclusive, could eliminate the need for keeping multiple sheath diameters available for different procedures. One embodiment is thus a single sheath size which is conformed to be dilatable across a range of diameters. Transseptal sheaths which may require delectability at two or more distances from the proximal handle may be preferred for device delivery around complex or multiple curves.

A plurality of other supportive structures may run linearly within the sheath body to preserve an adequate level of support for subsequent device delivery across more angulated anatomy. A 2–20 degree secondary bend, for example, may be positioned proximal to the more distal deflectable bend which can aid in achieving a more perpendicular angle at the FO for strong coaxial backup support. In addition, this can permit distal flexion greater than 180 degrees, which may on occasion be needed to achieve appropriate sheath positioning within the medial aspects of the left heart. A tight hemostatic valve on the sheath hub 114 can minimize back bleeding around the GW 10, including those with diameters down to 0.021in, for example. Preferably, the sheath 100 is 90cm long (70cm usable length) or longer. Hubs for locking the dilator to the sheath may be incorporated.

Dilator 108

The transseptal dilator 108 can have an ultra-low-profile distal segment 110 with a reverse taper back, illustrated at 106, to a fixed external diameter 118 at the distal end of the dilator 108, compatible with the internal sheath diameter. The dilator 108 can be advanced in a forward motion until "tenting" of the FO membrane is demonstrated in a precise position specific to the position visualized by TEE or other real time imaging detectors specific to the procedure being performed.

In a preferred embodiment, the dilator 108 can interact with the actuator 112 adjacent to the sheath handle 104 by way of a frictional contact element 121 or use of interlocking gears for precise gentle control of the dilator movements. An actuator 112 that permits advancement or retraction of the dilator will preferably be

13

Dkt. No. TEL-2004-WO01

controlled with the ipsilateral thumb, preserving the ability to maneuver both the dilator 108 and sheath handle 104 with one hand.  The dilator 108 can have variable flexibility along its length, with a more flexible distal segment 118 to prevent excessive straightening or movement of the catheter system as it is advanced over the GW looped segment 14.

The dilator distal segment 106 should be able to be advanced beyond the stationary distal sheath 100, preferably up to about 5cm, although it may be altered to extend beyond the sheath tip from about 3.0–8.0cm, inclusive, for example.  This allows controlled advancement of the dilator 108 across the FO 202 and into the LA 208 over the distal GW 10. After the septal puncture and advancement of the dilator 108 into the LA 208, while maintaining the sheath 104 fixed in the RA 206, there should be ample space until the radiopaque markers 122, 123 overlap in the RA 206 side of the septum following which the composite system with transseptal dilator 108 and sheath 100, having flush external diameters, are now able to be advanced into the LA 208 as a single unit. The dilator distal segment 106 ends in a low profile tip 110 and can have a radiopaque marker 122 proximal to the dilator distal segment 106 matching the profile of the radiopaque marker 123 on the sheath tip 124 rendering a point of smooth transition between the two for simultaneous advancement across the FO 202 preventing "hang-up" of the sheath tip edge on the atrial septal crossing point.

Method of Use

Referring to FIGS. 7 and 8, an exemplary method of operation can be as follows on a human patient 201.  As described below, this technique generally is guided by TEE or TTE supplemented with standard fluoroscopy.  It should be understood that the procedure could also be guided by intra-cardiac echo, real-time MRI or image integration with pre-procedural volume rendered computer tomography images. This later imaging method uses standard fluoroscopic images to which the pre-acquired computer tomography images may be oriented and superimposed on for guidance.  Reference is made to U.S. Patent 8,900,214 to Nance et al., which is incorporated herein for a general description of human anatomy, including the heart 200, and insertion of a transseptal sheath 100 into the atrial

14

region.

A 0.032in J-tipped GW is advanced from the right femoral vein 216 into the superior vena cava 218 using fluoroscopy. The deflectable sheath 100 and dilator 108 are advanced as a unit over the J-tipped GW 10 and positioned in the mid RA 206. The J-tipped GW 10 is removed and the dilator 108 is flushed. The distal tip 18 of the GW 10 is then advanced into the 0.032in compatible dilator 108 under fluoroscopy and the distal tip 18 of the GW 10 is positioned just proximal to the dilator distal segment 110.

The ergonometric handle 104 on the sheath 100 is oriented axially to permit the deflectable tip 124 to be ante-flexed toward the FO 202. One to 3cm of the dilator 108 is advanced distal to the fixed sheath 100 fluoroscopically and echocardiographically prior to maneuvering the sheath 100 toward the FO 202. To accomplish this anterior or posterior orientation, the sheath 100 is torqued anteriorly or posteriorly. The sheath 100 is advanced or withdrawn to gain a more superior or inferior position. Once again, the proximal sheath handle 104 is turned to flex the distal tip 124 to a superior, i.e., retrograde, or inferior, i.e., antegrade, trajectory. A TEE probe is most commonly used for optimal imaging of the FO 202 and adjacent dilator distal tip 110 using orthogonal views: bicaval view for superior-inferior orientation and short axis view at the aortic level to demonstrate anterior-posterior positioning. Using these TEE views, a precise position on the FO 202 for a procedure specific puncture can be obtained. The actuator 112 adjacent to the sheath handle 104 is used to slowly and iteratively advance the dilator tip 110 creating "tenting" within the FO 202 and the correct position confirmed by TEE. If the dilator distal tip 110 is incorrectly positioned, the dilator 108 can be withdrawn with the actuator 112 and redirected after manipulating the sheath 100.

With correct positioning confirmed using the tenting position, the GW 10 proximal end is advanced and the needle tip 18 punctures and crosses the FO 202 membrane. As the GW 10 is further advanced, the needle 12 flexes sharply at the hinge point 20 where it is attached to the loop segment 14 of the GW 10. As the GW 10 is still further advanced, its distal coils 14 are self-positioned in the LA 208 and the needle 12 is kept flexed central to the coils 24, 26. Catheters are always

15

Dkt. No. TEL-2004-WO01

aspirated and flushed with exchanges. The patient is therapeutically heparinized as soon as the GW loop segment 14 is advanced into the LA. Correct positioning of the GW 10 is confirmed by verifying its preformed shape. The coiled or looped segment 14 can take on several different embodiments as noted herein. The dilator 108 is advanced over the coiled wire maintaining the sheath 100 in a fixed position within the RA 206.

With the appropriate length of dilator 108 advanced under fluoroscopy, the radiopaque markers 122, 123 on the dilator 108 and sheath tip 124 come to overlap in the RA 206 confirming that the outer diameters of both catheters are equivalent and ready to be advanced into the LA 208 as a single unit. The sheath tip 124 now comes to rest across the FO 202 and in the LA 208. Again, all the dilator 108 and sheath 100 manipulations are carried out as a single-handed procedure. The dilator 108 is removed, keeping the GW wire loops 24, 26 and sheath 100 stationary in the LA 208.

The elongated proximal segment of the GW 10 is loaded with the primary device that is now advanced to the sheath tip 124 and the GW 10 is removed. The sheath 100 can then be more finely manipulated to deliver the device to the target and subsequently deployed. After deployment, the deflectable sheath 100 is drawn back into the RA 206 and subsequently removed from the patient. The heparin is reversed with protamine and the percutaneous vascular entry is closed.

This transseptal procedure is carried out with a forward-looking catheter system which is iteratively advanced onto a precise position of the FO 202 prior to being punctured. The nature of the catheter system is such that only one device shape will be required to access the LA 208. This is unlike current techniques where catheters are torqued into the FO 202 using a multitude of catheter sizes which may be initially too small and unable to reach the FO 202 or too long placing the patient at risk for slipping off the FO membrane and potentially perforating the RA free wall.

Guidewire, Needle, Dilator and Sheath

FIGS. 9A and 9B show an embodiment for the guidewire distal end 22, which can be the distal end of guidewire loop 14 of the transseptal guidewire 10 of the present subject matter, as described earlier in FIGS. 1–4. The transseptal guidewire 10

16

Dkt. No. TEL-2004-WO01

can be positioned within the dilator distal segment 106 of the dilator shaft 109 of the present subject matter. The dilator shaft 109 and dilator distal segment 106 have a dilator lumen 111 with a dilator lumen diameter 250 that allows ease of passage of the guidewire needle tip 18, guidewire loop segment 14, and transseptal needle 12 therethrough without significant frictional forces. As shown in FIGS. 9A and 9B, the needle body 252 with a needle body diameter 255, which is shown to be the same diameter as the guidewire diameter 258, can be smaller than the dilator lumen diameter 250 by about 0.002in, for example (range 0.001–0.004in, inclusive). The needle body diameter 255 is not significantly smaller than the dilator lumen diameter 250 such that the dilator inner curve wall 260 and dilator outer curve wall 265 can make contact with the needle body 252 and provide alignment of the needle body central axis 270 with the dilator central axis 275. The needle 12 can have a needle length of about 5mm (range 3–20mm, inclusive) to provide axial alignment of the needle body 252 that is coaxial with the dilator central axis 275.

The needle tip 18 can extend with a conical or tapered shape from the needle body 252 forming a sharp needle point 285 that is able to penetrate through tissues found in the FO 202 of the atrial septum 204, as shown in FIG. 14A, or can be used to penetrate other locations peripheral to the FO or penetrate through other vascular walls or an organ septum. To allow the needle-guidewire 10 to traverse in a distal direction within the dilator lumen 111 without making penetrating contact of the needle point 285 with the dilator outer curve wall 265, the needle tip 18 can be formed with a specified needle tip length 295 and needle tip angle 300. As shown in FIG. 9B, the dilator 108 can be bent into a curved shape with a dilator radius of curvature 305. A lower limit for the dilator radius of curvature 305 necessary to access the FO 202 from the inferior vena cava 215 (see FIG. 8) can be about 1cm (range 0.75–2cm, inclusive). The dilator lumen diameter 250 can be about 0.035in, for example (range 0.026–0.038in, inclusive); the needle body diameter 255 can be about 0.030in, for example (range 0.025–0.031in, inclusive). Using standard geometric considerations for a dilator 108 extending around a dilator radius of curvature 305 bend of 1cm, for example, it can be shown that a needle tip 18 having a needle tip length 295 of approximately 2mm and a needle tip angle of 26 degrees, for example (range 8–30 degrees, inclusive) will provide for travel of the needle tip 18

17

Dkt. No. TEL-2004-WO01

around the dilator radius of curvature 305 without allowing the needle point 285 to stick or penetrate into the dilator outer curve wall 265. Various needle tip 18 shapes (such as nonlinear surface curvature) and angles can be used to alter the needle tip length 295 and needle tip angle 300. A close tolerance between the needle body diameter 255 of about 0.002in, for example, smaller than the dilator lumen diameter 250 will provide for axial alignment of the needle body 252 and needle tip 18 such that buckling of the needle 12 at the hinge point 20 is not significant and the transseptal dilator 108 will direct the needle 12 in coaxial alignment with the dilator central axis 275.

FIGS. 10A–10D show embodiments for the hinge point 20 located between the guidewire distal end 22 and the needle body 252. The hinge point 20 or hinge 20 can be formed from an elastic material such as stainless steel, Nitinol, or other elastic metal, for example, which has a specified equilibrium shape such as a 90 degree bend, or preferably a more acute bend, for example. If the hinge point 20 is temporarily straightened out into a linear configuration due to a constraining force such as that provided by a dilator 108, for example, the hinge 20 will return to its bent shape upon removal of the constraining force. The hinge point 20 or hinge 20 can be formed as a contiguous portion of the guidewire distal end 22 that is joined to the needle body 252, the hinge 20 can be a contiguous portion of the needle body 252 that is joined to the guidewire distal end 22, or the hinge 20 can be a separate region that is joined to both the needle body 252 and joined to the guidewire distal end 22. The hinge 20 can be formed from Nitinol, for example, that is contiguous with a Nitinol needle; the needle 12 can be joined or attached to the guidewire distal end 22. The joining process can include various welding, brazing, or soldering methods or can use adhesives or mechanical joining methods. Alternately, thermal processing methods can be used to form the hinge point 20 into an equilibrium shape that has a specific abrupt angle such as an acute angle, for example.

The hinge point 20 can be formed from a hinge 20 that is cylindrical in cross-section and having a hinge diameter 310 that is equal to that of the guidewire diameter 258 or the needle body diameter 255, as shown in FIG. 10A. The hinge 20 can be formed from an elastic material such as Nitinol or Elgiloy, for example, such that it maintains a generally linear shape while contained within the dilator lumen 111 but

18

Dkt. No. TEL-2004-WO01

bends upon delivery of the hinge 20 out of the dilator distal tip 110 or dilator distal end 110 forming an equilibrium shape having, for example, an acute needle-GW angle 315 or bend (range 45–140 degrees, inclusive) between the guidewire distal end 22 and the needle body 252, as shown in FIG. 10B.

In an alternate embodiment, the hinge point 20 can be formed with a circular hinge cross-section 320 with a hinge diameter 310 smaller than the guidewire diameter 258 or the needle body diameter 255, as shown in FIG. 10C. The smaller hinge diameter 310 allows the hinge 20 to bend via elastic deformation of Nitinol material, for example, as it travels within the dilator lumen 111 in a generally linear configuration. Upon release of the hinge 20 from the dilator distal tip 110, the needle body 252 forms a specified needle-GW angle 315 (range 45–140 degrees, inclusive) with the guidewire distal end 22.

In still another embodiment, the hinge point 20 can be formed with a rectangular hinge 322 with a hinge cross-section 320, as shown in FIGS. 10D and 10E. The hinge 20 can again be formed from an elastic material but has been machined or otherwise formed to a rectangular shape that can provide benefits over a circular shape. Since the needle body 252 is intended to bend in a specific direction defined by the plane of the guidewire loop segment 14 (as shown as loop segments 14 generally in the plane of the paper, for example), the hinge 20 can be formed such that the hinge bending axis 323 is coplanar with the loop segment 14. The hinge height 325 can be much smaller than the hinge width 330, thereby allowing for ease of bending the hinge 20 while maintaining the hinge 20 well below its elastic limit such that the bending remains completely elastic while confined within the dilator lumen 111. The hinge width 330 can be equal to the guidewire diameter 258 at the guidewire distal end 22 and can have a rounded edge that is similar in curvature to the curvature of the guidewire distal end 22; the hinge width 330 being larger than the hinge height 325 can provide optimal push of the guidewire 10 being transferred to the needle body 252 such that the needle tip 18 can be pushed across the FO 202, as shown in FIG. 14A. The hinge length 335 can be adjusted to ensure that the hinge 20 remains in an elastic state during its generally linear configuration within the dilator 108 such that upon release of the hinge 20 from the dilator distal tip 110, the hinge 20 will bend to an acute needle-guidewire angle 315, for example, (range 45–140 degrees) thereby

19

Dkt. No. TEL-2004-WO01

bending the needle body 252 acutely relative to the guidewire distal end 22, as shown in FIG. 10E.

A longer hinge length 335 spreads the bending deformation over the longer length and hence the hinge point 20 retains greater elasticity for returning to an equilibrium bent shape after being delivered within the dilator 108 in a straightened shape. The hinge height 325, which can be smaller than the guidewire diameter 258, further maintains the hinge point 20 in an elastic condition during flexion of the hinge point 20. The hinge height 325 along with the hinge width 330 determine the amount of force provided to fold the needle to an acute angle with respect to the guidewire distal end 22 upon exiting the transseptal dilator 108. The hinge 20 can thereby be designed with a smaller hinge height 325, for example, relative to the guidewire diameter 258 to provide a smaller bending force to fold the needle body 252 than forming a hinge 20 from a cylindrical wire with the hinge 20 having the same diameter as the guidewire diameter 258.

In yet another embodiment, as shown in FIGS. 11A–11C, a tip sheath 340 is placed around the needle tip 18 to provide collinear alignment of the needle body central axis 270 with the dilator central axis 275. As shown in FIG. 11A, a tip sheath 340 is placed around the needle tip 18 and extends slightly distally to the needle point 285. The tip sheath 340 can fit via a frictional fit around the needle body 252 to allow the transseptal guidewire 10 and needle to traverse in a distal direction within the dilator lumen 111 without buckling and without the needle point 285 puncturing into the dilator luminal wall 342. The tip sheath 340 is formed such that it has a tip sheath outer diameter 345 that provides adequate clearance of .003in, for example (tip sheath diameter is 0.002–0.005in smaller than the dilator lumen diameter 250) from the dilator lumen diameter 250 to allow for ease of movement of the tip sheath 340 and needle body 252 together as they are advanced distally within the dilator lumen 111. Located at the dilator distal tip 110 can be a dilator stop 350 that prevents movement of the tip sheath 340 from inside the dilator lumen 111 to a region outside of the dilator 108. The dilator stop diameter 355 can be 0.004in, for example (range 0.002– 0.008in, inclusive) less than the tip sheath outer diameter 345 to prevent the tip sheath 340 from exiting the dilator lumen 111 across the dilator stop 350. As the needle body 252 and tip sheath 340 are advanced through the dilator lumen 111 in a distal

20

Dkt. No. TEL-2004-WO01

direction, the tip sheath 340 will make contact with the dilator stop 350 and will remain in contact with the dilator stop 350 while the needle body 252 which can be 0.002in smaller, for example (range 0.001–0.005in, inclusive, smaller) than the dilator stop diameter 355 is able to pass freely through the dilator stop 350. The tip sheath 340 can provide the needle tip 18 with a protective covering that prevents the needle tip 18 from puncturing into the dilator luminal wall 342 and can also provide the needle body central axis 270 with collinear alignment with the dilator central axis 275.

The tip sheath 340 can be formed from a lubricious plastic material such as Teflon, for example, such that it can slide well relative to the dilator luminal wall 342 during traversal through the dilator 108. Also, the Teflon surface allows the needle body 252 and transseptal guidewire 10 to pass through the inner surface of the tip sheath 340 after the tip sheath 340 has made contact with the dilator stop 350. The tip sheath inner diameter 360 can be 0.002in smaller than the guidewire diameter 258, for example, to provide unrestricted movement of the guidewire 10 through the dilator stop 350.

In yet another embodiment, the tip sheath 340 as described in FIG. 11A can be a releasable tip sheath 365 formed such that it provides a release from the needle body 252 after the releasable tip sheath 365 has made contact with the dilator stop 350, as shown in FIGS. 11B and 11C. The releasable tip sheath 365 can be formed such that it has a tip sheath equilibrium inner diameter 370 that is about 0.002in smaller, for example (range 0.001–0.010in smaller) than the needle body diameter 255. The smaller tip sheath equilibrium inner diameter 370 can provide a releasable holding attachment of the releasable tip sheath 365 to the needle body 252 during distal traversal of the needle body 252 through the dilator lumen 111. The releasable tip sheath 365 can be formed, for example, with a braided tubular structure or with an elastomeric polymeric tubular structure that tends to enlarge in diameter as it is forced into a shorter tip sheath length 375. Upon contact of the releasable tip sheath 365 with the dilator stop 350, as shown in FIG. 11C, the releasable tip sheath 365 is forced into compression upon contact with the dilator stop 350 and tends to enlarge in diameter to a releasable tip sheath expanded diameter 380 that has a larger releasable tip sheath expanded diameter than the needle body diameter 255; the expansion of the releasable

21

Dkt. No. TEL-2004-WO01

tip sheath 365 thereby allows the needle body 252 and guidewire 10 to pass freely through the releasable tip sheath lumen 385 and out of the dilator tip.

The transseptal guidewire 10 (needle-guidewire or guidewire), dilator 108, and deflectable sheath 100 of the present subject matter can comprise a structure and configuration as shown in FIGS. 12, 13, and 14A–14F; the present subject matter can be used to cross the FO from the RA into the left atrial chamber, for example, to perform a diagnostic or therapeutic procedure. It is understood that the present subject matter can also be used for crossing the wall of a vascular conduit, crossing another septum of the heart, or crossing a wall/septum of another organ of the body. The guidewire proximal segment 16, guidewire loop segment 14 and guidewire distal end 22 are shown in FIG. 12 and have been described earlier in FIGS. 1–4 and 7–8. The subject matter is intended to provide safe and efficient passage of the needle-guidewire 10 of the present subject matter across a FO wall 390 without allowing the abrupt bending of the transseptal needle from inadvertently impinging or penetrating into the atrial septum 204 and preventing proper formation of the guidewire loop segment 14 in the LA. As shown in FIGS. 12, 13, and 14A–14F, the transseptal guidewire 10 can have a hinge point 20 that allows the needle body 252 to bend abruptly and form a needle-guidewire angle 315, such as an acute angle, for example, (range 45-140 degrees, inclusive) with the guidewire distal end 22. As the needle body 252 extends out of the dilator 108 and into the LA 208 (see FIGS. 14A–14F), it is important that the needle tip 18 does not impinge or penetrate into the atrial septum 204 thereby preventing the loop segment 14 from being delivered properly into the LA 208 as described earlier. To help identify the location of the needle tip 18 when delivering the needle tip 18 across the atrial septum 204, a distal guidewire radiopaque marker 395 can be located on the needle body 252 at a location adjacent to the needle tip 18. A guidewire hinge radiopaque marker 398 may be located on the guidewire distal end 22 adjacent to the hinge 20 to provide fluoroscopic visualization of the needle body position relative to the dilator distal tip as identified via fluoroscopic visualization of the dilator distal radiopaque marker 505. It is noted that external markers can alternately or additionally be placed onto the guidewire proximal segment 16 and dilator shaft 109 at a location outside of the patient's body; such external markers can be used to determine axial positioning of the guidewire needle

22

Dkt. No. TEL-2004-WO01

tip 18 relative to the dilator distal end 110 during tenting of the FO and during advancement of the needle-guidewire 10 and dilator 108 across the FO.

The transseptal guidewire 10, as shown in FIG. 12, can be formed from a metal such as stainless steel, Nitinol, or other materials commonly used to form standard guidewires used in the medical device industry. The needle length 280 can be about 5mm, for example (range 3–15mm, inclusive), and is intended to have adequate needle length 280 to cross through the 2–3mm thick wall 390 of the FO 202 and still have at least 1–2mm of axial length of the transseptal needle extending within the dilator nose 400 (see FIGS. 13 and 14A) to hold the needle in axial alignment with the dilator nose 400 without bending at the hinge point 20 as will be further described in FIG. 14B and later in this specification. A shorter needle length 280 (still within the needle length range) could require multiple short advancements (e.g., 2-3 advancements of 1–3mm axial movements) of the needle to cross the FO wall 390 followed by multiple similar advancements of the dilator nose 400 which provided the axial alignment support for the needle. A longer needle length 280 (still within the needle length range) would require a longer dilator nose length 415 (see FIGS. 13 and 14A–14D) to ensure that the needle did not penetrate into the atrial septum 204 following exiting of needle from the dilator distal end 110 and bending of the needle-guidewire 10 at the hinge point 20; such a longer needle length 280 may also result in impingement of the needle tip 18 into the LA lateral wall 405 (see FIG. 14C) during deployment of the needle tip 18 from the dilator distal tip 110 or dilator distal end 110. The needle length 280 and dilator nose length 415 used in the present subject matter are intended to deliver the needle 12 into the central region of the LA prior to delivery of the full needle-guidewire 10 into the LA.

The dilator distal region 245 of an embodiment of the present subject matter, as shown in FIGS. 13 and 14A, can have a dilator distal segment 106 that comprises a dilator beveled segment 410 and a dilator nose 400. The outer cylindrical surface of the dilator nose 400 contacts the outer surface of the beveled segment 410 at a dilator inflection point 412. The dilator nose 400 extends from the beveled segment 410 to the dilator distal tip 110 and has a thin-walled cylindrical shape that is easily extended through the FO wall 390 without significantly dilating the FO 202 FO due to the low profile thin-walled dilator nose 400. The dilator nose 400 is thereby able to direct the

23

Dkt. No. TEL-2004-WO01

needle of the transseptal guidewire 10 through the FO and into the chamber of the LA 208 without allowing the needle to bend abruptly and potentially impinge or penetrate into the atrial septum 204. The dilator nose length 415 can be 9mm, for example, (range 5–18mm); a shorter dilator nose length 415 may not direct the needle across the FO wall 390 into the LA 208 thereby allowing hinge point 20 of the needle to bend to an acute angle and potentially impinge or penetrate into the atrial septum 204. A longer dilator nose length 415 may not provide the support to direct the needle perpendicular to the plane of the FO; additionally such a longer nose length 415 may extend further into the LA 208 than desired thereby potentially directing the needle tip 18 to be delivered into the LA 208 and impinging upon the lateral wall 405 of the LA 208 (see FIG. 4C).

The dilator nose 400 can be formed from a thin-walled hypo tube made of stainless steel, Nitinol, or other metal or it can be formed from a polymeric material such as polyimide, polyethylene terephthalate, or other polymer that is high in tensile strength and can be formed into a thin-walled (e.g., wall thickness of 0.003in, range 0.0015–0.005in, inclusive) tube with a dilator lumen diameter 250 able to provide passage with close tolerance (e.g., 0.002–0.004in, inclusive, clearance) for a 0.035in (range 0.025–0.038in, inclusive) transseptal guidewire 10 or standard guidewire. Thus the dilator nose 400 has an outer diameter that is similar to the guidewire fixed diameter 258 to provide the dilator nose 400 with easy transitional access across the FO 202. The dilator nose 400 can extend within and can be permanently attached to the dilator beveled segment 410 via adhesives, insert molding into the polymeric material of the dilator 108, thermal bonding, solvent bonding, or other bonding methods. The dilator beveled segment 410 provides support and a stable foundation to a nose support region 420 of the thin-walled tube that forms the dilator nose 400, as shown in FIG. 13. The dilator beveled segment 410 extends proximally from the dilator nose 400 in a tapered manner from a small diameter equal to the diameter of the dilator nose 400 to a dilator shoulder 425 having a larger diameter equal to the dilator fixed diameter 118 that is able to pass with minimal friction within and with full side support from the deflectable sheath 100 (sheath diameter is about 8.5 Fr, range 6 Fr to over 20 Fr, for example) as described earlier. The dilator beveled segment 410 can be formed of the same material as and contiguously with the dilator

24

Dkt. No. TEL-2004-WO01

nose 400 by forming these portions of the dilator with a material that is suitable to the functional aspects of the lubricious dilator bevel segment 410 and the thin-walled high compressive strength dilator nose 400 that can be advanced over a guidewire without collapse.

The dilator 108 can have a cylindrically shaped dilator alignment zone 430 having the dilator fixed diameter 118 extending proximally from the dilator shoulder 425 for an axial distance of 5mm (range 3mm to the full dilator shaft 109 proximal to the dilator shoulder). The dilator alignment zone 430 provides for axial alignment of the dilator central axis 275 with the sheath central axis 435 in the sheath straight region 440, as shown in FIG. 14A. The purpose of the dilator axial alignment zone 430 is to provide controlled directionality to the dilator axial alignment zone 430 and the dilator nose 400 such that the dilator alignment zone 430 and the dilator nose 400 are directed via the deflectable sheath 100 to be perpendicular to the FO during tenting 525 and prior to penetrating the FO 202 with the needle-guidewire 10. The axial alignment zone 430 enhances the ability of the needle to retain the desired target site within the FO 202 without sliding along the surface of the FO resulting in an angled septal puncture.

The transseptal dilator 108 of the present subject matter can have a dilator waist 445 located proximal to the dilator alignment zone 430 and extending for about 20mm (range 5–50mm, inclusive) to extend throughout the axial length of the sheath bend region 530 (see FIG. 14A). The dilator waist 445 provides a region of the dilator shaft 109 that is more flexible than the remainder of the dilator shaft 109 proximal to the dilator shoulder 425 but still with adequate pushability or dilator shaft 109 compression characteristics. The dilator waist 445 can have a dilator waist diameter 500, for example, which is 50 percent (range 30–95 percent, inclusive) of the diameter of the dilator fixed diameter 118. The waist 445 can also be formed from a polymer that has a lower durometer polymer, for example, than the remainder of the dilator shaft 109 such that the dilator waist diameter 500 can be uniform and equal to the dilator fixed diameter 118 but has a greater flexibility and retains adequate pushability.

A radiopaque marker such as a dilator distal radiopaque marker 505 is placed near the dilator distal tip 110. The distal dilator radiopaque RO marker 505 allows the

Dkt. No. TEL-2004-WO01

physician to visualize the location of the dilator distal tip 110 relative to the distal guidewire RO marker 395 to ensure that the needle tip 18 is not protruding from the dilator distal tip 110 as the dilator distal tip 110 is being positioned against the FO to form a tenting 525 of the FO as described earlier.

A dilator shoulder radiopaque marker 122 is located on the dilator shoulder 425 adjacent to the dilator beveled segment 410. The dilator shoulder radiopaque marker 122 can be aligned or overlapped (under fluoroscopy) with the distal sheath radiopaque marker 123 such that they overlap one another in an axial direction for the sheath 100 and dilator 108. Such alignment is used by the physician during delivery of the dilator 108 and sheath 100 over a standard guidewire through the vasculature of the body and into the RA. This alignment is also used by the physician to ensure a smooth transition of the sheath 100 and dilator 108 together with a flush diameter fit over the transseptal guidewire 10 of the present subject matter as the sheath 100 and dilator 108 are advanced together across the FO wall 390.

A dilator proximal port 515 located on the dilator manifold 520 can be used to provide access for a standard guidewire and also to provide passage for the transseptal guidewire 10 of the present subject matter. It is further noted that the presence of the dilator nose 400 on the distal dilator segment 106 provides an additional benefit for the present transseptal dilator 108 subject matter for the use of the dilator proximal port 515. With the dilator nose 400 positioned across the FO, the transseptal guidewire 10 can be removed from the dilator 108 and the dilator lumen 111 can be used to provide pressure measurement within the LA 208. The dilator proximal port 515 can be attached via appropriate pressure transduction tubing to a pressure transducer located outside of the patient's body in order to acquire a pressure reading in the LA 208 either prior to or following a therapeutic procedure. The transseptal guidewire 10 of the present subject matter can be effectively reintroduced back into the dilator lumen 111 of the present subject matter as needed to complete or resume the therapeutic procedure without need for a guidewire exchange; retracting the needle-guidewire 10 into the introducer would permit easy reintroduction of the needle-guidewire 10.

The transseptal guidewire 10 and dilator 108 of the present subject matter are shown in FIG. 14A contained within the sheath distal segment 107 of the deflectable

26

Dkt. No. TEL-2004-WO01

sheath 100 that is located within the RA 206 and in position to provide tenting 525 by the dilator nose 400 onto the FO 202. As described earlier, the dilator 108 and deflectable sheath 100 had been delivered to the site of the RA 206 over a standard guidewire, and the standard guidewire had been replaced by the transseptal guidewire 10 of the present subject matter. The delectable sheath 100 is initially steered adjacent to the FO using ultrasound or other imaging modalities. FIGS. 14A–14F describe an embodiment for the sequential methods of use for placing the transseptal guidewire 10 across the FO and into the LA.

As shown in FIG. 14A, adjacent to the sheath proximal end 102, the sheath handle 104 has been activated to form a bend in the sheath bend region 530 to align the sheath straight region 440 perpendicular to the plane of the FO 202. The actuator 212 located on the sheath handle 104 can be used to advance the dilator distally or withdraw the dilator proximally in a controlled manner relative to the deflectable sheath 100. The sheath distal end 124 is positioned via ultrasound observation of the distal sheath radiopaque marker 123 such that the sheath distal end 124 is about 5mm from the FO 202. The needle tip 18 has been withdrawn into the dilator nose 400 during tenting 525 as observed via fluoroscopy that shows the distal GW radiopaque marker 395 being overlapped (or slightly proximal in an axial direction) with the dilator distal radiopaque marker 505 to ensure that the needle tip 18 does not protrude out of the dilator distal end or dilator distal tip 110. The dilator alignment region is in full sliding and supportive contact with the sheath straight region 440 such that the dilator central axis 275 in the region of the dilator nose 400 is coaxial with the sheath central axis 435 in the region of the sheath straight region 440.

The dilator alignment region is held firmly by the sheath straight region 440 such that the deflectable sheath 100 can direct the dilator nose 400 perpendicular to the FO, as shown in FIG. 14A. The dilator waist 445 is located within the sheath bent region such that the enhanced flexibility of the dilator waist 445 does not tend to straighten the sheath bend region 530 during advancement of the dilator 108 within the sheath 100. The flexible dilator waist 445 reduces the tendency for the dilator 108 to form a straight axial configuration throughout its axial length, but rather is able to be easily held in a curved configuration that matches the bend of the sheath bend region 530 and provides perpendicular alignment of the dilator alignment zone 430

27

Dkt. No. TEL-2004-WO01

and dilator nose 400 perpendicular to the plane of the plane of the FO 202.

Once confirmed that tenting 525 has occurred in the proper location in the FO 202, the needle can be advanced across the FO wall 390, as shown in FIG. 14B. A portion of the needle distal to the hinge point 20 is contained within the dilator nose 400 to provide axial alignment of the needle body central axis 270 with the dilator central axis 275 in the region of the nose 400 such that the needle body 252 is directed perpendicular to the plane of the FO 202 preventing an angulated puncture of the needle and thus providing resistance to needle advancement across the FO 202. The guidewire hinge radiopaque marker 398 can be observed under fluoroscopy to be positioned proximal to the dilator distal radiopaque marker 505.

With the needle tip 18 advanced across the FO wall 390 (see FIG. 14C) the dilator 108 can be advanced over the transseptal guidewire 10 while maintaining the transseptal guidewire 10 in a fixed position. The dilator distal tip 110 extends distal to the needle tip 18 as evidenced under ultrasound and fluoroscopy by the locations of the dilator distal radiopaque RO marker being distal to the distal guidewire RO marker 395 and extending past the FO wall 390 by a nose penetration distance 535 equal to or greater than the needle length 280. For a FO wall thickness 540 of 3mm, a 9mm dilator nose 400, for example, can be advanced over the transseptal guidewire 10 until the dilator inflection point 412 comes into initial contact with the FO thereby providing a nose penetration or protrusion distance 535 of 6mm into the LA, for example, to ensure that the needle of 5mm needle length, for example, cannot inadvertently bend at the hinge point 20 and impinge or penetrate into the atrial septum 204.

As shown in FIG. 14D the needle-guidewire 10 is advanced through the dilator nose 400 placing the needle into the central region of the chamber of the LA 208 and allowing full deployment of the needle, and allowing the hinge to bend forming an acute needle-guidewire angle 315 with the guidewire distal end 22, preferably between 50–80 degrees, but having a range of 45–140 degrees. The nose protrusion distance 535 into the LA 208 being equal or larger than the needle length prevents the needle from impinging upon or penetrating into the atrial septum 204. The guidewire hinge radiopaque marker 398 has been advanced to a position distal to the dilator distal radiopaque marker 505 as evidenced under fluoroscopy and indicates

28

Dkt. No. TEL-2004-WO01

that the needle 12 extends distal to the dilator distal tip 110.

The transseptal guidewire 10 can be further advanced distally within the dilator lumen 111 such that a loop segment 14 is formed in the LA 208, as shown in FIG. 14E. The loop segment 14 can be comprised of multiple loops of different sizes and configurations as described earlier and have an external-most diameter of about 30mm, range 25–40mm. The loop segment 14 can make contact with the LA 208 lateral wall 405 and with the atrial septum 204 contributing to guidewire positional stability. The presence of guidewire loop segment 14 within the LA provides the positional stability to advance the dilator beveled segment 410 and deflectable sheath 100 over the needle-guidewire 10 and across the FO 202.

The sheath distal end 124 is aligned with the dilator shoulder 425 as evidenced by overlapping of the distal sheath RO marker 123 with the dilator shoulder RO marker 122, as shown in FIG. 14F. The dilator 108 and deflectable sheath 100 are then advanced together across the FO as shown in FIG. 14F placing a sheath protrusion distance 545 of at about 3mm into the LA, for example.

The deflectable sheath 100 can then be used, following removal of the dilator 108 from the sheath 100, for delivery of diagnostic or therapeutic devices across the FO 202 and over the transseptal guidewire 10. Alternately, the deflectable sheath 100 and dilator 108 can both be removed leaving the transseptal guidewire 10 across the FO for delivery of a diagnostic or therapeutic device across the FO.

As shown in FIG. 15 the FO wall thickness 540 can, upon occasion, be greater than 2–3mm for some patients, reaching 5mm or greater FO wall thickness 540 and thereby alter the step shown in FIG. 14D of the methods of use for advancing the transseptal guidewire 10 across the FO. Under the situation of excessively thickened FO wall 390, the physician may desire to advance the dilator inflection point 412 into a portion of the FO wall 390 thereby increasing the amount of dilator nose protrusion distance 535 extending into the LA. The increase in dilator nose protrusion length allows a needle having a needle length that is equal to or less than the nose protrusion length to be safely advanced into the LA 208 without concern that the needle tip 18 could inadvertently impinge or penetrate into the atrial septum 204. Multiple advancement steps of a few millimeters can be performed by advancing the transseptal guidewire 10 followed by advancing the dilator 108 until the FO wall 390

29

Dkt. No. TEL-2004-WO01

has been successfully traversed and the guidewire loop segment 14 has been successfully delivered into the LA. The remaining steps of the method of use are the same as described previously.

Closing Notes and Examples:

The above Detailed Description includes references to the accompanying drawings, which form a part of the Detailed Description. The Detailed Description should be read with reference to the drawings. The drawings show, by way of illustration, specific embodiments in which the present subject matter can be practiced. These embodiments are also referred to herein as "examples."

The Detailed Description is intended to be illustrative and not restrictive. For example, the above-described examples (or one or more features or components thereof) can be used in combination with each other. Other embodiments can be used, such as by one of ordinary skill in the art upon reviewing the Detailed Description. The scope of use of the examples can be expanded for other uses, e.g., non-transseptal procedures, both vascular and nonvascular cavity organ structures. Also, various features or components have been grouped together to streamline the disclosure. This should not be interpreted as intending that an unclaimed disclosed feature is essential to any claim. Rather, inventive subject matter can lie in less than all features of a particular disclosed embodiment. Thus, the following claim examples are hereby incorporated into the Detailed Description, with each example standing on its own as a separate embodiment:

In Example 1, a method of treating a patient can include advancing a dilator located in a lumen of a sheath distally relative to the sheath, including applying a tenting force to a septal wall associated with the fossa ovalis of a heart using a dilator nose located at a distal end portion of the dilator; advancing a tip of a needle attached to a guidewire and located in a lumen of the dilator distally relative to the dilator, including puncturing across the septal wall associated with the fossa ovalis; advancing the dilator distally over the guidewire while maintaining the guidewire and the sheath in a fixed position, including extending a distal end of the dilator nose beyond the septal wall associated with the fossa ovalis by a distance equal to or greater than a length of the needle; and advancing the guidewire distally through the dilator nose,

30

Dkt. No. TEL-2004-WO01

including allowing deployment of the needle in a central region of the left atrium of the heart.

In Example 2, the method of Example 1 can optionally be configured such that advancing the dilator distally relative to the sheath includes manipulating an actuator located on or positioned adjacent to a handle of the sheath.

In Example 3, the method of any one of Examples 1 or 2 can optionally be configured such that, when advancing the dilator distally relative to the sheath, the tip of the needle is positioned within the dilator nose.

In Example 4, the method of any one or any combination of Examples 1-3 can optionally be configured such that, when advancing the tip of the needle distally relative to the dilator, a position of a hinge connecting a distal end of the guidewire and a proximal end of the needle is maintained proximal to the distal end of the dilator nose.

In Example 5, the method of Example 4 can optionally be configured such that allowing deployment of the needle in the central region of the left atrium includes allowing the hinge to bend and form an acute angle between the distal end of the guidewire and the proximal end of the needle.

In Example 6, the method of any one of Examples 4 or 5 can optionally be configured such that allowing deployment of the needle in the central region of the left atrium includes visualizing a position of the hinge relative to the distal end of the dilator nose, and confirming that the hinge is positioned distal to the distal end of the dilator nose.

In Example 7, the method of any one or any combination of Examples 1-6 can optionally further comprise maintaining coaxial alignment between the dilator and the sheath through engagement of a dilator alignment region, located proximal of the dilator nose, with a lumen wall of the sheath.

In Example 8, the method of any one or any combination of Examples 1-7 can optionally be configured such that extending the distal end of the dilator nose beyond the septal wall associated with the fossa ovalis by the distance equal to or greater than the length of the needle includes preventing the needle from impinging upon the left size of the atrial septum of the heart.

In Example 9, the method of any one or any combination of Examples 1-8 can

31

Dkt. No. TEL-2004-WO01

optionally be configured such that advancing the guidewire distally through the dilator nose includes allowing a guidewire loop segment to form in the left atrium.

In Example 10, the method of Example 9 can optionally be configured such that allowing the guidewire loop segment to form in the left atrium includes engaging a portion of the guidewire loop segment with a left atrium lateral wall or the left side of the atrial septum.

In Example 11, the method of any one of Examples 9 or 10 can optionally further comprise advancing the dilator and the sheath distally over the guidewire and across the septal wall associated with the fossa ovalis, including extending a dilator bevel segment, located proximal to the dilator nose, into the left atrium followed by a dilator shoulder, located proximal to the dilator bevel segment, and a sheath distal end.

In Example 12, the method of Example 11 can optionally further comprise removing one or both of the dilator and the sheath from the patient and delivering a diagnostic or therapeutic device over the guidewire and across the septal wall associated with the fossa ovalis.

In Example 13, the method of any one or any combination of Examples 1-12 can optionally further comprise, prior to advancing the guidewire distally through the dilator nose, withdrawing the guidewire proximally and using the lumen of the dilator to measure pressure within the left atrium.

In Example 14, an anatomical wall crossing system can comprise a dilator extending from a proximal end portion to a distal end portion and including a lumen therethrough. The distal end portion can include a dilator nose and a dilator beveled segment. The dilator nose can have a first outer diameter and a length of about 5–18mm, inclusive. The dilator beveled segment can extend proximally of the dilator nose and can taper from a second outer diameter, greater than the first outer diameter, to the first outer diameter.

In Example 15, the wall crossing system of Example 14 can optionally be configured such that the dilator nose includes a cylindrical cross-sectional shape having a wall thickness of about 0.0015–0.005in, inclusive.

In Example 16, the wall crossing system of Example 15 can optionally be configured such that the dilator nose is formed from a thin-walled hypotube.

32

Dkt. No. TEL-2004-WO01

In Example 17, the wall crossing system of any one or any combination of Examples 14-16 can optionally be configured such that the dilator further includes a dilator alignment zone extending proximal of the dilator beveled segment and having a substantially uniform outer diameter.

In Example 18, the wall crossing system of Example 17 can optionally be configured such that the dilator further includes a dilator waist extending proximal of the dilator alignment zone and having a greater longitudinal flexibility than the dilator alignment zone.

In Example 19, the wall crossing system of Example 18 can optionally be configured such that the dilator waist has a length of about 5–50mm, inclusive.

In Example 20, the wall crossing system of any one of Examples 18 or 19 can optionally be configured such that the dilator waist has an outer diameter that is 30–90%, inclusive, of an outer diameter of the dilator alignment zone.

In Example 21, the wall crossing system of any one or any combination of Examples 18-20 can optionally be configured such that the dilator waist is formed from a lower durometer polymer than a polymer of the dilator alignment zone.

In Example 22, the wall crossing system of any one or any combination of Examples 14-21 can optionally further comprise a guidewire deliverable within the lumen of the dilator and extending from a proximal end to a distal end, the distal end attached to a puncture needle having a needle body and a needle tip.

In Example 23, the wall crossing system of Example 22 can optionally be configured such that an intermediate portion of the guidewire includes at least one looped segment.

In Example 24, the wall crossing system of any one of Examples 22 or 23 can optionally be configured such that the puncture needle has a length of 3–20mm, inclusive.

In Example 25, the wall crossing system of any one or any combination of Examples 22-24 can optionally be configured such that the needle body has a needle body diameter of 0.001–0.004in, inclusive, less than the lumen of the dilator to facilitate coaxial alignment of a needle body axis and a dilator axis.

In Example 26, the wall crossing system of any one or any combination of Examples 22-25 can optionally be configured such that the distal end of the guidewire

33

Dkt. No. TEL-2004-WO01

is attached to a proximal end of the puncture needle at a hinge.

In Example 27, the wall crossing system of Example 26 can optionally be configured such that the hinge includes a shape memory material and, when unconstrained, forms an angle between the distal end of the guidewire and the proximal end of the puncture needle of 45–140 degrees, inclusive.

In Example 28, the wall crossing system of any one of Examples 26 or 27 can optionally be configured such that the hinge includes a cylindrical cross-sectional shape having a diameter less than a diameter of the guidewire and of the needle body.

In Example 29, the wall crossing system of any one of Examples 26 or 27 can optionally be configured such that the hinge includes a rectangular cross-sectional shape and is configured to bend in a direction defined by a plane of the at least one loop segment.

In Example 30, the wall crossing system of any one or any combination of Examples 22-29 can optionally further comprise a tip sheath placed around the puncture needle to facilitate coaxial alignment of a needle body axis and a dilator axis.

In Example 31, the wall crossing system of Example 30 can optionally be configured such that the dilator includes a dilator stop configured to inhibit distal movement of the tip sheath from a position within the lumen of the dilator to a position external to the lumen of the dilator.

In Example 32, the wall crossing system of Example 31 can optionally be configured such that the tip sheath is configured to expand in diameter as it is placed under compression, thereby allowing its release from the puncture needle upon contact with the dilator stop.

In Example 33, the wall crossing system of any one or any combination of Examples 14-32 can optionally further comprise a deflectable sheath.

In Example 34, the wall crossing system of Example 33 can optionally be configured such that the proximal end portion of the dilator is configured to engage with an actuator incorporated into a handle of the deflectable sheath. The actuator can be configured to control distal and proximal advancement of the dilator relative to the deflectable sheath.

Certain terms are used throughout this patent document to refer to particular

Dkt. No. TEL-2004-WO01

features or components. As one skilled in the art appreciates, or will appreciate, different people may refer to the same feature or component by different names. This patent document does not intend to distinguish between components or features that differ in name but not in function.

For the following defined terms, certain definitions shall be applied unless a different definition is given elsewhere in this patent document. The terms "a," "an," and "the" are used to include one or more than one, independent of any other instances or usages of "at least one" or "one or more." The term "or" is used to refer to a nonexclusive or, such that "A or B" includes "A but not B," "B but not A," and "A and B." All numeric values are assumed to be modified by the term "about," whether or not explicitly indicated. The term "about" generally refers to a range of numbers that one of skill in the art would consider equivalent to the recited value (e.g., having the same function or result). In many instances, the term "about" can include numbers that are rounded to the nearest significant figure. The recitation of numerical ranges by endpoints includes all numbers and sub-ranges within and bounding that range (e.g., 1 to 4 includes 1, 1.5, 1.75, 2, 2.3, 2.6, 2.9, etc. and 1 to 1.5, 1 to 2, 1 to 3, 2 to 3.5, 2 to 4, 3 to 4, etc.). The terms "patient" and "subject" are intended to include mammals, such as for human or veterinary applications. The terms "distal" and "proximal" are used to refer to a position or direction relative to the treating clinician. "Distal" and "distally" refer to a position that is distant from, or in a direction away from, the treating clinician. "Proximal" and "proximally" refer to a position that is near, or in a direction toward, the treating clinician.

The scope of the present subject matter should be determined with reference to the appended claims, along with the full scope of equivalents to which such claims are entitled. In the appended claims, the terms "including" and "in which" are used as the plain-English equivalents of the respective terms "comprising" and "wherein." Also, in the following claims, the terms "including" and "comprising" are open-ended; that is, a system, device or method that includes features or components in addition to those listed after such a term in a claim are still deemed to fall within the scope of that claim. Moreover, in the following claims, the terms "first," "second" and "third," etc. are used merely as labels, and are not intended to impose numerical requirements on their objects.

35

Dkt. No. TEL-2004-WO01

The Abstract is provided to allow the reader to quickly ascertain the nature of the technical disclosure. It is submitted with the understanding that it will not be used to interpret or limit the scope or meaning of the claims.

Dkt. No. TEL-2004-WO01

WHAT IS CLAIMED IS:

1.      A method of treating a patient, comprising:

advancing a dilator located in a lumen of a sheath distally relative to the sheath, including applying a tenting force to a septal wall associated with the fossa ovalis of a heart using a dilator nose located at a distal end portion of the dilator;

advancing a tip of a needle attached to a guidewire and located in a lumen of the dilator distally relative to the dilator, including puncturing across the septal wall associated with the fossa ovalis;

advancing the dilator distally over the guidewire while maintaining the guidewire and the sheath in a fixed position, including extending a distal end of the dilator nose beyond the septal wall associated with the fossa ovalis by a distance equal to or greater than a length of the needle; and

advancing the guidewire distally through the dilator nose, including allowing deployment of the needle in a central region of the left atrium of the heart.

2.      The method of claim 1, wherein advancing the dilator distally relative to the sheath includes manipulating an actuator located on or positioned adjacent to a handle of the sheath.

3.      The method of claim 1, wherein, when advancing the dilator distally relative to the sheath, the tip of the needle is positioned within the dilator nose.

4.      The method of claim 1, wherein, when advancing the tip of the needle distally relative to the dilator, a position of a hinge connecting a distal end of the guidewire and a proximal end of the needle is maintained proximal to the distal end of the dilator nose.

5.      The method of claim 4, wherein allowing deployment of the needle in the central region of the left atrium includes allowing the hinge to bend such that an acute angle forms between the distal end of the guidewire and the proximal end of the needle.

37

Dkt. No. TEL-2004-WO01

6.      The method of claim 4, wherein allowing deployment of the needle in the central region of the left atrium includes visualizing a position of the hinge relative to the distal end of the dilator nose, and confirming that the hinge is positioned distal to the distal end of the dilator nose.

7.      The method of claim 1, further comprising maintaining coaxial alignment between the dilator and the sheath through engagement of a dilator alignment region, located proximal of the dilator nose, with a lumen wall of the sheath.

8.      The method of claim 1, wherein extending the distal end of the dilator nose beyond the septal wall associated with the fossa ovalis by the distance equal to or greater than the length of the needle includes preventing the needle from impinging upon the left side of the atrial septum of the heart.

9.      The method of claim 1, wherein advancing the guidewire distally through the dilator nose includes allowing a guidewire loop segment to form in the left atrium.

10.     The method of claim 9, wherein allowing the guidewire loop segment to form in the left atrium includes engaging a portion of the guidewire loop segment with a left atrium lateral wall or the left side of the atrial septum.

11.     The method of claim 9, further comprising advancing the dilator and the sheath distally over the guidewire and across the septal wall associated with the fossa ovalis, including extending a dilator bevel segment, located proximal to the dilator nose, into the left atrium followed by a dilator shoulder, located proximal to the dilator bevel segment, and a sheath distal end.

12.     The method of claim 11, further comprising removing one or both of the dilator and the sheath from the patient and delivering a diagnostic or therapeutic device over the guidewire and across the septal wall associated with the fossa ovalis.

38

Dkt. No. TEL-2004-WO01

13.    The method of claim 1, further comprising, prior to advancing the guidewire distally through the dilator nose, withdrawing the guidewire proximally and using the lumen of the dilator to measure pressure within the left atrium.

14.    An anatomical wall crossing system, comprising:
a dilator extending from a proximal end portion to a distal end portion and
        including a lumen therethrough, the distal end portion including a dilator
        nose and a dilator beveled segment,
the dilator nose having a first outer diameter and a length of about 5–18mm,
        inclusive, and
the dilator beveled segment extending proximally of the dilator nose and tapering
        from a second outer diameter, greater than the first outer diameter, to the
        first outer diameter.

15.    The wall crossing system of claim 14, wherein the dilator nose includes a cylindrical cross-sectional shape having a wall thickness of about 0.0015–0.005in, inclusive.

16.    The wall crossing system of claim 15, wherein the dilator nose is formed from a thin-walled hypotube.

17.    The wall crossing system of claim 14, wherein the dilator further includes a dilator alignment zone extending proximal of the dilator beveled segment and having a substantially uniform outer diameter.

18.    The wall crossing system of claim 17, wherein the dilator further includes a dilator waist extending proximal of the dilator alignment zone and having a greater longitudinal flexibility than the dilator alignment zone.

19.    The wall crossing system of claim 18, wherein the dilator waist has a length of about 5–50mm, inclusive.

39

Dkt. No. TEL-2004-WO01

20.    The wall crossing system of claim 18, wherein the dilator waist has an outer diameter that is 30–90%, inclusive, of an outer diameter of the dilator alignment zone.

21.    The wall crossing system of claim 18, wherein the dilator waist is formed from a lower durometer polymer than a polymer of the dilator alignment zone.

22.    The wall crossing system of claim 14, further comprising a guidewire deliverable within the lumen of the dilator and extending from a proximal end to a distal end, the distal end attached to a puncture needle having a needle body and a needle tip.

23.    The wall crossing system of claim 22, wherein an intermediate portion of the guidewire includes at least one looped segment.

24.    The wall crossing system of claim 22, wherein the puncture needle has a length of 3–20mm, inclusive.

25.    The wall crossing system of claim 22, wherein the needle body has a needle body diameter of 0.001–0.004in, inclusive, less than the lumen of the dilator to facilitate coaxial alignment of a needle body axis and a dilator axis.

26.    The wall crossing system of claim 22, wherein the distal end of the guidewire is attached to a proximal end of the puncture needle at a hinge.

27.    The wall crossing system of claim 26, wherein the hinge includes a shape memory material and, when unconstrained, forms an angle between the distal end of the guidewire and the proximal end of the puncture needle of 45–140 degrees, inclusive.

28.    The wall crossing system of claim 26, wherein the hinge includes a cylindrical cross-sectional shape having a diameter less than a diameter of the guidewire and of the needle body.

Dkt. No. TEL-2004-WO01

29.     The wall crossing system of claim 26, wherein the hinge includes a rectangular cross-sectional shape and is configured to bend in a direction defined by a plane of the at least one loop segment.

30.     The wall crossing system of claim 22, further comprising a tip sheath placed around the puncture needle to facilitate coaxial alignment of a needle body axis and a dilator axis.

31.     The wall crossing system of claim 30, wherein the dilator includes a dilator stop configured to inhibit distal movement of the tip sheath from a position within the lumen of the dilator to a position external to the lumen of the dilator.

32.     The wall crossing system of claim 31, wherein the tip sheath is configured to expand in diameter as it is placed under compression, thereby allowing its release from the puncture needle upon contact with the dilator stop.

33.     The wall crossing system of claim 14, further comprising a deflectable sheath.

34.     The wall crossing system of claim 33, wherein the proximal end portion of the dilator is configured to engage with an actuator incorporated into a handle of the deflectable sheath, the actuator configured to control distal and proximal advancement of the dilator relative to the deflectable sheath.

Dkt. No. TEL-2004-WO01

## ABSTRACT

Anatomical wall crossing systems, devices and related methods are disclosed in this patent document. A transseptal system, for example, can include a guidewire, a dilator, and a deflectable sheath configured to safely deliver a puncture needle through a septal wall associated with the fossa ovalis and into a central region of the left atrium of a heart. The dilator can include a dilator nose having a first outer diameter and a dilator beveled segment, extending proximal of the dilator nose, tapering from a second, greater outer diameter to the first outer diameter. The length and interplay of the puncture needle and the dilator nose can be configured such that the puncture needle is inhibited from bending and impinging upon the left side of the atrial septum of the heart during use. A body of the guidewire can include at least one loop segment to provide stable support in the left atrium for delivery of a diagnostic or therapeutic device along its more proximal portions. The deflectable sheath can position and align the dilator nose relative to the fossa ovalis.

**1/17**



FIG. 1

2/17



FIG. 2

**3/17**



FIG. 3

FIG. 4

4/17



FIG. 5

FIG. 6

5/17



FIG. 7

6/17



FIG. 8

**7/17**



FIG. 9A

FIG. 9B

*8/17*



**FIG. 10A**



**FIG. 10B**



**FIG. 10C**

9/17



FIG. 10D



FIG. 10E

10/17



FIG. 11A

*11/17*



**FIG. 11B**



**FIG. 11C**



FIG. 12



13/17

FIG. 13

**14/17**



FIG. 14A

*15/17*



FIG. 14B



FIG. 14C



FIG. 14D



FIG. 14E

*17/17*



FIG. 14F



FIG. 15

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | TRANSSEPTAL SYSTEMS, DEVICES AND METHODS |
| **First Named Inventor/Applicant Name:** | Wesley Robert PEDERSEN |
| **Filer:** | Gregory W. Smock/Julie Wang |
| **Attorney Docket Number:** | TEL-2004-WO01 |

Filed as Large Entity

**Filing Fees for   International Application (PCT) for filing in the US receiving office**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| TRANSMITTAL FEE | 1601 | 1 | 240 | 240 |
| PCT SEARCH FEE- NO PRIOR US APPL FILED | 1602 | 1 | 2080 | 2080 |
| SUPPL. INTL FILING FEE (EACH PAGE > 30) | 1703 | 33 | 15 | 495 |
| INTL FILING FIRST 30PGS EFS W/ ZIP FILE | 1710 | 1 | 1136 | 1136 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | **Total in USD ($)** | | | 3951 |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 39291384 |
| **Application Number:** | |
| **International Application Number:** | PCT/US20/30264 |
| **Confirmation Number:** | 5690 |
| **Title of Invention:** | TRANSSEPTAL SYSTEMS, DEVICES AND METHODS |
| **First Named Inventor/Applicant Name:** | Wesley Robert PEDERSEN |
| **Customer Number:** | 128550 |
| **Correspondence Address:** | SMOCK, Gregory W.<br><br>TELEFLEX INCORPORATED<br><br>Intellectual Property Department<br><br>6464 Sycamore Court North<br><br>Minneapolis          MN          55369<br><br>US          (763) 656-4328<br><br>USMIN-ip@teleflex.com |
| **Filer:** | Gregory W. Smock/Julie Wang |
| **Filer Authorized By:** | Gregory W. Smock |
| **Attorney Docket Number:** | TEL-2004-WO01 |
| **Receipt Date:** | 28-APR-2020 |
| **Filing Date:** | |
| **Time Stamp:** | 17:05:31 |
| **Application Type:** | International Application (PCT) for filing in the US receiving office |
| **Patent Number:** | |

# Payment information:

| Submitted with Payment | yes |
|---|---|
| Payment Type | DA |
| Payment was successfully received in RAM | $3951 |
| RAM confirmation Number | E20204RH06338896 |
| Deposit Account | 506636 |
| Authorized User | Julie Wang |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

37 CFR 1.445(a)(1), (a)(2), (a)(4) and (b) (International application filing, processing and search fees)

PCT Rule 14

PCT Rule 15

PCT Rule 16

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | ZIP | TEL2004WO01.zip | 120545 <br> ea68e7fba09b3b97577a6c7ed9319ae909f6b1d9 | yes | |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| fees.pdf | 1 | 1 |
| pct101.pdf | 1 | 4 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Power of Attorney | TEL2004WO01-SignedPOAs.pdf | 792406 <br> c220eb75979739e101b55151ce91ecb3431f1453 | no | 3 |

**Warnings:**

The page size in the PDF is too large. The pages should be 8.5 x 11 or A4. If this PDF is submitted, the pages will be resized upon entry into the Image File Wrapper and may affect subsequent processing

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | | TEL2004WO01-PCTspecification.pdf | 218959 <br> 3c6396af41a9a899d1d4a2a35a75afb5ed6157a7 | yes | 42 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |

| | | Specification | 1 | 36 |
|---|---|---|---|---|
| | | Claims | 37 | 41 |
| | | Abstract | 42 | 42 |

**Warnings:**

**Information:**

| 4 | Drawings-only black and white line drawings | TEL2004WO01-PCTdrawings.pdf | 4123913<br><br>15a002bfbfeb806ce80cfb53a37446d94690ba4a | no | 17 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 5 | Fee Worksheet (SB06) | fee-info.pdf | 37100<br><br>0a230c311a7c75f3d51bb3f9ef6d0b0b6827f8e6 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 5420837 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

## PATENT COOPERATION TREATY

From the INTERNATIONAL SEARCHING AUTHORITY

<table>
<tr><td>To: GREGORY W. SMOCK<br>TELEFLEX INCORPORATED<br>INTELLECTUAL PROPERTY DEPARTMENT<br>6464 SYCAMORE COURT NORTH<br>MINNEAPOLIS, MN 55369</td><td>## PCT<br><br>NOTIFICATION OF TRANSMITTAL OF<br>THE INTERNATIONAL SEARCH REPORT AND<br>THE WRITTEN OPINION OF THE INTERNATIONAL<br>SEARCHING AUTHORITY, OR THE DECLARATION<br><br>(PCT Rule 44.1)</td></tr>
</table>

<table>
<tr><td></td><td>Date of mailing<br>(day/month/year)   **27 AUG 2020**</td></tr>
<tr><td>Applicant's or agent's file reference<br><br>TEL-2004-WO01</td><td>**FOR FURTHER ACTION**   See paragraphs 1 and 4 below</td></tr>
<tr><td>International application No.<br>PCT/US2020/030264</td><td>International filing date<br>(day/month/year)   **28 April 2020**</td></tr>
<tr><td colspan="2">Applicant PEDERSEN, WESLEY ROBERT</td></tr>
</table>

1. ☒ The applicant is hereby notified that the international search report and the written opinion of the International Searching Authority have been established and are transmitted herewith.

   **Filing of amendments and statement under Article 19:**
   The applicant is entitled, if he so wishes, to amend the claims of the international application (see Rule 46):

   **When?** The time limit for filing such amendments is normally two months from the date of transmittal of the international search report.

   **How?** Directly to the International Bureau preferably through ePCT, or on paper to:
   The International Bureau of WIPO, 34, chemin des Colombettes, 1211 Geneva 20, Switzerland
   (Facsimile No.: +41 22 338 82 70)

   **For more detailed instructions,** see the *PCT Applicant's Guide*, International Phase, paragraphs 9.004 – 9.011.

2. ☐ The applicant is hereby notified that no international search report will be established and that the declaration under Article 17(2)(a) to that effect and the written opinion of the International Searching Authority are transmitted herewith.

3. ☐ **With regard to any protest** against payment of (an) additional fee(s) under Rule 40.2, the applicant is notified that:

   ☐ the protest together with the decision thereon has been transmitted to the International Bureau together with any request to forward the texts of both the protest and the decision thereon to the designated Offices.

   ☐ no decision has been made yet on the protest; the applicant will be notified as soon as a decision is made.

4. **Reminders**

   The applicant may submit **comments on an informal basis on the written opinion of the International Searching Authority** to the International Bureau. These comments will be made available to the public after international publication. The International Bureau will send a copy of such comments to all designated Offices unless an international preliminary examination report has been or is to be established.

   Shortly after the expiration of **18 months from the priority date, the international application will be published by the** International Bureau. If the applicant wishes to avoid or postpone publication, a notice of withdrawal of the international application, or of the priority claim, must reach the International Bureau before the completion of the technical preparations for international publication (Rules 90*bis*.1 and 90*bis*.3).

   Within **19 months** from the priority date, but only in respect of some designated Offices, a demand for international preliminary examination must be filed if the applicant wishes to postpone the entry into the national phase **until 30 months from the priority date** (in some Offices even later); otherwise, the applicant must, **within 20 months** from the priority date, perform the prescribed acts for **entry into the national phase** before those designated Offices. In respect of other designated Offices, the time limit of **30 months** (or later) will apply even if no demand is filed within 19 months. For details about the applicable time limits, Office by Office, see www.wipo.int/pct/en/texts/time_limits.html and the *PCT Applicant's Guide*, National Chapters.

   Within **22 months from the priority date, the applicant may request that a supplementary international search be carried out** by a different International Searching Authority that offers this service (Rule 45*bis*.1). The procedure for requesting supplementary international search is described in the *PCT Applicant's Guide*, International Phase, paragraphs 8.006-8.032.

<table>
<tr><td>Name and mailing address of the ISA/US<br>Mail Stop PCT, Attn: ISA/US<br>Commissioner for Patents<br>P.O. Box 1450, Alexandria, VA 22313-1450<br>Facsimile No. 571-273-8300</td><td>Authorized officer<br><br>Blaine R. Copenheaver<br><br>Telephone No. PCT Helpdesk: 571-272-4300</td></tr>
</table>

Form PCT/ISA/220 (revised January 2019)

## PATENT COOPERATION TREATY

# PCT

### INTERNATIONAL SEARCH REPORT

(PCT Article 18 and Rules 43 and 44)

| Applicant's or agent's file reference | **FOR FURTHER ACTION** |
|---|---|
| TEL-2004-WO01 | see Form PCT/ISA/220 as well as, where applicable, item 5 below. |

| International application No. | International filing date *(day/month/year)* | (Earliest) Priority Date *(day/month/year)* |
|---|---|---|
| PCT/US2020/030264 | 28 April 2020 | 29 April 2019 |

| Applicant |
|---|
| PEDERSEN, WESLEY ROBERT |

This international search report has been prepared by this International Searching Authority and is transmitted to the applicant according to Article 18. A copy is being transmitted to the International Bureau.

This international search report consists of a total of __4__ sheets.

☐ It is also accompanied by a copy of each prior art document cited in this report.

1. **Basis of the report**

   a. With regard to the **language**, the international search was carried out on the basis of:

   ☒ the international application in the language in which it was filed.

   ☐ a translation of the international application into _____ which is the language of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b)).

   b. ☐ This international search report has been established taking into account the **rectification of an obvious mistake** authorized by or notified to this Authority under Rule 91 (Rule 43.6*bis*(a)).

   c. ☐ With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, see Box No. I.

2. ☐ **Certain claims were found unsearchable** (see Box No. II).

3. ☒ **Unity of invention is lacking** (see Box No. III).

4. With regard to the **title**,

   ☒ the text is approved as submitted by the applicant.

   ☐ the text has been established by this Authority to read as follows:

5. With regard to the **abstract**,

   ☒ the text is approved as submitted by the applicant.

   ☐ the text has been established, according to Rule 38.2, by this Authority as it appears in Box No. IV. The applicant may, within one month from the date of mailing of this international search report, submit comments to this Authority.

6. With regard to the **drawings**,

   a. the figure of the **drawings** to be published with the abstract is Figure No. __15__

   ☒ as suggested by the applicant.

   ☐ as selected by this Authority, because the applicant failed to suggest a figure.

   ☐ as selected by this Authority, because this figure better characterizes the invention.

   b. ☐ none of the figures is to be published with the abstract.

Form PCT/ISA/210 (first sheet) (July 2019)

**INTERNATIONAL SEARCH REPORT**

| International application No. |
| --- |
| PCT/US2020/030264 |

| Box No. II | Observations where certain claims were found unsearchable (Continuation of item 2 of first sheet) |
| --- | --- |

This international search report has not been established in respect of certain claims under Article 17(2)(a) for the following reasons:

1. ☐ Claims Nos.:
because they relate to subject matter not required to be searched by this Authority, namely:

2. ☐ Claims Nos.:
because they relate to parts of the international application that do not comply with the prescribed requirements to such an extent that no meaningful international search can be carried out, specifically:

3. ☐ Claims Nos.:
because they are dependent claims and are not drafted in accordance with the second and third sentences of Rule 6.4(a).

| Box No. III | Observations where unity of invention is lacking (Continuation of item 3 of first sheet) |
| --- | --- |

This International Searching Authority found multiple inventions in this international application, as follows:

**See extra sheet(s).**

1. ☒ As all required additional search fees were timely paid by the applicant, this international search report covers all searchable claims.

2. ☐ As all searchable claims could be searched without effort justifying additional fees, this Authority did not invite payment of additional fees.

3. ☐ As only some of the required additional search fees were timely paid by the applicant, this international search report covers only those claims for which fees were paid, specifically claims Nos.:

4. ☐ No required additional search fees were timely paid by the applicant. Consequently, this international search report is restricted to the invention first mentioned in the claims; it is covered by claims Nos.:

| Remark on Protest | ☐ The additional search fees were accompanied by the applicant's protest and, where applicable, the payment of a protest fee. |
| --- | --- |
| | ☐ The additional search fees were accompanied by the applicant's protest but the applicable protest fee was not paid within the time limit specified in the invitation. |
| | ☒ No protest accompanied the payment of additional search fees. |

Form PCT/ISA/210 (continuation of first sheet (2)) (July 2019)

# INTERNATIONAL SEARCH REPORT

| | International application No. |
|---|---|
| | PCT/US2020/030264 |

## A. CLASSIFICATION OF SUBJECT MATTER

IPC(8) - A61M 25/09; A61B 17/00; A61B 17/34; A61M 25/01; A61M 29/00 (2020.01)
CPC - A61M 25/09041; A61B 17/00; A61B 2017/00247; A61B 17/34; A61B 17/3417; A61B 17/3468; A61B 17/3478; A61M 25/01; A61M 25/09; A61M 29/00 (2020.08)

According to International Patent Classification (IPC) or to both national classification and IPC

## B. FIELDS SEARCHED

Minimum documentation searched (classification system followed by classification symbols)
see Search History document

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched
see Search History document

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)
see Search History document

## C. DOCUMENTS CONSIDERED TO BE RELEVANT

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X --- Y | US 2019/0015644 A1 (BAYLIS MEDICAL COMPANY INC.) 17 January 2019 (17.01.2019) entire document | 14-25, 33, 34 --- 26-31 |
| Y | US 2017/0296781 A1 (TRANSSEPTAL SOLUTIONS LTD.) 19 October 2017 (19.10.2017) entire document | 1-13 |
| Y | US 2016/0175009 A1 (BAYLIS MEDICAL COMPANY INC.) 23 June 2016 (23.06.2016) entire document | 1-13 |
| Y | US 2014/0188108 A1 (MITRALIGN, INC.) 03 July 2014 (03.07.2014) entire document | 26-29 |
| Y | US 2014/0371676 A1 (CLPH, LLC) 18 December 2014 (18.12.2014) entire document | 30, 31 |
| A | US 2008/0125802 A1 (CARROLL) 29 May 2008 (29.05.2008) entire document | 1-34 |
| A | US 2015/0173794 A1 (PRESSURE PRODUCTS MEDICAL SUPPLIES INC.) 25 June 2015 (25.06.2015) entire document | 1-34 |
| A | US 2016/0022962 A1 (TELEFLEX MEDICAL INCORPORATED) 28 January 2016 (28.01.2016) entire document | 1-34 |

| ☐ Further documents are listed in the continuation of Box C. | ☐ See patent family annex. |
|---|---|

| * | Special categories of cited documents: | "T" | later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention |
|---|---|---|---|
| "A" | document defining the general state of the art which is not considered to be of particular relevance | | |
| "D" | document cited by the applicant in the international application | "X" | document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone |
| "E" | earlier application or patent but published on or after the international filing date | | |
| "L" | document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified) | "Y" | document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art |
| "O" | document referring to an oral disclosure, use, exhibition or other means | | |
| "P" | document published prior to the international filing date but later than the priority date claimed | "&" | document member of the same patent family |

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 10 August 2020 | 27 AUG 2020 |
| Name and mailing address of the ISA/US | Authorized officer |
| Mail Stop PCT, Attn: ISA/US, Commissioner for Patents P.O. Box 1450, Alexandria, VA 22313-1450 | Blaine R. Copenheaver |
| Facsimile No. 571-273-8300 | Telephone No. PCT Helpdesk: 571-272-4300 |

Form PCT/ISA/210 (second sheet) (July 2019)

## INTERNATIONAL SEARCH REPORT

International application No.

PCT/US2020/030264

Continued from Box No. III Observations where unity of invention is lacking

This application contains the following inventions or groups of inventions which are not so linked as to form a single general inventive concept under PCT Rule 13.1. In order for all inventions to be examined, the appropriate additional examination fees must be paid.

Group I, claims 1-13, are drawn to a method of treating a patient, comprising: advancing a dilator located in a lumen of a sheath distally relative to the sheath.

Group II, claims 14-34, are drawn to an anatomical wall crossing system, comprising: a dilator extending from a proximal end portion to a distal end portion and including a lumen therethrough, the distal end portion including a dilator nose.

The inventions listed as Groups I-II do not relate to a single general inventive concept under PCT Rule 13.1 because, under PCT Rule 13.2, they lack the same or corresponding special technical features for the following reasons: the special technical feature of the Group I invention: advancing a dilator located in a lumen of a sheath distally relative to the sheath, including applying a tenting force to a septal wall associated with the fossa ovalis of a heart using a dilator nose located at a distal end portion of the dilator; advancing a tip of a needle attached to a guidewire and located in a lumen of the dilator distally relative to the dilator, including puncturing across the septal wall associated with the fossa ovalis; advancing the dilator distally over the guidewire while maintaining the guidewire and the sheath in a fixed position, including extending a distal end of the dilator nose beyond the septal wall associated with the fossa ovalis by a distance equal to or greater than a length of the needle; and advancing the guidewire distally through the dilator nose, including allowing deployment of the needle in a central region of the left atrium of the heart as claimed therein is not present in the invention of Group II. The special technical feature of the Group II invention: a dilator extending from a proximal end portion to a distal end portion and including a lumen therethrough, the distal end portion including a dilator nose and a dilator beveled segment, the dilator nose having a first outer diameter and a length of about 5-18mm, inclusive, and the dilator beveled segment extending proximally of the dilator nose and tapering from a second outer diameter, greater than the first outer diameter, to the first outer diameter as claimed therein is not present in the invention of Group I.

Groups I and II lack unity of invention because even though the inventions of these groups require the technical feature of a dilator nose located at a distal end portion of a dilator, this technical feature is not a special technical feature as it does not make a contribution over the prior art.

Specifically, US 2016/0022962 A1 to Teleflex Medical Incorporated teaches a dilator nose located at a distal end portion of a dilator (The dilator nose, that is, distal dilator tip, is tapered for easy mold release and tight fit into sheath internal diameter (ID) feature. The nose helps lead into sheath internal diameter (ID), para.0180).

Since none of the special technical features of the Group I or II inventions are found in more than one of the inventions, unity of invention is lacking.

Form PCT/ISA/210 (extra sheet) (July 2019)

# EXHIBIT 9

**PATENT COOPERATION TREATY**

# PCT

**INTERNATIONAL SEARCH REPORT**

(PCT Article 18 and Rules 43 and 44)

| Applicant's or agent's file reference<br>RFPPCT02627 | **FOR FURTHER ACTION** | see Form PCT/ISA/220<br>as well as, where applicable, item 5 below |
|---|---|---|
| International application No.<br>**PCT/IB2013/060287** | International filing date *(day/month/year)*<br>20 November 2013 (20-11-2013) | (Earliest)Priority date *(day/month/year)*<br>07 August 2013 (07-08-2013) |

Applicant
**BAYLIS MEDICAL COMPANY INC.**

This international search report has been prepared by this International Searching Authority and is transmitted to the applicant according to Article 18. A copy is being transmitted to the International Bureau.

This international search report consists of a total of __11__ sheets.

   [X] It is also accompanied by a copy of each prior art document cited in this report.

1.  **Basis of the report**

  a.  With regard to the **language**, the international search was carried out on the basis of:

      [X]  the international application in the language in which it was filed

      [ ]  a translation of the international application into             , which is the language
         of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b))

  b.  [ ] This international search report has been established taking into account the **rectification of an obvious mistake**

      authorized by or notified to this Authority under Rule 91 (Rule 43.6*bis*(a)).

  c.  [ ] With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, see Box No. I

2.    [X] **Certain claims were found unsearchable** (see Box No. II)

3.    [ ] **Unity of invention is lacking** (see Box No. III)

4.    With regard to the **title**,

    [X] the text is approved as submitted by the applicant

    [ ] the text has been established by this Authority to read as follows :

5.    With regard to the **abstract**,

    [X] the text is approved as submitted by the applicant

    [ ] the text has been established, according to Rule 38.2, by this Authority as it appears in Box No. IV. The applicant
      may, within one month from the date of mailing of this international search report, submit comments to this Authority

6.    With regard to the **drawings**,

    a.  the figure of the **drawings** to be published with the abstract is Figure No.      1

      [X]  as suggested by the applicant

      [ ]  as selected by this Authority, because the applicant failed to suggest a figure

      [ ]  as selected by this Authority, because this figure better characterizes the invention

    b.  [ ]  none of the figures is to be published with the abstract

Form PCT/ISA/210 (first sheet) (July 2009)                          Page 1 of 11

| INTERNATIONAL SEARCH REPORT | International application No.<br>PCT/IB2013/060287 |
| --- | --- |

| **Box No. II** **Observations where certain claims were found unsearchable (Continuation of item 2 of the first sheet)** |
| --- |

This international search report has not been established in respect of certain claims under Article 17(2)(a) for the following reasons :

1.  [X] Claim Nos. :    62-81, 84

    because they relate to subject matter not required to be searched by this Authority, namely :

    Claims 62-81 and 84 are directed to a method for treatment of the human or animal body by surgery or therapy.

2.  [ ] Claim Nos. :

    because they relate to parts of the international application that do not comply with the prescribed requirements to such an extent that no meaningful international search can be carried out, specifically :

3.  [ ] Claim Nos. :

    because they are dependent claims and are not drafted in accordance with the second and third sentences of Rule 6.4(a).

| **Box No. III** **Observations where unity of invention is lacking (Continuation of item 3 of first sheet)** |
| --- |

This International Searching Authority found multiple inventions in this international application, as follows :

1.  [ ] As all required additional search fees were timely paid by the applicant, this international search report covers all searchable claims.

2.  [ ] As all searchable claims could be searched without effort justifying additional fees, this Authority did not invite payment of additional fees.

3.  [ ] As only some of the required additional search fees were timely paid by the applicant, this international search report covers only those claims for which fees were paid, specifically claim Nos. :

4.  [ ] No required additional search fees were timely paid by the applicant. Consequently, this international search report is restricted to the invention first mentioned in the claims; it is covered by claim Nos. :

**Remark on Protest**   [ ] The additional search fees were accompanied by the applicant's protest and, where applicable, the payment of a protest fee.

[ ] The additional search fees were accompanied by the applicant's protest but the applicable protest fee was not paid within the time limit specified in the invitation.

[ ] No protest accompanied the payment of additional search fees.

Form PCT/ISA/210 (continuation of first sheet (2)) (July 2009)                                              Page 2 of 11

| **INTERNATIONAL SEARCH REPORT** | International application No.<br>PCT/IB2013/060287 |
|---|---|

| A. | CLASSIFICATION OF SUBJECT MATTER |
|---|---|

IPC: *A61M 25/01* (2006.01) , *A61B 17/34* (2006.01) , *A61B 18/14* (2006.01) , *A61M 25/06* (2006.01) , *A61M 29/00* (2006.01)

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)

IPC (2006.01): A61B 17/34, A61M 25/06, A61M 29/00

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched
N/A

Electronic database(s) consulted during the international search (name of database(s) and, where practicable, search terms used)
databases: TotalPatent (all databases), Epoque (EPODOC)
keywords: rail, bend, flexible, heart, puncture, pierce, ablation

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | WO2008/079828 A2 (Nance, E.J. et al.) 3 July 2008 (03-07-2008)<br>*paragraph [0069] and figure 5* | 1-61, 82 and 83 |
| X | US2003/0208220 A1 (Worley, S.J. et al.) 6 November 2003 (06-11-2003)<br>*paragraphs [0058],[0063] and figure 5* | 1-61, 82 and 83 |
| X | US2001/0044591 A1 (Stevens. J.H. et al.) 22 November 2001 (22-11-2001)<br>*paragraphs [0206] ,[0254] and figure 25* | 1-61, 82 and 83 |
| A | US6036677 (Javier, Jr. et al.) 14 March 2000 (14-03-2000)<br>*figure 3* | 1-61, 82 and 83 |
| A | WO2005/065562 A1 (Bhola, S.) 21 July 2005 (21-07-2005)<br>*figures 3A, 3B, 4C* | 1-61, 82 and 83 |

| [ ] Further documents are listed in the continuation of Box C. | [X] See patent family annex. |
|---|---|

| * | Special categories of cited documents : | "T" | later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention |
|---|---|---|---|
| "A" | document defining the general state of the art which is not considered to be of particular relevance | | |
| "E" | earlier application or patent but published on or after the international filing date | "X" | document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone |
| "L" | document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified) | "Y" | document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art |
| "O" | document referring to an oral disclosure, use, exhibition or other means | | |
| "P" | document published prior to the international filing date but later than the priority date claimed | "&" | document member of the same patent family |

| Date of the actual completion of the international search<br><br>05 March 2014 (05-03-2014) | Date of mailing of the international search report<br><br>06 March 2014 (06-03-2014) |
|---|---|
| Name and mailing address of the ISA/CA<br>Canadian Intellectual Property Office<br>Place du Portage I, C114 - 1st Floor, Box PCT<br>50 Victoria Street<br>Gatineau, Quebec K1A 0C9<br>Facsimile No.: 001-819-953-2476 | Authorized officer<br><br>Alison Canteenwalla 934-8534 |

Form PCT/ISA/210 (second sheet ) (July 2009)                                       Page 3 of 11

**INTERNATIONAL SEARCH REPORT**
Information on patent family members

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| WO2008079828A2 | 03 July 2008 (03-07-2008) | US2008215008A1 | 04 September 2008 (04-09-2008) |
| | | US8337518B2 | 25 December 2012 (25-12-2012) |
| | | US2013281978A1 | 24 October 2013 (24-10-2013) |
| | | WO2008079828A3 | 14 August 2008 (14-08-2008) |
| US2003208220A1 | 06 November 2003 (06-11-2003) | AU2003232090A1 | 17 November 2003 (17-11-2003) |
| | | AU2003232090A8 | 17 November 2003 (17-11-2003) |
| | | EP1509119A2 | 02 March 2005 (02-03-2005) |
| | | EP1509119A4 | 22 December 2010 (22-12-2010) |
| | | US7384422B2 | 10 June 2008 (10-06-2008) |
| | | WO03092480A2 | 13 November 2003 (13-11-2003) |
| | | WO03092480A3 | 01 April 2004 (01-04-2004) |
| US2001044591A1 | 22 November 2001 (22-11-2001) | US2001044591A1 | 22 November 2001 (22-11-2001) |
| | | US6866650B2 | 15 March 2005 (15-03-2005) |
| | | AT226840T | 15 November 2002 (15-11-2002) |
| | | AT261329T | 15 March 2004 (15-03-2004) |
| | | AT269742T | 15 July 2004 (15-07-2004) |
| | | AT277556T | 15 October 2004 (15-10-2004) |
| | | AT479462T | 15 September 2010 (15-09-2010) |
| | | AU668690B2 | 16 May 1996 (16-05-1996) |
| | | AU7719794A | 10 April 1995 (10-04-1995) |
| | | AU685161B2 | 15 January 1998 (15-01-1998) |
| | | AU687232B2 | 19 February 1998 (19-02-1998) |
| | | AU6024594A | 14 September 1994 (14-09-1994) |
| | | AU688303B2 | 12 March 1998 (12-03-1998) |
| | | AU1433295A | 17 July 1995 (17-07-1995) |
| | | AU691236B2 | 14 May 1998 (14-05-1998) |
| | | AU1175995A | 19 June 1995 (19-06-1995) |
| | | AU691854B2 | 28 May 1998 (28-05-1998) |
| | | AU691893B2 | 28 May 1998 (28-05-1998) |
| | | AU4284796A | 26 June 1996 (26-06-1996) |
| | | AU696812B2 | 17 September 1998 (17-09-1998) |
| | | AU1099595A | 27 June 1995 (27-06-1995) |
| | | AU702940B2 | 11 March 1999 (11-03-1999) |
| | | AU708976B2 | 19 August 1999 (19-08-1999) |
| | | AU4469096A | 31 July 1996 (31-07-1996) |
| | | AU709259B2 | 26 August 1999 (26-08-1999) |
| | | AU719765B2 | 18 May 2000 (18-05-2000) |
| | | AU723379B2 | 24 August 2000 (24-08-2000) |
| | | AU740743B2 | 15 November 2001 (15-11-2001) |
| | | AU761079B2 | 29 May 2003 (29-05-2003) |
| | | AU767608B2 | 20 November 2003 (20-11-2003) |
| | | AU773823B2 | 10 June 2004 (10-06-2004) |
| | | AU773823C | 03 February 2005 (03-02-2005) |
| | | AU775394B2 | 29 July 2004 (29-07-2004) |
| | | AU1087497A | 27 June 1997 (27-06-1997) |
| | | AU1296197A | 03 July 1997 (03-07-1997) |
| | | AU1564802A | 11 April 2002 (11-04-2002) |
| | | AU1582497A | 22 August 1997 (22-08-1997) |
| | | AU1749897A | 11 August 1997 (11-08-1997) |
| | | AU1805499A | 28 June 1999 (28-06-1999) |
| | | AU1980895A | 03 October 1995 (03-10-1995) |
| | | AU2071097A | 22 September 1997 (22-09-1997) |
| | | AU2412792A | 23 February 1993 (23-02-1993) |
| | | AU2777495A | 19 January 1996 (19-01-1996) |
| | | AU3214895A | 14 March 1996 (14-03-1996) |
| | | AU3394397A | 07 January 1998 (07-01-1998) |
| | | AU3737397A | 10 February 1998 (10-02-1998) |
| | | AU4272800A | 07 September 2000 (07-09-2000) |
| | | AU5003197A | 15 May 1998 (15-05-1998) |
| | | AU5188596A | 16 October 1996 (16-10-1996) |
| | | AU5189496A | 16 October 1996 (16-10-1996) |
| | | AU5308996A | 07 November 1996 (07-11-1996) |
| | | AU5781401A | 07 February 2002 (07-02-2002) |
| | | AU5951996A | 30 December 1996 (30-12-1996) |
| | | AU5956596A | 30 December 1996 (30-12-1996) |

| INTERNATIONAL SEARCH REPORT | International application No. PCT/IB2013/060287 |
|---|---|

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | AU6154199A | 10 April 2000 (10-04-2000) |
| | | AU6354200A | 05 February 2001 (05-02-2001) |
| | | AU8613098A | 23 March 2000 (23-03-2000) |
| | | AU2002315167B2 | 08 November 2007 (08-11-2007) |
| | | AU2003275243A1 | 19 April 2004 (19-04-2004) |
| | | AU2003275243B2 | 02 April 2009 (02-04-2009) |
| | | AU2003275243C1 | 21 January 2010 (21-01-2010) |
| | | AU2004205242A1 | 23 September 2004 (23-09-2004) |
| | | AU2004205242B2 | 08 November 2007 (08-11-2007) |
| | | CA2113476A1 | 04 February 1993 (04-02-1993) |
| | | CA2113476C | 10 October 2006 (10-10-2006) |
| | | CA2154354A1 | 01 September 1994 (01-09-1994) |
| | | CA2171097A1 | 30 March 1995 (30-03-1995) |
| | | CA2177490A1 | 15 June 1995 (15-06-1995) |
| | | CA2177490C | 27 June 2006 (27-06-2006) |
| | | CA2177491A1 | 08 June 1995 (08-06-1995) |
| | | CA2179897A1 | 06 July 1995 (06-07-1995) |
| | | CA2185093A1 | 21 September 1995 (21-09-1995) |
| | | CA2198127A1 | 29 February 1996 (29-02-1996) |
| | | CA2206091A1 | 13 June 1996 (13-06-1996) |
| | | CA2208350A1 | 18 July 1996 (18-07-1996) |
| | | CA2215970A1 | 03 October 1996 (03-10-1996) |
| | | CA2218105A1 | 03 October 1996 (03-10-1996) |
| | | CA2218545A1 | 24 October 1996 (24-10-1996) |
| | | CA2218545C | 11 September 2012 (11-09-2012) |
| | | CA2222218A1 | 19 December 1996 (19-12-1996) |
| | | CA2222326A1 | 19 December 1996 (19-12-1996) |
| | | CA2222326C | 15 August 2006 (15-08-2006) |
| | | CA2239907A1 | 19 December 1996 (19-12-1996) |
| | | CA2249064A1 | 12 September 1997 (12-09-1997) |
| | | CA2253315A1 | 24 December 1997 (24-12-1997) |
| | | CA2354677A1 | 05 February 2002 (05-02-2002) |
| | | CA2377583A1 | 25 January 2001 (25-01-2001) |
| | | CA2450075A1 | 27 December 2002 (27-12-2002) |
| | | CA2450075C | 19 November 2013 (19-11-2013) |
| | | CA2499223A1 | 08 April 2004 (08-04-2004) |
| | | CA2499223C | 18 June 2013 (18-06-2013) |
| | | DE69230375D1 | 05 January 2000 (05-01-2000) |
| | | DE69230375T2 | 06 July 2000 (06-07-2000) |
| | | DE69233210D1 | 23 October 2003 (23-10-2003) |
| | | DE69233210T2 | 19 August 2004 (19-08-2004) |
| | | DE69233715D1 | 27 December 2007 (27-12-2007) |
| | | DE69233715T2 | 30 October 2008 (30-10-2008) |
| | | DE69430382D1 | 16 May 2002 (16-05-2002) |
| | | DE69430382T2 | 12 December 2002 (12-12-2002) |
| | | DE69430433D1 | 23 May 2002 (23-05-2002) |
| | | DE69430433T2 | 12 December 2002 (12-12-2002) |
| | | DE69431872D1 | 23 January 2003 (23-01-2003) |
| | | DE69431872T2 | 18 September 2003 (18-09-2003) |
| | | DE69434040D1 | 04 November 2004 (04-11-2004) |
| | | DE69434040T2 | 06 October 2005 (06-10-2005) |
| | | DE69435281D1 | 22 April 2010 (22-04-2010) |
| | | DE69435312D1 | 14 October 2010 (14-10-2010) |
| | | DE69528712D1 | 05 December 2002 (05-12-2002) |
| | | DE69528712T2 | 03 April 2003 (03-04-2003) |
| | | DE69532686D1 | 15 April 2004 (15-04-2004) |
| | | DE69532686T2 | 10 February 2005 (10-02-2005) |
| | | DE69626105D1 | 13 March 2003 (13-03-2003) |
| | | DE69626105T2 | 23 October 2003 (23-10-2003) |
| | | DE69626822D1 | 24 April 2003 (24-04-2003) |
| | | DE69626822T2 | 04 March 2004 (04-03-2004) |
| | | DE69632776D1 | 29 July 2004 (29-07-2004) |
| | | DE69632776T2 | 25 August 2005 (25-08-2005) |
| | | DE69738378D1 | 24 January 2008 (24-01-2008) |
| | | DE69738378T2 | 27 November 2008 (27-11-2008) |
| | | DE69739942D1 | 02 September 2010 (02-09-2010) |
| | | DE69942614D1 | 02 September 2010 (02-09-2010) |
| | | EP0597967A1 | 25 May 1994 (25-05-1994) |

| INTERNATIONAL SEARCH REPORT | International application No. PCT/IB2013/060287 |
|---|---|

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | EP0597967A4 | 07 December 1994 (07-12-1994) |
| | | EP0597967B1 | 01 December 1999 (01-12-1999) |
| | | EP0684781A1 | 06 December 1995 (06-12-1995) |
| | | EP0684781A4 | 18 September 1996 (18-09-1996) |
| | | EP0684781B1 | 11 December 2002 (11-12-2002) |
| | | EP0719161A1 | 03 July 1996 (03-07-1996) |
| | | EP0719161A4 | 04 June 1997 (04-06-1997) |
| | | EP0719161B1 | 17 April 2002 (17-04-2002) |
| | | EP0731720A1 | 18 September 1996 (18-09-1996) |
| | | EP0731720A4 | 18 June 1997 (18-06-1997) |
| | | EP0731720B1 | 10 April 2002 (10-04-2002) |
| | | EP0732890A1 | 25 September 1996 (25-09-1996) |
| | | EP0732890A4 | 05 November 1997 (05-11-1997) |
| | | EP0732890B1 | 29 September 2004 (29-09-2004) |
| | | EP0737083A1 | 16 October 1996 (16-10-1996) |
| | | EP0737083A4 | 29 December 1997 (29-12-1997) |
| | | EP0805701A1 | 12 November 1997 (12-11-1997) |
| | | EP0805701A4 | 02 February 2000 (02-02-2000) |
| | | EP0808191A1 | 26 November 1997 (26-11-1997) |
| | | EP0808191A4 | 26 November 1997 (26-11-1997) |
| | | EP0808191B1 | 30 October 2002 (30-10-2002) |
| | | EP0819013A1 | 21 January 1998 (21-01-1998) |
| | | EP0819013A4 | 23 December 1998 (23-12-1998) |
| | | EP0819013B1 | 23 June 2004 (23-06-2004) |
| | | EP0819014A1 | 21 January 1998 (21-01-1998) |
| | | EP0819014A4 | 23 December 1998 (23-12-1998) |
| | | EP0819014B1 | 05 February 2003 (05-02-2003) |
| | | EP0822777A1 | 11 February 1998 (11-02-1998) |
| | | EP0822777A4 | 17 January 2007 (17-01-2007) |
| | | EP0836423A1 | 22 April 1998 (22-04-1998) |
| | | EP0836501A1 | 22 April 1998 (22-04-1998) |
| | | EP0836501A4 | 25 August 1999 (25-08-1999) |
| | | EP0836501B1 | 19 March 2003 (19-03-2003) |
| | | EP0837712A1 | 29 April 1998 (29-04-1998) |
| | | EP0837712A4 | 26 November 2003 (26-11-2003) |
| | | EP0841963A1 | 20 May 1998 (20-05-1998) |
| | | EP0841963A4 | 19 August 1998 (19-08-1998) |
| | | EP0841963B1 | 10 March 2004 (10-03-2004) |
| | | EP0888144A1 | 07 January 1999 (07-01-1999) |
| | | EP0888144A4 | 10 October 2001 (10-10-2001) |
| | | EP0901346A1 | 17 March 1999 (17-03-1999) |
| | | EP0901346A4 | 17 March 1999 (17-03-1999) |
| | | EP0921831A1 | 16 June 1999 (16-06-1999) |
| | | EP0921831A4 | 26 April 2000 (26-04-2000) |
| | | EP0937439A2 | 25 August 1999 (25-08-1999) |
| | | EP0937439A3 | 13 October 1999 (13-10-1999) |
| | | EP0937439B1 | 17 September 2003 (17-09-2003) |
| | | EP0991362A1 | 12 April 2000 (12-04-2000) |
| | | EP0991362A4 | 06 October 2004 (06-10-2004) |
| | | EP0991362B1 | 12 December 2007 (12-12-2007) |
| | | EP1123130A1 | 16 August 2001 (16-08-2001) |
| | | EP1123130A4 | 13 July 2005 (13-07-2005) |
| | | EP1123130B1 | 21 July 2010 (21-07-2010) |
| | | EP1129744A1 | 05 September 2001 (05-09-2001) |
| | | EP1129744B1 | 01 September 2010 (01-09-2010) |
| | | EP1177772A1 | 06 February 2002 (06-02-2002) |
| | | EP1207788A1 | 29 May 2002 (29-05-2002) |
| | | EP1207788A4 | 09 December 2009 (09-12-2009) |
| | | EP1208867A2 | 29 May 2002 (29-05-2002) |
| | | EP1208867A3 | 02 May 2003 (02-05-2003) |
| | | EP1208867B1 | 10 March 2010 (10-03-2010) |
| | | EP1283027A2 | 12 February 2003 (12-02-2003) |
| | | EP1283027A3 | 23 April 2003 (23-04-2003) |
| | | EP1283027B1 | 14 November 2007 (14-11-2007) |
| | | EP1408862A2 | 21 April 2004 (21-04-2004) |
| | | EP1408862A4 | 03 March 2010 (03-03-2010) |
| | | EP1542606A2 | 22 June 2005 (22-06-2005) |
| | | EP1542606A4 | 08 December 2010 (08-12-2010) |
| | | EP1647229A2 | 19 April 2006 (19-04-2006) |

| INTERNATIONAL SEARCH REPORT | International application No. PCT/IB2013/060287 |
|---|---|

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | EP1542606A2 | 22 June 2005 (22-06-2005) |
| | | EP1542606A4 | 08 December 2010 (08-12-2010) |
| | | EP1647229A2 | 19 April 2006 (19-04-2006) |
| | | EP1647229A3 | 26 April 2006 (26-04-2006) |
| | | EP1864619A2 | 12 December 2007 (12-12-2007) |
| | | EP1864619A3 | 13 August 2008 (13-08-2008) |
| | | EP1864619B1 | 21 July 2010 (21-07-2010) |
| | | EP1980200A2 | 15 October 2008 (15-10-2008) |
| | | EP1980200A3 | 08 December 2010 (08-12-2010) |
| | | ES2142829T3 | 01 May 2000 (01-05-2000) |
| | | ES2207885T3 | 01 June 2004 (01-06-2004) |
| | | ES2217288T3 | 01 November 2004 (01-11-2004) |
| | | ES2229229T3 | 16 April 2005 (16-04-2005) |
| | | ES2296854T3 | 01 May 2008 (01-05-2008) |
| | | JPH09509074A | 16 September 1997 (16-09-1997) |
| | | JP3618754B2 | 09 February 2005 (09-02-2005) |
| | | JPH10510178A | 06 October 1998 (06-10-1998) |
| | | JP3650122B2 | 18 May 2005 (18-05-2005) |
| | | JPH09509585A | 30 September 1997 (30-09-1997) |
| | | JP3717929B2 | 16 November 2005 (16-11-2005) |
| | | JP2001518808A | 16 October 2001 (16-10-2001) |
| | | JP3992734B2 | 17 October 2007 (17-10-2007) |
| | | JPH06511167A | 15 December 1994 (15-12-1994) |
| | | JPH08511694A | 10 December 1996 (10-12-1996) |
| | | JPH09502889A | 25 March 1997 (25-03-1997) |
| | | JPH09510117A | 14 October 1997 (14-10-1997) |
| | | JPH10500587A | 20 January 1998 (20-01-1998) |
| | | JPH10507653A | 28 July 1998 (28-07-1998) |
| | | JPH10512163A | 24 November 1998 (24-11-1998) |
| | | JPH11503646A | 30 March 1999 (30-03-1999) |
| | | JP2000506051A | 23 May 2000 (23-05-2000) |
| | | JP2000512874A | 03 October 2000 (03-10-2000) |
| | | JP2002113009A | 16 April 2002 (16-04-2002) |
| | | USRE35352E | 15 October 1996 (15-10-1996) |
| | | US5370685A | 06 December 1994 (06-12-1994) |
| | | US5425705A | 20 June 1995 (20-06-1995) |
| | | US5433700A | 18 July 1995 (18-07-1995) |
| | | US5452733A | 26 September 1995 (26-09-1995) |
| | | US5458574A | 17 October 1995 (17-10-1995) |
| | | US5536251A | 16 July 1996 (16-07-1996) |
| | | US5545214A | 13 August 1996 (13-08-1996) |
| | | US5558644A | 24 September 1996 (24-09-1996) |
| | | US5569274A | 29 October 1996 (29-10-1996) |
| | | US5571215A | 05 November 1996 (05-11-1996) |
| | | US5584803A | 17 December 1996 (17-12-1996) |
| | | US5613937A | 25 March 1997 (25-03-1997) |
| | | US5618307A | 08 April 1997 (08-04-1997) |
| | | US5626607A | 06 May 1997 (06-05-1997) |
| | | US5682906A | 04 November 1997 (04-11-1997) |
| | | US5695457A | 09 December 1997 (09-12-1997) |
| | | US5702368A | 30 December 1997 (30-12-1997) |
| | | US5713951A | 03 February 1998 (03-02-1998) |
| | | US5718725A | 17 February 1998 (17-02-1998) |
| | | US5725496A | 10 March 1998 (10-03-1998) |
| | | US5728151A | 17 March 1998 (17-03-1998) |
| | | US5735290A | 07 April 1998 (07-04-1998) |
| | | US5738652A | 14 April 1998 (14-04-1998) |
| | | US5759170A | 02 June 1998 (02-06-1998) |
| | | US5762624A | 09 June 1998 (09-06-1998) |
| | | US5766151A | 16 June 1998 (16-06-1998) |
| | | US5769812A | 23 June 1998 (23-06-1998) |
| | | US5792094A | 11 August 1998 (11-08-1998) |
| | | US5795325A | 18 August 1998 (18-08-1998) |
| | | US5797960A | 25 August 1998 (25-08-1998) |
| | | US5799661A | 01 September 1998 (01-09-1998) |
| | | US5807318A | 15 September 1998 (15-09-1998) |
| | | US5814016A | 29 September 1998 (29-09-1998) |

## INTERNATIONAL SEARCH REPORT

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | US5814016A | 29 September 1998 (29-09-1998) |
| | | US5814097A | 29 September 1998 (29-09-1998) |
| | | US5823956A | 20 October 1998 (20-10-1998) |
| | | US5829447A | 03 November 1998 (03-11-1998) |
| | | US5849005A | 15 December 1998 (15-12-1998) |
| | | US5855210A | 05 January 1999 (05-01-1999) |
| | | US5855590A | 05 January 1999 (05-01-1999) |
| | | US5855614A | 05 January 1999 (05-01-1999) |
| | | US5863366A | 26 January 1999 (26-01-1999) |
| | | US5868702A | 09 February 1999 (09-02-1999) |
| | | US5879499A | 09 March 1999 (09-03-1999) |
| | | US5885238A | 23 March 1999 (23-03-1999) |
| | | US5913842A | 22 June 1999 (22-06-1999) |
| | | US5916193A | 29 June 1999 (29-06-1999) |
| | | US5924424A | 20 July 1999 (20-07-1999) |
| | | US5961481A | 05 October 1999 (05-10-1999) |
| | | US5971973A | 26 October 1999 (26-10-1999) |
| | | US5972030A | 26 October 1999 (26-10-1999) |
| | | US5980455A | 09 November 1999 (09-11-1999) |
| | | US6010531A | 04 January 2000 (04-01-2000) |
| | | US6027476A | 22 February 2000 (22-02-2000) |
| | | US6029671A | 29 February 2000 (29-02-2000) |
| | | US6079414A | 27 June 2000 (27-06-2000) |
| | | US6125852A | 03 October 2000 (03-10-2000) |
| | | US6152141A | 28 November 2000 (28-11-2000) |
| | | US6161543A | 19 December 2000 (19-12-2000) |
| | | US6237605B1 | 29 May 2001 (29-05-2001) |
| | | US6251093B1 | 26 June 2001 (26-06-2001) |
| | | US6283127B1 | 04 September 2001 (04-09-2001) |
| | | US6309382B1 | 30 October 2001 (30-10-2001) |
| | | US6311692B1 | 06 November 2001 (06-11-2001) |
| | | US6311693B1 | 06 November 2001 (06-11-2001) |
| | | US6314962B1 | 13 November 2001 (13-11-2001) |
| | | US6314963B1 | 13 November 2001 (13-11-2001) |
| | | US6325067B1 | 04 December 2001 (04-12-2001) |
| | | US6338735B1 | 15 January 2002 (15-01-2002) |
| | | US6346074B1 | 12 February 2002 (12-02-2002) |
| | | US2001016750A1 | 23 August 2001 (23-08-2001) |
| | | US6368340B2 | 09 April 2002 (09-04-2002) |
| | | US6401720B1 | 11 June 2002 (11-06-2002) |
| | | US6451004B1 | 17 September 2002 (17-09-2002) |
| | | US6451054B1 | 17 September 2002 (17-09-2002) |
| | | US6474340B1 | 05 November 2002 (05-11-2002) |
| | | US6478029B1 | 12 November 2002 (12-11-2002) |
| | | US6482171B1 | 19 November 2002 (19-11-2002) |
| | | US6484727B1 | 26 November 2002 (26-11-2002) |
| | | US6494211B1 | 17 December 2002 (17-12-2002) |
| | | US2002023653A1 | 28 February 2002 (28-02-2002) |
| | | US6494897B2 | 17 December 2002 (17-12-2002) |
| | | US6558318B1 | 06 May 2003 (06-05-2003) |
| | | US2002183839A1 | 05 December 2002 (05-12-2002) |
| | | US6564805B2 | 20 May 2003 (20-05-2003) |
| | | US2003040736A1 | 27 February 2003 (27-02-2003) |
| | | US6579259B2 | 17 June 2003 (17-06-2003) |
| | | US2002087183A1 | 04 July 2002 (04-07-2002) |
| | | US6613069B2 | 02 September 2003 (02-09-2003) |
| | | US2002022848A1 | 21 February 2002 (21-02-2002) |
| | | US6645197B2 | 11 November 2003 (11-11-2003) |
| | | US6645202B1 | 11 November 2003 (11-11-2003) |
| | | US6651671B1 | 25 November 2003 (25-11-2003) |
| | | US2002026094A1 | 28 February 2002 (28-02-2002) |
| | | US6651672B2 | 25 November 2003 (25-11-2003) |
| | | US2002096183A1 | 25 July 2002 (25-07-2002) |
| | | US6679268B2 | 20 January 2004 (20-01-2004) |
| | | US2002042610A1 | 11 April 2002 (11-04-2002) |
| | | US6689128B2 | 10 February 2004 (10-02-2004) |
| | | US2002045895A1 | 18 April 2002 (18-04-2002) |
| | | US6701931B2 | 09 March 2004 (09-03-2004) |
| | | US2002072741A1 | 13 June 2002 (13-06-2002) |

| INTERNATIONAL SEARCH REPORT | International application No. PCT/IB2013/060287 |
|---|---|

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | US2002045895A1 | 18 April 2002 (18-04-2002) |
| | | US6701931B2 | 09 March 2004 (09-03-2004) |
| | | US2002072741A1 | 13 June 2002 (13-06-2002) |
| | | US6719755B2 | 13 April 2004 (13-04-2004) |
| | | US2003102000A1 | 05 June 2003 (05-06-2003) |
| | | US6802319B2 | 12 October 2004 (12-10-2004) |
| | | US6805128B1 | 19 October 2004 (19-10-2004) |
| | | US6805129B1 | 19 October 2004 (19-10-2004) |
| | | US2002173784A1 | 21 November 2002 (21-11-2002) |
| | | US6840936B2 | 11 January 2005 (11-01-2005) |
| | | US2002042611A1 | 11 April 2002 (11-04-2002) |
| | | US6858026B2 | 22 February 2005 (22-02-2005) |
| | | US2003145865A1 | 07 August 2003 (07-08-2003) |
| | | US6899704B2 | 31 May 2005 (31-05-2005) |
| | | US2001016725A1 | 23 August 2001 (23-08-2001) |
| | | US6913600B2 | 05 July 2005 (05-07-2005) |
| | | US2001023334A1 | 20 September 2001 (20-09-2001) |
| | | US6913601B2 | 05 July 2005 (05-07-2005) |
| | | US2003069577A1 | 10 April 2003 (10-04-2003) |
| | | US6929010B2 | 16 August 2005 (16-08-2005) |
| | | US2003079753A1 | 01 May 2003 (01-05-2003) |
| | | US6949095B2 | 27 September 2005 (27-09-2005) |
| | | US2003225402A1 | 04 December 2003 (04-12-2003) |
| | | US6955175B2 | 18 October 2005 (18-10-2005) |
| | | US2003073992A1 | 17 April 2003 (17-04-2003) |
| | | US6971394B2 | 06 December 2005 (06-12-2005) |
| | | US2002092533A1 | 18 July 2002 (18-07-2002) |
| | | US7017581B2 | 28 March 2006 (28-03-2006) |
| | | US2002013569A1 | 31 January 2002 (31-01-2002) |
| | | US7028692B2 | 18 April 2006 (18-04-2006) |
| | | US2004054363A1 | 18 March 2004 (18-03-2004) |
| | | US7052493B2 | 30 May 2006 (30-05-2006) |
| | | US2002100485A1 | 01 August 2002 (01-08-2002) |
| | | US7100614B2 | 05 September 2006 (05-09-2006) |
| | | US2004194791A1 | 07 October 2004 (07-10-2004) |
| | | US7131447B2 | 07 November 2006 (07-11-2006) |
| | | US2004055608A1 | 25 March 2004 (25-03-2004) |
| | | US7213601B2 | 08 May 2007 (08-05-2007) |
| | | US2003078571A1 | 24 April 2003 (24-04-2003) |
| | | US7338486B2 | 04 March 2008 (04-03-2008) |
| | | US2004106918A1 | 03 June 2004 (03-06-2004) |
| | | US7387126B2 | 17 June 2008 (17-06-2008) |
| | | US2008045935A1 | 21 February 2008 (21-02-2008) |
| | | US7517345B2 | 14 April 2009 (14-04-2009) |
| | | US2005033274A1 | 10 February 2005 (10-02-2005) |
| | | US7674257B2 | 09 March 2010 (09-03-2010) |
| | | US2006200119A1 | 07 September 2006 (07-09-2006) |
| | | US7824402B2 | 02 November 2010 (02-11-2010) |
| | | US2006184167A1 | 17 August 2006 (17-08-2006) |
| | | US7824403B2 | 02 November 2010 (02-11-2010) |
| | | US2007066974A1 | 22 March 2007 (22-03-2007) |
| | | US2009192506A9 | 30 July 2009 (30-07-2009) |
| | | US7857811B2 | 28 December 2010 (28-12-2010) |
| | | US2006052802A1 | 09 March 2006 (09-03-2006) |
| | | US7967833B2 | 28 June 2011 (28-06-2011) |
| | | US2007191714A1 | 16 August 2007 (16-08-2007) |
| | | US8002771B2 | 23 August 2011 (23-08-2011) |
| | | US2007255276A1 | 01 November 2007 (01-11-2007) |
| | | US8057465B2 | 15 November 2011 (15-11-2011) |
| | | US2006135954A1 | 22 June 2006 (22-06-2006) |
| | | US8114069B2 | 14 February 2012 (14-02-2012) |
| | | US2009171335A1 | 02 July 2009 (02-07-2009) |
| | | US8177780B2 | 15 May 2012 (15-05-2012) |
| | | US2007293854A1 | 20 December 2007 (20-12-2007) |
| | | US8211096B2 | 03 July 2012 (03-07-2012) |
| | | US2008091195A1 | 17 April 2008 (17-04-2008) |

| INTERNATIONAL SEARCH REPORT | International application No. PCT/IB2013/060287 |
|---|---|

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | US8308719B2 | 13 November 2012 (13-11-2012) |
| | | US2012226269A1 | 06 September 2012 (06-09-2012) |
| | | US8535301B2 | 17 September 2013 (17-09-2013) |
| | | US2001001812A1 | 24 May 2001 (24-05-2001) |
| | | US2001010247A1 | 02 August 2001 (02-08-2001) |
| | | US2002017306A1 | 14 February 2002 (14-02-2002) |
| | | US2002029783A1 | 14 March 2002 (14-03-2002) |
| | | US2002056460A1 | 16 May 2002 (16-05-2002) |
| | | US2002058995A1 | 16 May 2002 (16-05-2002) |
| | | US2011270388A9 | 03 November 2011 (03-11-2011) |
| | | US2002062065A1 | 23 May 2002 (23-05-2002) |
| | | US2002062066A1 | 23 May 2002 (23-05-2002) |
| | | US2002068855A1 | 06 June 2002 (06-06-2002) |
| | | US2002068922A1 | 06 June 2002 (06-06-2002) |
| | | US2002068970A1 | 06 June 2002 (06-06-2002) |
| | | US2002069884A1 | 13 June 2002 (13-06-2002) |
| | | US2002074004A1 | 20 June 2002 (20-06-2002) |
| | | US2002087157A1 | 04 July 2002 (04-07-2002) |
| | | US2002100482A1 | 01 August 2002 (01-08-2002) |
| | | US2002128639A1 | 12 September 2002 (12-09-2002) |
| | | US2003024537A1 | 06 February 2003 (06-02-2003) |
| | | US2003028187A1 | 06 February 2003 (06-02-2003) |
| | | US2003029462A1 | 13 February 2003 (13-02-2003) |
| | | US2003069574A1 | 10 April 2003 (10-04-2003) |
| | | US2004019348A1 | 29 January 2004 (29-01-2004) |
| | | US2004073301A1 | 15 April 2004 (15-04-2004) |
| | | US2004117032A1 | 17 June 2004 (17-06-2004) |
| | | US2004225355A1 | 11 November 2004 (11-11-2004) |
| | | US2004236418A1 | 25 November 2004 (25-11-2004) |
| | | US2004260278A1 | 23 December 2004 (23-12-2004) |
| | | US2005148997A1 | 07 July 2005 (07-07-2005) |
| | | US2005245918A1 | 03 November 2005 (03-11-2005) |
| | | US2005251125A1 | 10 November 2005 (10-11-2005) |
| | | US2006004352A1 | 05 January 2006 (05-01-2006) |
| | | US2006058775A1 | 16 March 2006 (16-03-2006) |
| | | US2007282324A1 | 06 December 2007 (06-12-2007) |
| | | US2007293855A1 | 20 December 2007 (20-12-2007) |
| | | US2008029105A1 | 07 February 2008 (07-02-2008) |
| | | US2008045936A1 | 21 February 2008 (21-02-2008) |
| | | US2008045946A1 | 21 February 2008 (21-02-2008) |
| | | US2008183168A1 | 31 July 2008 (31-07-2008) |
| | | US2012271334A1 | 25 October 2012 (25-10-2012) |
| | | WO0016850A1 | 30 March 2000 (30-03-2000) |
| | | WO0016850A9 | 26 October 2000 (26-10-2000) |
| | | WO0105306A1 | 25 January 2001 (25-01-2001) |
| | | WO9301768A1 | 04 February 1993 (04-02-1993) |
| | | WO9418881A1 | 01 September 1994 (01-09-1994) |
| | | WO9508364A1 | 30 March 1995 (30-03-1995) |
| | | WO9515192A1 | 08 June 1995 (08-06-1995) |
| | | WO9515715A1 | 15 June 1995 (15-06-1995) |
| | | WO9517919A1 | 06 July 1995 (06-07-1995) |
| | | WO9524940A1 | 21 September 1995 (21-09-1995) |
| | | WO9600033A1 | 04 January 1996 (04-01-1996) |
| | | WO9605773A1 | 29 February 1996 (29-02-1996) |
| | | WO9617644A1 | 13 June 1996 (13-06-1996) |
| | | WO9621489A1 | 18 July 1996 (18-07-1996) |
| | | WO9630072A1 | 03 October 1996 (03-10-1996) |
| | | WO9630073A1 | 03 October 1996 (03-10-1996) |
| | | WO9632882A1 | 24 October 1996 (24-10-1996) |
| | | WO9639942A1 | 19 December 1996 (19-12-1996) |
| | | WO9640347A1 | 19 December 1996 (19-12-1996) |
| | | WO9640354A1 | 19 December 1996 (19-12-1996) |
| | | WO9720506A1 | 12 June 1997 (12-06-1997) |

## INTERNATIONAL SEARCH REPORT

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | WO9721462A1 | 19 June 1997 (19-06-1997) |
| | | WO9726034A1 | 24 July 1997 (24-07-1997) |
| | | WO9727799A1 | 07 August 1997 (07-08-1997) |
| | | WO9732623A1 | 12 September 1997 (12-09-1997) |
| | | WO9748434A1 | 24 December 1997 (24-12-1997) |
| | | WO9803213A1 | 29 January 1998 (29-01-1998) |
| | | WO9817187A1 | 30 April 1998 (30-04-1998) |
| | | WO9929251A1 | 17 June 1999 (17-06-1999) |
| | | WO02102231A2 | 27 December 2002 (27-12-2002) |
| | | WO02102231A3 | 15 May 2003 (15-05-2003) |
| | | WO2004028233A2 | 08 April 2004 (08-04-2004) |
| | | WO2004028233A3 | 24 June 2004 (24-06-2004) |
| US6036677A | 14 March 2000 (14-03-2000) | AU6347398A | 22 September 1998 (22-09-1998) |
| | | US6093177A | 25 July 2000 (25-07-2000) |
| | | US2002077654A1 | 20 June 2002 (20-06-2002) |
| | | WO9839045A1 | 11 September 1998 (11-09-1998) |
| WO2005065562A1 | 21 July 2005 (21-07-2005) | AT507789T | 15 May 2011 (15-05-2011) |
| | | AU2004312058A1 | 21 July 2005 (21-07-2005) |
| | | AU2004312058B2 | 02 December 2010 (02-12-2010) |
| | | CA2552165A1 | 21 July 2005 (21-07-2005) |
| | | CA2552165C | 22 October 2013 (22-10-2013) |
| | | DE602004032574D1 | 16 June 2011 (16-06-2011) |
| | | EP1706052A1 | 04 October 2006 (04-10-2006) |
| | | EP1706052B1 | 04 May 2011 (04-05-2011) |
| | | JP2007516795A | 28 June 2007 (28-06-2007) |
| | | JP4970049B2 | 04 July 2012 (04-07-2012) |
| | | MXPA06007624A | 30 January 2007 (30-01-2007) |
| | | US2005165388A1 | 28 July 2005 (28-07-2005) |
| | | US7655005B2 | 02 February 2010 (02-02-2010) |

# EXHIBIT 10

PTO/AIA/15 (10-17)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# UTILITY PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| *Attorney Docket No.* | **RFP026027USCON03** |
| *First Named Inventor* | **Gareth Davies** |
| *Title* | Methods and Devices for Puncturing Tissue |
| *Priority Mail Express® Label No.* | |

## APPLICATION ELEMENTS
*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:**

**Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450**

1. [✔] **Fee Transmittal Form**
(PTO/SB/17 or equivalent)

2. [ ] **Applicant asserts small entity status.**
See 37 CFR 1.27

3. [ ] **Applicant certifies micro entity status.** See 37 CFR 1.29.
Applicant must attach form PTO/SB/15A or B or equivalent.

4. [✔] **Specification**   [*Total Pages* 34  ]
Both the claims and abstract must start on a new page.
*(See MPEP § 608.01(a) for information on the preferred arrangement)*

5. [✔] **Drawing(s)** (35 U.S.C. 113)   [*Total Sheets* 23  ]

6. **Inventor's Oath or Declaration**   [*Total Pages* 8  ]
*(including substitute statements under 37 CFR 1.64 and assignments serving as an oath or declaration under 37 CFR 1.63(e))*

   a. [ ] Newly executed (original or copy)

   b. [✔] A copy from a prior application (37 CFR 1.63(d))

7. [✔] **Application Data Sheet**   * See note below.
See 37 CFR 1.76 (PTO/AIA/14 or equivalent)

8. **CD-ROM or CD-R**
in duplicate, large table, or Computer Program (*Appendix*)
   [ ] Landscape Table on CD

9. **Nucleotide and/or Amino Acid Sequence Submission**
*(if applicable, items a. – c. are required)*

   a. [ ] Computer Readable Form (CRF)

   b. [ ] Specification Sequence Listing on:

      i. [ ] CD-ROM or CD-R (2 copies); or

      ii. [ ] Paper

   c. [ ] Statements verifying identity of above copies

## ACCOMPANYING APPLICATION PAPERS

10. [ ] **Assignment Papers**
(cover sheet & document(s))
Name of Assignee _____
_____

11. [ ] **37 CFR 3.73(c) Statement**   [ ] **Power of Attorney**
(*when there is an assignee*)

12. [ ] **English Translation Document**
(*if applicable*)

13. [ ] **Information Disclosure Statement**
(PTO/SB/08 or PTO-1449)
   [ ] Copies of citations attached

14. [ ] **Preliminary Amendment**

15. [ ] **Return Receipt Postcard**
(*MPEP § 503*) (*Should be specifically itemized*)

16. [ ] **Certified Copy of Priority Document(s)**
(*if foreign priority is claimed*)

17. [ ] **Nonpublication Request**
Under 35 U.S.C. 122(b)(2)(B)(i). Applicant must attach form PTO/SB/35 or equivalent.

18. [ ] **Other:** _____
_____
_____
_____
_____

**\*Note:** (1) Benefit claims under 37 CFR 1.78 and foreign priority claims under 1.55 **must** be included in an Application Data Sheet (ADS).
(2) For applications filed under 35 U.S.C. 111, the application must contain an ADS specifying the applicant if the applicant is an assignee, person to whom the inventor is under an obligation to assign, or person who otherwise shows sufficient proprietary interest in the matter. See 37 CFR 1.46(b).

### 19. CORRESPONDENCE ADDRESS

[✔] The address associated with Customer Number: 48497    **OR**   [ ] Correspondence address below

| Name | |
|---|---|
| Address | |
| City | | State | | Zip Code | |
| Country | | Telephone | | Email | |

| | | | |
|---|---|---|---|
| Signature | /Glenn Arnold/ | Date | 8 Sep 2021 |
| Name (Print/Type) | Glenn Arnold | Registration No. (Attorney/Agent) | 65997 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.,* GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number PCT/IB2013/060287

filed on 20-Nov-2013

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Bogdan Beca                                      Date (Optional): 01-Feb-2016

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( *i.e.,* GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014  OMB 0651-0032
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number **PCT/IB2013/060287**
filed on **20-Nov-2013**

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Ferryl Alley                    Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( *i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number  **PCT/IB2013/060287**

filed on  **20-Nov-2013**.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application.  If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14).  Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

### LEGAL NAME OF INVENTOR

Inventor:  **Gareth Davies**                                  Date (Optional):

Signature:

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed.  Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( *i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number PCT/IB2013/060287

filed on 20-Nov-2013.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: John Paul Urbanski

Date (Optional):

Signature:

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | Methods and Devices for Puncturing Tissue |
| **First Named Inventor/Applicant Name:** | Gareth Davies |
| **Filer:** | Nir Lifshitz/Sabrina Mohess |
| **Attorney Docket Number:** | RFP026027USCON03 |

Filed as Large Entity

**Filing Fees for  Utility under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| UTILITY APPLICATION FILING | 1011 | 1 | 320 | 320 |
| UTILITY SEARCH FEE | 1111 | 1 | 700 | 700 |
| UTILITY EXAMINATION FEE | 1311 | 1 | 800 | 800 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | 1820 |

1

**Methods and Devices for Puncturing Tissue**

**CROSS REFERENCED APPLICATIONS**

[0001] The present application is a continuation of U.S. application 16/445,790, filed on June 19, 2019, which is a continuation of U.S. application 14/910,525, filed on February 5, 2016, which is a national phase entry of PCT/IB2013/060286, filed on November 20, 2013, which claims benefit of U.S. application 61/863,265, filed on August 7, 2013 and claims benefit of U.S. application 61/863,579 filed on August 8, 2013.

**TECHNICAL FIELD**

[0002] The disclosure relates to devices, systems and methods used to gain access to various tissue sites from particular access sites, and in particular to devices and associated methods used to access the left side of a heart via puncturing tissue.

**SUMMARY OF THE DISCLOSURE**

[0003]    In one broad aspect, embodiments of the present invention comprise a medical device for puncturing tissue at a tissue site. The medical device is an elongate member having a proximal section, a distal section, and a rail section therebetween. The medical device includes an active tip at a distal end of the distal section and is operable to deliver energy to create a puncture through the tissue. The rail section is configured to both act as a rail for supporting installation of one or more tubular members thereupon, as well as be maneuverable for enabling access to the tissue site.

[0004]    In the aforementioned embodiments, the distal section defines a distal section curved portion and a distal section straight portion, where the distal section straight portion is distal to the distal section curved portion. A further embodiment of the present invention has the elongate member comprising a reverse taper. The reverse taper increases in outer diameter from the distal end of the distal section curved portion to the distal section straight portion. In an embodiment of the present invention, the distal section defines a distal section curved portion configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture. Further, the coil is configured such that, upon deployment from a confined state, along an axis of advancement, the active tip curves away from the axis of advancement. Additionally, the distal section further comprises a distal section straight portion, distal to the distal section curved portion. The distal section straight portion includes the active tip. In some embodiments, the distal section straight portion has a length of about 3mm to 10mm. In some embodiments, the distal coil is configured as a double pigtail curve. In another embodiment of the present invention, the elongate member is a conductive guidewire. The electrically conductive guidewire is substantially covered by a layer of electrical insulation with a distal tip of the electrically conductive guidewire exposed. Further, the guidewire comprises an exposed portion on the proximal section for coupling to a source of electrical energy. In some embodiments, the active tip is substantially atraumatic. In some embodiments, the medical device includes a radiopaque marker positioned on the distal section. In another embodiment, the radiopaque marker comprises a helical coil around the elongate member at the distal section. In some embodiments, the active tip comprises an electrode. Further, the electrode is dome shaped.

2

**BRIEF DESCRIPTION OF THE DRAWINGS**

[0005] In order that the invention may be readily understood, embodiments of the invention are illustrated by way of examples in the accompanying drawings, in which:

[0006] Fig. 1 is an illustration of a system in accordance with an embodiment of the present invention;

[0007] Fig. 1A is an illustration of a dilator in accordance an embodiment of the present invention;

[0008] Fig. 1B is an illustration of a steerable sheath for use with a dilator in accordance with an embodiment of the present invention;

[0009] Fig. 1C is an illustration of a dilator in accordance with an alternate embodiment of the present invention;

[0010] Figs. 1D-1E illustrate a dilator within a steerable sheath in accordance with various embodiments of the present invention;

[0011] Figs. 2A-2C illustrate a dilator in use with a steerable sheath, in accordance with various embodiments of the present invention;

[0012] Figs. 3A-3E illustrate various distal tip configurations of a dilator in accordance with an embodiment of the present invention;

[0013] Fig. 4 illustrates an embodiment of a steerable sheath suitable for use with an embodiment of a dilator of the present invention;

[0014] Fig. 5A is a side view of an embodiment of a medical device, for example a multi-function guidewire of the present invention;

[0015] Fig. 5B includes side views of an internal metal wire of a multi-function guidewire in a straight configuration and a corresponding coiled configuration;

[0016] Fig. 5C is an exterior view of detail "A" of Fig. 5A;

[0017] Fig. 5D is a cross section view of detail "A" of Fig. 5A;

[0018] Fig. 5E is an exterior view of the distal section straight portion of a curved distal section;

[0019] Fig. 5F is a cut-away view of section A-A of Fig. 5D;

[0020] Figs. 6A-6D illustrate a wire and dilator used in conjunction with a steerable sheath, in accordance with embodiments of the present invention; and

[0021] Figs. 7A-7G illustrate a further embodiment of a method of using a system in accordance with embodiments of the present invention to perform a transseptal puncture from a superior access approach.

**DETAILED DESCRIPTION**

[0022] In some medical applications, it may be desirable to reach a desired target tissue site within a region of tissue within a patient's body in order for example, to provide access to a particular cavity or space. In some applications access to the cavity or space may be provided through a puncture that is created within the desired tissue site. In order to initially

reach the desired tissue site within the region of tissue, access may be provided into and/or through vasculature using a guidewire. A sheath and dilator assembly may then be advanced over the guide wire, and the sheath may be used to guide the dilator, as well as any other devices positioned through the assembly, to the desired target tissue site.

[0023] In some such applications, a particular access point into the patient's vasculature may be dictated by, for example, treatment requirements or anatomical considerations. For example, patients with occluded or stenosed vasculature may require an alternate access point. In addition, procedures such as lead placement dictate particular access points in order to allow implanted leads to be connected to a battery.

[0024] Thus, in certain procedures, a particular tissue puncture site is required while the access point into the vasculature is also restricted. In some such procedures, delivering treatment tools and assemblies from the access point to the tissue puncture site is difficult and/or may require many device exchanges due, for example, to the curvature and/or tortuosity of the vasculature within that region of the body.

[0025] For example, in some such applications, a very sharp or high curve or trajectory may be required to access the desired tissue site. In order to reach the desired tissue site, fixed curve sheaths or steerable sheaths may be utilized but both have drawbacks when used with current accessory devices.

[0026] In particular, where a fixed curve sheath is used, the fixed curve sheath may not be able to retain its curvature. This may be a result of a relatively stiff dilator and/or other devices inserted within the fixed curve sheath. As such, the sheath may not be able to position the dilator and/or any other device at the desired target tissue site.

[0027] In situations where a steerable sheath is utilized, upon actuation of the steerable sheath (in some such embodiments), the stiffness of the dilator, and/or any additional devices inserted through the steerable sheath, may limit or prevent the steerable sheath from reaching the intended or required curvature, thus preventing the steerable sheath from positioning the dilator and/or other devices at the target tissue site. Furthermore, stiffness of the dilator may result in breakage of the actuation mechanism of the steerable sheath upon actuation of the steerable sheath. In one particular example, the pull wires may separate from a distal joint within the sheath or may separate from the proximal lever or actuation mechanism of the steerable sheath. In other examples, the stiffness of the dilator may result in breakage of the pull wires upon actuation of the steerable sheath.

[0028] In addition, as mentioned above, puncturing certain tissue sites while being limited to particular access points also often requires exchanging devices multiple times, with each device performing a specific function during the course of the procedure. For example, current methods of accessing a heart chamber on the left side of the heart using a superior access approach require multiple device exchanges resulting in relatively inefficient and lengthy procedures. In a further example of procedural inefficiencies, existing techniques for gaining trannseptal access for delivery of cardiac leads generally require that the transseptal puncture and lead delivery be performed using different access points, necessitating, for example, either transferring the lead, or trying to re-locate the puncture site, and then installing the lead within the heart.

[0029] The present inventors have conceived and reduced to practice novel and unique devices (which may be referred to as "hybrid devices" in the description below) and associated methods to facilitate efficient and repeatable puncture of a plurality of tissue sites while allowing vascular access from various access points on a patient's body. These devices

4

include dilators and wires, for example guidewires, usable alone or in combination to facilitate this tissue access and puncture at various anatomical locations from desired access points.

[0030] For example, the present inventors have conceived and reduced to practice a flexible dilator that is usable in combination with an ancillary medical device (which may include a catheter, a fixed curve sheath or a steerable sheath), the dilator being designed and configured so that it does not substantially affect the curvature of the ancillary device.

[0031] Embodiments of a dilator of the present invention are sufficiently flexible to allow the ancillary device to guide and position the dilator and/or additional devices in a wide array of patient anatomies. Embodiments of the dilator accomplish this function by providing a flexible intermediate region having reduced stiffness. The location of the flexible region, when the dilator is inserted into/through the ancillary device, corresponds to a region of the ancillary device that is amenable to deflection or has a particular shape or curve, whereby the flexibility of the dilator at that location helps to ensure that the dilator does not substantially impair the ability of the ancillary device to retain, maintain or reach its intended shape or curvature. In some embodiments, the dilator, while being sufficiently flexible along the intermediate region, has sufficient stiffness along a distal end region to allow the dilator to be tracked or advanced across tissue for dilating a perforation or puncture at the desired target tissue site.

[0032] Relatedly, the present inventors have discovered, and reduced to practice, guidewire-based medical devices for puncturing a septum of the heart and for providing reliable and robust guidewire rail support across the puncture even when accessing the heart via veins superior to the heart (such as the subclavian veins). Such medical devices are sufficiently flexible to be directed towards the appropriate puncture site from the desired access point, yet are also stiff enough to support insertion of additional devices thereupon. In addition, embodiments of such devices include features for maintaining the medical device in position across the puncture to maintain patency of the puncture and to ensure continued access to tissue across the puncture.

[0033] Furthermore, the present inventors have conceived and reduced to practice methods of treatment that employ one or more novel devices for puncturing tissue sites utilizing defined access points and for performing multiple steps of the procedure to thereby reduce and/or minimize the number of device exchanges. In addition to improving efficiencies and reducing treatment procedure time, these methods allow for transseptal puncture and lead delivery to be performed using a single access point.

[0034] With specific reference now to the drawings in detail, it is stressed that the particulars shown are by way of example and for purposes of illustrative discussion of certain embodiments of the present invention only. Before explaining at least one embodiment of the invention in detail, it is to be understood that the invention is not limited in its application to the details of construction and the arrangement of the components set forth in the following description or illustrated in the drawings. The invention is capable of other embodiments or of being practiced or carried out in various ways. Also, it is to be understood that the phraseology and terminology employed herein is for the purpose of description and should not be regarded as limiting.

[0035] <u>Systems</u>

[0036] Fig. 1 is an illustration of a system 50 that incorporates embodiments of devices of the present invention and that may be utilized during the course of an inventive procedure as described further hereinbelow. As illustrated, system 50

includes a steerable device such as steerable sheath 300 with dilator 100 inserted therein, and wire 200 inserted into dilator 100. Steerable sheath 300 and dilator 100 each defines a respective lumen through which devices may be inserted, and may therefore be referred to as "tubular members". Although a steerable sheath is discussed throughout this application, it will be evident to one of skill in the art that other steerable devices or articulating components may be used. For ease of explaining the fundamental principles of the invention, "Steerable Sheath" will be used throughout the specification as an example of a steerable or articulating device. Alternatively, in some embodiments, a fixed curve sheath may be utilized in place of an articulating sheath, depending on the access point and tissue puncture site chosen by a user.

[0037] Wire 200 is connected to a generator 500 by connector 502. Steerable sheath 300 includes a steerable sheath handle 302. In some embodiments, the steerable sheath is unidirectional i.e. it allows deflection in a single direction. In other embodiments, a bi-directional sheath may be used. In the exemplary applications disclosed below, an 8.5 French steerable sheath with a 40 cm usable length is typically used; procedures for larger patients may use a sheath with a 45 cm usable length or other lengths as may be appropriate. Fig. 1(i) shows an expanded view of a portion of heart 400 illustrating a distal portion of steerable sheath 300, distal tip 106 of dilator 100, and wire 200, which may be a radiofrequency puncture wire.

[0038] Dilators

[0039] In accordance with one embodiment of the present invention, as shown in Fig.1A, a flexible dilator 100 is disclosed for use with a steerable sheath 300 (shown in Fig. 1B) to access a region of tissue within a patient's body. The steerable sheath 300 has a range of deflection angles and can achieve a range of curvatures upon actuation. Referring again to Fig. 1A, the dilator 100 comprises a dilator hub 102 that is coupled to an elongate member 120 that comprises regions of varying flexibility including an intermediate region 100b that terminates in a distal end region 100a. In accordance with an embodiment of the present invention, the intermediate region 100b is a substantially flexible or soft section that provides minimal resistance to deflection and is operable to be deflected under guidance to allow the dilator 100 to reach a desired site within a region of tissue within the patient's body to facilitate advancement of the distal end region 100a there-through. The flexible intermediate region 100b allows the dilator 100 to conform to the curvature of the steerable sheath 300 that is achieved through actuation of the steerable sheath 300. Thus, in some embodiments, as outlined herein, the flexible intermediate region 100b does not inhibit the range of motion of the steerable sheath 300.

[0040] Additionally, the elongate member 120 of the dilator 100 further comprises a distal end region 100a that is formed distally adjacent to the flexible intermediate region 100b, such that the flexible intermediate region 100b continues distally until (and terminates at) a proximal boundary or edge of the distal end region 100a. In other words the distal end region 100a extends proximally from the distal edge of the dilator 100 until a distal edge of the flexible intermediate region 100b. The distal end region 100a has a stiffness or rigidity that is greater than the flexible intermediate region 100b to facilitate advancement of the dilator 100 through the tissue once the dilator 100 has been positioned at the desired tissue site, such as a desired puncture site. The stiff or substantially rigid distal end region 100a provides enhanced pushability and may prevent deformation thereof during advancement of the distal end region 100a through the tissue (for example over a guide-wire or a puncturing device), for example at the puncture site in order to dilate the puncture site.

6

[0041] In one particular example, the elongate member 120 and the hub 102 may be formed, for example using techniques as may generally be known in the art, such as molding techniques. In some embodiments, the distal end region 100a is formed from a rigid polymer, and the intermediate region 100b is formed from a flexible polymer. In one particular embodiment, the rigid distal end region 100a is formed from High Density Polyethylene (HDPE) and the flexible or soft intermediate region 100b is formed from Low Density Polyethylene (LDPE). In some embodiments, the flexible intermediate region 100b may be formed from a material that exhibits sufficient flexibility to enable the flexible intermediate region 100b to conform to the curvature of a steerable sheath 300 and substantially does not impair, limit or inhibit the ability of the steerable sheath 300 to reach its intended curvature. Additionally, the rigid distal end region 100a is formed from a material that exhibits sufficient rigidity that to enable the rigid distal end region 100a to be advanced through a tissue site such as through a puncture site within a region of tissue. Thus, dilator 100 can be understood to be a hybrid device in that it is sufficiently flexible to be guided to the tissue site yet maintains sufficient rigidity to be advanced through the tissue site.

[0042] As outlined previously, in accordance with an embodiment of the present invention, a dilator 100 is provided that is usable with a steerable sheath 300 to access a region of tissue within a patient's body. The steerable sheath 300 may be of the type shown in Fig. 1B comprising an articulating portion or deflectable region 200b that is amenable to deflection upon actuation of a steerable actuation mechanism for example such as a knob of a handle 302. During use, the dilator 100 is inserted within the steerable sheath 300 for use therewith such that a location or position of the flexible intermediate region 100b of the dilator 100 corresponds to the articulating portion or deflectable region 200b of the steerable sheath. This enables the steerable sheath 300 to reach its allowable range of curvatures or deflection (as shown and discussed later with reference to Figs. 2A-2C), upon actuation, as minimal resistance is introduced by the dilator 100. In other words, the flexible intermediate region 100b of the dilator does not impart rigidity to the steerable sheath 300 as the dilator 100 is being steered by the steerable sheath 300. This enables the steerable sheath 300 to position the distal end region 100a of the dilator 100 at a desired target location within a region of tissue such as at a desired puncture location or site to enable the distal end region 100a to subsequently advance there-through for example to dilate the puncture site.

[0043] In one particular embodiment, with reference to Fig.1A, dilator 100 further comprises a proximal region 100c that forms a part of elongate member 120 of dilator 100. The proximal region 100c extends proximally from the flexible intermediate region 100b. More specifically, the proximal region 100c extends proximally from a proximal boundary of the flexible intermediate region 100b and may extend until the hub 102. In some embodiments the proximal region 100c may also be formed from a flexible material and exhibits flexibility. Alternatively, in other embodiments, as shown in Fig. 1C, the flexible intermediate region 100b may extend along the proximal region 100c and may include the proximal region 100c. In some such embodiments, the flexible intermediate region 100b may have varying regions of flexibility. In some examples, a proximal region 100c is provided that is flexible as this may be desirable in certain applications. In some examples, flexibility of the dilator 100 in the proximal region 100c may lead to buckling observed in segment 112 of the proximal region 100c of the dilator 100 as the dilator is inserted into the steerable sheath 300, as shown in Fig. 1D. In some such embodiments, it may be desirable to provide stiffness or rigidity to the device proximal region 100c in order to make the dilator 100 less susceptible to buckling.

[0044] Therefore, in some embodiments as shown in Fig. 1E, a dilator 100 is provided where the proximal region 100c has a rigidity that is greater than that of the flexible intermediate region 100b. In some embodiments, the rigid proximal region 100c is formed from a material that exhibits sufficient rigidity to enable the rigid proximal 100c to be advanced through the steerable sheath 300 substantially without buckling or deforming. The rigidity of the dilator 100 in the proximal region 100c reduces the likelihood of the dilator bending or deforming as it is being inserted into the steerable sheath 300 during a procedure. In some embodiments, the distal end region 100a and the proximal region 100c have substantially the same rigidity. In a particular embodiment, the rigid distal end region 100a and the proximal region 100c are formed from a rigid polymer and the flexible intermediate region is formed from a flexible polymer. In one example, the rigid distal end region 100a and the proximal region 100c comprise substantially the same stiffness. In other embodiments, the rigidity of the rigid distal end region 100a and the proximal region 100c may differ. In one particular embodiment, the rigid distal end region 100a and the proximal region 100c are formed from High Density Polyethylene (HDPE ) having a stiffness that is equal to about 0.8 GPa, whereas, the flexible intermediate region 100b is formed from Low Density Polyethylene (LDPE) having a stiffness of about 0.3 GPa.  In other embodiments, the flexible and rigid regions of the dilator maybe formed from PEBAX® with different durometers of PEBAX® being used for the respective flexible and rigid regions.

[0045] In some embodiments, the dilator 100 has a usable length (i.e. the length of the elongate member 120) that is between about 60 cm to about 100 cm. More specifically, in one example, the dilator has a usable length of between about 67 cm and 68 cm.  In a specific example of this, the dilator has a usable length of about 67.6 cm. In another example, the dilator has a usable length of between about 70 cm to about 71 cm. In a specific example of this, the dilator has a usable length of about 70.6 cm.

[0046]  In some such embodiments, the flexible intermediate region 100b has a length of between about 7 cm to about 15 cm. In one particular example, the flexible intermediate region has a length of about 15 cm.

[0047] In some embodiments, the distal end region 100a has a length of between about 0.4 cm to about 4.0 cm. In a specific embodiment, the distal end region 100a has a length of about 0.5 cm to about 1 cm. In a particular example of this, the distal end region 100a has a length of between about 0.6 cm to about 0.7 cm. In a specific example, the distal end region has a length equal to about 0.7 cm. In some embodiments, the rigid distal end region 100a has a length of between about 2.5 % to about 60% of the length of the flexible intermediate region.

[0048]  In some embodiments, the rigid proximal section 100c may have a length of between about 41 cm to about 92 cm. In one particular embodiment, the proximal end section 100c has a length of about 51 to about 52 cm. In a specific example of this, the proximal end section has a length of about 51.9 cm.

[0049] With reference now to Figs. 2A-2C, various embodiments of a steerable sheath 300 are shown with the dilator 100 inserted there-through.  In some embodiments, once the dilator 100 has been inserted through the steerable sheath 300, the dilator 100 extends by a distance, for example about 3 cm, distally beyond the distal end or tip of the steerable sheath 300 (more specifically, beyond the distal end/edge of the steerable sheath 300). In some embodiments, the dilator extends by between about 2 cm to about 4 cm beyond the distal edge of the steerable sheath 300. In some embodiments, the steerable sheath 300 has a usable length 201 that is between about 45 cm to about 71 cm.

8

[0050] In one specific example, with reference now to Fig. 2A, the steerable sheath 300 is an 8.5 French unidirectional steerable sheath, that has a deflectable region or articulating portion 200b operable to adopt a curve S having an angle of about 180 degrees and a having a radius of curvature of about 8.5 mm. Alternatively, in the example as shown in Fig. 2B, the deflectable region or articulating portion 200b of the steerable sheath 300 is operable to adopt a curve M having a radius of curvature of about 11 mm. In another example as shown in Fig. 2C, the deflectable region or articulating portion 200b of the steerable sheath 300 is operable to adopt a curve L, having a radius of curvature equal to about 25 mm.

[0051] With reference again to Figs. 2A to 2C, in some embodiments, the usable length 201 of the steerable sheath 300 is equal to about 45 cm. In some such embodiments, the steerable sheath 300 is used with an 8.5 French flexible dilator 100 having a usable length of about 67 cm and comprising a flexible intermediate region 100b with a length of about 15 cm. Thus, in accordance with various embodiments of the present invention, a steerable sheath 300 and dilator 100 are provided that work in conjunction with each other, with the steerable sheath 300 and dilator 100 having suitable lengths and sizes (including inner and outer diameters) that are usable to reach a desired region of tissue when inserted through the vasculature.

[0052] With reference now to Figs. 3A-3D, various dilator distal tip configurations are shown with alternative distal end regions 100a. In the particular example shown in Fig. 3A, the dilator 100 comprises a taper 122 along a distal end of the dilator 100, forming a tapered distal tip 106. In the example shown, the distal end region 100a extends partially along the length of the taper 122 and as such forms a part of the taper 122. In a specific example of this, the taper 122 has a length of about 1cm. In one such example the rigid distal end region 100a has a length of about 0.7 cm. In another such example, the rigid distal end region 100a has a length of between about 0.3 cm to about 0.5 cm.

[0053] Figs. 3B, 3C and 3D illustrate alternative configurations for the tapered distal tip 106. As shown in Fig. 3B, in some embodiments, the distal end region 100a may extend along the entire length of the taper 122. In a further example of this, as shown in Figs. 3C and 3D, the distal end region 100a may additionally extend further proximally along the elongate member 120, beyond the taper 122.

[0054] Fig. 3C illustrates a dilator 100 that is an 8.5 French dilator that tapers down to an outer diameter (OD) of about 0.046" (about 1.2 mm) and an inner diameter (ID) of about 0.036" (about 0.9 mm), along the tapered distal tip 106. In a specific example, the taper 122 has a length of about 2 cm. In some such embodiments, the distal end region 100a has a length of about 3cm and is formed from HDPE, whereas the flexible intermediate region is formed from LDPE. The dilator 100 may be formed from a re-flow of the two polymers, HDPE and LDPE, in a glass die via lap joining.

[0055] Additionally, Fig. 3D illustrates a dilator 100 that has a distal tip 106 that comprises a double taper configuration. In one specific example, the dilator 100 is an 8.5 French dilator that tapers down to about 5.6 French along a first tapered region R1, with the first tapered region R1 having a length of about 1 cm. The dilator 100 then tapers from about 5.6 French to an outer diameter (OD) of about 0.046" and an inner diameter (ID) of about 0.036", along a second tapered region R2, with the second tapered region have a length of about 1 cm. In one specific example, the distance between the first and second tapered regions R1 and R2 is also equal to about 1 cm. In one such example, the distal end region has a length of about 4 cm. The dual taper configuration may provide greater feedback during dilation and may allow the user

to feel the tactile feedback (in the form of a pop) associated with each of the first and second tapered regions R1 and R2. The dual taper configuration may be formed in a similar manner to above, using a glass tipping die via lap joining.

[0056] In some embodiments, the dual taper distal tip configuration shown in Fig. 3D may require less force to advance it through a tissue site (for example, through a puncture within a region of tissue) than a single taper distal tip configuration, as shown Figs. 3B and 3C. Furthermore, in some examples, a longer taper length (as shown and discussed with respect to Fig. 3C) may require less force to be advanced through tissue than a shorter taper length (as shown in Fig. 3A). The longer taper provides a lower slope and hence a smoother transition. Additionally, the longer taper length may prevent high mechanical resistance when the dilator is advanced through a puncture site and may prevent the dilator from slipping away from the puncture site. Additionally, in examples where the dilator is used to dilate a puncture within a septum of the heart (where access is provided through the right atrium and an RF wire is used to create the puncture as described further below), the longer taper length may prevent the RF wire from being pulled back into the right atrium of the heart and losing the puncture site and thus may help prevent the need to create a second puncture.

[0057] Furthermore, in some embodiments, the dilator 100 comprises a straight dilator that substantially lacks a curvature. In other words, the dilator 100 has a substantially straight configuration along each of the rigid proximal region 100c, the flexible intermediate flexible portion 100b and the rigid distal end region 100a. During use, the straight dilator 100 does not impart a curvature to the steerable sheath 300 to enable the steerable sheath 300 to reach its desired curvature upon actuation. This allows the steerable sheath 300 to position the distal end region 100a at a desired target location, for example at a desired puncture site to enable the distal end region 100a to advance there-through to dilate a puncture once it has been formed. Therefore, the straight dilator 100 does not interfere with or affect the intended curvature of the steerable sheath 300 and thus does not inhibit the desired range of motion of the steerable sheath 300. In accordance with an embodiment of the present invention, the dilator 100 comprises both a straight configuration and a flexible or soft intermediate region 100b, and the combination provides a synergistic or combined effect preventing the dilator 100 from inhibiting the range of movement of the articulating portion or deflectable region 200b of the steerable sheath 300. This may allow the steerable sheath 300 to guide the dilator 100 to access a region of tissue within a patient's body such as for example an area of the heart.

[0058] In a specific example, as shown in Fig. 3E, a dilator 100 is provided that is an 8.5 French dilator. Along the proximal region 100c and flexible intermediate region 100b (not including the taper 122), the dilator has an outer diameter (OD) that is equal to about 0.111" +/- 0.002" and an inner diameter (ID) that is equal to about 0.058" +/- 0.002", that tapers down along the tapered distal tip 106 to an outer diameter of about 0.044" +/- 0.001" and an inner diameter of about 0.036" +/- 0.001" at the distal boundary or edge of the distal tip 106. This allows the dilator 100 to be compatible with a 0.035" OD guide-wire. Furthermore, the taper 122 along the tapered distal tip 106 has a length of about 1cm and the rigid distal end region 100a has a length of about 0.7cm. In one such example, the dilator 100 has a usable length of about 67.6 cm, with the flexible intermediate region 100b having a length of about 15 cm, with the rigid proximal region 100c having a length of about 51.9 cm. In one particular embodiment, the rigid distal end region 100a and the proximal region 100c are formed from High Density Polyethylene (HDPE) having a stiffness of 0.8 GPa, whereas, the flexible intermediate region 100b is formed from Low Density Polyethylene (LDPE) having a stiffness of about 0.3 GPa. In the example described herein, the dilator 100 comprises varying regions of flexibility (i.e. flexible and rigid regions), and

since the dilator 100 comprises a fairly constant OD and ID, the behavior or various regions, in terms of rigidity, is governed by the stiffness of the materials used.

[0059] In embodiments described herein, the flexural rigidity value of the dilator 100 is the product of Young's modulus $E$ (in Pa) [also known as the flexural modulus) which indicates stiffness of a material, and the second moment of area (or area moment of inertia I) (in $m^4$), having SI units of $Pa \cdot m^4$ which also equals $N \cdot m^2$. The area moment of inertia I may be calculated from the values of the inner diameter (ID) and the outer diameter (OD) by a person skilled in the art using the formula $[I=\pi/64(OD^4-ID^4)]$. In one particular example discussed herein, the flexural rigidity value is calculated to be 0.0023 $N \cdot m^2$ for the flexible intermediate region 100b comprising LDPE and 0.00086$N \cdot m^2$ for the rigid proximal region 100c comprising HDPE. In some embodiments, the ID of the dilator 100 along the flexible intermediate region 100b and the rigid distal end 100a (not including the taper), ranges from between about 0.056" to about 0.06". In some such embodiments, the OD of the dilator 100 along the flexible intermediate region 100b and the rigid distal end 100a (not including the taper), ranges from between about 0.109" to about 0.113". In some embodiments, the flexible intermediate region 100b comprising LDPE, has a rigidity that ranges from between about 0.00030 $N \cdot m^2$ to about 0.0014 $N.m^2$, and the rigid distal end region 100a comprising HDPE has a rigidity that ranges from between about 0.0015 $N.m^2$ to about 0.0046 $N.m^2$.

[0060] In one particular example, the dilator 100 is usable with a steerable sheath 300 that is an 8.5 French unidirectional steerable sheath, as shown in Fig. 2A, that has a deflectable region or articulating portion 200b that is operable to deflect with a curve S having an angle of about 180 degrees and with a radius of curvature of about 8.5mm. The steerable sheath 300 has a length equal to about 45 cm. In one particular example, the steerable sheath 300 may be a SUREFLEX™ Steerable Sheath sold by Baylis Medical Company Inc., as shown in Figure 4. The steerable sheath 300 comprises a metal wire braid comprising a High Tensile 304v Stainless Steel 0.002" x 0.006" with a polymer jacket disposed thereon, and an inner PTFE liner. The polymer jacket comprises sections of PEBAX and Nylon with varying durometers (D) and lengths. The deflectable portion of the steerable sheath 300 is indicated by reference number 200b.

[0061] In one such embodiment, a steerable sheath assembly is described with the dilator 100 being inserted within the steerable sheath 300. In a particular example of this, the steerable sheath 300 is actuated to reach an angle of about 90 degrees. In one such example, the actual observed deflection of the steerable sheath 300 is equal to about 80 degrees. Thus, the steerable sheath 300 is able to reach about 88.8% of its intended curvature. As such the dilator 100 allows the steerable sheath 300 to substantially reach its intended curvature. Conversely, unlike the embodiments of the present invention, when a rigid HDPE dilator with similar dimensions is used (i.e. a dilator with similar ID and OD that comprises entirely of HDPE) the steerable sheath 300 is only able to reach a 45 degree curvature which is about half of the intended curvature.

[0062] In an additional example, the steerable sheath 300 is actuated to reach a deflection angle of about 180 degrees, however, an actual deflection equal to about 140 degrees is observed. Thus, the steerable sheath 300 is able to reach 77.8% of its intended curvature. Contrary to this, when the steerable sheath 300 is used with a rigid HDPE dilator, the steerable sheath 300 is only able to reach a 90 degree curvature.

[0063] In still an additional example, the steerable sheath 300 is actuated to reach a deflection angle of about 250 degrees with the actual observed deflection being equal to about 180 degrees. Thus, the steerable sheath is able to reach about 72% of its intended curvature. On the other hand, when the steerable sheath 300 is used with a rigid HDPE dilator, the steerable sheath 300 is only able to reach a curvature of about 110 degrees.

[0064] As such, in the examples outlined above, the flexible intermediate region 100b of dilator 100, in accordance with an embodiment of the present invention, substantially does not inhibit the range of motion of the steerable sheath 300, allowing the steerable sheath 300 to reach its intended shape or curvature in order to access a desired tissue site within a region of tissue within a patient's body. Thus, in some embodiments the dilator 100 allows the steerable sheath to reach a curvature that is equal to at least about 70% of its intended curvature. In other embodiments the dilator 100 allows the steerable sheath to reach a curvature that is equal to greater than about 50% of the intended curvature.

[0065] In one particular embodiment, the dilator 100 is usable with an ancillary device such that it allows the ancillary device to maintain or reach its intended shape or curvature in order to access a desired tissue site within a region of tissue within a patient's body. The dilator 100 may be of the type described herein above, that comprises a rigid distal end region 100a and a flexible intermediate region 100b terminating at the distal end region 100a, with the rigid distal end region 100a having a rigidity greater than the flexible intermediate region 100b to enable the dilator 100 to advance through tissue. The dilator 100 is configured for use in conjunction with the ancillary device such that during use, the flexible intermediate region 100b corresponds to a region of the ancillary device that is functional for imparting or providing a curvature. In one particular example, the dilator 100 is advanced over or through the ancillary device such that such that during use the flexible intermediate region 100b of the dilator 100 does not affect the region of the ancillary device that is functional for imparting a curvature, allowing the ancillary device to substantially maintain or reach its intended position or shape in order to position the dilator rigid distal end region 100a at a desired location within the region of tissue.

[0066] In one such example, the ancillary device comprises a steerable device such as a sheath, catheter or guide-wire that is steerable, where the ancillary device is functional for imparting a curvature by actuation of the ancillary device. When in use in conjunction with the dilator 100, the flexible intermediate region 100b of the dilator does not inhibit or prevent the ancillary device from reaching its intended curvature upon actuation to position the dilator distal end region 100a at a desired location.

[0067] Alternatively in some embodiments, the ancillary device comprises a fixed curve device such as a fixed curve sheath that has a preformed curve. Similar to embodiments discussed previously herein, the fixed curve sheath is usable with the dilator 100 and during use the flexible intermediate region 100b of the dilator 100 does not affect the preformed curvature of the sheath, thus allowing the sheath to position the rigid distal end 100a of the dilator 100 at the desired location within the region of tissue. Furthermore, the use of the dilator 100, in accordance with an embodiment of the present invention, may prevent the need for over curving the sheath in anticipation of a substantial decrease in curvature of the sheath once the dilator 100 there-through.

[0068] In one such example, a fixed curve sheath is described with the dilator 100 being inserted therein. The fixed curve sheath has a pre-formed curve with an angle of about 40 degrees. Once the dilator 100 is positioned through the fixed curve sheath, the curvature of the sheath is observed to be about 32 degrees. Thus, the fixed curve sheath is able to

maintain its curvature at about 80% of the intended curvature. As such the dilator 100 allows the fixed curve sheath to substantially maintain its intended curvature. Contrary to this, if a rigid HDPE dilator is utilized, unlike embodiments of the present invention (as described previously herein above), the curvature of the fixed curve sheath is reduced to about 22.5 degrees.

[0069] Similarly in another example, a fixed curve sheath is described that has a pre-formed curvature with an angle of about 135 degrees. Once a dilator 100, is inserted through the sheath in accordance with an embodiment of the present invention, the observed angle of curvature of the fixed curve sheath, is equal to about 112 degrees. Thus, the fixed curve sheath 300 is able to maintain a curvature that is equal to about 77.8 % of its intended curvature. Contrary to this, if a rigid HDPE dilator is utilized, unlike embodiments of the present invention, the curvature of the fixed curve sheath is reduced to about 78 degrees. Thus, in some such embodiments, the fixed curve sheath is able to maintain an angle of curvature that is greater than about 60% of its intended curvature. In other embodiments, the fixed curve sheath is able to maintain an angle of curvature that is equal to at least about 75% of its intended curvature.

[0070] As outlined above, in some embodiments described herein above, the dilator 100 comprises varying regions of flexibility (i.e. rigid and flexible regions) to define a hybrid medical device. Since the dilator 100 comprises a fairly constant OD and ID and thus fairly constant wall thickness along its length, the behavior of the various regions, in terms of rigidity, is governed by the stiffness of the materials used. For example, the higher the stiffness of a material, the greater the rigidity, and the lower the stiffness of the material the lower the rigidity. Alternatively, in other embodiments, a single material may be used to form the dilator where the varying regions of flexiblity are provided by varying the wall thickness along the respective regions. For example, an HDPE dilator may be provided with a relatively thin wall thickness along the flexible intermediate region and a relatively thicker wall thickness along the distal end region, in order to provide a dilator with the functionality described previously hereinabove.

[0071] Puncture devices

[0072] In accordance with further embodiments of the present invention, as described hereinabove, Figures 5A-5F illustrate embodiments of a medical device operable to be guided to a tissue site to puncture tissue and to function as a rail for installing devices thereupon. Such embodiments provide efficiencies to medical procedures in which they are utilized as they perform multiple functions and thereby reduce the amount of device exchanges that need to be performed. The "hybrid" medical devices described herein further facilitate the access and puncture of a tissue site upon insertion at a particular access site on a patient's body, as described hereinabove.

[0073] With reference to Fig. 5A, an embodiment of a medical device, referred to herein as multi-function guidewire 200, is shown. Multi-function guidewire 200 includes an elongate member which comprises a proximal section 206 which is typically curved, a rail section 204, and a distal section 202 which is also typically curved. Multi-function guidewire 200 is sufficiently flexible to enable access to heart tissue, such as a septum, from, for example, an inferior approach or a superior approach. Thus, multi-function guidewire 200 allows access to a particular tissue site from one of several vascular access sites. While certain aspects and features of the multi-function guidewire 200 will be presently described with reference to one specific application, namely creating a puncture in a heart septum, it will be understood by those of

skill in the art that the medical device described herein is usable in various applications and its utility is not limited to this particular procedure.

[0074] An active tip 208 (shown in detail in Fig. 5E) at the distal end of the distal section 202 is operable to deliver energy for puncturing tissue such as a heart septum to create a puncture site through which distal section 202 and the distal part of rail section 204 can be advanced, for example to enter the left atrium. Once advanced through the puncture site, distal section 202 is biased to form a coil for anchoring multi-function guidewire 200 beyond the puncture site. Typically, when distal section 202 is advanced out of a dilator and beyond the septum to curl up into a coil in the left atrium, the distal end of the rail section will have been advanced into the left atrium i.e. in order for the distal section to form a coil, rail section 204 is typically advanced into the left atrium to define a rail thereto. In some embodiments, particularly for use in accessing the left atrium, the distal section 202 is sized such that when it forms a coil in the left atrium, the coil will not be accidentally advanced into openings adjacent the left atrium, such as a left pulmonary vein or a mitral valve. Once the guidewire is anchored, rail section 204 functions as a substantially stiff rail for supporting the installation of one or more tubular members thereupon and for advancing devices into the heart. In typical embodiments, rail section 204 includes a metal wire 212 (Fig. 5B) which is fabricated of spring tempered steel. In some embodiments, for example when accessing the heart from a superior approach, the rail is sufficiently flexible to bend about 180° and yet maintains sufficient rigidity to function as a rail for advancing devices thereover. Additionally, the flexibility of rail section 204 enables it to be maneuvered (for example, by a steerable sheath) to access a tissue site. Thus, as described with respect to dilator 100 above, a medical device such as multi-function guidewire 200 can be understood to be a "hybrid" device, having sufficient flexibility to be positioned at a tissue site from a particular access site, while being sufficiently rigid to function as a rail for installation of other devices thereupon.

[0075] In some embodiments of the multi-function guidewire 200, rail section 204 has a length of about 700 mm to about 1750 mm to enable access to the tissue site. In some embodiments, the rail section has a length of between about 1200 and 1300 mm, more particularly about 1240 mm. Typically, as shown in Fig. 5B, the rail section has a constant diameter in maximum rail portion 234 and tapers distally in tapered rail portion 236. In some examples, the rail section (including metal wire 12 and insulation 214, described further hereinbelow) has an outer diameter of about 0.86 mm (0.034 inches) at its proximal end (i.e. at maximum rail portion 234) and about 0.71 mm at its distal end (i.e. at the distal end of tapered rail portion 236). In some such embodiments, the diameter of the guidewire elongate member is constant throughout maximum rail portion 234. In some embodiments, the upper limit for the outer diameter of the proximal end of the rail section (including metal wire 12 and insulation 214) is about 1.1 mm and the lower limit of the outer diameter of the distal end of rail section 204 (distal end of tapered rail portion 236) is about 0.6 mm. In some alternative embodiments, the outer diameter tapers in maximum rail portion 234.

[0076] The proximal section 206 is biased to a coiled configuration for improved handing of the medical device, for example to avoid interfering with users of the device such as doctors, nurses and other medical personnel. In some embodiments, the proximal section is biased to assume a spiral-shaped coil, while in other embodiments; it is biased to assume a constant diameter coil (i.e. the diameter across the entire coil is substantially constant). In some embodiments, proximal section 206 has a length of about 150 to about 600 mm. In one specific example, proximal section has a length of about 500 mm.

[0077] For ease of illustration of the primary sections of multi-function guidewire 200, these sections are shown in Fig. 5B, as follows: the lower part of the figure shows the wire 212 of guidewire 200 in a typical configuration in use, with both distal section 202 and proximal section 206 adopting a coil shape, while the upper portion of the figure shows the wire 212 in a straight configuration. The divisions between the different sections of multi-function guide-wire 200 are shown by construction lines between the top and bottom drawings, with the exception of the two end parts, proximal section straight portion 215 and distal section straight portion 216.

[0078] Referring to the straight configuration wire shown in the upper part of Fig. 5B, proximal section 206 includes proximal section straight portion 215 and proximal section curved portion 232. Typically, wire 212 has a constant diameter in proximal section 206. Transition portion 222 is located between proximal section 206 and rail section 204. The diameter of wire 212 increases distally through transition portion 222. Referring to the coiled configuration of wire 212, shown in the lower part of Fig. 5B, proximal section straight portion 215 is shown at the bottom of the coil formed by proximal section 206. The proximal end of straight portion 215 includes an exposed portion 212a of electrically conductive wire 212.

[0079] Rail section 204 includes maximum (or 'constant-diameter') rail portion 234 and tapered rail portion 236. Typically, maximum rail portion 234 has a constant diameter along its length which generally corresponds to the largest diameter of the wire. In some embodiments, the diameter of wire 212 tapers distally through tapered rail portion 236.

[0080] Distal section 202 is distal of rail section 204 and includes distal section curved portion 226 and distal section straight portion 216. Distal section straight portion 216 is shown, in the lower portion of Fig. 5B, inside of the coil formed by distal section 202.

[0081] Typically, wire 212 is comprised of spring tempered stainless steel.

[0082] In some embodiments, wire 212 of the rail section has an outer diameter of about 0.64 mm (more specifically, 0.6 mm) at maximum rail portion 234 and at a proximal end of the tapered rail portion 236 (i.e. the diameter is constant in maximum rail portion 234); and an outer diameter of about 0.5 mm at a distal end of tapered rail portion 236 of the rail section 204. More broadly, embodiments of the wire 212 of the rail section have an outer diameter ranging from about 0.89 mm and to about 0.36 mm, or about 0.9 mm to about 0.3 mm, with the diameter of wire 212 typically being constant in maximum rail portion 234. In alternative embodiments, the outer diameter tapers in maximum rail portion 234.

[0083] In some embodiments, the proximal end of rail section 204 (i.e. the proximal end of maximum rail portion 234) of wire 212 has a stiffness of 2119 N/m or less. In some embodiments, the distal end of tapered rail portion 236 has a stiffness of 118 N/m or more. Typically, the stiffness is constant throughout the length of maximum rail 234, but it may decrease distally in alternative embodiments. In one example, the proximal end of rail section 204 (the proximal end of maximum rail portion 234) has a stiffness of about 550 +/- 5 N/m, more specifically 552 N/m, and the distal end of tapered rail 236 has a stiffness of about 200 +/- 5 N/m, more specifically 204 N/m, to enable the rail section to be bendable by at least 180 degrees and to function as a rail for supporting installation of one or more tubular members thereupon. In another embodiment, the rail section has a stiffness of between about 100 N/m to about 600 N/m. It should be noted that the stiffness values noted herein are derived using a 3-point bend test over a 50 mm span, as would be understood to those of skill in the art.

[0084] For ease of understanding, a table of correspondence is included for converting certain of the stiffness measurements included herein to normalized flexural rigidity:

| Wire diameter (mm) | Stiffness in three point bending over span of 50 mm (N/m) | Flexural rigidity (N*m^2) |
|---|---|---|
| 0.635 | 552 | 1.4E-3 |
| 0.5 | 204 | 5.3E-4 |
| 0.89 | 2119 | 5.5E-3 |
| 0.43 | 118 | 3.1E-4 |
| 0.157 | 2.1 | 5.4E-6 |
| 0.127 | 0.88 | 2.0E-6 |

[0085]

[0086] The diameter of wire 212 (and thereby multi-function guide-wire 200) decreases distally along distal section curved portion 226 of the distal section, and alternately decreases and increases distally in distal section straight portion 216 (explained below, with reference to Fig. 5F).

[0087] In typical embodiments, a layer of electrical insulation 214 (Fig. 5D) covers electrically conductive wire 212, with the exception of active tip 208 at the distal end of multi-function guide-wire 200 and an electrically exposed portion 212a at the proximal end of the guidewire, both of which remain electrically exposed. Exposed portion 212a is part of proximal section straight portion 215 and is operable to be electrically connected to an electrosurgical generator. Proximal section straight portion 215 facilitates loading/installation of over-the-wire devices (e.g. tubular members) onto the multi-function guidewire.

[0088] Fig. 5C is an exterior view of detail "A" of Fig. 5A showing distal section 202. The distal section 202 includes a distal section straight portion 216 which is distal of a distal section curved portion 226. Distal section straight portion includes active tip 208. In some embodiments, a length of distal section 202 is about 30 mm to about 150 +/- 10 mm. In some embodiments, a length of the distal section is about 125 mm.

[0089] Distal section 202 is configured such that when it is advanced through a puncture site in tissue, such as cardiac structures, it assumes a coiled configuration whereby the active tip 208 is directed away from the tissue, and is positioned at a predetermined distanced from electrically insulated portions of distal section 202. Distal section straight portion 216 of distal section 202 advances forward along a substantially straight path (the "axis of advancement") immediately after puncturing tissue and prevents the guidewire from immediately curling back on itself in order to potentially deliver energy a second time to the tissue site. When distal section straight portion 216 has been completely advanced out of a lumen (for example, the lumen of a dilator), distal section curved portion 226 is configured such that, upon deployment of distal section 202 from a confined state (inside the lumen) along an axis of advancement, active tip 208 curves away from the axis of advancement. For example, after puncturing a septum, the configuration of distal section 202 during and after deployment (Fig. 5C) acts to prevent the electrode (active tip 208) from directly contacting tissue on the left side of the

heart, and from contacting the distal section curved portion 226 of the guidewire. Positioning the active tip 208 at a distance from distal section curved portion 226 helps to ensure that the guidewire will not be damaged if energy is delivered through active tip 208 once the coil configuration has been achieved.

[0090] The configuration of a coiled distal section 202 is shown in Figs. 5A, 5C and 5D, which illustrate examples of an approximately 630° generally spiral-shaped curve (also known as a double pigtail curve). Distal section 202 (Fig. 5C) has an inner curve diameter d1 associated with an inner region of the 630° spiral-shaped curve and an outer curve diameter d2 associated with an outer region of the curve. Distal curves of some alternative embodiments range from about 270° to about 630°, with a specific alternative embodiment having a 270° curve (a single pigtail curve). Other alternative embodiments have curves of about 360° and about 450°. Yet other alternative embodiments have distal section 202 curves of less than 270°.

[0091] In some embodiments of the multi-function guidewire, inner curve diameter d1 is about 6 mm to about 30 mm, and in some embodiments is about 10 mm. In some embodiments of the multi-function guidewire, outer curve diameter d2 is about 20 to about 40 mm, and in some specific embodiments is about 22 mm.

[0092] As previously mentioned and, distal section 202 is configured such that active tip 208 does not contact distal section curved portion 226. 31. Fig. 5C illustrates an example of a distal curved section in a coiled configuration in which active tip 208 is spaced a pre-determined distance away from distal section curved portion 226. In the illustrated embodiment, active tip 208 is orthogonal (at a 90° angle) to the point along distal section curved portion 226 to which it is closest. In some embodiments, the distance of the active tip 208 from the insulated portion of the distal section 202 to which it is orthogonal (i.e. closest to) ranges from about 0.8 mm to about 4 mm. In some embodiments, the pre-determined distance of the active tip from an insulated portion of the distal section which it is closest to, is about 2.8 mm.

[0093] The pre-determined distance of the active tip from the distal section curved portion 226 of distal section 202 can also be measured relative to the diameter of the active tip. Using this method of measurement, in some embodiments the pre-determined distance of the active tip from an insulated portion of the distal section is equivalent to about 1 to about 5 times a diameter of the active tip, and in a specific embodiment is equivalent to about 4.6 times a diameter of the active tip.

[0094] Distal section 202 is substantially atraumatic. It includes a rounded electrode (active tip 208) for puncturing, not a sharp tip such as used for mechanical puncturing. Furthermore, distal section 202 is substantially flexible (i.e. floppy) so as to avoid exertion of traumatic forces on tissue (i.e. it acts as an atraumatic bumper) and distal section 202 (with the exception of the rounded electrode) is covered with a smooth layer insulation 214 (which may be anti-thrombogenic). In embodiments of the present invention, distal section 202 does not contain any sharp edges or rough surfaces.

[0095] Fig. 5D is a cross section view of distal section 202 indicated by detail "A" in Fig. 5A. Distal section 202 includes wire 212 with electrical insulation 214 thereupon, marker 210, distal section straight portion 216, and active tip 208 at the furthermost distal tip of the wire. Marker 210 surrounds a distal segment of wire 212 and electrical insulation 214 covers marker 210. Typically, active tip 208 is an electrode operable to deliver electrical energy for puncturing tissue, and is radiopaque, whereby it also functions as a visibility marker under medical imaging. In some embodiments, active tip 208 is formed by welding together a radiopaque marker band with the distal end of wire 212 to form a rounded electrode

which is devoid of the layer of electrical insulation. Marker coil 210 may also be radiopaque and may comprise a helical coil surrounding wire 212. Marker coil 210 helps align the active tip with target tissue (e.g. a fossa ovalis) during tissue access and puncture procedures.

[0096] The outer layer of electrical insulation 214 covers wire 212 and marker 210. In typical embodiments, electrical insulation layer 214 is comprised of PTFE (Polytetrafluoroethylene) heat shrink. When multi-function guidewire 200 is advanced through tissue, the friction of the tissue on insulation layer 214 creates a force that could possibly cause the insulation to slide proximally relative to wire 212, but as illustrated more clearly in Fig. 5F, electrical insulation layer 214 extends distal of the helical coil 210, whereby the helical coil/marker helps to secure the layer of electrical insulation to the multi-function guidewire. Typically, marker coil 210 is welded, glued or otherwise suitably coupled to wire 212. In some embodiments, the insulation layer has a smooth outer surface to reduce the risk of thrombosis, and in some examples is antithrombogenic.

[0097] The stiffness of distal section 202 enables it to provide anchorage to prevent multi-functional guidewire 200 from inadvertently slipping out to a position proximal of a puncture site. The stiffness of distal section curved portion 226 decreases distally (i.e. it "tapers"). In some embodiments of the multi-function guidewire, the proximal end of distal section curved portion 226 has a stiffness about 550 +/- 10 N/m or less, and the stiffness decreases distally, without abrupt changes, such that the distal end of distal section curved portion 226 has a stiffness of about 1 +/- 0.5 N/m or greater, more specifically 0.88 N/m. In one example, a distal section curved portion 226 of the distal section has a stiffness of about 200 N/m at its proximal end and a stiffness of about 2.0 N/m, or more specifically 2.1 N/m, at its distal end.

[0098] In some embodiments, the stiffness of multi-function guidewire is mostly provided by wire 212, with electrical insulation 214 and marker 210 providing negligible stiffness relative to the wire. As known to one skilled in the art, the stiffness of multi-function guidewire 200 is related to (or a function of) the diameter of wire 212. In some embodiments of the multi-function guidewire 200, the wire 212 at the proximal end of the distal section curved portion 226 has an outer diameter of about 0.64 mm or less. In some examples, the wire at the distal end of distal section curved portion has an outer diameter of about 0.13 mm or more. In one example, the wire 212 of the distal section curved portion tapers distally from a proximal end outer diameter of about 0.5 mm to a distal end outer diameter of about 0.16 mm.

[0099] In typical embodiments, the elasticity and stiffness of distal section 202 make it possible for the multi-function guidewire to align with a curved lumen of a device, such as a dilator, containing the multi-function guidewire (i.e. to conform to a shape of a tubular member while positioned within a lumen of the tubular member).

[00100] Marker 210 aids in positioning the distal end of the multi-function guidewire 200, in particular, positioning active tip 208 before, during and after puncturing, and also in positioning devices that are advanced over the guidewire, such as pacemaker leads, thereby increasing the safety and efficacy of related medical procedures.

[00101] In some embodiments, marker/coil 210 is comprised of platinum and tungsten, and in one embodiment is comprised of platinum with about 8% tungsten. In most embodiments, the helical coil extends proximally from the active tip along a curve of about 180° to about 630°, and in one example along a curve of about 270°. Typically, the helical coil has length of about 15 to about 100 mm, and in one example has length of about 30 mm.

[00102] In some embodiments, the outer diameter of multi-purpose guidewire 200 (including wire 212, insulation layer 214 and coil 210, as applicable) at a proximal end of the distal section curved portion is about 0.86 mm or less, and a distal end of the distal section curved portion has an outer diameter which is about 0.59 mm or more. In one example, the outer diameter of the proximal end of distal section curved portion is about 0.72 mm and the outer diameter at the distal end of the distal section curved portion is about 0.59 mm.

[00103] Fig. 5E illustrates an exterior view of distal section straight portion 216. As shown in Fig. 5C, distal section straight portion 216 is distal of distal section curved portion 226. The distal section straight portion prevents distal section 202 from curving immediately upon exiting a lumen, for example, the lumen of a dilator. In some embodiments, distal section straight portion 216 has a larger diameter than a distal end of the distal section curved portion 226. In most embodiments, distal section straight portion has a length of about 3 to about 10 mm, and in one example distal section straight portion has a length of about 6.5 mm.

[00104] Fig. 5F shows a cross-sectional view of distal section straight portion 216 along the line A-A from Fig. 5E. Fig. 5F includes: distal section straight portion 216, the distal end 228 of distal section curved portion 226, wire 212, minimum diameter portion 230, constant diameter portion 224, and active tip 208.

[00105] Distal section straight portion 216 includes constant diameter portion 224, which is a part of wire 212, and which typically has an outer diameter ranging from about 0.13 mm to about 0.65 mm. In one paritcular example, the diameter at the constant diameter portion 224 is about 0.25 mm. The outer diameter of the constant diameter portion 224 is the largest diameter of wire 212 within the distal section straight portion 216. Wire 212 is has a larger diameter adjacent active tip 208 in order to withstand the heat produced by active tip 208 without being damaged.

[00106] In some embodiments, the diameter of wire 212 at the minimum diameter portion 230 is the smallest diameter of wire 212 within distal section straight portion 216, and is also the smallest diameter of wire 212 of the entire multi-function guidewire 200. The diameter of wire 212 at minimum diameter portion 230 typically ranges from about 0.13 mm to about 0.64 mm, and in one example is about 0.16 mm, and is proximal of the constant diameter portion. The outer diameter of wire 212 increases distally from minimum diameter portion 230 to constant diameter portion 224, i.e. wire 212 flares out distally (or has a reverse taper).

[00107] As previously described, active tip 208 is used for delivering energy, for example for puncturing tissue. In some embodiments, active tip 208 is comprised of platinum and iridium, and in one embodiment is comprised of platinum with 10% iridium. Typically, active tip is dome-shaped. In some embodiments of the multi-function guidewire, the active tip 208 has a diameter ranging from about 0.4 to about 0.7 mm, and in one example has a diameter of about 0.6 mm. Typically, active tip 208 has a length ranging from about 0.75 mm to about 1.5 mm, and in one embodiment has a length of about 0.8 mm.

[00108] Referring back to Fig. 5B, proximal section 206 includes proximal section curved portion 232 and proximal section straight portion 215, which includes exposed portion 212a of wire 212.

[00109] While proximal section 206 is typically biased to a coiled configuration, it is also flexible which allows it to be uncoiled. Typically, wire 212 has a constant diameter throughout the proximal section 206, with typical embodiments of the wire at proximal section curved portion 232 having an outer diameter ranging from about 0.13 mm to about 0.64 mm,

and in one example having an outer diameter of about 0.38 mm. In some embodiments, the proximal section of the guidewire/elongate member (i.e. wire 212 as well as insulation layer 214) has an outer diameter of about 0.60 mm.

[00110] In some embodiments, proximal section 206 is curved in the same plane as distal section 202, i.e. the curves are coplanar. Having coplanar proximal and distal curves is advantageous in that, for example, when the distal section extends out of a dilator within the body, the orientation of the proximal curve outside of the patient's body can be used to ascertain the orientation of the distal curve, which itself may not be directly visualized, in order to aid in positioning.

[00111] The configuration of proximal section straight portion 215 aids in loading over-the-wire devices onto the multi-function guidewire 200. To assist in providing this functionality, the proximal section straight portion 215 is elongated and has a diameter less than or equal to the rail section. In some embodiments, proximal section straight portion 215 has a length of about 5 to about 50 mm, and in one embodiment, has a length of about 25 mm. To provide for greater user safety when loading devices onto the multi-function guidewire, proximal section straight portion 215 has a rounded tip.

[00112] An additional function of proximal section straight portion 215 is provided by its relatively small diameter. Due to its size, proximal section straight portion 215 is operable to puncture tissue mechanically (i.e. without the delivery of electrical energy). This allows a user the option to potentially attempt both mechanical and electrical punctures using a single device. For example, a user may attempt mechanical puncture using the proximal end of the device and, if unsuccessful, the user may withdraw the device and insert the distal end to attempt electrical puncture. In some embodiments, the elongate member/guidewire 200 at the proximal section, including wire 212 and insulation 214, has an outer diameter of about 0.86 mm or less, with one embodiment having an outer diameter of about 0.60 mm or less.

[00113] Multi-function guidewire 200 includes exposed portion 212a of wire 212 to allow for coupling to a source of electrical energy, for example using a removable push-button connector placed over exposed portion 212a. In some embodiments, exposed portion 212a has a length ranging from about 5 to about 15 mm, and in one example, has a length of about 10 mm.

[00114] Some embodiments of multi-function guidewire 200 include transitional portion 222 between the proximal section 206 and rail section 204 to avoid having an abrupt change in diameter, for example to avoid structural weaknesses. In some embodiments, the transitional portion 222 defines a length ranging from about 15 mm to about 100 mm, with one embodiment defining a length of about 25 mm. The proximal end of transitional portion 222 has an outer diameter ranging from about 0.35 mm to about 0.86 mm and the distal end has an outer diameter of about 0.58 mm to about 1.12 mm. One particular embodiment has a minimum outer diameter of about 0.60 mm and a maximum outer diameter of 0.86 mm.

[00115] In a specific embodiment of multi-functional guidewire 200, active tip 208 is primarily comprised of platinum, with 10% iridium; marker 210 is a helical coil primarily comprised of platinum, with 8% tungsten; and each of the proximal section 206, rail section 204, and distal section 202 are comprised of a 304V stainless steel wire 212 (spring tempered) with PTFE heat shrink insulation (electrical insulation 214) thereupon. Stainless steel wire 212 has adequate stiffness to provide pushability to multi-functional guidewire 200 and is also an efficient electrical conductor.

[00116] In this specific embodiment, active tip 208 has a length of about 0.8 mm and a diameter of about 0.024 inches (~0.61 mm); the wire 212 and active tip 208, combined, extend 2 mm beyond the distal end of marker 210; and marker

210 has a length of about 3 cm. Furthermore, distal section straight portion 216 has a length of about 6 to 10 mm and a diameter of about 0.018 to 0.0225 inches (0.45 to 0.57 mm)); distal section 202 has an inner curve diameter d1 of about 1 to 3 cm and an outer curve diameter d2 of about 2 to 4 cm (Fig. 5C); the diameter of rail section 204 adjacent the distal section 202 is 0.029 to 0.035 inches (0.74 to 0.89 mm).

[00117] The specific embodiment further includes wire 212 of distal section 202 having a length of 15 cm and tapering over the 15 cm segment of the wire from 0.025 inches (0.64 mm) to 0.006 inches (0.15 mm) at the tip of wire 212. The tip of wire 212 has a length of 5.5 mm and a diameter of 0.010 inches (0.25 mm) over the 5.5 mm length. The point along wire 212 that is 15 cm from the distal tip of distal section 202 (i.e. the part of distal section 202 with the largest diameter of wire 212) has a proximal stiffness (force/displacement) of about 552 N/M. In this embodiment, active tip 208 is welded to wire 212. The distal tip of marker coil 210 is 2 mm proximal from active tip 208 and has length of 30 mm. Electrical insulation 214 is comprised of PTFE heat shrink and has a wall thickness of 0.004 inches (0.10 mm).

[00118] Furthermore, in this specific embodiment, rail section 204 has a length of about 120 cm; and the wire 212 within the rail section has a diameter of about 0.635 mm ± 0.008 and stiffness of about 552 N/M. Proximal section 206 has a length of about 525 mm ± 1.5, including a tapered section of about 2.5 cm (tapering down from the rail section), and the wire 212 of proximal section 206 has a diameter of about 0.381 mm ± 0.008. The overall length of wire 212 is 1800 mm ± 2.

[00119] Some alternative embodiments of multi-functional guidewire 200 comprise a straight proximal section 206 and/or a J-shaped distal section 202.

[00120] In alternative embodiments of the disclosed methods (described further hereinbelow), mechanical wires are used for puncturing. The mechanical wires typically have a distal part/portion/section that is J-shaped to prevent accidental punctures and trauma by a sharp distal tip. Some alternative mechanical wire embodiments have a distal part that is coiled, while others have a straight distal part.

[00121] Methods

[00122] A first broad aspect of a method of accessing a chamber of a patient's heart using a superior access approach comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator to position the dilator substantially adjacent a tissue; and (c) advancing the dilator through a puncture in the tissue. The procedure is performed using forms of imaging known to those skilled in the art.

[00123] With reference now to Fig. 6A, in a particular embodiment, as described herein, the steerable sheath 300 may be used to guide the dilator 100 to reach an area of the heart 400, in order for example to perform a transseptal puncture. In one such example, a guiding introducer or apparatus such as an introducer sheath may be advanced through the vasculature. A guide-wire may then be advanced through the introducer sheath and advanced through the vasculature, for example the superior vena cava 412, to be positioned within the right atrium 410. In some embodiments, the guide wire may be advanced without the use of an introducer sheath. A dilator 100, in accordance with an embodiment of the present

invention, may then be inserted through the steerable sheath 300 forming a dilator and sheath assembly, or in other words a steerable sheath assembly 300a.

[00124] Dilator 100 comprises a flexible intermediate region 100b terminating at a rigid distal end region 100a. In the specific example shown, the dilator 100 additionally has a rigid proximal region 100c, as described previously, that helps minimize the risk of the dilator buckling as it is inserted into the steerable sheath 300. (Alternatively, a dilator 100 may be provided with a softer proximal portion 100c.)  The dilator 100 is usable with a steerable sheath 300, as described previously herein above.  The steerable sheath 300 defines a lumen there-through for receiving the dilator 100 and further comprises an articulating portion or deflectable region 200b that terminates in a sheath distal end.  In some embodiments, the steerable sheath 300 and dilator 100 may be provided as a steerable sheath kit.

[00125] Once the dilator 100 is inserted through the steerable sheath 300, the dilator 100 extends through the sheath lumen with the distal end region 100a of the dilator extending beyond the sheath distal end. Thus, in some embodiments, the dilator 100 is inserted through the steerable sheath 300 prior to the step of inserting the steerable sheath 300 through the vasculature, and the steps of inserting and advancing the dilator 100 are performed substantially simultaneously with the steps of inserting and advancing the steerable sheath 300. Once assembled, the dilator 100 and the steerable sheath 300 are configured to co-operate with one another such that the flexible intermediate region 100b of the dilator 100 corresponds to the articulating portion or deflectable region 200b of the steerable sheath 300 during use.

[00126] In alternative embodiments, the steps of inserting and advancing the steerable sheath 300 may be performed prior to the steps of inserting and advancing the dilator 100. In a specific example, the steerable sheath 300 may initially be advanced into the right atrium 410, with a catheter or any other dilator inserted there-through, such as a second dilator. The catheter or second dilator may then be swapped out with the flexible dilator 100. That is the catheter or second dilator may be removed and the dilator 100 may be inserted through the sheath and advanced into the right atrium. In still further alternative embodiments, the steps of inserting and advancing said dilator 100 may be performed prior to the steps of inserting and advancing said steerable sheath 300, which for example, may be advanced over the dilator 100.

[00127] After positioning the steerable sheath assembly 300a within the right atrium 410, the initial guide-wire is swapped out with an RF guide-wire or other energy delivery device (such as RF guidewire 200 visible in Fig. 6C).  Referring now to Fig. 6B, the steerable sheath 300 is then actuated to allow the steerable sheath 300 to achieve a desired deflection angle to position the dilator distal end region 100a at a desired location within a region of tissue, within a patient's body, for example a desired location within the septum 422 of the heart 400 (in some examples, more specifically, at the fossa ovalis region of the septum 422).  The dilator 100 provides a flexible intermediate region 100b that does not hinder the ability of the steerable sheath 300 to curl or curve and as such allows the articulating portion or deflectable region 200b of the steerable sheath 300 to deflect upon actuation to position the dilator 100 and the RF guide-wire as desired. As such, the steerable sheath 300 is able to reach its intended curvature, as shown by path 300b, upon actuation, to position the distal end region 100a of the dilator 100 as well as a distal end of the RF guide-wire at the septum 422.  Using a dilator lacking such a flexible intermediate region may result in the steerable sheath not being able to achieve the required or intended curvature, whereby the steerable sheath assembly may be limited to the curvature shown in Fig. 6A.

22

[00128] Additionally, as outlined previously, the dilator 100 is essentially a straight dilator that is lacking a curve. As a result the dilator 100 does not interfere with the curvature of the steerable sheath 300 by imparting a curvature to the steerable sheath 300. Thus, the lack of curvature in the dilator 100 in conjunction with the flexible intermediate region 100b, additionally aids in allowing the steerable sheath 300 to attain the required deflection angle or curvature to position the dilator distal end region 100a as well as the RF guide-wire at the septum 422.

[00129] With reference now to Fig. 6C, once the distal end region 100a of the dilator 100 has been positioned at the septum 422, a transseptal puncture may then be performed, for example by using a puncturing device as described hereinabove. In one embodiment, as shown, the puncturing device comprises the RF guidewire 200 (that was previously positioned within the steerable sheath assembly 300a) which may then be activated to deliver RF and be advanced across the septum 422 to create the puncture. The guidewire 200 may then be advanced into the left atrium 408 of the heart 400, as shown in Fig. 6C. The dilator 100 may then be advanced over the guidewire 200 through the septum 422 in order to dilate the transseptal puncture site, as shown in Fig. 6D, for example in order to facilitate tracking of other devices through the puncture site. The steerable sheath 300 and the dilator 100 may then be withdrawn and the other devices may be advanced over the guidewire 200, for example, to perform a procedure within the heart.

[00130] Figs. 7A to 7G illustrate the steps of an alternate embodiment of a method for gaining access to the left side of a heart. Anatomical features illustrated in Fig. 7A include: heart 400, left ventricle 402, right ventricle 404, mitral valve 406, left atrium 408, right atrium 410, superior vena cava 412, inferior vena cava 414, aorta 416, and brachiocephalic veins 418.

[00131] Fig. 7B(i) shows access being gained through the left subclavian vein 420, which is superior (i.e. above) to heart 400. In some alternative embodiments a large diameter, short length introducer (not shown in drawings), known to those skilled in the art, is secured at the left subclavian access site to accommodate the steerable sheath. In the embodiment of Fig. 7B(i), steerable sheath 300 is advanced through left subclavian vein 420. Steerable sheath 300 is controlled using steerable sheath handle 302. Dilator 100, which includes dilator hub 102, is inserted into steerable sheath 300. Typically dilator 100 and steerable sheath 300 are locked together before being advanced through the vasculature to form a steerable sheath assembly. Fig. 7B(i) also shows that a wire 200 is inserted into dilator 100.

[00132] As described above in the above embodiment of a method of the present invention, step (a) is for advancing a steerable device having a lumen and containing a dilator within the lumen, from a superior approach, into a heart of a patient. To arrive at the configuration of Fig. 7A, a steerable device, steerable sheath 300, is advanced through superior vena cava 412 and right atrium 410, as indicated by sheath movement arrow 310, and temporally positioned in inferior vena cava 414. Fig. 7A illustrates the position of apparatus upon a completion of step (a). From the position shown in Fig. 7A, steerable sheath 300 and dilator 100 are slightly withdrawn to position the dilator's distal tip 106 in right atrium 410. In alternative embodiments of the method, steerable sheath 300 is not advanced into inferior vena cava 414, but instead, advancement is stopped when the distal tip of the steerable sheath is still in right atrium 410. Steerable sheath 300 defines a lumen and contains a dilator 100 within the lumen. Typically, the physician selects the dilator and steerable sheath to match the outer diameter of dilator 100 with the inner diameter of steerable sheath 300 (i.e. so that the dilator fits snugly within the sheath or, put differently, that the dilator is cooperatively fitted to the sheath) so that the dilator may provide support for the sheath to prevent the sheath from buckling when making sharp turns, such as when, for example, steering

the sheath towards the atrial septum after the sheath is advanced through the superior vena cava. Furthermore, matching the outer diameter of dilator 100 with the inner diameter of steerable sheath 300 facilitates smooth advancement through the vasculature by avoiding and/or reducing scraping of tissue.

[00133] Once the dilator's distal tip 106 is advanced into right atrium 410, the tip is positioned within the right atrium using the steerable sheath. The portion of the dilator shaft 104 of dilator 100 inside of right atrium 410 (and within steerable sheath 300) is flexible enough to be cooperatively steered by the sheath i.e. sheath 300 can manipulate dilator shaft 104 to the required angle to contact tissue without the dilator restricting the sheath's range of motion. Only the portion of dilator shaft 104 within the part of steerable sheath 300 that is being bent for the "U-turn" from the superior vena to contact the atrial septum needs such a high degree of flexibility: the disclosed method can still be performed even if other portions of dilator shaft 104 (not inside the right atrium) are relatively less flexible (i.e. more rigid) than the highly flexible portion.

[00134] Step (b) of the method is for the physician articulating the steerable device (steerable sheath 300), in the direction indicated by sheath movement arrow 310, to cooperatively manipulate a distal portion of the dilator 100 and thereby position the dilator substantially adjacent a tissue. The dilator is manipulated to arrive at the position shown in Fig. 7B. For the sake of simplicity, some embodiments of the method use a unidirectional sheath: the direction of deflection is known before the procedure such that a bi-directional sheath is not required, although it may be used as well.

[00135] Fig. 7B also shows dilator 100 slightly extended from steerable sheath 300 and touching a tissue site (atrial septum 422). A flexible elongate puncture member (medical device/guidewire 200) is located wihtin the dilator's lumen when the physician adjusts steerable sheath 300 to cooperatively position dilator 100. Typically, the elongate puncture member 200 is positioned to be close to, but not contacting, the fossa ovalis of the atrial septum. The embodiment of guidewire 200 of Fig. 5D has radiopaque active tip 208 and radiopaque helical marker 210, which when positioned towards the front of the dilator aid in positioning dilator 100 under imaging.

[00136] Typical embodiments of a method of the invention comprise the dilator having a lumen (not shown in drawings) and containing an elongate puncture member therein, and the method including between steps (b) and (c), advancing the elongate puncture member and puncturing the tissue. While the method is not limited to any particular type of tissue, in the illustrated embodiment the tissue is a septum of the heart and the method comprises, between steps (b) and (c), advancing an elongate puncture member (wire 200) and puncturing atrial septum 422, as illustrated in Figs. 7C(i) to 7C(iii). In Fig. 7C(i), the distal tip of dilator 100 is tenting the atrial septum 422 while the wire is advanced in the direction of wire movement arrow 220. The steerable device (steerable sheath 300) is used to position dilator 100 for tenting the septum dilator under imaging. Tenting ensures the dilator is properly positioned and in contact with the septum. Fig. 7C(iv) shows wire being advanced from the proximal end (the end toward the physician) and indicates diagrammatically the use of RF energy. Fig. 7C(ii) shows wire 200 having just punctured atrial septum 422. The distal portion/part of the wire is comprised of a material with shape memory and it curves back as it is extended into left atrium 408. Fig. 7C(iii) shows the wire further extended and curving back approximately 270° into a "pig-tail" configuration (although, as described hereinabove, this coil may typically traverse between 270° and 630°). Fig. 7C shows heart 400 with the wire 200 that has punctured the septum and is in the position of Fig. 7C(iii). As previously noted, curved distal part 202 acts to prevent the electrode (active tip 208) from directly contacting tissue on the left side of the heart.

24

[00137] In some embodiments of the method aspect of the present invention, the elongate puncture member is an energy delivery device, and puncturing tissue between steps (b) and (c) comprises delivering energy through the energy delivery device (e.g. a distal end of the energy delivery device) to puncture the tissue. In some such embodiments, the energy delivery device is operable to deliver electrical energy, and in some specific embodiments, the electrical energy is in the RF range.

[00138] In some other embodiments, the elongate puncture member is a mechanical wire with a sharp tip, and puncturing tissue between steps (b) and (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

[00139] After wire 200 has punctured the septum, the physician proceeds to step (c) of the method. Step (c) is for advancing the dilator through a puncture in the tissue. The first broad aspect of the method includes the use of a hybrid dilator having a flexible intermediate region 100b that can be bent from a superior approach to approach the septum, a bend of about 180° (i.e. a U-shaped turn), with the hybrid dilator also having a distal tip that is sufficiently hard to provide for dilating tissue without deformation of the taper. The use of the hybrid dilator makes it unnecessary to use a soft dilator for steering and bending for the U-shaped turn, and then changing to a stiffer dilator for crossing the septum, whereby the hybrid dilator reduces the number of steps in the procedure by eliminating the steps of withdrawing a soft dilator and advancing a hard dilator.

[00140] Fig. 7D shows a positioning of the dilator after completion of step (c) of the method (advancing the dilator through a puncture in the tissue). Distal tip 106 of dilator 100 is comprised of hard (shape retaining) material that pushes aside tissue as dilator 100 is advanced. A portion of flexible intermediate region 100b is shown extended from steerable sheath 300 inside of right atrium 410 in Fig. 7C. Typically, advancement of dilator 100 is stopped when maximum dilation is achieved; resulting in the dilator being positioned such that a distal portion of dilator's distal tip 106 is in left atrium 408 and a portion of distal tip is in right atrium 410. In alternative embodiments of the method, the dilator is further advanced so that all of distal tip 106 is in the left atrium, such as, for example if the physician wants to ensure that maximum dilation has been achieved.

[00141] Some embodiments of the method aspects of the present invention further comprise a step (d) of withdrawing the elongate puncture member (and advancing an anchor wire until the anchor wire bridges (crosses) the septum and a right atrium to thereby provide a bridge between the superior vena cava and the left atrium (put differently, the anchor wire bridges the septum between the right and left atria). After an anchor wire is advanced, some embodiments further comprise a step (e) of withdrawing the dilator and sheath. Fig. 7E illustrates an installed anchor wire (wire 200) with the dilator and sheath withdrawn. As previously described, curved distal part 202 of wire 200 provides anchorage to prevent wire 200 from inadvertently slipping back into the right atrium. The anchor wire is sufficiently stiff that it may, by itself, provide a rail for advancing medical devices into the left atrium. Such medical devices are selected at the discretion of the physician and can include, at least, ablation catheters and pacing leads (e.g. for left ventricular endocardial pacing). As described hereinabove as well as hereinbelow, in an exemplary embodiment of a method of the present invention, a single wire may be utilized for both the puncturing step as well as for anchoring in the left atrium by using a hybrid medical device, such as multi-function guidewire 200, to puncture the tissue site and provide a rail (as well as an anchor) through the puncture site.

[00142] Some embodiments of the method aspect further comprise a step (f) of advancing a lead delivery catheter 350 (and possibly a lead delivery dilator, if dilator 100 may not be used for the stated purpose), configured for delivering leads (such as pacemaker leads), into the left atrium of the heart, as shown in Fig. 7F. As previously described, other medical devices are advanced/implanted in some alternative embodiments.

[00143] Some embodiments further include a step (g) of withdrawing the wire 200 (as well as any dilators, including a lead delivery dilator). Some such embodiments further comprise a step (h) of advancing the lead delivery catheter 350 as indicated by catheter movement arrow 360 (Fig. 7F), to thereby position the distal end of lead delivery catheter 350 in left ventricle 402, as shown in Fig. 7G.

[00144] For some embodiments of this method aspect, a stiff introductory wire (rather than a hybrid wire such as guidewire 200) is used. Such embodiments comprise: prior to step (a), advancing the stiff introductory wire into the right atrium; and step (a) includes advancing the steerable sheath and the dilator over the stiff introductory wire; and between steps (b) and (c), the stiff introductory wire is withdrawn and the elongate puncture member is advanced to puncture the septum. In some such embodiments, the stiff introductory wire is comprised of stainless steel. Typically, an introductory wire has an atraumatic tip that is generally J-shaped.

[00145] In some embodiments, as noted above, a stiff introductory wire is not utilized; rather, a hybrid wire such as described above may be utilizaed. Such embodiments comprise: prior to step (a), the wire/elongate puncture member is advanced into the right atrium; and step (a) includes advancing the steerable sheath and the dilator over the wire/elongate puncture member.

[00146] A further broad aspect of the method of accessing a chamber of a patient's heart using a superior access approach is described below. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing an elongate puncture member within the lumen; (b) articulating the steerable device to manipulate a distal portion of the elongate puncture member for positioning the puncture member substantially adjacent a tissue; (c) creating a puncture in the tissue using the puncture member; and (d) advancing a dilator over the puncture member through the puncture.

[00147] This broad aspect relates to the concept of reducing or minimizing the number of steps in a procedure by using multifunctional or hybrid devices. First, embodiments of the second broad aspect include the elongate puncture member having a rail section that is stiff enough to provide rail for advancing devices, thereby eliminating (making unnecessary) using an anchor wire and the steps of withdrawing the puncture member and advancing the anchor wire. Second, the steerable device is advanced over the puncture member, thereby eliminating the use of a stiff introductory wire and the steps for exchanging the introductory wire and puncture member. Also, embodiments of the second broad aspect include the elongate puncture member being flexible enough to be cooperatively manipulated by the steerable device, steerable sheath 300.

[00148] Making reference to Figs. 7A to 7D, in some embodiments of this broad aspect: step (a) includes advancing the steerable device (e.g. steerable sheath 300) into the right atrium 410 of a heart 400; step (b) includes articulating the steerable device (steerable sheath 300) to manipulate a distal portion of the elongate puncture member (wire 200) for positioning the puncture member; step (c) includes advancing the puncture member (wire 200) to create a puncture in the

26

tissue (atrial septum 422); and step (d) includes advancing dilator 100 over the puncture member (wire 200) through the puncture in the tissue (atrial septum 422). In some embodiments, step (c) further comprises advancing the elongate puncture member into the left atrium. In some embodiments the method further includes a step (e) of withdrawing the steerable device and dilator, whereby the elongate puncture provides a rail for advancing medical devices into the left atrium.

[00149] In some embodiments of the second broad aspect, the elongate puncture member is an energy delivery device (e.g. a wire operable to deliver electricity) and puncturing tissue in step (c) comprises delivering energy through the distal end of the energy delivery device to puncture the tissue. In some other embodiments of the second broad aspect, the elongate puncture member is a mechanical wire with a sharp tip and puncturing tissue in step (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

[00150] A specific embodiment of this broad aspect comprises the steps of: (a) introducing a steerable sheath and a soft dilator into the right atrium; (b) positioning the steerable sheath and the soft dilator such as to be aimed towards the septum; (c) withdrawing the soft dilator and advancing a stiffer dilator; (d) adjusting the steerable sheath to position the stiffer dilator, and an energy delivery device inside the dilator's lumen, substantially adjacent the atrial septum; (e) delivering energy through the distal end of the energy delivery device to puncture the septum; (f) advancing the energy delivery device until a distal tip of the energy delivery device crosses the septum and enters the left atrium wherein the portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium; and (g) advancing the stiffer dilator to dilate the puncture.

[00151] Some embodiments of this broad aspect include using a soft and a hard dilator, while some alternative embodiments include using a hybrid dilator as described hereinabove.

[00152] Details regarding characteristics of the initial broad aspect of an embodiment of a method of the present invention, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to the second broad aspect.

[00153] A further broad aspect of the method of accessing a chamber of a patient's heart using a superior access approach is described below. The method comprises the steps of: (a) advancing a steerable device through a patient's vasculature, from a superior approach, into a heart of a patient, the steerable device defining a lumen and containing a dilator within the lumen; (b) articulating the steerable device to manipulate a distal portion of the dilator for positioning the dilator substantially adjacent a tissue; (c) advancing an elongate puncture member, from within a lumen of the dilator, to create a puncture in the tissue; and (d) advancing the dilator over the elongate puncture member through the puncture.

[00154] This broad aspect, similar to the first broad aspect mentioned above with respect to a method of the resent invention, also uses a hybrid dilator. The use of the hybrid dilator renders unnecessary the use of a soft dilator for steering and bending, and then changing to a stiffer dilator for crossing tissue, whereby the hybrid dilator reduces the number of steps in the procedure by eliminating the steps of withdrawing a soft dilator and advancing a stiffer (hard) dilator. Also, this broad aspect, similar to the second mentioned above, includes the elongate puncture member having a rail section that is stiff enough to provide rail for advancing devices, thereby eliminating (making unnecessary) the use of an anchor

wire and the steps of exchanging the puncture member and anchor wire. Thus, this broad aspect includes embodiments of both hybrid devices described hereinabove.

[00155] Making reference again to Figs. 7A-7D, some embodiments of the method comprises the steps of: (a) advancing a steerable sheath 300 containing dilator 100 within a lumen of steerable sheath 300, from a superior approach, into a heart 400 of a patient; (b) articulating the steerable sheath 300 to manipulate a distal portion of dilator 100 for positioning the dilator substantially adjacent atrial septum 422; (c) advancing an elongate puncture member (wire 200), from a lumen of dilator 100, to create a puncture in atrial septum 422; and (d) advancing dilator 100 over wire 200 and through the puncture.

[00156] Similar to the previous broad aspects, step (c) comprises advancing the elongate puncture member to enter into the left atrium. In some embodiments of the third broad aspect, the method further includes a step (e) of withdrawing the steerable device and dilator to thereby provide a rail for advancing medical devices into the left atrium.

[00157] In some embodiments of the third broad aspect, the elongate puncture member is an energy delivery device and puncturing the tissue in step (c) comprises delivering energy through a distal end of the energy delivery device to puncture the tissue. In some other embodiments of the third broad aspect, the elongate puncture member is a mechanical wire with a sharp tip and puncturing the tissue in step (c) comprises advancing the mechanical wire such that the sharp tip of the mechanical wire punctures the tissue.

[00158] A specific embodiment of this third broad aspect comprises the steps of: (a) introducing a steerable sheath and a dilator into the right atrium; (b) positioning the steerable sheath and the dilator such as to be aimed towards the septum wherein the portion of the dilator shaft within the steerable sheath is flexible enough to be cooperatively steered by the sheath; (c) adjusting the steerable sheath to cooperatively position the dilator, and an energy delivery device inside the dilator's lumen, substantially adjacent the atrial septum; (d) delivering energy through the distal end of the energy delivery device to puncture the septum; (e) advancing the energy delivery device until a distal portion tip of the energy delivery device bridges (crosses) the septum and enters the left atrium wherein the distal portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium; and (f) advancing the dilator whereby a shape-retaining (i.e. hard) tip section of the dilator dilates the puncture.

[00159] Details regarding the earlier broad aspects, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to this third broad aspect.

[00160] A fourth broad aspect of the invention is described below. Making reference to Figs. 7A to 7B, it is a method of accessing a chamber of a patient's heart using a superior access approach. The method comprises the steps of: (a) advancing an energy delivery device from an access site superior to the heart, through a superior vena cava and into a right atrium; (b) adjusting/articulating/manipulating a steerable device to position the energy delivery device substantially adjacent a septum of the heart; (c) delivering energy through a distal end of the energy delivery device to puncture the septum; (d) advancing the energy delivery device into a left atrium; and (e) advancing a dilator over the energy delivery device whereby the dilator dilates the puncture.

[00161] The fourth broad aspect also relates to the concept of reducing or minimizing the number of steps in a procedure by using hybrid devices. Embodiments of the fourth broad aspect include using an energy delivery device (wire 200)

28

having a rail section that is stiff enough to provide rail for advancing devices, thereby making unnecessary using an anchor wire and eliminating the steps of withdrawing the energy delivery device and advancing the anchor wire.

[00162] Some embodiments of this aspect further comprise a step (f) of withdrawing the steerable device (steerable sheath 300) and the dilator 100, after which the portion of the energy delivery device bridging the right atrium and septum is stiff enough to provide a device-supporting rail to the left atrium for advancing medical devices into the left atrium.

[00163] Some embodiments of the fourth broad aspect include using a soft and a hard dilator, while some alternative embodiments include using a hybrid dilator.

[00164] In some embodiments of the fourth broad aspect, the access site is at a left subclavian vein 420. In some other embodiments, the access site is at a right subclavian vein. In yet some further embodiments, the access site is at a jugular vein.

[00165] Details regarding the first broad aspect, including (but not limited to) the description of tenting, the use of electricity and the dilator supporting the steerable sheath, also apply to the fourth broad aspect.

[00166] Thus, as described above, disclosed herein are several embodiments of a method of providing access for medical devices to a specified tissue site, such as the left side of the heart from a particular access site, such as superior access site. The method comprises using one or more hybrid devices for performing multiple steps of a medical procedure to thereby reduce and/or minimize the number of device exchanges. Some of the methods include puncturing the left side of the heart using an energy delivery device sufficiently flexible so as to be advanced from a superior approach and using the energy delivery device as a rail for advancing other instruments thereupon, thereby providing a means of support for advancing instrumentation through to the left side of the heart.

[00167] <u>FURTHER EXAMPLES</u>

[00168] Example 1. A multi-function guidewire for a accessing a heart including a septum, the multi-function guidewire comprising: a rail section sufficiently stiff to act as rail and flexible enough to enable access to a septum from any approach; a distal section which is generally curved and distal of the rail section; and an active tip at a distal end of the distal section, the active tip operable to deliver energy for puncturing the septum to define a puncture site; the distal section being configured to form a coil whereby it anchors the multi-function guidewire beyond the puncture site when the distal section is advanced beyond the septum.

[00169] 2. The multi-function guidewire of example 1, wherein the rail is sufficiently flexible to enable access to the septum from an inferior approach and/or a superior approach.

[00170] 3. The multi-function guidewire of example 1, wherein the rail section has a maximum outer diameter of about 1.1 mm and a minimum outer diameter of about 0.58 mm, or more particularly, an outer diameter of about 0.86 mm at its proximal end and about 0.72 mm at its distal end.

[00171] 4. The multi-function guidewire of example 1, further comprising a metal wire, wherein the metal wire of a proximal curved portion of the proximal section has an outer diameter of about 0.13 to about 0.64 mm or, more specifically, an outer diameter of about 0.38 mm.

[00172] 5. The multi-function guidewire of example 1, wherein the distal section is sized and configured to anchor a distal end of the multi-function guidewire in an atrium without accidentally being advanced into openings adjacent the left atrium such as a left pulmonary vein or a mitral valve.

[00173] 6. The multi-function guidewire of example 1, wherein the rail section has a maximum elasticity of about 2100 N/m and a minimum elasticity of about 100 N/m.

[00174] 7. The multi-function guidewire of example 1, wherein a distal curved portion of the distal section has a maximum elasticity of about 550 N/m and a minimum elasticity of about 1 N/m.

[00175] 8. The multi-function guidewire of example 1, wherein the distal section comprises a spiral-shaped coil traversing a curve of about 630°.

[00176] 9. The multi-function guidewire of example 8, wherein a diameter of an inner curve of the coil is between about 6 mm to about 30 mm or, more specifically, about 10 mm.

[00177] 10. The multi-function guidewire of example 8, wherein a diameter of an outer curve of the coil is between about 20 mm to about 40 mm or, more specifically, about 22 mm.

[00178] 11. The multi-function guidewire of example 1, wherein a diameter of the guidewire decreases distally along a distal curved portion of the distal section.

[00179] 12. The multi-function guidewire of example 11, wherein an outer diameter of the guidewire at a proximal end of the distal curved portion is between about 0.72 mm to about 0.86 mm, and an outer diameter at a distal end of the distal curved portion is between about 0.59 mm to about 0.72 mm.

[00180] 13. The multi-function guidewire of example 1, wherein the distal section further comprises a helical coil, the helical coil having a length of between about 15 mm to about 100 mm or, more particularly, about 30 mm.

[00181] 14. The multi-function guidewire of example 13, wherein the helical coil is comprised of platinum and tungsten or, more particularly, wherein the helical coil comprises about 8% tungsten.

[00182] 15. The multi-function guidewire of example 1, wherein the active tip is comprised of platinum and iridium or, more particularly, wherein the active tip is comprised of platinum with 10% iridium.

[00183] 16. The multi-function guidewire of example 1, wherein the proximal section is biased to a curved configuration, the curved configuration being selected from the group consisting of a spiral-shaped coil and a constant diameter coil.

[00184] 17. The multi-function guidewire of example 1, wherein an outer diameter of the guidewire at the proximal section is between about 0.35 mm to about 0.86 mm or, more particularly, about 0.6 mm.

[00185] Example 18. A dilator for use with a steerable sheath to access a region of tissue within a patient's body, the steerable sheath defining a lumen there-through for receiving the dilator and having a range of deflection angles, the dilator comprising: a rigid distal end region; and a flexible intermediate region terminating at the distal end region; the dilator being configured for use in conjunction with the steerable sheath such that a location of the flexible intermediate region corresponds to a location of a region of the steerable sheath that is amenable to deflection; and the rigid distal end region having a rigidity greater than the flexible intermediate region to enable the dilator to advance through tissue.

[00186] 19. The dilator of example 18, wherein the dilator comprises a substantially straight dilator.

[00187] 20. The dilator of example 18, wherein the distal end region comprises a rigid polymer and the intermediate region comprises a flexible polymer.

[00188] 21. The dilator of example 20, wherein the rigid distal end region is formed from High Density Polyethylene and the flexible intermediate region is formed from Low Density Polyethylene.

[00189] 22. The dilator of example 18, wherein the flexible intermediate region has a length of between about 7 cm to about 17 cm or, more particularly, about 15 cm.

[00190] 23. The dilator of example 18, wherein the rigid distal end region has a length of between about 0.4 cm to about 4.0 cm or, more particularly, between about 0.5 cm to about 1.0 cm or, even more particularly, between about 0.6 cm to about 0.7 cm.

[00191] 24. The dilator of example 18, wherein the dilator defines a taper.

[00192] 25. The dilator of example 24, wherein the rigid distal end region forms a part of the taper.

[00193] 26. The dilator of example 25, wherein the taper has a length of about 1 cm.

[00194] 27. The dilator of example 18, wherein the rigid distal end region has a length of between about 2.5% to about 60% of a length of said flexible intermediate region.

[00195] 28. The dilator of example 18, wherein the dilator further comprises a proximal region extending proximally from the flexible intermediate region, the proximal region having a rigidity greater than the flexible intermediate region.

[00196] 29. The dilator of example 28, wherein the distal end region and the proximal region have a rigidity that is substantially equal.

[00197] 30. The dilator of example 29, wherein the distal end region and the proximal region are formed from a rigid polymer and wherein the intermediate region is formed from a flexible polymer.

[00198] 31. The dilator of example 30, wherein the distal end region and the proximal region are formed from High Density Polyethylene, and wherein the flexible intermediate region is formed from Low Density Polyethylene.

[00199] 32. The dilator of example 29, wherein the rigidity of each of the distal end region and the proximal region is equal to about 0.8 GPa and wherein the rigidity of the flexible intermediate region is equal to about 0.3 Gpa.

[00200] 33. The dilator of example 18, wherein the steerable sheath is actuatable to define a curve.

[00201] The embodiments of the invention described above are intended to be exemplary only. The scope of the invention is therefore intended to be limited solely by the scope of the appended claims.

[00202]    It is appreciated that certain features of the invention, which are, for clarity, described in the context of separate embodiments, may also be provided in combination in a single embodiment.  Conversely, various features of the invention, which are, for brevity, described in the context of a single embodiment, may also be provided separately or in any suitable subcombination.

31

[00203]    Although the invention has been described in conjunction with specific embodiments thereof, it is evident that many alternatives, modifications and variations will be apparent to those skilled in the art.  Accordingly, it is intended to embrace all such alternatives, modifications and variations that fall within the broad scope of the appended claims.   All publications, patents and patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual publication, patent or patent application was specifically and individually indicated to be incorporated herein by reference.  In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present invention.

**We Claim:**

1. A medical device for puncturing tissue at a tissue site, the medical device comprising:

   an elongate member having a proximal section, a distal section, and a rail section between the proximal and distal sections; and,

   an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue; and,

   the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon, as well as to be maneuverable for enabling access to the tissue site.

2. The medical device of claim 1, wherein the distal section defines a distal section curved portion and a distal section straight portion, the distal section straight portion being distal to the distal section curved portion.

3. The medical device of claim 2, wherein the elongate member comprises a reverse taper, wherein the reverse taper increases in outer diameter from the distal end of the distal section curved portion to the distal section straight portion.

4. The medical device of claim 1, wherein the distal section defines a distal section curved portion configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture.

5. The medical device of claim 4, wherein the coil is configured such that, upon deployment from a confined state, along an axis of advancement, the active tip curves away from the axis of advancement.

6. The medical device of claim 4, wherein the distal section further comprises a distal section straight portion distal to the distal section curved portion, the distal section straight portion including the active tip.

7. The medical device of claim 6, wherein the distal section straight portion has a length of about 3 mm to 10 mm.

8. The medical device of claim 4, wherein the distal coil is configured as a double pigtail curve.

9. The medical device of claim 1, wherein the elongate member comprises an electrically conductive guidewire.

10. The medical device of claim 9, wherein the electrically conductive guidewire is substantially covered by a layer of electrical insulation with a distal tip of the electrically conductive guidewire exposed.

11. The medical device of claim 10, wherein the electrically conductive guidewire further comprises an exposed portion on the proximal section, wherein the exposed portion allows for coupling to a source of electrical energy.

12. The medical device of claim 1, wherein the active tip is substantially atraumatic.

13. The medical device of claim 1, wherein the medical device further comprises a radiopaque marker positioned on the distal section.

14. The medical device of claim 13, wherein the radiopaque marker comprises a helical coil surrounding the elongate member at the distal section.

15.  The medical device of claim 14, wherein the helical coil has a length of about 15 mm to about 100 mm.

16.  The medical device of claim 1, wherein the active tip comprises an electrode.

17.  The medical device of claim 16, wherein the electrode is dome shaped.

18.  The medical device of claim 17, wherein the active tip further comprises a radiopaque marker band.

19.  The medical device of claim 1, wherein the active tip is configured to deliver radiofrequency energy.

20.  The medical device of claim 1, wherein the distal section defines a J-shaped distal section.

34

**ABSTRACT OF THE DISCLOSURE:**

Novel and unique medical devices and associated methods are disclosed, for a medical device for puncturing tissue at a tissue site. The medical device is an elongate member having a proximal section, a distal section, and a rail section therebetween. The medical device includes an active tip at a distal end of the distal section and is operable to deliver energy to create a puncture through the tissue. The rail section is configured to both act as a rail for supporting installation of one or more tubular members thereupon, as well as be maneuverable for enabling access to the tissue site.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 43759934 |
| **Application Number:** | 17474415 |
| **International Application Number:** | |
| **Confirmation Number:** | 4560 |
| **Title of Invention:** | Methods and Devices for Puncturing Tissue |
| **First Named Inventor/Applicant Name:** | Gareth  Davies |
| **Customer Number:** | 48497 |
| **Filer:** | Nir Lifshitz/Sabrina Mohess |
| **Filer Authorized By:** | Nir Lifshitz |
| **Attorney Docket Number:** | RFP026027USCON03 |
| **Receipt Date:** | 14-SEP-2021 |
| **Filing Date:** | |
| **Time Stamp:** | 13:51:38 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | EFT |
| Payment was successfully received in RAM | $1820 |
| RAM confirmation Number | E20219DD52454912 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Drawings-only black and white line drawings | RFP026027USCON03_DRAWINGS.pdf | 1946828 / f3e385074530fb2b7cd4209dc7a730f2a7f68d58 | no | 23 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Application Data Sheet | RFP026027USCON03_ADS_signed.pdf | 1256474 / 3710f76daa2708164a58674891b7b526eac8f938 | no | 10 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Transmittal Letter | RFP026027USCON03_Transmittal_signed.pdf | 280105 / 58c20b1449a50ff70c203c1c414e90e5390f836f | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Oath or Declaration filed | RFP026027USCON03_Declaration_BB_signed.pdf | 195450 / c391ac1fcbf5bc2c6e7da79ee35475a56bd9e20e | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Oath or Declaration filed | RFP026027USCON03_Declaration_FA_signed.pdf | 229525 / 2f85e86123efdd4773d949159492ae88df969383 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | Oath or Declaration filed | RFP026027USCON03_Declaration_GD_signed.pdf | 227967 / 226424437fa4b6828b9ebb606e79f4f000ffefa0 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 7 | Oath or Declaration filed | RFP026027USCON03_Declaration_JPU_signed.pdf | 224921<br><br>03300c7241e2201d098e4d30c34ea3f0ab23539d | no | 2 |

**Warnings:**

**Information:**

| | | | | | |
|---|---|---|---|---|---|
| 8 | Fee Worksheet (SB06) | fee-info.pdf | 43952<br><br>9de049988752d0fd04bfffc354f0cbaeb8f3dec6 | no | 2 |

**Warnings:**

**Information:**

| | | | | | |
|---|---|---|---|---|---|
| 9 | Specification | 2021_09_14_13_26_47_0521_ba924a60-bb92-44d1-9ef7-1488d0d89c33.docx | 67388<br><br>64751e9aa638b1399a234f3b005f8cb7c13bb0b27985e4385d0bb05fffbe97b34eb915ccb5b5e0ed5f0c3af90a09b7c4319bd87abec74d0eef9181bc60777a01 | no | 31 |

**Warnings:**

Bookmarks have been detected here and will be removed.

**Information:**

| | | | | | |
|---|---|---|---|---|---|
| 10 | Claims | 2021_09_14_13_26_50_0610_bfde35d7-abf1-4500-b793-13a758148760.docx | 31322<br><br>814aad8ae3f1220eb9e478aaed3fabe02550 93295bc2f23ba714dd31c0b7015fa1fa98b7 5b15a1fd695c4982450762590be2ddf0d41 55adce3bb7592ce3fb577 | no | 2 |

**Warnings:**

Comments were found and have been removed.

Bookmarks have been detected here and will be removed.

Hidden items were found and have been removed.

A claim contains more than one sentence. Please review and revise if necessary.

The claims contain a claim that references two sets of claims to different features.  Please review and revise if necessary.

**Information:**

| | | | | | |
|---|---|---|---|---|---|
| 11 | Abstract | 2021_09_14_13_26_51_0651_caeed9b-d422-4b08-910b-e3e636242119.docx | 28668<br><br>937deb9e33a08d970ac5623dbbd9201596 ea1f710bdc74d0d0e54a669f07accfcf02ec2 edc967f9e835564c660102d99cfe8b39cf60f bcbcaddd446af39f1fc9 | no | 1 |

**Warnings:**

The document is missing page numbering. Please review and revise if necessary.

Bookmarks have been detected here and will be removed.

**Information:**

| | | |
|---|---|---|
| **Total Files Size (in bytes):** | | 4876387 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.



Fig. 1 (i)

Fig. 1

Fig. 1A

Fig. 1B



Fig. 1C



Fig. 1D



Fig. 1E



Fig. 2A



Fig. 2B



Fig. 2C



Fig. 3A



Fig. 3B



**Fig.3C**



**Fig. 3D**



Fig. 3E



Fig. 4



Fig. 5a



Fig. 5b



Fig. 5d

Fig. 5c



Fig. 5e



Fig. 5f



Fig. 6A



Fig. 6B



Fig. 6C



Fig. 6D



Fig. 7a



Fig. 7b (i)

Fig. 7b



Fig. 7c (iv)

Fig. 7c (i)

Fig. 7c (ii)

Fig. 7c (iii)

Fig. 7c



Fig. 7d

Fig. 7e



Fig. 7g

Fig. 7f

PTO/AIA/14 (02-18)
Approved for use through 10/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

# Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2  (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

# Inventor Information:

| Inventor | 1 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| ▾ | Gareth | | Davies | ▾ |

**Residence Information (Select One)**    US Residency    ● Non US Residency    Active US Military Service

| City | Toronto | Country of Residence [i] | CA |
|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 6825 Explorer Drive |
|---|---|
| Address 2 | |
| City | Mississauga | State/Province | ON |
| Postal Code | L4W 5P6 | Country [i] | CA |

| Inventor | 2 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| ▾ | John Paul | | Urbanski | ▾ |

**Residence Information (Select One)**    US Residency    ◉ Non US Residency    Active US Military Service

| City | Toronto | Country of Residence [i] | CA |
|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 6825 Explorer Drive |
|---|---|
| Address 2 | |
| City | Mississauga | State/Province | ON |
| Postal Code | L4W 5P6 | Country [i] | CA |

| Inventor | 3 | | Remove |
|---|---|---|---|

**Legal Name**

PTO/AIA/14 (02-18)
Approved for use through 10/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Ferryl | | Alley | |

**Residence Information (Select One)**  US Residency  ⦿ Non US Residency  Active US Military Service

| City | Burlington | Country of Residence ⁱ | CA |
|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 6825 Explorer Drive |
|---|---|
| Address 2 | |

| City | Mississauga | State/Province | ON |
|---|---|---|---|
| Postal Code | L4W 5P6 | Country ⁱ | CA |

Inventor  4    [Remove]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Bogdan | | Beca | |

**Residence Information (Select One)**  US Residency  ⦿ Non US Residency  Active US Military Service

| City | Thornhill | Country of Residence ⁱ | ON |
|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 6825 Explorer Drive |
|---|---|
| Address 2 | |

| City | Mississauga | State/Province | ON |
|---|---|---|---|
| Postal Code | L4W 5P6 | Country ⁱ | CA |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.    [Add]

## Correspondence Information:

**Enter either Customer Number or complete the Correspondence Information section below.**
**For further information see 37 CFR 1.33(a).**

☐ **An Address is being provided for the correspondence Information of this application.**

| Customer Number | 48497 |
|---|---|
| Email Address | ipdocket@baylismedical.com    [Add Email]  [Remove Email] |

PTO/AIA/14 (02-18)
Approved for use through 10/30/2023. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

# Application Information:

| Title of the Invention | Methods and Devices for Puncturing Tissue | |
|---|---|---|
| Attorney Docket Number | RFP026027USCON03 | Small Entity Status Claimed ☐ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| Total Number of Drawing Sheets (if any) | 23 | Suggested Figure for Publication (if any) | |

# Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

# Publication Information:

| ☐ | Request Early Publication (Fee required at time of Request 37 CFR 1.219) |
|---|---|
| ☐ | **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing. |

# Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ● Customer Number | US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 48497 | | |

EFS Web 2.2.13

PTO/AIA/14 (02-18)
Approved for use through 10/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.

When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | Pending | ▾ | | Remove |
|---|---|---|---|---|
| **Application Number** | **Continuity Type** | | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| | Continuation of ▾ | | 16445790 | 2019-06-19 |

| Prior Application Status | Pending | ▾ | | Remove |
|---|---|---|---|---|
| **Application Number** | **Continuity Type** | | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| 16445790 | Continuation of ▾ | | 14910525 | 2016-02-05 |

| Prior Application Status | Expired | ▾ | | Remove |
|---|---|---|---|---|
| **Application Number** | **Continuity Type** | | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| 14910525 | a 371 of international ▾ | | PCTIB2013060287 | 2013-11-20 |

| Prior Application Status | Expired | ▾ | | Remove |
|---|---|---|---|---|
| **Application Number** | **Continuity Type** | | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| PCTIB2013060287 | Claims benefit of provisional ▾ | | 61863579 | 2013-08-08 |

| Prior Application Status | Expired | ▾ | | Remove |
|---|---|---|---|---|
| **Application Number** | **Continuity Type** | | **Prior Application Number** | **Filing or 371(c) Date (YYYY-MM-DD)** |
| PCTIB2013060287 | Claims benefit of provisional ▾ | | 61863265 | 2013-08-07 |

| Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button. | Add |
|---|---|

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

PTO/AIA/14 (02-18)
Approved for use through 10/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
|  | Application Number |  |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

Remove

| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
|---|---|---|---|
|  |  |  |  |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

Add

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.

NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

PTO/AIA/14 (02-18)
Approved for use through 10/30/2026. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027USCON03 |
| --- | --- | --- |
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
| --- | --- |

# Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**:  This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application.  After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s).  Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1.  Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A.  Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2)  any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B.  Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2.  Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐    A.  Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed.  If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐    B.  Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:**  Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

PTO/AIA/14 (02-18)
Approved for use through 10/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
| | Application Number | |
| Title of Invention | Methods and Devices for Puncturing Tissue | |

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

| Applicant | 1 | Remove |
|---|---|---|

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| Assignee | Legal Representative under 35 U.S.C. 117 | Joint Inventor |
|---|---|---|
| Person to whom the inventor is obligated to assign. | Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here.  ☒

| Organization Name | Baylis Medical Company Inc. |
|---|---|

**Mailing Address Information For Applicant:**

| Address 1 | 5959 Trans-Canada Highway | | |
|---|---|---|---|
| Address 2 | | | |
| City | Montreal | State/Province | QC |
| Country | CA | Postal Code | H4T 1A1 |
| Phone Number | 5144889801 | Fax Number | 5144887209 |
| Email Address | ipdocket@baylismedical.com | | |

Additional Applicant Data may be generated within this form by selecting the Add button.    Add

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

PTO/AIA/14 (02-18)
Approved for use through 10/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

**Assignee** | 1

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

Remove

If the Assignee or Non-Applicant Assignee is an Organization check here.  ☐

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| ▼ | | | | ▼ |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| Address 1 | |
|---|---|
| Address 2 | |
| **City** | | **State/Province** | |
| **Country** i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

Add

## Signature:

Remove

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the INITIAL filing of the application and either box A or B is not checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| **Signature** | /Glenn Arnold/ | | | Date (YYYY-MM-DD) | 2021-09-10 |
|---|---|---|---|---|---|
| First Name | Glenn | Last Name | Arnold | Registration Number | 65997 |

Additional Signature may be generated within this form by selecting the Add button.

Add

PTO/AIA/14 (02-18)
Approved for use through 10/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | RFP026027USCON03 |
|---|---|---|
| | Application Number | |

| Title of Invention | Methods and Devices for Puncturing Tissue |
|---|---|

This collection of information is required by 37 CFR 1.76.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/AIA/82A (07-13)
Approved for use through 01/31/2018. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form.  If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | 17474415 |
| Filing Date | 14-September-2021 |
| First Named Inventor | Gareth Davies |
| Title | Methods and Devices for Puncturing Tissue |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | RFP026027USCON03 |

## SIGNATURE of Applicant or Patent Practitioner

| Signature | /Glenn Arnold/ | Date (Optional) | 8 Sep 2021 |
|---|---|---|---|
| Name | Glenn Arnold | Registration Number | 65997 |

| Title (if Applicant is a juristic entity) | |
|---|---|
| Applicant Name (if Applicant is a juristic entity) | |

**NOTE:**  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

☐    *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Doc Code: PA..

Document Description: Power of Attorney

PTO/AIA/82B (07-13)
Approved for use through 01/31/2016. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

## POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in <u>either</u> the attached transmittal letter or the boxes below.

| Application Number | Filing Date |
|---|---|
|  |  |

(Note: The boxes above may be left blank if information is provided on form PTO/AIA/82A.)

[ ] I hereby appoint the Patent Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above:

OR

[✓] I hereby appoint Practitioner(s) named in the attached list (form PTO/AIA/82C) as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the patent application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above. (Note: Complete form PTO/AIA/82C.)

**Please recognize or change the correspondence address for the application identified in the attached transmittal letter or the boxes above to:**

[ ] The address associated with the above-mentioned Customer Number

OR

[✓] The address associated with Customer Number: 48497

OR

| [ ] Firm or Individual Name |  |  |  |  |  |
|---|---|---|---|---|---|
| Address |  |  |  |  |  |
| City |  | State |  | Zip |  |
| Country |  |  |  |  |  |
| Telephone |  | Email |  |  |  |

I am the Applicant (if the Applicant is a juristic entity, list the Applicant name in the box):

### Baylis Medical Company Inc.

[ ] Inventor or Joint Inventor (title not required below)

[ ] Legal Representative of a Deceased or Legally Incapacitated Inventor (title not required below)

[✓] Assignee or Person to Whom the Inventor is Under an Obligation to Assign (provide signer's title if applicant is a juristic entity)

[ ] Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document) (provide signer's title if applicant is a juristic entity)

### SIGNATURE of Applicant for Patent

The undersigned (whose title is supplied below) is authorized to act on behalf of the applicant (e.g., where the applicant is a juristic entity).

| Signature |  | Date (Optional) |  |
|---|---|---|---|
| Name | Kris Shah |  |  |
| Title | President, Baylis Medical Company Inc. |  |  |

NOTE: Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. If more than one applicant, use multiple forms.

[ ] Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/82C (07-13)
Approved for use through 01/31/2018. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# POWER OF ATTORNEY BY APPLICANT

No more than ten (10) patent practitioners total may be appointed as set forth below by name and registration number. This page need not be submitted if appointing the Patent Practitioner(s) associated with a Customer Number (see form PTO/AIA/82B):

| Name | Registration Number |
|---|---|
| Nir Lifshitz | 62427 |
| Glenn Arnold | 65997 |
| Vincent Man | 72144 |
| Samuel Tekie | 56839 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 43760033 |
| **Application Number:** | 17474415 |
| **International Application Number:** | |
| **Confirmation Number:** | 4560 |
| **Title of Invention:** | Methods and Devices for Puncturing Tissue |
| **First Named Inventor/Applicant Name:** | Gareth Davies |
| **Customer Number:** | 48497 |
| **Filer:** | Nir Lifshitz/Sabrina Mohess |
| **Filer Authorized By:** | Nir Lifshitz |
| **Attorney Docket Number:** | RFP026027USCON03 |
| **Receipt Date:** | 14-SEP-2021 |
| **Filing Date:** | |
| **Time Stamp:** | 13:56:47 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Power of Attorney | RFP026027USCON03_POA_signed.pdf | 306265 <br> cd0b86c333bfe08fd636e7356467155d2637cead | no | 4 |

**Warnings:**

| Information: | | |
|---|---|---|
| Total Files Size (in bytes): | | 306265 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**
**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**
**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

PTO/AIA/82A (07-13)
Approved for use through 03/31/2021. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form. If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | 17/474,415 |
| Filing Date | September 14, 2021 |
| First Named Inventor | Gareth Davies |
| Title | Methods and Devices for Puncturing Tissue |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 051666/12005 |

### SIGNATURE of Applicant or Patent Practitioner

| Signature | /Jason R. Kraus/ | Date (Optional) | 2023-02-23 |
|---|---|---|---|
| Name | Jason R. Kraus | Registration Number | 42765 |
| Title (if Applicant is a juristic entity) | | | |
| Applicant Name (if Applicant is a juristic entity) | | | |

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

☐    *Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/80 (07-17)
Approved for use through 03/31/2021. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no person is required to respond to a collection of information unless it displays a valid OMB control number

# POWER OF ATTORNEY TO PROSECUTE APPLICATIONS BEFORE THE USPTO

I hereby revoke all previous powers of attorney given in the application identified in the attached statement under 37 CFR 3.73(c).

I hereby appoint:

[X] Practitioners associated with Customer Number: **188636**

**OR**

[ ] Practitioner(s) named below (if more than ten patent practitioners are to be named, then a customer number must be used):

| Name | Registration Number | Name | Registration Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

As attorney(s) or agent(s) to represent the undersigned before the United States Patent and Trademark Office (USPTO) in connection with any and all patent applications assigned only to the undersigned according to the USPTO assignment records or assignment documents attached to this form in accordance with 37 CFR 3.73(c).

Please change the correspondence address for the application identified in the attached statement under 37 CFR 3.73(c) to:

[X] The address associated with Customer Number: **188636**

**OR**

[ ] Firm or individual name **Nelson Mullins Riley & Scarborough LLP**

| Address | | | |
|---|---|---|---|
| City | | State | Zip |
| Country | | | |
| Telephone | | Email | |

Assignee name and address: Boston Scientific Medical Device Limited
Ballybrit Business Park
Ballybrit, Galway IRELAND

**A copy of this form, together with a statement under 37 CFR 3.73(c) (Form PTO/AIA/96 or equivalent) is required to be filed in each application in which this form is used. The statement under 37 CFR 3.73(c) may be completed by one of the practitioners appointed in this form, and must identify the application in which this Power of Attorney is to be filed.**

### SIGNATURE of Assignee of Record

The individual whose signature and title is supplied below is authorized to act on behalf of the assignee.

| Signature | _Katrina Witschen_ DocuSigned by C67C8F311F41463... | Date | 7/6/2022 \| 1:40 PM PDT |
|---|---|---|---|
| Name | Katrina Witschen | Telephone | 651.582.6310 |
| Title | Authorized Patent Officer | | |

This collection of information is required by 37 CFR 1.31, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public, which is to update (and by the USPTO to process) the file of a patent or reexamination proceeding. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 18 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

## Corrected Application Data Sheet

## Correspondence Information

Correspondence Customer Number::  ~~48497~~ 188636

E-Mail address::  ~~ipdocket@baylismedical.com~~

ipdocket@nelsonmullins.com

## Application Information

Application Number::  17/474,415

Filing Date::  09/14/2021

Application Type::  Nonprovisional

Title::  METHODS AND DEVICES FOR PUNCTURING TISSUE

Attorney Docket Number::  ~~RFP026027USCON03~~ 051666/12005

## Representative Information

Representative Customer Number::  ~~48497~~ 188636

## Applicant Information

Applicant Number::  1

Applicant Type::  Assignee

Organization Name::  ~~Baylis Medical Company Inc.~~ Boston Scientific Medical Device Limited

Street of mailing address::  ~~5959 Trans-Canada Highway~~ Ballybrit Business Park

City of mailing address::  ~~Montreal~~ Ballybrit, Galway

State or Province of mailing address::  ~~QC~~

Page # 1            Corrected 17474415 9/14/2021 2/23/2023

Country of mailing address::                    ~~Canada~~ Ireland

Postal or Zip Code of mailing address::         ~~H4T 1A1~~ H91 Y868

Phone Number::                                  ~~5144889801~~

Fax Number::                                    ~~5144887209~~

E-Mail Address::                                ~~ipdocket@baylismedical.com~~

                                                ipdocket@nelsonmullins.com


## Signature:

| NOTE: This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the <u>INITIAL</u> filing of the application <u>and</u> either box A or B is <u>not</u> checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).** |
|---|
|     This Application Data Sheet <u>**must**</u> be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, <u>**all**</u> joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of <u>**all**</u> joint inventor-applicants.<br>    See 37 CFR 1.4(d) for the manner of making signatures and certifications. |

| Signature | /Jason R. Kraus/ | Date (YYYY-MM-DD) | 2023-02-23 |
|---|---|---|---|
| Name | Jason R. Kraus | Registration Number | 42,765 |



UNITED STATES
PATENT AND TRADEMARK OFFICE

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION #<br>**17/474,415** | RECEIPT DATE / TIME<br>**02/23/2023 11:02:40 AM ET** | ATTORNEY DOCKET #<br>**051666/12005** |
|---|---|---|

## Title of Invention

Methods and Devices for Puncturing Tissue

## Application Information

| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
|---|---|---|---|
| CONFIRMATION # | 4560 | FILED BY | Carmen Prince |
| PATENT CENTER # | 61638468 | FILING DATE | 09/14/2021 |
| CUSTOMER # | 48497 | FIRST NAMED INVENTOR | Gareth Davies |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Jason Kraus |

## Documents

# TOTAL DOCUMENTS: 5

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| 051666-12005 BSMDL_POA.pdf | 3 | Power of Attorney | 381 KB |
| 051666-12005 Request to Change Applicant.pdf | 2 | Request under 37CFR1.46(c) to correct, update, change applicant | 304 KB |
| 051666-12005 Corrected ADS.pdf | 2 | Application Data Sheet | 212 KB |

Warning: This is not a USPTO supplied ADS fillable form. Data in the form cannot be automatically loaded to other USPTO systems.

| 051666.12005 Request for | 1 | Request for Corrected Filing | 132 KB |

| | | | |
|---|---|---|---|
| Corrected Filing Receipt.pdf | | Receipt | |
| 051666-12005 3-73 Statement.pdf | 2 | Assignee showing of ownership per 37 CFR 3.73 | 182 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| 051666-12005 BSMDL_POA.pdf | 7BF68D804E3911387B267C7C1C381E3C2C78A64C06B3A19AC ED95273D59DD09DE5282E2391BA515921280CD4B6C13AA562 A9B1C60746111167E4DE957832C379 |
| 051666-12005 Request to Change Applicant.pdf | 6AFCF262709AC76D998701F2BF4921C2BCEF89464AD8625C0 42C0069C28F38F43DB24E4F57DE7FA25E50D315BC8406FCEF C69E2A275E9F84D3565CD541393108 |
| 051666-12005 Corrected ADS.pdf | 154D382278E617FDE4709DF4CF6127667A1B4A7225ED6FCE6 FC0ED9AC79F01918E0B5561DFB4B86D41E079239F60A6022A EA81EF1E03C22B61E0026D2DDB4D60 |
| 051666.12005 Request for Corrected Filing Receipt.pdf | 3297E18519B97CFBEADB80863C061141257A52596F0320D467 1F4E09727A7ED657BC75C8CF1F708D15FD37E9EBFBDB57DF B9472A945ABE562F21B64B9042418B |
| 051666-12005 3-73 Statement.pdf | 86A0C720FE67791BF9AAD00CED431D88631363D6A1B7404E9 1C8CFE962F0022BDC9E426A72CE761947E2183D586E1D09BC 0E2D84C3D7A8FE0A44B16C86330A52 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage

submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

### New International Application Filed with the USPTO as a Receiving Office

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

051666/12005    PTO/AIA/96 (08-12)
Approved for use through 11/30/2020.  OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

Applicant/Patent Owner:    Baylis Medical Company Inc.

Application No./Patent No.:    17/474,415    Filed/Issue Date:    September 14, 2021

Titled:    METHODS AND DEVICES FOR PUNCTURING TISSUE

Boston Scientific Medical Device Limited , a    Corporation
(Name of Assignee)    (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that, for the patent application/patent identified above, it is (choose **one** of options 1, 2, 3 or 4 below):

1. [x] The assignee of the entire right, title, and interest.

2. [ ]

   [ ] The extent (by percentage) of its ownership interest is _____ %.  Additional Statement(s) by the owners holding the balance of the interest <u>must be submitted</u> to account for 100% of the ownership interest.

   [ ] There are unspecified percentages of ownership.  The other parties, including inventors, who together own the entire right, title and interest are:

   |  |
   |  |

   Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

3. [ ] The assignee of an undivided interest in the entirety (a complete assignment from one of the joint inventors was made).
The other parties, including inventors, who together own the entire right, title, and interest are:

   |  |
   |  |

   Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

4. [ ] The recipient, via a court proceeding or the like (*e.g.*, bankruptcy, probate), of an undivided interest in the entirety (a complete transfer of ownership interest was made).  The certified document(s) showing the transfer is attached.

The interest identified in option 1, 2 or 3 above (not option 4) is evidenced by either (choose **one** of options A or B below):

A. [ ] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____ , Frame _____ , or for which a copy thereof is attached.

B. [x] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

   1. From:   Gareth Davies et al.    To:   Baylis Medical Company Inc.
      The document was recorded in the United States Patent and Trademark Office at
      Reel    057475    , Frame    0703    , or for which a copy thereof is attached.

   2. From:   Baylis Medical Company Inc.    To:   Boston Scientific Medical Device Limited
      The document was recorded in the United States Patent and Trademark Office at
      Reel    061738    , Frame    0845    , or for which a copy thereof is attached.

[Page 1 of 2]

PTO/AIA/96 (08-12)
Approved for use through 11/30/2020.  OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

3.  From: _____  To: _____

The document was recorded in the United States Patent and Trademark Office at

Reel _____ , Frame _____ , or for which a copy thereof is attached.

4.  From: _____  To: _____

The document was recorded in the United States Patent and Trademark Office at

Reel _____ , Frame _____ , or for which a copy thereof is attached.

5.  From: _____  To: _____

The document was recorded in the United States Patent and Trademark Office at

Reel _____ , Frame _____ , or for which a copy thereof is attached.

6.  From: _____  To: _____

The document was recorded in the United States Patent and Trademark Office at

Reel _____ , Frame _____ , or for which a copy thereof is attached.

[ ] Additional documents in the chain of title are listed on a supplemental sheet(s).

[x] As required by 37 CFR 3.73(c)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

[NOTE:  A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

| /Jason R. Kraus/ | February 23, 2023 |
|---|---|
| Signature | Date |
| Jason R. Kraus | 42765 |
| Printed or Typed Name | Title or Registration Number |

[Page 2 of 2]

Doc Code: R46C.REQ
Document Description: Request under 37 CFR 1.46(c) to correct, update or change the applicant.

PTO/AIA/41 (04-15)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| REQUEST TO CORRECT OR UPDATE THE NAME OF THE APPLICANT UNDER 37 CFR 1.46(c)(1), OR CHANGE THE APPLICANT UNDER 37 CFR 1.46(c)(2) (FOR USE ONLY IN APPLICATIONS FILED ON OR AFTER SEPTEMBER 16, 2012) | | |
|---|---|---|
| | Application Number | 17/474,415 |
| | Filing Date | September 14, 2021 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | Not Yet Assigned |
| | Examiner Name | Not Yet Assigned |
| | Practitioner Docket Number | 051666/12005 |

**To:    Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA  22313-1450**

Applicant hereby **requests that the name of the applicant be corrected or updated under 37 CFR 1.46(c)(1), or that the applicant be changed under 37 CFR 1.46(c)(2),** in the above-identified application.  **Requests under 37 CFR 1.46(c)(1) or (c)(2) cannot be submitted after payment of the issue fee or if the application has been patented.**

Please check the applicable box(es) below.

☐    1. This request is to **correct or update the name of the applicant (under 37 CFR 1.46(c)(1))** and includes:

☐    An application data sheet (ADS) in accordance with 37 CFR 1.76(c) with the corrected or updated information shown with markings (*e.g.*, underlining for insertions, strikethrough for deletions).  A Corrected Web-based ADS may be used.

**Note:** Requests under 37 CFR 1.46(c)(1) may be filed to correct typographical errors in the name of the § 1.46 applicant, or for updating the name of the § 1.46 applicant (*i.e.*, where there is no change in the applicant itself but just in the applicant's name).  See the Manual of Patent Examining Procedure (MPEP) section 605.01.

■    2. This request is to **change the applicant (under 37 CFR 1.46(c)(2))** and includes:

■    An application data sheet (ADS) in accordance with 37 CFR 1.76(c) that identifies the changes with proper markings (underlining for insertions and strikethrough for deletions).  A Corrected Web-based ADS may be used.

■    A Statement Under 37 CFR 3.73(c) (Form PTO/AIA/96 or equivalent).  See MPEP 325.

I am the

☐ applicant*    ■ attorney or agent of record    ☐ attorney or agent acting under 37 CFR 1.34
                  Registration number 42765           Registration number _____

Signature  /Jason R. Kraus/
Typed or printed name  Jason R. Kraus
Date  February 23, 2023

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications.  *Juristic entities must be represented by a patent practitioner (See 37 CFR 1.31, applicable to any paper filed on or after September 16, 2012 that is presented on behalf of a juristic entity, regardless of application filing date).  Submit multiple forms if more than one signature is required, see below**.

☐    ** Total of _____ forms are submitted.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **If filing this completed form by mail, send to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a Federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 9) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

## Additional Uses

Additional USPTO uses of the information in this record may include disclosure to: 1) the International Bureau of the World Intellectual Property Organization, if the record is related to an international application filed under the Patent Cooperation Treaty;  2) the public i) after publication of the application pursuant to 35 U.S.C. 122(b), ii) after issuance of a patent pursuant to 35 U.S.C. 151, iii) if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections, or an issued patent, or iv) without publication of the application or patent under the specific circumstances provided for by 37 CFR 1.14(a)(1)(v)-(vii); and/or 3) the National Archives and Records Administration, for inspection of records.

# UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| **Inventor(s):** | Gareth Davies, et al. | **Examiner:** | Not Yet Assigned |
| **Appln. No.:** | 17/474,415 | **Group Art Unit:** | Not Yet Assigned |
| **Filing Date:** | September 14, 2021 | **Confirmation No.:** | 4560 |
| **Title:** | METHODS AND DEVICES FOR PUNCTURING TISSUE | **Docket No.:** | 051666/12005 |

Commissioner for Patents
P. O. Box 1450
Alexandria, VA  22313-1450

I CERTIFY THAT THIS PAPER (ALONG WITH ANY REFERRED TO AS BEING ATTACHED OR ENCLOSED) IS BEING TRANSMITTED TO THE COMMISSIONER FOR PATENTS, P. O. BOX 1450, ALEXANDRIA, VA 22313-1450 ON FEBRUARY 23, 2023, VIA THE USPTO-EFS-WEB FILING SYSTEM.

_/Carmen Prince/_
CARMEN PRINCE

## REQUEST FOR CORRECTED FILING RECEIPT

Applicant hereby requests that a corrected Filing Receipt be issued in the above-identified application to reflect the following change:

1.  Applicant respectfully requests that the Applicant be updated from Baylis Medical Company Inc. to Boston Scientific Medical Device Limited.  The required Request to Update Applicant and corrected Application Data Sheet are filed herewith.

No new matter is submitted with this request and no fee is believed to be necessary. Should any fee be required, the Commissioner is authorized to charge Deposit Account No. 50-1196.

Respectfully submitted,

Nelson Mullins Riley & Scarborough LLP

By:    /Jason R. Kraus/_____
          Jason R. Kraus
          Reg. No.  42,765
          Customer No.: 188636

Dated: February 23, 2023

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 17474415 |
| Filing Date | 2021-09-14 |
| First Named Inventor | Gareth Davies |
| Art Unit | OPAP |
| Examiner Name | CENTRAL, DOCKET |
| Attorney Docket  Number | 051666/12005 |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 0175254 | | 1876-03-28 | C OBERLY | |
| | 2 | 0827626 | | 1906-07-31 | GILLET ALEXIS F | |
| | 3 | 0848711 | | 1907-04-02 | WEAVER DANIEL | |
| | 4 | 1072954 | | 1913-09-09 | JUNN FRANK B | |
| | 5 | 1279654 | | 1918-09-24 | CHARLESWORTH HORACE M | |
| | 6 | 1918094 | | 1933-07-11 | GEEKAS DEMETRIUS G | |
| | 7 | 1996986 | | 1935-04-09 | ALEXANDER WEINBERG | |
| | 8 | 2021989 | | 1935-11-26 | DE MASTER MATTHEW J | |

EFS Web 2.1.18

| | | | Application Number | 17474415 |
|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | Filing Date | 2021-09-14 |
| | | | First Named Inventor | Gareth Davies |
| | | | Art Unit | OPAP |
| | | | Examiner Name | CENTRAL, DOCKET |
| | | | Attorney Docket Number | 051666/12005 |

| | | | | |
|---|---|---|---|---|
| 9 | 2146636 | | 1939-02-07 | LIPCHOW WALTER F |
| 10 | 3429574 | | 1969-02-25 | WILLIAMS CHARLES L |
| 11 | 3448739 | | 1969-06-10 | STARK et al. |
| 12 | 3575415 | | 1971-04-20 | FULP et al. |
| 13 | 3595239 | | 1971-07-27 | PETERSEN ROY A |
| 14 | 4129129 | | 1978-12-12 | AMRINE BRUCE A |
| 15 | 4244362 | | 1981-01-13 | ANDERSON CHARLES C |
| 16 | 4401124 | | 1983-08-30 | GUESS et al. |
| 17 | 4639252 | | 1987-01-27 | KELLY et al. |
| 18 | 4641649 | | 1987-02-10 | WALINSKY et al. |
| 19 | 4669467 | | 1987-06-02 | WILLETT et al. |

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | | 17474415 | |
|---|---|---|---|---|---|
| | | Filing Date | | 2021-09-14 | |
| | | First Named Inventor | Gareth Davies | | |
| | | Art Unit | | OPAP | |
| | | Examiner Name | CENTRAL, DOCKET | | |
| | | Attorney Docket  Number | | 051666/12005 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 20 | 4682596 | | 1987-07-28 | BALES et al. | |
| | 21 | 4790311 | | 1988-12-13 | RUIZ OSCAR F | |
| | 22 | 4790809 | | 1988-12-13 | KUNTZ DAVID H | |
| | 23 | 4793350 | | 1988-12-27 | MAR et al. | |
| | 24 | 4807620 | | 1989-02-28 | STRUL et al. | |
| | 25 | 4832048 | | 1989-05-23 | COHEN DONALD | |
| | 26 | 4840622 | | 1989-06-20 | HARDY DWAYNE E | |
| | 27 | 4863441 | | 1989-09-05 | LINDSAY et al. | |
| | 28 | 4884567 | | 1989-12-05 | ELLIOTT et al. | |
| | 29 | 4892104 | | 1990-01-09 | ITO et al. | |
| | 30 | 4896671 | | 1990-01-30 | CUNNINGHAM et al. | |

<table>
<tr>
<td colspan="3"><strong>INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT</strong><br>( Not for submission under 37 CFR 1.99)</td>
<td colspan="2">Application Number</td>
<td colspan="2">17474415</td>
</tr>
<tr>
<td colspan="2">Filing Date</td>
<td colspan="2">2021-09-14</td>
</tr>
<tr>
<td colspan="2">First Named Inventor</td>
<td>Gareth Davies</td>
<td></td>
</tr>
<tr>
<td colspan="2">Art Unit</td>
<td colspan="2">OPAP</td>
</tr>
<tr>
<td colspan="2">Examiner Name</td>
<td colspan="2">CENTRAL, DOCKET</td>
</tr>
<tr>
<td colspan="2">Attorney Docket Number</td>
<td colspan="2">051666/12005</td>
</tr>
</table>

| | | | | | |
|---|---|---|---|---|---|
| 31 | 4928693 | | 1990-05-29 | GOODIN et al. | |
| 32 | 4936281 | | 1990-06-26 | STASZ PETER | |
| 33 | 4960410 | | 1990-10-02 | PINCHUK LEONARD | |
| 34 | 4977897 | | 1990-12-18 | HURWITZ ROBERT | |
| 35 | 4998933 | | 1991-03-12 | EGGERS et al. | |
| 36 | 5006119 | | 1991-04-09 | ACKER et al. | |
| 37 | 5019076 | | 1991-05-28 | YAMANASHI et al. | |
| 38 | 5047026 | | 1991-09-10 | RYDELL MARK A | |
| 39 | 5081997 | | 1992-01-21 | BOSLEY et al. | |
| 40 | 5098392 | A | 1992-03-24 | FLEISCHHACKER et al. | |
| 41 | 5098431 | A | 1992-03-24 | RYDELL MARK A | |

<table>
<tr><td rowspan="7">INFORMATION DISCLOSURE STATEMENT BY APPLICANT<br>( Not for submission under 37 CFR 1.99)</td><td colspan="2">Application Number</td><td>17474415</td></tr>
<tr><td colspan="2">Filing Date</td><td>2021-09-14</td></tr>
<tr><td colspan="2">First Named Inventor</td><td>Gareth Davies</td></tr>
<tr><td colspan="2">Art Unit</td><td>OPAP</td></tr>
<tr><td colspan="2">Examiner Name</td><td>CENTRAL, DOCKET</td></tr>
<tr><td colspan="2">Attorney Docket  Number</td><td>051666/12005</td></tr>
</table>

| | | | | | |
|---|---|---|---|---|---|
| | 42 | 5112048 | A | 1992-05-12 | KIENLE ROBERT N |
| | 43 | 5154724 | A | 1992-10-13 | ANDREWS WINSTON A |
| | 44 | 5201756 | A | 1993-04-13 | HORZEWSKI et al. |
| | 45 | 5209741 | A | 1993-05-11 | SPAETH EDMUND E |
| | 46 | 5211183 | A | 1993-05-18 | WILSON BRUCE C |
| | 47 | 5221256 | A | 1993-06-22 | MAHURKAR SAKHARAM D |
| | 48 | 5230349 | A | 1993-07-27 | LANGBERG EDWIN |
| | 49 | 5281216 | A | 1994-01-25 | KLICEK MICHAEL S |
| | 50 | 5300068 | A | 1994-04-05 | ROSAR et al. |
| | 51 | 5300069 | A | 1994-04-05 | HUNSBERGER et al. |
| | 52 | 5312341 | A | 1994-05-17 | TURI ZOLTAN |

EFS Web 2.1.18

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | | |

| | | |
|---|---|---|
| Application Number | | 17474415 |
| Filing Date | | 2021-09-14 |
| First Named Inventor | Gareth Davies | |
| Art Unit | | OPAP |
| Examiner Name | CENTRAL, DOCKET | |
| Attorney Docket  Number | | 051666/12005 |

| | | | | |
|---|---|---|---|---|
| 53 | 5314418 | A | 1994-05-24 | TAKANO et al. |
| 54 | 5318525 | A | 1994-06-07 | WEST et al. |
| 55 | 5327905 | A | 1994-07-12 | AVITALL BOAZ |
| 56 | 5364393 | A | 1994-11-15 | AUTH et al. |
| 57 | 5366443 | A | 1994-11-22 | EGGERS et al. |
| 58 | 5372596 | A | 1994-12-13 | KLICEK et al. |
| 59 | 5380304 | A | 1995-01-10 | PARKER FRED T |
| 60 | 5395341 | A | 1995-03-07 | SLATER ANDREA T |
| 61 | 5397304 | A | 1995-03-14 | TRUCKAI CSABA |
| 62 | 5403338 | A | 1995-04-04 | MILO SIMCHA |
| 63 | 5423809 | A | 1995-06-13 | KLICEK MICHAEL S |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 17474415 | |
| Filing Date | 2021-09-14 | |
| First Named Inventor | Gareth Davies | |
| Art Unit | OPAP | |
| Examiner Name | CENTRAL, DOCKET | |
| Attorney Docket  Number | 051666/12005 | |

| | 64 | 5425382 | A | 1995-06-20 | GOLDEN et al. | |
|---|---|---|---|---|---|---|
| | 65 | 5490859 | A | 1996-02-13 | MISCHE et al. | |
| | 66 | 5497774 | A | 1996-03-12 | SWARTZ et al. | |
| | 67 | 5499975 | A | 1996-03-19 | COPE et al. | |
| | 68 | 5507751 | A | 1996-04-16 | GOODE et al. | |
| | 69 | 5509411 | A | 1996-04-23 | LITTMANN et al. | |
| | 70 | 5540681 | A | 1996-07-30 | STRUL et al. | |
| | 71 | 5545200 | A | 1996-08-13 | WEST et al. | |
| | 72 | 5555618 | A | 1996-09-17 | WINKLER JOSEF | |
| | 73 | 5571088 | A | 1996-11-05 | LENNOX et al. | |
| | 74 | 5575766 | A | 1996-11-19 | SWARTZ et al. | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br>( **Not for submission under 37 CFR 1.99)** | | Application Number | | 17474415 | |
| | | | | Filing Date | | 2021-09-14 | |
| | | | | First Named Inventor | Gareth Davies | | |
| | | | | Art Unit | | OPAP | |
| | | | | Examiner Name | | CENTRAL, DOCKET | |
| | | | | Attorney Docket  Number | | 051666/12005 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 75 | 5575772 | A | 1996-11-19 | LENNOX CHARLES D | |
| | 76 | 5599347 | A | 1997-02-04 | HART et al. | |
| | 77 | 5605162 | A | 1997-02-25 | MIRZAEE et al. | |
| | 78 | 5617878 | A | 1997-04-08 | TAHERI SYDE A | |
| | 79 | 5622169 | A | 1997-04-22 | GOLDEN et al. | |
| | 80 | 5624430 | A | 1997-04-29 | ETON et al. | |
| | 81 | 5667488 | A | 1997-09-16 | LUNDQUIST et al. | |
| | 82 | 5673695 | A | 1997-10-07 | MCGEE et al. | |
| | 83 | 5674208 | A | 1997-10-07 | BERG et al. | |
| | 84 | 5680860 | A | 1997-10-28 | IMRAN MIR A | |
| | 85 | 5683366 | A | 1997-11-04 | EGGERS et al. | |

EFS Web 2.1.18

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| Application Number | 17474415 |
|---|---|
| Filing Date | 2021-09-14 |
| First Named Inventor | Gareth Davies |
| Art Unit | OPAP |
| Examiner Name | CENTRAL, DOCKET |
| Attorney Docket Number | 051666/12005 |

| | | | | |
|---|---|---|---|---|
| 86 | 5720744 | A | 1998-02-24 | EGGLESTON et al. |
| 87 | 5741249 | A | 1998-04-21 | MOSS et al. |
| 88 | 5766135 | A | 1998-06-16 | TERWILLIGER RICHARD A |
| 89 | 5779688 | A | 1998-07-14 | IMRAN et al. |
| 90 | 5810764 | A | 1998-09-22 | EGGERS et al. |
| 91 | 5814028 | A | 1998-09-29 | SWARTZ et al. |
| 92 | 5830214 | A | 1998-11-03 | FLOM et al. |
| 93 | 5836875 | A | 1998-11-17 | WEBSTER JR WILTON W |
| 94 | 5849011 | A | 1998-12-15 | JONES et al. |
| 95 | 5851210 | A | 1998-12-22 | TOROSSIAN RICHARD |
| 96 | 5885227 | A | 1999-03-23 | FINLAYSON MAUREEN |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | **Application Number** | | 17474415 | |
| | | | | **Filing Date** | | 2021-09-14 | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | | **First Named Inventor** | Gareth Davies | | |
| | | | | **Art Unit** | | OPAP | |
| | | | | **Examiner Name** | CENTRAL, DOCKET | | |
| | | | | **Attorney Docket  Number** | | 051666/12005 | |

| | | | | | |
|---|---|---|---|---|---|
| 97 | 5888201 | A | 1999-03-30 | STINSON et al. | |
| 98 | 5893848 | A | 1999-04-13 | NEGUS et al. | |
| 99 | 5893885 | A | 1999-04-13 | WEBSTER JR WILTON W | |
| 100 | 5904679 | A | 1999-05-18 | CLAYMAN RALPH V | |
| 101 | 5916210 | A | 1999-06-29 | WINSTON THOMAS R | |
| 102 | 5921957 | A | 1999-07-13 | KILLION et al. | |
| 103 | 5931818 | A | 1999-08-03 | WERP et al. | |
| 104 | 5944023 | A | 1999-08-31 | JOHNSON et al. | |
| 105 | 5951482 | A | 1999-09-14 | WINSTON et al. | |
| 106 | 5957842 | A | 1999-09-28 | LITTMANN et al. | |
| 107 | 5964757 | A | 1999-10-12 | PONZI DEAN M | |

EFS Web 2.1.18

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | | | |
|---|---|---|---|---|---|

| Application Number | 17474415 |
|---|---|
| Filing Date | 2021-09-14 |
| First Named Inventor | Gareth Davies |
| Art Unit | OPAP |
| Examiner Name | CENTRAL, DOCKET |
| Attorney Docket Number | 051666/12005 |

| | | | | | |
|---|---|---|---|---|---|
| 108 | 5967976 | A | 1999-10-19 | LARSEN et al. | |
| 109 | 5989276 | A | 1999-11-23 | HOUSER et al. | |
| 110 | 6007555 | A | 1999-12-28 | DEVINE TERRENCE M | |
| 111 | 6009877 | A | 2000-01-04 | EDWARDS STUART D | |
| 112 | 6013072 | A | 2000-01-11 | WINSTON et al. | |
| 113 | 6017340 | A | 2000-01-25 | CASSIDY et al. | |
| 114 | 6018676 | A | 2000-01-25 | DAVIS et al. | |
| 115 | 6030380 | A | 2000-02-29 | AUTH et al. | |
| 116 | 6032674 | A | 2000-03-07 | EGGERS et al. | |
| 117 | 6036677 | A | 2000-03-14 | JAVIER JR. et al. | |
| 118 | 6048349 | A | 2000-04-11 | WINSTON et al. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17474415 |
| | Filing Date | 2021-09-14 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | OPAP |
| | Examiner Name | CENTRAL, DOCKET |
| | Attorney Docket Number | 051666/12005 |

| | | | | | |
|---|---|---|---|---|---|
| 119 | 6053870 | A | 2000-04-25 | FULTON III RICHARD EUSTIS | |
| 120 | 6053904 | A | 2000-04-25 | SCRIBNER et al. | |
| 121 | 6056747 | A | 2000-05-02 | SAADAT et al. | |
| 122 | 6063093 | A | 2000-05-16 | WINSTON et al. | |
| 123 | 6093185 | A | 2000-07-25 | ELLIS et al. | |
| 124 | 6106515 | A | 2000-08-22 | WINSTON et al. | |
| 125 | 6106520 | A | 2000-08-22 | LAUFER et al. | |
| 126 | 6117131 | A | 2000-09-12 | TAYLOR JUNIUS E | |
| 127 | 6142992 | A | 2000-11-07 | CHENG et al. | |
| 128 | 6146380 | A | 2000-11-14 | RACZ et al. | |
| 129 | 6155264 | A | 2000-12-05 | RESSEMANN et al. | |

EFS Web 2.1.18

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | 17474415 |
| | | | | Filing Date | | 2021-09-14 |
| | | | | First Named Inventor | Gareth Davies | |
| | | | | Art Unit | | OPAP |
| | | | | Examiner Name | CENTRAL, DOCKET | |
| | | | | Attorney Docket  Number | | 051666/12005 |

| | | | | | |
|---|---|---|---|---|---|
| | 130 | 6156031 | A | 2000-12-05 | AITA et al. |
| | 131 | 6171305 | B1 | 2001-01-09 | SHERMAN MARSHALL L |
| | 132 | 6179824 | B1 | 2001-01-30 | EGGERS et al. |
| | 133 | 6193676 | B1 | 2001-02-27 | WINSTON et al. |
| | 134 | 6193715 | B1 | 2001-02-27 | WRUBLEWSKI et al. |
| | 135 | 6210408 | B1 | 2001-04-03 | CHANDRASEKARAN et al. |
| | 136 | 6217575 | B1 | 2001-04-17 | DEVORE et al. |
| | 137 | 6221061 | B1 | 2001-04-24 | ENGELSON et al. |
| | 138 | 6228076 | B1 | 2001-05-08 | WINSTON et al. |
| | 139 | 6245054 | B1 | 2001-06-12 | FUIMAONO et al. |
| | 140 | 6267758 | B1 | 2001-07-31 | DAW et al. |

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | | 17474415 | |
|---|---|---|---|---|---|
| | | Filing Date | | 2021-09-14 | |
| | | First Named Inventor | Gareth Davies | | |
| | | Art Unit | | OPAP | |
| | | Examiner Name | CENTRAL, DOCKET | | |
| | | Attorney Docket Number | | 051666/12005 | |

| | | | | | |
|---|---|---|---|---|---|
| | 141 | 6283983 | B1 | 2001-09-04 | MAKOWER et al. |
| | 142 | 6292678 | B1 | 2001-09-18 | HALL et al. |
| | 143 | 6293945 | B1 | 2001-09-25 | PARINS et al. |
| | 144 | 6296615 | B1 | 2001-10-02 | BROCKWAY et al. |
| | 145 | 6296636 | B1 | 2001-10-02 | CHENG et al. |
| | 146 | 6302898 | B1 | 2001-10-16 | EDWARDS et al. |
| | 147 | 6304769 | B1 | 2001-10-16 | ARENSON et al. |
| | 148 | 6315777 | B1 | 2001-11-13 | COMBEN RICHARD H |
| | 149 | 6328699 | B1 | 2001-12-11 | EIGLER et al. |
| | 150 | 6360128 | B2 | 2002-03-19 | KORDIS et al. |
| | 151 | 6364877 | B1 | 2002-04-02 | GOBLE et al. |

| | | | | | |
|---|---|---|---|---|---|
| | | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17474415 | |
| | | | Filing Date | 2021-09-14 | |
| | | | First Named Inventor | Gareth Davies | |
| | | | Art Unit | OPAP | |
| | | | Examiner Name | CENTRAL, DOCKET | |
| | | | Attorney Docket Number | 051666/12005 | |

| | | | | | |
|---|---|---|---|---|---|
| | 152 | 6385472 | B1 | 2002-05-07 | HALL et al. |
| | 153 | 6394976 | B1 | 2002-05-28 | WINSTON et al. |
| | 154 | 6395002 | B1 | 2002-05-28 | ELLMAN et al. |
| | 155 | 6419674 | B1 | 2002-07-16 | BOWSER et al. |
| | 156 | 6428551 | B1 | 2002-08-06 | HALL et al. |
| | 157 | 6450989 | B2 | 2002-09-17 | DUBRUL et al. |
| | 158 | 6475214 | B1 | 2002-11-05 | MOADDEB SHAHRAM |
| | 159 | 6485485 | B1 | 2002-11-26 | WINSTON et al. |
| | 160 | 6508754 | B1 | 2003-01-21 | LIPRIE et al. |
| | 161 | 6524303 | B1 | 2003-02-25 | GARIBALDI JEFFREY M |
| | 162 | 6530923 | B1 | 2003-03-11 | DUBRUL et al. |

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 17474415 | |
| Filing Date | 2021-09-14 | |
| First Named Inventor | Gareth Davies | |
| Art Unit | OPAP | |
| Examiner Name | CENTRAL, DOCKET | |
| Attorney Docket Number | 051666/12005 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 163 | 6554827 | B2 | 2003-04-29 | CHANDRASEKARAN et al. | |
| | 164 | 6562031 | B2 | 2003-05-13 | CHANDRASEKARAN et al. | |
| | 165 | 6562049 | B1 | 2003-05-13 | NORLANDER et al. | |
| | 166 | 6565562 | B1 | 2003-05-20 | SHAH et al. | |
| | 167 | 6607520 | B2 | 2003-08-19 | KEANE DAVID | |
| | 168 | 6607529 | B1 | 2003-08-19 | JONES et al. | |
| | 169 | 6632222 | B1 | 2003-10-14 | EDWARDS et al. | |
| | 170 | 6639999 | B1 | 2003-10-28 | COOKINGHAM et al. | |
| | 171 | 6650923 | B1 | 2003-11-18 | LESH et al. | |
| | 172 | 6651672 | B2 | 2003-11-25 | ROTH ALEX T | |
| | 173 | 6662034 | B2 | 2003-12-09 | SEGNER et al. | |

| | | | | | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | 17474415 | |
| | | Filing Date | | 2021-09-14 | |
| | | First Named Inventor | Gareth Davies | | |
| | | Art Unit | | OPAP | |
| | | Examiner Name | | CENTRAL, DOCKET | |
| | | Attorney Docket  Number | | 051666/12005 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 174 | 6663621 | B1 | 2003-12-16 | WINSTON et al. | |
| | 175 | 6702811 | B2 | 2004-03-09 | STEWART et al. | |
| | 176 | 6709444 | B1 | 2004-03-23 | MAKOWER JOSHUA | |
| | 177 | 6723052 | B2 | 2004-04-20 | MILLS STANLEY L | |
| | 178 | 6733511 | B2 | 2004-05-11 | HALL et al. | |
| | 179 | 6740103 | B2 | 2004-05-25 | HALL et al. | |
| | 180 | 6752800 | B1 | 2004-06-22 | WINSTON et al. | |
| | 181 | 6755816 | B2 | 2004-06-29 | RITTER et al. | |
| | 182 | 6811544 | B2 | 2004-11-02 | SCHAER ALAN K | |
| | 183 | 6814733 | B2 | 2004-11-09 | SCHWARTZ et al. | |
| | 184 | 6820614 | B2 | 2004-11-23 | BONUTTI PETER M | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | 17474415 | | |
| | | | Filing Date | 2021-09-14 | | |
| | | | First Named Inventor | Gareth Davies | | |
| | | | Art Unit | OPAP | | |
| | | | Examiner Name | CENTRAL, DOCKET | | |
| | | | Attorney Docket Number | 051666/12005 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 185 | 6834201 | B2 | 2004-12-21 | GILLIES et al. | |
| | 186 | 6842639 | B1 | 2005-01-11 | WINSTON et al. | |
| | 187 | 6852109 | B2 | 2005-02-08 | WINSTON et al. | |
| | 188 | 6855143 | B2 | 2005-02-15 | DAVISON et al. | |
| | 189 | 6860856 | B2 | 2005-03-01 | WARD et al. | |
| | 190 | 6869431 | B2 | 2005-03-22 | MAGUIRE et al. | |
| | 191 | 6911026 | B1 | 2005-06-28 | HALL et al. | |
| | 192 | 6951554 | B2 | 2005-10-04 | JOHANSEN et al. | |
| | 193 | 6951555 | B1 | 2005-10-04 | SURESH et al. | |
| | 194 | 6955675 | B2 | 2005-10-18 | JAIN MUDIT K | |
| | 195 | 6970732 | B2 | 2005-11-29 | WINSTON et al. | |

EFS Web 2.1.18

| | | | | | |
|---|---|---|---|---|---|
| | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br>( **Not for submission under 37 CFR 1.99**) | Application Number | | 17474415 | |
| | | Filing Date | | 2021-09-14 | |
| | | First Named Inventor | Gareth Davies | | |
| | | Art Unit | | OPAP | |
| | | Examiner Name | CENTRAL, DOCKET | | |
| | | Attorney Docket Number | | 051666/12005 | |

| | | | | | |
|---|---|---|---|---|---|
| | 196 | 6980843 | B2 | 2005-12-27 | ENG et al. |
| | 197 | 7029470 | B2 | 2006-04-18 | FRANCISCHELLI et al. |
| | 198 | 7056294 | B2 | 2006-06-06 | KHAIRKHAHAN et al. |
| | 199 | 7083566 | B2 | 2006-08-01 | TORNES et al. |
| | 200 | 7112197 | B2 | 2006-09-26 | HARTLEY et al. |
| | 201 | 7165552 | B2 | 2007-01-23 | DEEM et al. |
| | 202 | 7186251 | B2 | 2007-03-06 | MALECKI et al. |
| | 203 | 7335197 | B2 | 2008-02-26 | SAGE et al. |
| | 204 | 7618430 | B2 | 2009-11-17 | SCHEIB MARK S |
| | 205 | 7651492 | B2 | 2010-01-26 | WHAM ROBERT H |
| | 206 | 7666203 | B2 | 2010-02-23 | CHANDUSZKO et al. |

EFS Web 2.1.18

| | | | | | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | 17474415 | |
| | | Filing Date | | 2021-09-14 | |
| | | First Named Inventor | Gareth Davies | | |
| | | Art Unit | | OPAP | |
| | | Examiner Name | CENTRAL, DOCKET | | |
| | | Attorney Docket Number | | 051666/12005 | |

| | | | | | |
|---|---|---|---|---|---|
| | 207 | 7678081 | B2 | 2010-03-16 | WHITING et al. |
| | 208 | 7682360 | B2 | 2010-03-23 | GUERRA PAUL |
| | 209 | 7828796 | B2 | 2010-11-09 | WONG et al. |
| | 210 | 7900928 | B2 | 2011-03-08 | HELD et al. |
| | 211 | 7988690 | B2 | 2011-08-02 | CHANDUSZKO et al. |
| | 212 | 8021359 | B2 | 2011-09-20 | AUTH et al. |
| | 213 | 8192425 | B2 | 2012-06-05 | MIRZA et al. |
| | 214 | 8257323 | B2 | 2012-09-04 | JOSEPH et al. |
| | 215 | 8337518 | B2 | 2012-12-25 | NANCE et al. |
| | 216 | 8388549 | B2 | 2013-03-05 | PAUL et al. |
| | 217 | 8500697 | B2 | 2013-08-06 | KURTH et al. |

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17474415 |
|---|---|---|
| | Filing Date | 2021-09-14 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | OPAP |
| | Examiner Name | CENTRAL, DOCKET |
| | Attorney Docket Number | 051666/12005 |

| 218 | 11339579 | B1 | 2022-05-24 | STEARNS KENNETH W | |

If you wish to add additional U.S. Patent citation information please click the Add button.     | Add |

### U.S.PATENT APPLICATION PUBLICATIONS     | Remove |

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20010012934 | A1 | 2001-08-09 | CHANDRASEKARAN et al. | |
| | 2 | 20010021867 | A1 | 2001-09-13 | KORDIS et al. | |
| | 3 | 20010044591 | A1 | 2001-11-22 | STEVENS et al. | |
| | 4 | 20020019644 | A1 | 2002-02-14 | HASTINGS et al. | |
| | 5 | 20020022781 | A1 | 2002-02-21 | MCLNTIRE et al. | |
| | 6 | 20020022836 | A1 | 2002-02-21 | GOBLE et al. | |
| | 7 | 20020035361 | A1 | 2002-03-21 | HOUSER et al. | |
| | 8 | 20020087153 | A1 | 2002-07-04 | ROSCHAK et al. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | | Application Number | 17474415 |
| | | | Filing Date | 2021-09-14 |
| | | | First Named Inventor | Gareth Davies |
| | | | Art Unit | OPAP |
| | | | Examiner Name | CENTRAL, DOCKET |
| | | | Attorney Docket  Number | 051666/12005 |

| | | | | | |
|---|---|---|---|---|---|
| 9 | 20020087156 | A1 | 2002-07-04 | MAGUIRE et al. | |
| 10 | 20020111618 | A1 | 2002-08-15 | STEWART et al. | |
| 11 | 20020123749 | A1 | 2002-09-05 | JAIN MUDIT K | |
| 12 | 20020147485 | A1 | 2002-10-10 | MAMO et al. | |
| 13 | 20020169377 | A1 | 2002-11-14 | KHAIRKHAHAN et al. | |
| 14 | 20020188302 | A1 | 2002-12-12 | BERG et al. | |
| 15 | 20020198521 | A1 | 2002-12-26 | MAGUIRE MARK A | |
| 16 | 20030032929 | A1 | 2003-02-13 | MCGUCKIN JAMES F | |
| 17 | 20030040742 | A1 | 2003-02-27 | UNDERWOOD et al. | |
| 18 | 20030144658 | A1 | 2003-07-31 | SCHWARTZ et al. | |
| 19 | 20030158480 | A1 | 2003-08-21 | TORNES et al. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | 17474415 |
| | | Filing Date | 2021-09-14 |
| | | First Named Inventor | Gareth Davies |
| | | Art Unit | OPAP |
| | | Examiner Name | CENTRAL, DOCKET |
| | | Attorney Docket  Number | 051666/12005 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 20 | 20030163153 | A1 | 2003-08-28 | SCHEIB MARK S | |
| | 21 | 20030208220 | A1 | 2003-11-06 | WORLEY et al. | |
| | 22 | 20030225392 | A1 | 2003-12-04 | MCMICHAEL et al. | |
| | 23 | 20040015162 | A1 | 2004-01-22 | MCGAFFIGAN THOMAS H | |
| | 24 | 20040024396 | A1 | 2004-02-05 | EGGERS PHILIP E | |
| | 25 | 20040030328 | A1 | 2004-02-12 | EGGERS et al. | |
| | 26 | 20040044350 | A1 | 2004-03-04 | MARTIN et al. | |
| | 27 | 20040073243 | A1 | 2004-04-15 | SEPETKA et al. | |
| | 28 | 20040077948 | A1 | 2004-04-22 | VIOLANTE et al. | |
| | 29 | 20040116851 | A1 | 2004-06-17 | JOHANSEN et al. | |
| | 30 | 20040127963 | A1 | 2004-07-01 | UCHIDA et al. | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | Application Number | | 17474415 | | |
| | | Filing Date | | 2021-09-14 | | |
| | | First Named Inventor | | Gareth Davies | | |
| | | Art Unit | | OPAP | | |
| | | Examiner Name | | CENTRAL, DOCKET | | |
| | | Attorney Docket Number | | 051666/12005 | | |

| | | | | | |
|---|---|---|---|---|---|
| 31 | 20040133113 | A1 | 2004-07-08 | KRISHNAN SUBRAMANIAM C | |
| 32 | 20040133130 | A1 | 2004-07-08 | FERRY et al. | |
| 33 | 20040143256 | A1 | 2004-07-22 | BEDNAREK MICHAEL C | |
| 34 | 20040147950 | A1 | 2004-07-29 | MUELLER et al. | |
| 35 | 20040181213 | A1 | 2004-09-16 | GONDO MASAKATSU | |
| 36 | 20040230188 | A1 | 2004-11-18 | CIOANTA et al. | |
| 37 | 20050004585 | A1 | 2005-01-06 | HALL et al. | |
| 38 | 20050010208 | A1 | 2005-01-13 | WINSTON et al. | |
| 39 | 20050038359 | A1 | 2005-02-17 | AIMI et al. | |
| 40 | 20050049628 | A1 | 2005-03-03 | SCHWEIKERT et al. | |
| 41 | 20050059966 | A1 | 2005-03-17 | MCCLURKEN et al. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17474415 |
|---|---|---|
| | Filing Date | 2021-09-14 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | OPAP |
| | Examiner Name | CENTRAL, DOCKET |
| | Attorney Docket  Number | 051666/12005 |

| | | | | | |
|---|---|---|---|---|---|
| | 42 | 20050065507 | A1 | 2005-03-24 | HARTLEY et al. |
| | 43 | 20050085806 | A1 | 2005-04-21 | AUGE et al. |
| | 44 | 20050096529 | A1 | 2005-05-05 | COOPER et al. |
| | 45 | 20050101984 | A1 | 2005-05-12 | CHANDUSZKO et al. |
| | 46 | 20050119556 | A1 | 2005-06-02 | GILLIES et al. |
| | 47 | 20050137527 | A1 | 2005-06-23 | KUNIN DAVID |
| | 48 | 20050149012 | A1 | 2005-07-07 | PENNY et al. |
| | 49 | 20050203504 | A1 | 2005-09-15 | WHAM et al. |
| | 50 | 20050203507 | A1 | 2005-09-15 | TRUCKAI et al. |
| | 51 | 20050261607 | A1 | 2005-11-24 | JOHANSEN et al. |
| | 52 | 20050288631 | A1 | 2005-12-29 | LEWIS et al. |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | | 17474415 | |
|---|---|---|---|---|---|
| | | Filing Date | | 2021-09-14 | |
| | | First Named Inventor | | Gareth Davies | |
| | | Art Unit | | OPAP | |
| | | Examiner Name | | CENTRAL, DOCKET | |
| | | Attorney Docket  Number | | 051666/12005 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 53 | 20060041253 | A1 | 2006-02-23 | NEWTON et al. | |
| | 54 | 20060074398 | A1 | 2006-04-06 | WHITING et al. | |
| | 55 | 20060079769 | A1 | 2006-04-13 | WHITING et al. | |
| | 56 | 20060079787 | A1 | 2006-04-13 | WHITING et al. | |
| | 57 | 20060079884 | A1 | 2006-04-13 | MANZO et al. | |
| | 58 | 20060085054 | A1 | 2006-04-20 | ZIKORUS et al. | |
| | 59 | 20060089638 | A1 | 2006-04-27 | CARMEL et al. | |
| | 60 | 20060106375 | A1 | 2006-05-18 | WERNETH et al. | |
| | 61 | 20060135962 | A1 | 2006-06-22 | KICK et al. | |
| | 62 | 20060142756 | A1 | 2006-06-29 | DAVIES et al. | |
| | 63 | 20060189972 | A1 | 2006-08-24 | GROSSMAN JESSICA | |

| | | | | | |
|---|---|---|---|---|---|
| | | **Application Number** | | 17474415 | |
| | | **Filing Date** | | 2021-09-14 | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | **First Named Inventor** | | Gareth Davies | |
| | | **Art Unit** | | OPAP | |
| | | **Examiner Name** | | CENTRAL, DOCKET | |
| | | **Attorney Docket  Number** | | 051666/12005 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 64 | 20060241586 | A1 | 2006-10-26 | WILK PETER J | |
| | 65 | 20060247672 | A1 | 2006-11-02 | VIDLUND et al. | |
| | 66 | 20060264927 | A1 | 2006-11-23 | RYAN PHILLIP A | |
| | 67 | 20060276710 | A1 | 2006-12-07 | KRISHNAN SUBRAMANIAM C | |
| | 68 | 20070060879 | A1 | 2007-03-15 | WEITZNER et al. | |
| | 69 | 20070066975 | A1 | 2007-03-22 | WONG et al. | |
| | 70 | 20070118099 | A1 | 2007-05-24 | TROUT HUGH H III | |
| | 71 | 20070123964 | A1 | 2007-05-31 | DAVIES et al. | |
| | 72 | 20070167775 | A1 | 2007-07-19 | KOCHAVI et al. | |
| | 73 | 20070185522 | A1 | 2007-08-09 | DAVIES et al. | |
| | 74 | 20070208256 | A1 | 2007-09-06 | MARILLA BRENNAN | |

<table>
<tr><td rowspan="3"><strong>INFORMATION DISCLOSURE STATEMENT BY APPLICANT</strong><br>( Not for submission under 37 CFR 1.99)</td><td>Application Number</td><td>17474415</td></tr>
</table>

| | Application Number | 17474415 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | 2021-09-14 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | OPAP |
| | Examiner Name | CENTRAL, DOCKET |
| | Attorney Docket  Number | 051666/12005 |

| | | | | | |
|---|---|---|---|---|---|
| | 75 | 20070225681 | A1 | 2007-09-27 | HOUSE MORGAN | |
| | 76 | 20070270741 | A1 | 2007-11-22 | HASSETT ET AL. | Corresponds to JP 2009-537255 A |
| | 77 | 20070270791 | A1 | 2007-11-22 | WANG et al. | |
| | 78 | 20080039865 | A1 | 2008-02-14 | SHAHER et al. | |
| | 79 | 20080042360 | A1 | 2008-02-21 | WEIKLEY AARON M | |
| | 80 | 20080086120 | A1 | 2008-04-10 | MIRZA et al. | |
| | 81 | 20080097213 | A1 | 2008-04-24 | CARLSON et al. | |
| | 82 | 20080108987 | A1 | 2008-05-08 | BRUSZEWSKI et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button.  | Add |

**FOREIGN PATENT DOCUMENTS**   | Remove |

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 0465449 | EP | A2 | 1992-01-08 | HEART TECHN INC | English Abstract Submitted | |

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | | | |
|---|---|---|---|---|
| Application Number | 17474415 |
| Filing Date | 2021-09-14 |
| First Named Inventor | Gareth Davies |
| Art Unit | OPAP |
| Examiner Name | CENTRAL, DOCKET |
| Attorney Docket Number | 051666/12005 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | 2444115 | EP | A1 | 2012-04-25 | ASAHI INTECC CO LTD | Corresponds to US 20120095448 A1 |
| 3 | 2550988 | EP | A1 | 2013-01-30 | COOK MEDICAL TECHNOLOGIES LLC | Corresponds to US 20130025588 A1 |
| 4 | 60-261465 | JP | A | 1985-12-24 | TERUMO CORP | |
| 5 | 2007-510458 | JP | A | 2007-04-26 | NMT MEDICAL INC | Corresponds to US 20050101984 A1 |
| 6 | 2009-537255 | JP | A | 2009-10-29 | HASSETT ET AL. | Corresponds to US 20070270741 A1 |
| 7 | 2010-227580 | JP | A | 2010-10-14 | CIRCULITE INC | Corresponds to US 20100249491 A1 |
| 8 | 2005/065562 | WO | A1 | 2005-07-21 | BIOSENSE WEBSTER INC | |
| 9 | 2008/066557 | WO | A1 | 2008-06-05 | MEDTRONIC INC | |
| 10 | 2008/079828 | WO | A2 | 2008-07-03 | ONSET MEDICAL CORP | |
| 11 | 2011/014496 | WO | A1 | 2011-02-03 | CARDIOSOLUTIONS INC | |
| 12 | 2013/101632 | WO | A1 | 2013-07-04 | VOLCANO CORP | |

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17474415 |
|---|---|---|
| | Filing Date | 2021-09-14 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | OPAP |
| | Examiner Name | CENTRAL, DOCKET |
| | Attorney Docket Number | 051666/12005 |

| If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |
|---|---|

**NON-PATENT LITERATURE DOCUMENTS** | Remove |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | European Search Opinion for European Application No. 13891200.1 dated Feb. 7, 2017. | |
| | 2 | International Search Report and Written Opinion received for PCT Patent Application No. PCT/IB2013/060287, mailed on Mar 06, 2014, 16 pages. | |
| | 3 | Japanese Patent Office Examination Report for counterpart Japanese Application No. 2016-532745, dated Oct. 3, 2017. | |
| | 4 | Search Report for corresponding European patent application EP19204215. | |
| | 5 | Search Report for corresponding Japanese patent application 2018211611. | |
| | 6 | Supplementary European Search Report for European Application No. 13891200.1 dated Feb. 7, 2017. | |

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 17474415 |
| Filing Date | 2021-09-14 |
| First Named Inventor | Gareth Davies |
| Art Unit | OPAP |
| Examiner Name | CENTRAL, DOCKET |
| Attorney Docket  Number | 051666/12005 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| | | | |
|---|---|---|---|
| Signature | /Jason R. Kraus/ | Date (YYYY-MM-DD) | 2023-05-01 |
| Name/Print | Jason R. Kraus | Registration Number | 42,765 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.     The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.     A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.     A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.     A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.     A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.     A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.     A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.     A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.     A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( **Not for submission under 37 CFR 1.99**)

| | |
|---|---|
| Application Number | 17474415 |
| Filing Date | 2021-09-14 |
| First Named Inventor | Gareth Davies |
| Art Unit | OPAP |
| Examiner Name | CENTRAL, DOCKET |
| Attorney Docket Number | 051666/12005 |

### U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.    Add

### U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20080146918 | A1 | 2008-06-19 | MAGNIN et al. | |
| | 2 | 20080171934 | A1 | 2008-07-17 | GREENAN et al. | |
| | 3 | 20080208121 | A1 | 2008-08-28 | YOUSSEF et al. | |
| | 4 | 20080243222 | A1 | 2008-10-02 | SCHAFERSMAN et al. | |
| | 5 | 20080275439 | A1 | 2008-11-06 | FRANCISCHELLI et al. | |

EFS Web 2.1.18

| | | | | | | |
|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | Application Number | | 17474415 | |
| | | | Filing Date | | 2021-09-14 | |
| | | | First Named Inventor | Gareth Davies | | |
| | | | Art Unit | | OPAP | |
| | | | Examiner Name | CENTRAL, DOCKET | | |
| | | | Attorney Docket Number | | 051666/12005 | |

| | | | | | |
|---|---|---|---|---|---|
| | 6 | 20090093802 | A1 | 2009-04-09 | KULESA et al. | |
| | 7 | 20090105654 | A1 | 2009-04-23 | KURTH et al. | |
| | 8 | 20090105742 | A1 | 2009-04-23 | KURTH et al. | |
| | 9 | 20090138009 | A1 | 2009-05-28 | VISWANATHAN et al. | |
| | 10 | 20090163850 | A1 | 2009-06-25 | BETTS et al. | |
| | 11 | 20090177114 | A1 | 2009-07-09 | CHIN et al. | |
| | 12 | 20090182281 | A1 | 2009-07-16 | KURTH et al. | |
| | 13 | 20090264977 | A1 | 2009-10-22 | BRUSZEWSKI et al. | |
| | 14 | 20100022948 | A1 | 2010-01-28 | WILSON et al. | |
| | 15 | 20100087789 | A1 | 2010-04-08 | LEEFLANG et al. | |
| | 16 | 20100125282 | A1 | 2010-05-20 | MACHEK et al. | |

EFS Web 2.1.18

<table>
<tr><td rowspan="7"><strong>INFORMATION DISCLOSURE STATEMENT BY APPLICANT</strong><br>( Not for submission under 37 CFR 1.99)</td><td>Application Number</td><td colspan="2">17474415</td></tr>
<tr><td>Filing Date</td><td colspan="2">2021-09-14</td></tr>
<tr><td>First Named Inventor</td><td colspan="2">Gareth Davies</td></tr>
<tr><td>Art Unit</td><td colspan="2">OPAP</td></tr>
<tr><td>Examiner Name</td><td colspan="2">CENTRAL, DOCKET</td></tr>
<tr><td>Attorney Docket  Number</td><td colspan="2">051666/12005</td></tr>
</table>

| | | | | | | |
|---|---|---|---|---|---|---|
| | 17 | 20100168684 | A1 | 2010-07-01 | RYAN SHAWN | |
| | 18 | 20100179632 | A1 | 2010-07-15 | BRUSZEWSKI et al. | |
| | 19 | 20100191142 | A1 | 2010-07-29 | PAUL et al. | |
| | 20 | 20100194047 | A1 | 2010-08-05 | SAUERWINE DEAN N | |
| | 21 | 20100249491 | A1 | 2010-09-30 | FARNAN ET AL. | Corresponds to JP 2010-227580 A |
| | 22 | 20110046619 | A1 | 2011-02-24 | DUCHARME RICHARD W | |
| | 23 | 20110130752 | A1 | 2011-06-02 | OLLIVIER JEAN-FRANCOIS | |
| | 24 | 20110152716 | A1 | 2011-06-23 | CHUDZIK et al. | |
| | 25 | 20110160592 | A1 | 2011-06-30 | MITCHELL CHRISTOPHER | |
| | 26 | 20110190763 | A1 | 2011-08-04 | URBAN et al. | |
| | 27 | 20110224666 | A1 | 2011-09-15 | DAVIES et al. | |

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | | 17474415 |
| | Filing Date | | 2021-09-14 |
| | First Named Inventor | | Gareth Davies |
| | Art Unit | | OPAP |
| | Examiner Name | | CENTRAL, DOCKET |
| | Attorney Docket Number | | 051666/12005 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 28 | 20120095448 | A1 | 2012-04-19 | KAJII TATSUHIKO | Corresponds to EP 2444115 A1 |
| | 29 | 20120109079 | A1 | 2012-05-03 | ASLESON et al. | |
| | 30 | 20120232546 | A1 | 2012-09-13 | MIRZA et al. | |
| | 31 | 20120265055 | A1 | 2012-10-18 | MELSHEIMER et al. | |
| | 32 | 20120330156 | A1 | 2012-12-27 | BROWN et al. | |
| | 33 | 20130025588 | A1 | 2013-01-31 | BOSEL CHRISTOPHER D | Corresponds to EP 2550988 A1 |
| | 34 | 20130184551 | A1 | 2013-07-18 | PAGANELLI et al. | |
| | 35 | 20130184735 | A1 | 2013-07-18 | FISCHELL et al. | |
| | 36 | 20130282084 | A1 | 2013-10-24 | MATHUR et al. | |
| | 37 | 20140206987 | A1 | 2014-07-24 | URBANSKI et al. | |
| | 38 | 20140296769 | A1 | 2014-10-02 | HYDE et al. | |

EFS Web 2.1.18

| | | | | | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Application Number | | 17474415 | |
| | | Filing Date | | 2021-09-14 | |
| | | First Named Inventor | | Gareth Davies | |
| | | Art Unit | | OPAP | |
| | | Examiner Name | | CENTRAL, DOCKET | |
| | | Attorney Docket Number | | 051666/12005 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 39 | 20150173782 | A1 | 2015-06-25 | GARRISON et al. | |
| | 40 | 20160220741 | A1 | 2016-08-04 | GARRISON et al. | |
| | 41 | 20190021763 | A1 | 2019-01-24 | ZHOU et al. | |
| | 42 | 20190247035 | A1 | 2019-08-15 | GITTARD et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add

**FOREIGN PATENT DOCUMENTS** | Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add

**NON-PATENT LITERATURE DOCUMENTS** | Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | | |

If you wish to add additional non-patent literature document citation information please click the Add button | Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( **Not for submission under 37 CFR 1.99)** | Application Number | 17474415 |
| | Filing Date | 2021-09-14 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | OPAP |
| | Examiner Name | CENTRAL, DOCKET |
| | Attorney Docket  Number | 051666/12005 |

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 17474415 |
| --- | --- | --- |
| | Filing Date | 2021-09-14 |
| | First Named Inventor | Gareth Davies |
| | Art Unit | OPAP |
| | Examiner Name | CENTRAL, DOCKET |
| | Attorney Docket  Number | 051666/12005 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Jason R. Kraus/ | Date (YYYY-MM-DD) | 2023-05-01 |
| --- | --- | --- | --- |
| Name/Print | Jason R. Kraus | Registration Number | 42,765 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **17/474,415** | **05/01/2023 06:35:32 PM ET** | **051666/12005** |

## Title of Invention

Methods and Devices for Puncturing Tissue

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 4560 | FILED BY | Carmen Prince |
| PATENT CENTER # | 62015085 | FILING DATE | 09/14/2021 |
| CUSTOMER # | 188636 | FIRST NAMED INVENTOR | Gareth Davies |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Jason Kraus |

## Documents

# TOTAL DOCUMENTS: 20

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| IDS_17474415_1.pdf | 32 | Information Disclosure Statement (IDS) Form (SB08) | 1250 KB |
| IDS_17474415_2.pdf | 8 | Information Disclosure Statement (IDS) Form (SB08) | 1244 KB |
| FOR_11_WO2011014496A1_1505664.pdf | 63 | Foreign Reference | 1816 KB |
| FOR_10_WO2008079828A2_1506569.pdf | 81 | Foreign Reference | 3573 KB |
| FOR_1_EP0465449A2_1505665.pdf | 7 | Foreign Reference | 449 KB |

| File | Pages | Type | Size |
|---|---|---|---|
| FOR_12_WO2013101632A1_1507549.pdf | 54 | Foreign Reference | 2515 KB |
| FOR_2_EP2444115A1_1505640.pdf | 20 | Foreign Reference | 881 KB |
| FOR_3_EP2550988A1_1505662.pdf | 19 | Foreign Reference | 1007 KB |
| FOR_4_JP60261465A_1507621.pdf | 7 | Foreign Reference | 386 KB |
| FOR_5_JP2007510458A_1507468.pdf | 28 | Foreign Reference | 961 KB |
| FOR_6_JP2009537255A_1507464.pdf | 14 | Foreign Reference | 344 KB |
| FOR_7_JP2010227580A_1507462.pdf | 83 | Foreign Reference | 2421 KB |
| FOR_8_WO2005065562A1_1506570.pdf | 87 | Foreign Reference | 4886 KB |
| FOR_9_WO2008066557A1_1505650.pdf | 49 | Foreign Reference | 2321 KB |
| NPL_1_P2066EP00_17020_1507405.pdf | 1 | Non Patent Literature | 33 KB |
| NPL_2_ISR_1506548.pdf | 16 | Non Patent Literature | 769 KB |
| NPL_4_19204215_EP_sea_1507454.pdf | 2 | Non Patent Literature | 74 KB |
| NPL_3_RFP026027_US_Ja_1507402.pdf | 5 | Non Patent Literature | 882 KB |
| NPL_5_SearchReport_by_1507455.pdf | 9 | Non Patent Literature | 341 KB |

| | | | |
|---|---|---|---|
| NPL_6_P2066EP00_17020_ 1507404.pdf | 2 | Non Patent Literature | 67 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| IDS_17474415_1.pdf | B55BA0178A16435E69FC96B6D65FFEE8B948D31D91A1E66AA 746D75F1FEF6F16F702E2ADBAC1B5E54B2CE9CD2B10C55DC AA438AE7DE3E1949CF05620B8965622 |
| IDS_17474415_2.pdf | D04EB8E8971825A5D07734B24949DFF6FD8BFBDEE5F48F7D3 F276BA0936300646AFF90D40B53D96F452BD0F563D235198FA C00022B882891FFD9FA918734810E |
| FOR_11_WO2011014496A1_1 505664.pdf | FBCD5625C90FC5ED45A5A2F20A7D0A551558D645544145DEA 60EB6E1DE1DB703902A80A24DE35BA2CF5252C318A3B5D714 563BB56CFD43971218FB4993AA46BA |
| FOR_10_WO2008079828A2_1 506569.pdf | 92F5D5D04B5E46C281A807C8DB62A4D7374F4227A1B026CF3 741D0C906A2E9AD116EDD3D822ADF4E42F7328CD31945983C C465CE231D924D915E097044BA1D3A |
| FOR_1_EP0465449A2_150566 5.pdf | D76974318DA86EE23D777BC4FD6B700CE1205CE59FDF081E B09C81F6F704B07EC058680F6277276F92F412A29ABA1DC179 839F2105088DB87D0063D69CE70D4F |
| FOR_12_WO2013101632A1_1 507549.pdf | AEEBF6AA41BF209A8C51EF5CD5EF0CEB3EC04576C23CDF0 199C3A22F4F43DE34BD1E1B284DC7A87B648BE0D639BC407 C6F9785C540B0AD279FB703C7F2766686 |
| FOR_2_EP2444115A1_150564 0.pdf | A41C2736D7FA958580D9ADB9F2BC0E53373D5FB35C404B9A3 557EA68BFD1CB5C5B921B811132C00214A14ECA46E659771A 078D8C6E0AFC3C088397F7DFEC5C17 |
| FOR_3_EP2550988A1_150566 2.pdf | C538341C0E09074662AE5A20BCA6ED1F6AB3A4C71E2ADBE6 239E42522ED4D904E3594FEF6E8FB615B842334FFD760F050C B90DCB0A9C215CA494A4B812969EDD |

| | |
|---|---|
| FOR_4_JP60261465A_1507621.pdf | A8EF861895621A68230345BE8D8602E3FBDA6642E7D9E1F5CED42759A5799991CAACB38C5CE2E25FA4B2126DE754449D91DB541E0F5D3E295C1AB5D731D2581A |
| FOR_5_JP2007510458A_1507468.pdf | ECC2B52E7E646934E37C66C98096E25FDC7C45E28163CDDFA77F974F661CE5151EA522768C5E7EC884E04836754F86E499120CB0C378618547C96EB338F5E75B |
| FOR_6_JP2009537255A_1507464.pdf | F40D63605422CEAA0A1D1B5D5A6FF008ADCF2165DE6CBEA7AF6FAEE00775D4B5DAADE67A6A717528CFB9925005684C7C1C1F63E56E1B748FDD617E673F5C6CE1 |
| FOR_7_JP2010227580A_1507462.pdf | FCC8E8A7A2187F8FC2A2AC151285E2052BBEFCCF48B842AE4F7C85A6462D94FF46AF49197FCF67460418EE5F29543CF43F5C635CA7C3869C8EEE02B4F9E57641 |
| FOR_8_WO2005065562A1_1506570.pdf | DA15525A87D76C0490ED2FBA594DA48617611EFD331447A0690835BEC85DEA4F00CA6F619CB696C9639B1F18AD67F7FDCA04388C5B45F2F9A46CC6ADD02B7009 |
| FOR_9_WO2008066557A1_1505650.pdf | 884BD4A34C5AD4F6BDBB985FEA94F98EA164FAE245008C97B239F3F52230782D097622667CD89C4FF1163EA9DE669847A56590B2A49F663C579E690040765F89 |
| NPL_1_P2066EP00_17020_1507405.pdf | D2D8DDA7CA36FDA78BA7B54A7EF1BF0C6F66350D8EB4F4EAD8689A2209A91345B9E7E62BCD1DE07FC1A2664B276561048120BE927DEC0DC2DECFC12F9470A334 |
| NPL_2_ISR_1506548.pdf | 569791771453F1E3D9F0CCBF146FEE6B688C0AE2F82E51E5D65A471A9EB51045A8AAD6084BAA60E01A93DCFB275C6349CE499CF75A8EA003393C0921A39C4DB2 |
| NPL_4_19204215_EP_sea_1507454.pdf | 490F947421FC5FC83A06235E3666F95A4DDFBD2AA911A9B397428ED9274FC2F5C431C128D5D1C6D7840AADA0AF1A05A7D179C662563AB2314C427AECB84823CA |
| NPL_3_RFP026027_US_Ja_1507402.pdf | 6583A6F160C1D1794E68CA098800E2A0387025D9E6D364B72876207DD0BE3690F45C20D07B72FBCEC5CF09884E50899930B4AB75153D36202B34E1BAB6F63F7C |

| NPL_5_SearchReport_by_1507455.pdf | B7D719DD75AE4F9FD18CBDE5443DD9B5E2AFB67E14254A72 8D3DCD6C9818904E7CA2C017389F35AFD54C28681E863DEF0 B136080DF29CF0B4CD9164709A206F5 |
| NPL_6_P2066EP00_17020_1507404.pdf | 09CE8E2665FABDDCDDEEE3E4A7D756300199C93F994CC528 C550BB4D0FD30378622217C0CB6D8D95E0D22C7A33990A39A 255351131735E3771AF623D45D757B1 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

## PATENT COOPERATION TREATY

# PCT

### INTERNATIONAL SEARCH REPORT

(PCT Article 18 and Rules 43 and 44)

| Applicant's or agent's file reference<br>RFPPCT02627 | **FOR FURTHER ACTION** | see Form PCT/ISA/220<br>as well as, where applicable, item 5 below |
|---|---|---|
| International application No.<br>**PCT/IB2013/060287** | International filing date *(day/month/year)*<br>20 November 2013 (20-11-2013) | (Earliest)Priority date *(day/month/year)*<br>07 August 2013 (07-08-2013) |

| Applicant<br>BAYLIS MEDICAL COMPANY INC. |
|---|

This international search report has been prepared by this International Searching Authority and is transmitted to the applicant according to Article 18. A copy is being transmitted to the International Bureau.

This international search report consists of a total of __11__ sheets.

    [X] It is also accompanied by a copy of each prior art document cited in this report.

1.   **Basis of the report**

    a.  With regard to the **language**, the international search was carried out on the basis of:

        [X]   the international application in the language in which it was filed

        [  ]  a translation of the international application into                , which is the language
            of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b))

    b.  [  ] This international search report has been established taking into account the **rectification of an obvious mistake**

        authorized by or notified to this Authority under Rule 91 (Rule 43.6*bis*(a)).

    c.  [  ] With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, see Box No. I

2.   [X] **Certain claims were found unsearchable** (see Box No. II)

3.   [  ] **Unity of invention is lacking** (see Box No. III)

4.   With regard to the **title**,

    [X] the text is approved as submitted by the applicant

    [  ] the text has been established by this Authority to read as follows :

5.   With regard to the **abstract**,

    [X] the text is approved as submitted by the applicant

    [  ] the text has been established, according to Rule 38.2, by this Authority as it appears in Box No. IV. The applicant
        may, within one month from the date of mailing of this international search report, submit comments to this Authority

6.   With regard to the **drawings**,

    a.  the figure of the **drawings** to be published with the abstract is Figure No.       __1__

        [X]  as suggested by the applicant

        [  ]  as selected by this Authority, because the applicant failed to suggest a figure

        [  ]  as selected by this Authority, because this figure better characterizes the invention

    b.  [  ]  none of the figures is to be published with the abstract

**INTERNATIONAL SEARCH REPORT**

| International application No. |
|---|
| PCT/IB2013/060287 |

| **Box No. II**   **Observations where certain claims were found unsearchable (Continuation of item 2 of the first sheet)** |
|---|

This international search report has not been established in respect of certain claims under Article 17(2)(a) for the following reasons :

1.   [X]  Claim Nos. :   62-81, 84
  because they relate to subject matter not required to be searched by this Authority, namely :

  Claims 62-81 and 84 are directed to a method for treatment of the human or animal body by surgery or therapy.

2.   [ ]  Claim Nos. :
  because they relate to parts of the international application that do not comply with the prescribed requirements to such an extent that no meaningful international search can be carried out, specifically :

3.   [ ]  Claim Nos. :
  because they are dependent claims and are not drafted in accordance with the second and third sentences of Rule 6.4(a).

| **Box No. III**   **Observations where unity of invention is lacking (Continuation of item 3 of first sheet)** |
|---|

This International Searching Authority found multiple inventions in this international application, as follows :

1.   [ ]  As all required additional search fees were timely paid by the applicant, this international search report covers all searchable claims.

2.   [ ]  As all searchable claims could be searched without effort justifying additional fees, this Authority did not invite payment of additional fees.

3.   [ ]  As only some of the required additional search fees were timely paid by the applicant, this international search report covers only those claims for which fees were paid, specifically claim Nos. :

4.   [ ]  No required additional search fees were timely paid by the applicant. Consequently, this international search report is restricted to the invention first mentioned in the claims; it is covered by claim Nos. :

  **Remark on Protest**   [ ]  The additional search fees were accompanied by the applicant's protest and, where applicable, the payment of a protest fee.

  [ ]  The additional search fees were accompanied by the applicant's protest but the applicable protest fee was not paid within the time limit specified in the invitation.

  [ ]  No protest accompanied the payment of additional search fees.

Form PCT/ISA/210 (continuation of first sheet (2)) (July 2009)                                                                Page 2 of 11

**INTERNATIONAL SEARCH REPORT**

| International application No. |
| --- |
| PCT/IB2013/060287 |

| A. | CLASSIFICATION OF SUBJECT MATTER |
| --- | --- |

IPC: *A61M 25/01* (2006.01) , *A61B 17/34* (2006.01) , *A61B 18/14* (2006.01) , *A61M 25/06* (2006.01) ,
*A61M 29/00* (2006.01)
According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
IPC (2006.01): A61B 17/34, A61M 25/06, A61M 29/00

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched
N/A

Electronic database(s) consulted during the international search (name of database(s) and, where practicable, search terms used)
databases: TotalPatent (all databases), Epoque (EPODOC)
keywords: rail, bend, flexible, heart, puncture, pierce, ablation

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
| --- | --- | --- |
| X | WO2008/079828 A2 (Nance, E.J. et al.) 3 July 2008 (03-07-2008) <br> *paragraph [0069] and figure 5* | 1-61, 82 and 83 |
| X | US2003/0208220 A1 (Worley, S.J. et al.) 6 November 2003 (06-11-2003) <br> *paragraphs [0058],[0063] and figure 5* | 1-61, 82 and 83 |
| X | US2001/0044591 A1 (Stevens. J.H. et al.) 22 November 2001 (22-11-2001) <br> *paragraphs [0206] ,[0254] and figure 25* | 1-61, 82 and 83 |
| A | US6036677 (Javier, Jr. et al.) 14 March 2000 (14-03-2000) <br> *figure 3* | 1-61, 82 and 83 |
| A | WO2005/065562 A1 (Bhola, S.) 21 July 2005 (21-07-2005) <br> *figures 3A, 3B, 4C* | 1-61, 82 and 83 |

| [ ] | Further documents are listed in the continuation of Box C. | [X] | See patent family annex. |
| --- | --- | --- | --- |

| * | Special categories of cited documents : | "T" | later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention |
| --- | --- | --- | --- |
| "A" | document defining the general state of the art which is not considered to be of particular relevance | | |
| "E" | earlier application or patent but published on or after the international filing date | "X" | document of particular relevance, the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone |
| "L" | document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified) | "Y" | document of particular relevance, the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art |
| "O" | document referring to an oral disclosure, use, exhibition or other means | | |
| "P" | document published prior to the international filing date but later than the priority date claimed | "&" | document member of the same patent family |

| Date of the actual completion of the international search | Date of mailing of the international search report |
| --- | --- |
| 05 March 2014 (05-03-2014) | 06 March 2014 (06-03-2014) |

| Name and mailing address of the ISA/CA <br> Canadian Intellectual Property Office <br> Place du Portage I, C114 - 1st Floor, Box PCT <br> 50 Victoria Street <br> Gatineau, Quebec K1A 0C9 <br> Facsimile No.: 001-819-953-2476 | Authorized officer <br><br> Alison Canteenwalla 934-8534 |
| --- | --- |

Form PCT/ISA/210 (second sheet ) (July 2009)                                                                 Page 3 of 11

**INTERNATIONAL SEARCH REPORT**
Information on patent family members

| International application No. |
| --- |
| PCT/IB2013/060287 |

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
| --- | --- | --- | --- |
| WO2008079828A2 | 03 July 2008 (03-07-2008) | US2008215008A1 | 04 September 2008 (04-09-2008) |
| | | US8337518B2 | 25 December 2012 (25-12-2012) |
| | | US2013281978A1 | 24 October 2013 (24-10-2013) |
| | | WO2008079828A3 | 14 August 2008 (14-08-2008) |
| US2003208220A1 | 06 November 2003 (06-11-2003) | AU2003232090A1 | 17 November 2003 (17-11-2003) |
| | | AU2003232090A8 | 17 November 2003 (17-11-2003) |
| | | EP1509119A2 | 02 March 2005 (02-03-2005) |
| | | EP1509119A4 | 22 December 2010 (22-12-2010) |
| | | US7384422B2 | 10 June 2008 (10-06-2008) |
| | | WO03092480A2 | 13 November 2003 (13-11-2003) |
| | | WO03092480A3 | 01 April 2004 (01-04-2004) |
| US2001044591A1 | 22 November 2001 (22-11-2001) | US2001044591A1 | 22 November 2001 (22-11-2001) |
| | | US6866650B2 | 15 March 2005 (15-03-2005) |
| | | AT226840T | 15 November 2002 (15-11-2002) |
| | | AT261329T | 15 March 2004 (15-03-2004) |
| | | AT269742T | 15 July 2004 (15-07-2004) |
| | | AT277556T | 15 October 2004 (15-10-2004) |
| | | AT479462T | 15 September 2010 (15-09-2010) |
| | | AU668690B2 | 16 May 1996 (16-05-1996) |
| | | AU7719794A | 10 April 1995 (10-04-1995) |
| | | AU685161B2 | 15 January 1998 (15-01-1998) |
| | | AU687232B2 | 19 February 1998 (19-02-1998) |
| | | AU6024594A | 14 September 1994 (14-09-1994) |
| | | AU688303B2 | 12 March 1998 (12-03-1998) |
| | | AU1433295A | 17 July 1995 (17-07-1995) |
| | | AU691236B2 | 14 May 1998 (14-05-1998) |
| | | AU1175995A | 19 June 1995 (19-06-1995) |
| | | AU691854B2 | 28 May 1998 (28-05-1998) |
| | | AU691893B2 | 28 May 1998 (28-05-1998) |
| | | AU4284796A | 26 June 1996 (26-06-1996) |
| | | AU696812B2 | 17 September 1998 (17-09-1998) |
| | | AU1099595A | 27 June 1995 (27-06-1995) |
| | | AU702940B2 | 11 March 1999 (11-03-1999) |
| | | AU708976B2 | 19 August 1999 (19-08-1999) |
| | | AU4469096A | 31 July 1996 (31-07-1996) |
| | | AU709259B2 | 26 August 1999 (26-08-1999) |
| | | AU719765B2 | 18 May 2000 (18-05-2000) |
| | | AU723379B2 | 24 August 2000 (24-08-2000) |
| | | AU740743B2 | 15 November 2001 (15-11-2001) |
| | | AU761079B2 | 29 May 2003 (29-05-2003) |
| | | AU767608B2 | 20 November 2003 (20-11-2003) |
| | | AU773823B2 | 10 June 2004 (10-06-2004) |
| | | AU773823C | 03 February 2005 (03-02-2005) |
| | | AU775394B2 | 29 July 2004 (29-07-2004) |
| | | AU1087497A | 27 June 1997 (27-06-1997) |
| | | AU1296197A | 03 July 1997 (03-07-1997) |
| | | AU1564802A | 11 April 2002 (11-04-2002) |
| | | AU1582497A | 22 August 1997 (22-08-1997) |
| | | AU1749897A | 11 August 1997 (11-08-1997) |
| | | AU1805499A | 28 June 1999 (28-06-1999) |
| | | AU1980895A | 03 October 1995 (03-10-1995) |
| | | AU2071097A | 22 September 1997 (22-09-1997) |
| | | AU2412792A | 23 February 1993 (23-02-1993) |
| | | AU2777495A | 19 January 1996 (19-01-1996) |
| | | AU3214895A | 14 March 1996 (14-03-1996) |
| | | AU3394397A | 07 January 1998 (07-01-1998) |
| | | AU3737397A | 10 February 1998 (10-02-1998) |
| | | AU4272800A | 07 September 2000 (07-09-2000) |
| | | AU5003197A | 15 May 1998 (15-05-1998) |
| | | AU5188596A | 16 October 1996 (16-10-1996) |
| | | AU5189496A | 16 October 1996 (16-10-1996) |
| | | AU5308996A | 07 November 1996 (07-11-1996) |
| | | AU5781401A | 07 February 2002 (07-02-2002) |
| | | AU5951996A | 30 December 1996 (30-12-1996) |
| | | AU5956596A | 30 December 1996 (30-12-1996) |

**INTERNATIONAL SEARCH REPORT**

| | International application No. |
|---|---|
| | PCT/IB2013/060287 |

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | AU6154199A | 10 April 2000 (10-04-2000) |
| | | AU6354200A | 05 February 2001 (05-02-2001) |
| | | AU8613098A | 23 March 2000 (23-03-2000) |
| | | AU2002315167B2 | 08 November 2007 (08-11-2007) |
| | | AU2003275243A1 | 19 April 2004 (19-04-2004) |
| | | AU2003275243B2 | 02 April 2009 (02-04-2009) |
| | | AU2003275243C1 | 21 January 2010 (21-01-2010) |
| | | AU2004205242A1 | 23 September 2004 (23-09-2004) |
| | | AU2004205242B2 | 08 November 2007 (08-11-2007) |
| | | CA2113476A1 | 04 February 1993 (04-02-1993) |
| | | CA2113476C | 10 October 2006 (10-10-2006) |
| | | CA2154354A1 | 01 September 1994 (01-09-1994) |
| | | CA2171097A1 | 30 March 1995 (30-03-1995) |
| | | CA2177490A1 | 15 June 1995 (15-06-1995) |
| | | CA2177490C | 27 June 2006 (27-06-2006) |
| | | CA2177491A1 | 08 June 1995 (08-06-1995) |
| | | CA2179897A1 | 06 July 1995 (06-07-1995) |
| | | CA2185093A1 | 21 September 1995 (21-09-1995) |
| | | CA2198127A1 | 29 February 1996 (29-02-1996) |
| | | CA2206091A1 | 13 June 1996 (13-06-1996) |
| | | CA2208350A1 | 18 July 1996 (18-07-1996) |
| | | CA2215970A1 | 03 October 1996 (03-10-1996) |
| | | CA2218105A1 | 03 October 1996 (03-10-1996) |
| | | CA2218545A1 | 24 October 1996 (24-10-1996) |
| | | CA2218545C | 11 September 2012 (11-09-2012) |
| | | CA2222218A1 | 19 December 1996 (19-12-1996) |
| | | CA2222326A1 | 19 December 1996 (19-12-1996) |
| | | CA2222326C | 15 August 2006 (15-08-2006) |
| | | CA2239907A1 | 19 December 1996 (19-12-1996) |
| | | CA2249064A1 | 12 September 1997 (12-09-1997) |
| | | CA2253315A1 | 24 December 1997 (24-12-1997) |
| | | CA2354677A1 | 05 February 2002 (05-02-2002) |
| | | CA2377583A1 | 25 January 2001 (25-01-2001) |
| | | CA2450075A1 | 27 December 2002 (27-12-2002) |
| | | CA2450075C | 19 November 2013 (19-11-2013) |
| | | CA2499223A1 | 08 April 2004 (08-04-2004) |
| | | CA2499223C | 18 June 2013 (18-06-2013) |
| | | DE69230375D1 | 05 January 2000 (05-01-2000) |
| | | DE69230375T2 | 06 July 2000 (06-07-2000) |
| | | DE69233210D1 | 23 October 2003 (23-10-2003) |
| | | DE69233210T2 | 19 August 2004 (19-08-2004) |
| | | DE69233715D1 | 27 December 2007 (27-12-2007) |
| | | DE69233715T2 | 30 October 2008 (30-10-2008) |
| | | DE69430382D1 | 16 May 2002 (16-05-2002) |
| | | DE69430382T2 | 12 December 2002 (12-12-2002) |
| | | DE69430433D1 | 23 May 2002 (23-05-2002) |
| | | DE69430433T2 | 12 December 2002 (12-12-2002) |
| | | DE69431872D1 | 23 January 2003 (23-01-2003) |
| | | DE69431872T2 | 18 September 2003 (18-09-2003) |
| | | DE69434040D1 | 04 November 2004 (04-11-2004) |
| | | DE69434040T2 | 06 October 2005 (06-10-2005) |
| | | DE69435281D1 | 22 April 2010 (22-04-2010) |
| | | DE69435312D1 | 14 October 2010 (14-10-2010) |
| | | DE69528712D1 | 05 December 2002 (05-12-2002) |
| | | DE69528712T2 | 03 April 2003 (03-04-2003) |
| | | DE69532686D1 | 15 April 2004 (15-04-2004) |
| | | DE69532686T2 | 10 February 2005 (10-02-2005) |
| | | DE69626105D1 | 13 March 2003 (13-03-2003) |
| | | DE69626105T2 | 23 October 2003 (23-10-2003) |
| | | DE69626822D1 | 24 April 2003 (24-04-2003) |
| | | DE69626822T2 | 04 March 2004 (04-03-2004) |
| | | DE69632776D1 | 29 July 2004 (29-07-2004) |
| | | DE69632776T2 | 25 August 2005 (25-08-2005) |
| | | DE69738378D1 | 24 January 2008 (24-01-2008) |
| | | DE69738378T2 | 27 November 2008 (27-11-2008) |
| | | DE69739942D1 | 02 September 2010 (02-09-2010) |
| | | DE69942614D1 | 02 September 2010 (02-09-2010) |
| | | EP0597967A1 | 25 May 1994 (25-05-1994) |

**INTERNATIONAL SEARCH REPORT**

| International application No. |
|---|
| PCT/IB2013/060287 |

| Patent Document<br>Cited in Search Report | Publication<br>Date | Patent Family<br>Member(s) | Publication<br>Date |
|---|---|---|---|
| | | EP0597967A4 | 07 December 1994 (07-12-1994) |
| | | EP0597967B1 | 01 December 1999 (01-12-1999) |
| | | EP0684781A1 | 06 December 1995 (06-12-1995) |
| | | EP0684781A4 | 18 September 1996 (18-09-1996) |
| | | EP0684781B1 | 11 December 2002 (11-12-2002) |
| | | EP0719161A1 | 03 July 1996 (03-07-1996) |
| | | EP0719161A4 | 04 June 1997 (04-06-1997) |
| | | EP0719161B1 | 17 April 2002 (17-04-2002) |
| | | EP0731720A1 | 18 September 1996 (18-09-1996) |
| | | EP0731720A4 | 18 June 1997 (18-06-1997) |
| | | EP0731720B1 | 10 April 2002 (10-04-2002) |
| | | EP0732890A1 | 25 September 1996 (25-09-1996) |
| | | EP0732890A4 | 05 November 1997 (05-11-1997) |
| | | EP0732890B1 | 29 September 2004 (29-09-2004) |
| | | EP0737083A1 | 16 October 1996 (16-10-1996) |
| | | EP0737083A4 | 29 December 1997 (29-12-1997) |
| | | EP0805701A1 | 12 November 1997 (12-11-1997) |
| | | EP0805701A4 | 02 February 2000 (02-02-2000) |
| | | EP0808191A1 | 26 November 1997 (26-11-1997) |
| | | EP0808191A4 | 26 November 1997 (26-11-1997) |
| | | EP0808191B1 | 30 October 2002 (30-10-2002) |
| | | EP0819013A1 | 21 January 1998 (21-01-1998) |
| | | EP0819013A4 | 23 December 1998 (23-12-1998) |
| | | EP0819013B1 | 23 June 2004 (23-06-2004) |
| | | EP0819014A1 | 21 January 1998 (21-01-1998) |
| | | EP0819014A4 | 23 December 1998 (23-12-1998) |
| | | EP0819014B1 | 05 February 2003 (05-02-2003) |
| | | EP0822777A1 | 11 February 1998 (11-02-1998) |
| | | EP0822777A4 | 17 January 2007 (17-01-2007) |
| | | EP0836423A1 | 22 April 1998 (22-04-1998) |
| | | EP0836501A1 | 22 April 1998 (22-04-1998) |
| | | EP0836501A4 | 25 August 1999 (25-08-1999) |
| | | EP0836501B1 | 19 March 2003 (19-03-2003) |
| | | EP0837712A1 | 29 April 1998 (29-04-1998) |
| | | EP0837712A4 | 26 November 2003 (26-11-2003) |
| | | EP0841963A1 | 20 May 1998 (20-05-1998) |
| | | EP0841963A4 | 19 August 1998 (19-08-1998) |
| | | EP0841963B1 | 10 March 2004 (10-03-2004) |
| | | EP0888144A1 | 07 January 1999 (07-01-1999) |
| | | EP0888144A4 | 10 October 2001 (10-10-2001) |
| | | EP0901346A1 | 17 March 1999 (17-03-1999) |
| | | EP0901346A4 | 17 March 1999 (17-03-1999) |
| | | EP0921831A1 | 16 June 1999 (16-06-1999) |
| | | EP0921831A4 | 26 April 2000 (26-04-2000) |
| | | EP0937439A2 | 25 August 1999 (25-08-1999) |
| | | EP0937439A3 | 13 October 1999 (13-10-1999) |
| | | EP0937439B1 | 17 September 2003 (17-09-2003) |
| | | EP0991362A1 | 12 April 2000 (12-04-2000) |
| | | EP0991362A4 | 06 October 2004 (06-10-2004) |
| | | EP0991362B1 | 12 December 2007 (12-12-2007) |
| | | EP1123130A1 | 16 August 2001 (16-08-2001) |
| | | EP1123130A4 | 13 July 2005 (13-07-2005) |
| | | EP1123130B1 | 21 July 2010 (21-07-2010) |
| | | EP1129744A1 | 05 September 2001 (05-09-2001) |
| | | EP1129744B1 | 01 September 2010 (01-09-2010) |
| | | EP1177772A1 | 06 February 2002 (06-02-2002) |
| | | EP1207788A1 | 29 May 2002 (29-05-2002) |
| | | EP1207788A4 | 09 December 2009 (09-12-2009) |
| | | EP1208867A2 | 29 May 2002 (29-05-2002) |
| | | EP1208867A3 | 02 May 2003 (02-05-2003) |
| | | EP1208867B1 | 10 March 2010 (10-03-2010) |
| | | EP1283027A2 | 12 February 2003 (12-02-2003) |
| | | EP1283027A3 | 23 April 2003 (23-04-2003) |
| | | EP1283027B1 | 14 November 2007 (14-11-2007) |
| | | EP1408862A2 | 21 April 2004 (21-04-2004) |
| | | EP1408862A4 | 03 March 2010 (03-03-2010) |
| | | EP1542606A2 | 22 June 2005 (22-06-2005) |
| | | EP1542606A4 | 08 December 2010 (08-12-2010) |
| | | EP1647229A2 | 19 April 2006 (19-04-2006) |

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | EP1542606A2 | 22 June 2005 (22-06-2005) |
| | | EP1542606A4 | 08 December 2010 (08-12-2010) |
| | | EP1647229A2 | 19 April 2006 (19-04-2006) |
| | | EP1647229A3 | 26 April 2006 (26-04-2006) |
| | | EP1864619A2 | 12 December 2007 (12-12-2007) |
| | | EP1864619A3 | 13 August 2008 (13-08-2008) |
| | | EP1864619B1 | 21 July 2010 (21-07-2010) |
| | | EP1980200A2 | 15 October 2008 (15-10-2008) |
| | | EP1980200A3 | 08 December 2010 (08-12-2010) |
| | | ES2142829T3 | 01 May 2000 (01-05-2000) |
| | | ES2207885T3 | 01 June 2004 (01-06-2004) |
| | | ES2217288T3 | 01 November 2004 (01-11-2004) |
| | | ES2229229T3 | 16 April 2005 (16-04-2005) |
| | | ES2296854T3 | 01 May 2008 (01-05-2008) |
| | | JPH09509074A | 16 September 1997 (16-09-1997) |
| | | JP3618754B2 | 09 February 2005 (09-02-2005) |
| | | JPH10510178A | 06 October 1998 (06-10-1998) |
| | | JP3650122B2 | 18 May 2005 (18-05-2005) |
| | | JPH09509585A | 30 September 1997 (30-09-1997) |
| | | JP3717929B2 | 16 November 2005 (16-11-2005) |
| | | JP2001518808A | 16 October 2001 (16-10-2001) |
| | | JP3992734B2 | 17 October 2007 (17-10-2007) |
| | | JPH06511167A | 15 December 1994 (15-12-1994) |
| | | JPH08511694A | 10 December 1996 (10-12-1996) |
| | | JPH09502889A | 25 March 1997 (25-03-1997) |
| | | JPH09510117A | 14 October 1997 (14-10-1997) |
| | | JPH10500587A | 20 January 1998 (20-01-1998) |
| | | JPH10507653A | 28 July 1998 (28-07-1998) |
| | | JPH10512163A | 24 November 1998 (24-11-1998) |
| | | JPH11503646A | 30 March 1999 (30-03-1999) |
| | | JP2000506051A | 23 May 2000 (23-05-2000) |
| | | JP2000512874A | 03 October 2000 (03-10-2000) |
| | | JP2002113009A | 16 April 2002 (16-04-2002) |
| | | USRE35352E | 15 October 1996 (15-10-1996) |
| | | US5370685A | 06 December 1994 (06-12-1994) |
| | | US5425705A | 20 June 1995 (20-06-1995) |
| | | US5433700A | 18 July 1995 (18-07-1995) |
| | | US5452733A | 26 September 1995 (26-09-1995) |
| | | US5458574A | 17 October 1995 (17-10-1995) |
| | | US5536251A | 16 July 1996 (16-07-1996) |
| | | US5545214A | 13 August 1996 (13-08-1996) |
| | | US5558644A | 24 September 1996 (24-09-1996) |
| | | US5569274A | 29 October 1996 (29-10-1996) |
| | | US5571215A | 05 November 1996 (05-11-1996) |
| | | US5584803A | 17 December 1996 (17-12-1996) |
| | | US5613937A | 25 March 1997 (25-03-1997) |
| | | US5618307A | 08 April 1997 (08-04-1997) |
| | | US5626607A | 06 May 1997 (06-05-1997) |
| | | US5682906A | 04 November 1997 (04-11-1997) |
| | | US5695457A | 09 December 1997 (09-12-1997) |
| | | US5702368A | 30 December 1997 (30-12-1997) |
| | | US5713951A | 03 February 1998 (03-02-1998) |
| | | US5718725A | 17 February 1998 (17-02-1998) |
| | | US5725496A | 10 March 1998 (10-03-1998) |
| | | US5728151A | 17 March 1998 (17-03-1998) |
| | | US5735290A | 07 April 1998 (07-04-1998) |
| | | US5738652A | 14 April 1998 (14-04-1998) |
| | | US5759170A | 02 June 1998 (02-06-1998) |
| | | US5762624A | 09 June 1998 (09-06-1998) |
| | | US5766151A | 16 June 1998 (16-06-1998) |
| | | US5769812A | 23 June 1998 (23-06-1998) |
| | | US5792094A | 11 August 1998 (11-08-1998) |
| | | US5795325A | 18 August 1998 (18-08-1998) |
| | | US5797960A | 25 August 1998 (25-08-1998) |
| | | US5799661A | 01 September 1998 (01-09-1998) |
| | | US5807318A | 15 September 1998 (15-09-1998) |
| | | US5814016A | 29 September 1998 (29-09-1998) |

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | US5814016A | 29 September 1998 (29-09-1998) |
| | | US5814097A | 29 September 1998 (29-09-1998) |
| | | US5823956A | 20 October 1998 (20-10-1998) |
| | | US5829447A | 03 November 1998 (03-11-1998) |
| | | US5849005A | 15 December 1998 (15-12-1998) |
| | | US5855210A | 05 January 1999 (05-01-1999) |
| | | US5855590A | 05 January 1999 (05-01-1999) |
| | | US5855614A | 05 January 1999 (05-01-1999) |
| | | US5863366A | 26 January 1999 (26-01-1999) |
| | | US5868702A | 09 February 1999 (09-02-1999) |
| | | US5879499A | 09 March 1999 (09-03-1999) |
| | | US5885238A | 23 March 1999 (23-03-1999) |
| | | US5913842A | 22 June 1999 (22-06-1999) |
| | | US5916193A | 29 June 1999 (29-06-1999) |
| | | US5924424A | 20 July 1999 (20-07-1999) |
| | | US5961481A | 05 October 1999 (05-10-1999) |
| | | US5971973A | 26 October 1999 (26-10-1999) |
| | | US5972030A | 26 October 1999 (26-10-1999) |
| | | US5980455A | 09 November 1999 (09-11-1999) |
| | | US6010531A | 04 January 2000 (04-01-2000) |
| | | US6027476A | 22 February 2000 (22-02-2000) |
| | | US6029671A | 29 February 2000 (29-02-2000) |
| | | US6079414A | 27 June 2000 (27-06-2000) |
| | | US6125852A | 03 October 2000 (03-10-2000) |
| | | US6152141A | 28 November 2000 (28-11-2000) |
| | | US6161543A | 19 December 2000 (19-12-2000) |
| | | US6237605B1 | 29 May 2001 (29-05-2001) |
| | | US6251093B1 | 26 June 2001 (26-06-2001) |
| | | US6283127B1 | 04 September 2001 (04-09-2001) |
| | | US6309382B1 | 30 October 2001 (30-10-2001) |
| | | US6311692B1 | 06 November 2001 (06-11-2001) |
| | | US6311693B1 | 06 November 2001 (06-11-2001) |
| | | US6314962B1 | 13 November 2001 (13-11-2001) |
| | | US6314963B1 | 13 November 2001 (13-11-2001) |
| | | US6325067B1 | 04 December 2001 (04-12-2001) |
| | | US6338735B1 | 15 January 2002 (15-01-2002) |
| | | US6346074B1 | 12 February 2002 (12-02-2002) |
| | | US2001016750A1 | 23 August 2001 (23-08-2001) |
| | | US6368340B2 | 09 April 2002 (09-04-2002) |
| | | US6401720B1 | 11 June 2002 (11-06-2002) |
| | | US6451004B1 | 17 September 2002 (17-09-2002) |
| | | US6451054B1 | 17 September 2002 (17-09-2002) |
| | | US6474340B1 | 05 November 2002 (05-11-2002) |
| | | US6478029B1 | 12 November 2002 (12-11-2002) |
| | | US6482171B1 | 19 November 2002 (19-11-2002) |
| | | US6484727B1 | 26 November 2002 (26-11-2002) |
| | | US6494211B1 | 17 December 2002 (17-12-2002) |
| | | US2002023653A1 | 28 February 2002 (28-02-2002) |
| | | US6494897B2 | 17 December 2002 (17-12-2002) |
| | | US6558318B1 | 06 May 2003 (06-05-2003) |
| | | US2002183839A1 | 05 December 2002 (05-12-2002) |
| | | US6564805B2 | 20 May 2003 (20-05-2003) |
| | | US2003040736A1 | 27 February 2003 (27-02-2003) |
| | | US6579259B2 | 17 June 2003 (17-06-2003) |
| | | US2002087183A1 | 04 July 2002 (04-07-2002) |
| | | US6613069B2 | 02 September 2003 (02-09-2003) |
| | | US2002022848A1 | 21 February 2002 (21-02-2002) |
| | | US6645197B2 | 11 November 2003 (11-11-2003) |
| | | US6645202B1 | 11 November 2003 (11-11-2003) |
| | | US6651671B1 | 25 November 2003 (25-11-2003) |
| | | US2002026094A1 | 28 February 2002 (28-02-2002) |
| | | US6651672B2 | 25 November 2003 (25-11-2003) |
| | | US2002096183A1 | 25 July 2002 (25-07-2002) |
| | | US6679268B2 | 20 January 2004 (20-01-2004) |
| | | US2002042610A1 | 11 April 2002 (11-04-2002) |
| | | US6689128B2 | 10 February 2004 (10-02-2004) |
| | | US2002045895A1 | 18 April 2002 (18-04-2002) |
| | | US6701931B2 | 09 March 2004 (09-03-2004) |
| | | US2002072741A1 | 13 June 2002 (13-06-2002) |

Form PCT/ISA/210 (extra sheet) (July 2009)                                    Page 8 of 11

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | US2002045895A1 | 18 April 2002 (18-04-2002) |
| | | US6701931B2 | 09 March 2004 (09-03-2004) |
| | | US2002072741A1 | 13 June 2002 (13-06-2002) |
| | | US6719755B2 | 13 April 2004 (13-04-2004) |
| | | US2003102000A1 | 05 June 2003 (05-06-2003) |
| | | US6802319B2 | 12 October 2004 (12-10-2004) |
| | | US6805128B1 | 19 October 2004 (19-10-2004) |
| | | US6805129B1 | 19 October 2004 (19-10-2004) |
| | | US2002173784A1 | 21 November 2002 (21-11-2002) |
| | | US6840936B2 | 11 January 2005 (11-01-2005) |
| | | US2002042611A1 | 11 April 2002 (11-04-2002) |
| | | US6858026B2 | 22 February 2005 (22-02-2005) |
| | | US2003145865A1 | 07 August 2003 (07-08-2003) |
| | | US6899704B2 | 31 May 2005 (31-05-2005) |
| | | US2001016725A1 | 23 August 2001 (23-08-2001) |
| | | US6913600B2 | 05 July 2005 (05-07-2005) |
| | | US2001023334A1 | 20 September 2001 (20-09-2001) |
| | | US6913601B2 | 05 July 2005 (05-07-2005) |
| | | US2003069577A1 | 10 April 2003 (10-04-2003) |
| | | US6929010B2 | 16 August 2005 (16-08-2005) |
| | | US2003079753A1 | 01 May 2003 (01-05-2003) |
| | | US6949095B2 | 27 September 2005 (27-09-2005) |
| | | US2003225402A1 | 04 December 2003 (04-12-2003) |
| | | US6955175B2 | 18 October 2005 (18-10-2005) |
| | | US2003073992A1 | 17 April 2003 (17-04-2003) |
| | | US6971394B2 | 06 December 2005 (06-12-2005) |
| | | US2002092533A1 | 18 July 2002 (18-07-2002) |
| | | US7017581B2 | 28 March 2006 (28-03-2006) |
| | | US2002013569A1 | 31 January 2002 (31-01-2002) |
| | | US7028692B2 | 18 April 2006 (18-04-2006) |
| | | US2004054363A1 | 18 March 2004 (18-03-2004) |
| | | US7052493B2 | 30 May 2006 (30-05-2006) |
| | | US2002100485A1 | 01 August 2002 (01-08-2002) |
| | | US7100614B2 | 05 September 2006 (05-09-2006) |
| | | US2004194791A1 | 07 October 2004 (07-10-2004) |
| | | US7131447B2 | 07 November 2006 (07-11-2006) |
| | | US2004055608A1 | 25 March 2004 (25-03-2004) |
| | | US7213601B2 | 08 May 2007 (08-05-2007) |
| | | US2003078571A1 | 24 April 2003 (24-04-2003) |
| | | US7338486B2 | 04 March 2008 (04-03-2008) |
| | | US2004106918A1 | 03 June 2004 (03-06-2004) |
| | | US7387126B2 | 17 June 2008 (17-06-2008) |
| | | US2008045935A1 | 21 February 2008 (21-02-2008) |
| | | US7517345B2 | 14 April 2009 (14-04-2009) |
| | | US2005033274A1 | 10 February 2005 (10-02-2005) |
| | | US7674257B2 | 09 March 2010 (09-03-2010) |
| | | US2006200119A1 | 07 September 2006 (07-09-2006) |
| | | US7824402B2 | 02 November 2010 (02-11-2010) |
| | | US2006184167A1 | 17 August 2006 (17-08-2006) |
| | | US7824403B2 | 02 November 2010 (02-11-2010) |
| | | US2007066974A1 | 22 March 2007 (22-03-2007) |
| | | US2009192506A9 | 30 July 2009 (30-07-2009) |
| | | US7857811B2 | 28 December 2010 (28-12-2010) |
| | | US2006052802A1 | 09 March 2006 (09-03-2006) |
| | | US7967833B2 | 28 June 2011 (28-06-2011) |
| | | US2007191714A1 | 16 August 2007 (16-08-2007) |
| | | US8002771B2 | 23 August 2011 (23-08-2011) |
| | | US2007255276A1 | 01 November 2007 (01-11-2007) |
| | | US8057465B2 | 15 November 2011 (15-11-2011) |
| | | US2006135954A1 | 22 June 2006 (22-06-2006) |
| | | US8114069B2 | 14 February 2012 (14-02-2012) |
| | | US2009171335A1 | 02 July 2009 (02-07-2009) |
| | | US8177780B2 | 15 May 2012 (15-05-2012) |
| | | US2007293854A1 | 20 December 2007 (20-12-2007) |
| | | US8211096B2 | 03 July 2012 (03-07-2012) |
| | | US2008091195A1 | 17 April 2008 (17-04-2008) |

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | US8308719B2 | 13 November 2012 (13-11-2012) |
| | | US2012226269A1 | 06 September 2012 (06-09-2012) |
| | | US8535301B2 | 17 September 2013 (17-09-2013) |
| | | US2001001812A1 | 24 May 2001 (24-05-2001) |
| | | US2001010247A1 | 02 August 2001 (02-08-2001) |
| | | US2002017306A1 | 14 February 2002 (14-02-2002) |
| | | US2002029783A1 | 14 March 2002 (14-03-2002) |
| | | US2002056460A1 | 16 May 2002 (16-05-2002) |
| | | US2002058995A1 | 16 May 2002 (16-05-2002) |
| | | US2011270388A9 | 03 November 2011 (03-11-2011) |
| | | US2002062065A1 | 23 May 2002 (23-05-2002) |
| | | US2002062066A1 | 23 May 2002 (23-05-2002) |
| | | US2002068855A1 | 06 June 2002 (06-06-2002) |
| | | US2002068922A1 | 06 June 2002 (06-06-2002) |
| | | US2002068970A1 | 06 June 2002 (06-06-2002) |
| | | US2002069884A1 | 13 June 2002 (13-06-2002) |
| | | US2002074004A1 | 20 June 2002 (20-06-2002) |
| | | US2002087157A1 | 04 July 2002 (04-07-2002) |
| | | US2002100482A1 | 01 August 2002 (01-08-2002) |
| | | US2002128639A1 | 12 September 2002 (12-09-2002) |
| | | US2003024537A1 | 06 February 2003 (06-02-2003) |
| | | US2003028187A1 | 06 February 2003 (06-02-2003) |
| | | US2003029462A1 | 13 February 2003 (13-02-2003) |
| | | US2003069574A1 | 10 April 2003 (10-04-2003) |
| | | US2004019348A1 | 29 January 2004 (29-01-2004) |
| | | US2004073301A1 | 15 April 2004 (15-04-2004) |
| | | US2004117032A1 | 17 June 2004 (17-06-2004) |
| | | US2004225355A1 | 11 November 2004 (11-11-2004) |
| | | US2004236418A1 | 25 November 2004 (25-11-2004) |
| | | US2004260278A1 | 23 December 2004 (23-12-2004) |
| | | US2005148997A1 | 07 July 2005 (07-07-2005) |
| | | US2005245918A1 | 03 November 2005 (03-11-2005) |
| | | US2005251125A1 | 10 November 2005 (10-11-2005) |
| | | US2006004352A1 | 05 January 2006 (05-01-2006) |
| | | US2006058775A1 | 16 March 2006 (16-03-2006) |
| | | US2007282324A1 | 06 December 2007 (06-12-2007) |
| | | US2007293855A1 | 20 December 2007 (20-12-2007) |
| | | US2008029105A1 | 07 February 2008 (07-02-2008) |
| | | US2008045936A1 | 21 February 2008 (21-02-2008) |
| | | US2008045946A1 | 21 February 2008 (21-02-2008) |
| | | US2008183168A1 | 31 July 2008 (31-07-2008) |
| | | US2012271334A1 | 25 October 2012 (25-10-2012) |
| | | WO0016850A1 | 30 March 2000 (30-03-2000) |
| | | WO0016850A9 | 26 October 2000 (26-10-2000) |
| | | WO0105306A1 | 25 January 2001 (25-01-2001) |
| | | WO9301768A1 | 04 February 1993 (04-02-1993) |
| | | WO9418881A1 | 01 September 1994 (01-09-1994) |
| | | WO9508364A1 | 30 March 1995 (30-03-1995) |
| | | WO9515192A1 | 08 June 1995 (08-06-1995) |
| | | WO9515715A1 | 15 June 1995 (15-06-1995) |
| | | WO9517919A1 | 06 July 1995 (06-07-1995) |
| | | WO9524940A1 | 21 September 1995 (21-09-1995) |
| | | WO9600033A1 | 04 January 1996 (04-01-1996) |
| | | WO9605773A1 | 29 February 1996 (29-02-1996) |
| | | WO9617644A1 | 13 June 1996 (13-06-1996) |
| | | WO9621489A1 | 18 July 1996 (18-07-1996) |
| | | WO9630072A1 | 03 October 1996 (03-10-1996) |
| | | WO9630073A1 | 03 October 1996 (03-10-1996) |
| | | WO9632882A1 | 24 October 1996 (24-10-1996) |
| | | WO9639942A1 | 19 December 1996 (19-12-1996) |
| | | WO9640347A1 | 19 December 1996 (19-12-1996) |
| | | WO9640354A1 | 19 December 1996 (19-12-1996) |
| | | WO9720506A1 | 12 June 1997 (12-06-1997) |

**INTERNATIONAL SEARCH REPORT**

International application No.
PCT/IB2013/060287

| Patent Document Cited in Search Report | Publication Date | Patent Family Member(s) | Publication Date |
|---|---|---|---|
| | | WO9721462A1 | 19 June 1997 (19-06-1997) |
| | | WO9726034A1 | 24 July 1997 (24-07-1997) |
| | | WO9727799A1 | 07 August 1997 (07-08-1997) |
| | | WO9732623A1 | 12 September 1997 (12-09-1997) |
| | | WO9748434A1 | 24 December 1997 (24-12-1997) |
| | | WO9803213A1 | 29 January 1998 (29-01-1998) |
| | | WO9817187A1 | 30 April 1998 (30-04-1998) |
| | | WO9929251A1 | 17 June 1999 (17-06-1999) |
| | | WO02102231A2 | 27 December 2002 (27-12-2002) |
| | | WO02102231A3 | 15 May 2003 (15-05-2003) |
| | | WO2004028233A2 | 08 April 2004 (08-04-2004) |
| | | WO2004028233A3 | 24 June 2004 (24-06-2004) |
| US6036677A | 14 March 2000 (14-03-2000) | AU6347398A | 22 September 1998 (22-09-1998) |
| | | US6093177A | 25 July 2000 (25-07-2000) |
| | | US2002077654A1 | 20 June 2002 (20-06-2002) |
| | | WO9839045A1 | 11 September 1998 (11-09-1998) |
| WO2005065562A1 | 21 July 2005 (21-07-2005) | AT507789T | 15 May 2011 (15-05-2011) |
| | | AU2004312058A1 | 21 July 2005 (21-07-2005) |
| | | AU2004312058B2 | 02 December 2010 (02-12-2010) |
| | | CA2552165A1 | 21 July 2005 (21-07-2005) |
| | | CA2552165C | 22 October 2013 (22-10-2013) |
| | | DE602004032574D1 | 16 June 2011 (16-06-2011) |
| | | EP1706052A1 | 04 October 2006 (04-10-2006) |
| | | EP1706052B1 | 04 May 2011 (04-05-2011) |
| | | JP2007516795A | 28 June 2007 (28-06-2007) |
| | | JP4970049B2 | 04 July 2012 (04-07-2012) |
| | | MXPA06007624A | 30 January 2007 (30-01-2007) |
| | | US2005165388A1 | 28 July 2005 (28-07-2005) |
| | | US7655005B2 | 02 February 2010 (02-02-2010) |

**PATENT COOPERATION TREATY**

From the
INTERNATIONAL SEARCHING AUTHORITY

| | |
|---|---|
| To:<br>LIFSHITZ, NIR<br>c/o Baylis Medical Company Inc.<br>2645 Matheson Blvd. E.<br>MISSISAUGA, Ontario<br>Canada, L4W 5S4 | **PCT**<br><br>WRITTEN OPINION OF THE<br>INTERNATIONAL SEARCHING AUTHORITY<br><br>(PCT Rule 43*bis*.1) |

| | |
|---|---|
| | Date of mailing<br>*(day/month/year)*    6 March 2014 (06-03-2014) |
| Applicant's or agent's file reference<br>RFPPCT02627 | **FOR FURTHER ACTION**<br>See paragraph 2 below |

| International application No.<br>**PCT/IB2013/060287** | International filing date *(day/month/year)*<br>20 November 2013 (20-11-2013) | Priority date *(day/month/year)*<br>07 August 2013 (07-08-2013) |
|---|---|---|

International Patent Classification (IPC) or both national classification and IPC
IPC: *A61M 25/01* (2006.01) , *A61B 17/34* (2006.01) , *A61B 18/14* (2006.01) , *A61M 25/06* (2006.01) ,
*A61M 29/00* (2006.01)

Applicant
BAYLIS MEDICAL COMPANY INC.

1. This opinion contains indications relating to the following items :

| | | |
|---|---|---|
| [X] | Box No. I | Basis of the opinion |
| [ ] | Box No. II | Priority |
| [X] | Box No. III | Non-establishment of opinion with regard to novelty, inventive step and industrial applicability |
| [ ] | Box No. IV | Lack of unity of invention |
| [X] | Box No. V | Reasoned statement under Rule 43*bis*.1(a)(I) with regard to novelty, inventive step or industrial applicability; citations and explanations supporting such statement |
| [ ] | Box No. VI | Certain documents cited |
| [ ] | Box No. VII | Certain defects in the international application |
| [ ] | Box No. VIII | Certain observations on the international application |

2. **FURTHER ACTION**

If a demand for international preliminary examination is made, this opinion will be considered to be a written opinion of the International Preliminary Examining Authority ("IPEA") except that this does not apply where the applicant chooses an Authority other than this one to be the IPEA and the chosen IPEA has notified the International Bureau under Rule 66.1*bis*(b) that written opinions of this International Searching Authority will not be so considered.

If this opinion is, as provided above, considered to be a written opinion of the IPEA, the applicant is invited to submit to the IPEA a written reply together, where appropriate, with amendments, before the expiration of 3 months from the date of mailing of Form PCT/ISA/220 or before the expiration of 22 months from the priority date, whichever expires later.

For further options, see Form PCT/ISA/220.

| Name and mailing address of the ISA/CA<br>Canadian Intellectual Property Office<br>Place du Portage I, C114 - 1st Floor, Box PCT<br>50 Victoria Street<br>Gatineau, Quebec K1A 0C9<br>Facsimile No.: 001-819-953-2476 | Date of completion of this opinion<br><br>**05 March 2014 (05-03-2014)** | Authorized officer<br><br>Alison Canteenwalla 934-8534 |
|---|---|---|

Form PCT/ISA/237 (cover sheet) (July 2011)                                                   Page 1 of 5

| WRITTEN OPINION OF THE<br>INTERNATIONAL SEARCHING AUTHORITY | International application No.<br>PCT/IB2013/060287 |
|---|---|

| Box No. I | Basis of this opinion |
|---|---|

1.  With regard to the **language**, this opinion has been established on the basis of:

   [ X ]   the international application in the language in which it was filed

   [   ]   a translation of the international application into _____ , which is the language of a
           translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b)).

2.  [   ]   This opinion has been established taking into account the **rectification of an obvious mistake** authorized by or notified
           to this Authority under Rule 91 (Rule 43*bis*.1(a))

3.  With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, this opinion has been
    established on the basis of a sequence listing filed or furnished:

   a.   (means)

        [   ]   on paper

        [   ]   in electronic form

   b.   (time)

        [   ]   the international application as filed.

        [   ]   together with the international application in electronic form

        [   ]   subsequently to this Authority for the purposes of search

4.  [   ]   In addition, in the case that more than one version or copy of a sequence listing has been filed or furnished, the required
           statements that the information in the subsequent or additional copies is identical to that in the application as filed or does not
           go beyond the application as filed, as appropriate, were furnished.

5.  Additional comments :

**WRITTEN OPINION OF THE**
**INTERNATIONAL SEARCHING AUTHORITY**

International application No.
PCT/IB2013/060287

| Box No. III | Non-establishment of opinion with regard to novelty, inventive step and industrial applicability |

The questions whether the claimed invention appears to be novel, to involve an inventive step (to be non obvious), or to be industrially applicable have not been examined in respect of :

[  ]  the entire international application

[  ]  claim Nos.

because:

[ X ]  the said international application, or the said claim Nos.       62-81 and 84
       relate to the following subject matter which does not require an international search *(specify)* :

Claims 62-81 and 84 are directed to a method for treatment of the human or animal body by surgery or therapy.

[  ]  the description, claims or drawings *(indicate particular elements below)* or said claim Nos.
      are so unclear that no meaningful opinion could be formed *(specify)* :

[  ]  the claims, or said claims Nos.
      are so inadequately supported  by the description that no meaningful opinion could be formed *(specify)*:

[  ]  no international search report has been established for said claims Nos.

[  ]  a meaningful opinion could not be formed without the sequence listing; the applicant did not, within the prescribed time limit:

    [   ]  furnish a sequence listing on paper complying with the standard provided for in Annex C of the Administrative Instructions, and such listing was not available to the International Searching Authority in a form and manner acceptable to it;

    [   ]  furnish a sequence listing in electronic form complying with the standard provided for in Annex C of the Administrative Instructions, and such listing was not available to the International Searching Authority in a form and manner acceptable to it;

    [   ]  pay the required late furnishing fee for the furnishing of a sequence listing in response to an invitation under Rule 13*ter*.1(a) or (b).

[  ]  See Supplemental Box for further details.

Form PCT/ISA/237 (Box No. III) (July 2011)                                                                                   Page 3 of 5

| WRITTEN OPINION OF THE<br>INTERNATIONAL SEARCHING AUTHORITY | International application No.<br>PCT/IB2013/060287 |
|---|---|

| Box No. V | Reasoned statement under Rule 43*bis*.1(a)(I) with regard to novelty, inventive step or industrial applicability; citations and explanations supporting such statement |
|---|---|

1.      Statement

| | | | | |
|---|---|---|---|---|
| Novelty (N) | Claims | 2-48, 50-61 | | YES |
| | Claims | 1, 49, 82, 83 | | NO |
| Inventive step (IS) | Claims | none | | YES |
| | Claims | 1-61, 82, 83 | | NO |
| Industrial applicability (IA) | Claims | 1-61, 82, 83 | | YES |
| | Claims | none | | NO |

2.      Citations and explanations :

D1: WO2008/079828 A2 (Nance, E.J. et al.) 3 July 2008 (03-07-2008)
D2: US2003/0208220 A1 (Worley, S.J. et al.) 6 November 2003 (06-11-2003)
D3: US2001/0044591 A1 (Stevens, J.H. et al.) 22 November 2001 (22-11-2001)

**Novelty (N)**

Claims 1, 49, 82 and 83 are not novel and do not comply with Article 33(2) of the PCT.

D1 discloses in figure 5 and paragraph [0069] a medical device for puncturing tissue at a tissue site, the medical device comprising:
- an elongate member having a proximal section, a distal section and a rail section (300) between the proximal and distal sections; and
- an active tip (500) at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue;
- the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be manoeuvrable for enabling access to the tissue site. The device further includes a dilator (306).

D2 discloses in paragraphs [0058] and [0063] and figure 5 a medical device for puncturing tissue at a tissue site, the medical device comprising:
- an elongate member having a proximal section, a distal section (38) and a rail section (36) between the proximal and distal sections; and
- an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue;
- the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon as well as to be manoeuvrable for enabling access to the tissue site. The device can further include a dilator (paragraph [0058]).

D3 discloses in figure 25 and paragraph [0206] a dilator (330) for use with an ancillary device (342) to access a tissue site within a patient's body, the ancillary device comprising a curvature-imparting region operable to guide the dilator by directing the dilator along a curve, the dilator comprising:
a substantially rigid distal end region; and
a substantially flexible intermediate region (332) terminating at the distal end region;
the dilator being configured such that, when used with the ancillary device, a location of the substantially flexible intermediate region of the dilator corresponds to a location of the curvature imparting region of the ancillary device; and
the substantially rigid distal end region having a rigidity greater than the flexible intermediate region to enable the dilator to advance through the tissue site. The system further includes a catheter for puncturing tissue (paragraph [0254]).

Claims 2-48, and 50-61 are novel and do comply with Article 33(2) of the PCT. Document D1 is considered the closest prior art and discloses the dilator and device of the independent claims as described above.

The subject matter of claims 2-48, and 50-61 differs from the prior art by specific dimensions and minor design options.

**Continued in Supplemental Box V.**

| WRITTEN OPINION OF THE INTERNATIONAL SEARCHING AUTHORITY | International application No. PCT/IB2013/060287 |
|---|---|

**Supplemental Box**

In case **the space in any of the preceding boxes is not sufficient.**

Continuation of :    Box No. V

**Inventive Step (IS)**

Given the above objection, claims 1, 49, 82 and 83 are also considered to lack an inventive step in light of the described prior art and thus fail to comply with Article 33(3) of the PCT.

Claims 2-48, and 50-61 do not comply with Article 33(3) of the PCT. The subject matter of claims 2-48 and 50-61 does not involve an inventive step with regards to D1, D2 or D3 in view of common general knowledge. The additional features recited by these claims are deemed to be merely design options which would be well known to a person skilled in the art. Therefore unless they produce a new and unexpected result, they cannot be considered as inventive.

**Industrial applicability (IA)**

The subject matter of claims 1-61, 82 and 83 is considered to be industrially applicable and thus complies with the requirements of Article 33(4) of the PCT.

| | | Application/Control No.<br>17/474,415 | | Applicant(s)/Patent Under Reexamination<br>Davies et al. | |
|---|---|---|---|---|---|
| ***Notice of References Cited*** | | | | | |
| | | Examiner<br>MICHAEL PEFFLEY | | Art Unit<br>3794 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-5366443-A | 11-1994 | Eggers; Philip E. | A61B18/1492 | 604/114 |
| * | B | US-6325797-B1 | 12-2001 | Stewart; Mark T. | A61B18/1492 | 606/41 |
| * | C | US-5680860-A | 10-1997 | Imran; Mir A. | A61B18/1492 | 606/41 |
| * | D | US-20050101984-A1 | 05-2005 | Chanduszko, Andrzej J. | A61B17/0057 | 606/185 |
| * | E | US-20150245882-A1 | 09-2015 | VENKATRAGHAVAN; Vikram | A61M5/007 | 600/424 |
| * | F | US-8021359-B2 | 09-2011 | Auth; David C. | A61B18/1492 | 606/41 |
| * | G | US-6607520-B2 | 08-2003 | Keane; David | A61F2/88 | 606/2 |
| * | H | US-6123718-A | 09-2000 | Tu; Lily Chen | A61B18/1492 | 606/41 |
| * | I | US-20090093802-A1 | 04-2009 | Kulesa; Larry B. | A61B18/1492 | 606/41 |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20230901

# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/474,415 | 09/14/2021 | Gareth Davies | 051666/12005 | 4560 |

188636       7590       09/07/2023
Nelson Mullins Riley & Scarborough LLP / BSCI
IP Department
One Wells Fargo Center, Suite 2300
301 South College Street
Charlotte, NC 28202

| EXAMINER |
|---|
| PEFFLEY, MICHAEL F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3794 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/07/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

ip@nelsonmullins.com
ipdocket@baylismedical.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 17/474,415 | Applicant(s) Davies et al. |
|---|---|---|
| | Examiner MICHAEL PEFFLEY | Art Unit 3794 | AIA (FITF) Status Yes |

| | Application No. 17/474,415 | Applicant(s) Davies et al. |
|---|---|---|
| *Office Action Summary* | **Examiner** MICHAEL PEFFLEY | **Art Unit** 3794 | **AIA (FITF) Status** Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE **3** MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☑ Responsive to communication(s) filed on 9/14/2021.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**    2b) ☑ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5) ☑ Claim(s) __1-19__ is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) 1-19 is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

## Application Papers

10) ☑ The specification is objected to by the Examiner.
11) ☑ The drawing(s) filed on 9/14/2021 is/are: a)☑ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All    b)☐ Some**    c)☐ None of the:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. _____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
    Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

Application/Control Number: 17/474,415                                                     Page 2
Art Unit: 3794

### Notice of Pre-AIA or AIA Status

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### Information Disclosure Statement

The numerous references filed with the Information Disclosure Statements have been afforded a cursory review, similar to what would be expected of a classification search of the prior art. Should there be any references of particular relevance to the instant application claims, applicant is respectfully requested to identify such references for further review by the examiner.

### Specification

The disclosure is objected to because of the following informalities: the first sentence of the specification must be updated to provide the most current status (e.g. US Patent Number) for the related application(s).

Appropriate correction is required.

### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention.

Claims 1, 9-12, 16, 17 and 19 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by Eggers et al (5,366,443).

Application/Control Number: 17/474,415                                    Page 3
Art Unit: 3794

Eggers et al provide a medical device for puncturing tissue comprising an

elongate member (16) having a proximal section, a rail section (along which the

catheter is advanced) and a distal section having an active tip for delivering energy to

penetrate tissue (Figure 7, for example).  The rail section supports advancement of one

or more tubular members (i.e. catheter) and is maneuverable for enabling access to a

tissue site (i.e. is flexible enough to be advanced through a blood vessel to a treatment

site).  It is noted the Eggers et al guidewire is disclosed as a common electrode.  It is

noted that it inherently could also serve as an active electrode.  Applicant's claims do

not recite a power source, and the limitation of an "active tip" is deemed an intended

use limitation since there is no structure to specifically support the electrode is "active".

Regarding claim 9, the device is a conductive guidewire (col. 7, lines 18-21).

Regarding claim 10, the guidewire may be covered with an insulation (46) with a distal

tip of the guidewire exposed.  Regarding claim 11, there is a proximal exposed portion

of the guidewire that is coupled to an energy source (at 30 in Figure 1).  See column 7,

lines 49-51, for example.  Regarding claim 12, the active tip is substantially atraumatic

(see Figure 7, for example).  Regarding claim 16, the active tip comprises an electrode

as addressed above.  Regarding claim 17, the electrode is domed shape (Figure 7).

Regarding claim 19, the active tip is connected to an RF source of energy.


Claims 1, 2, 4, 5, 8, 9, 12, 16, 17, 19 and 20 are rejected under 35 U.S.C.

102(a)(1) as being anticipated by Stewart et al (6,325,797).

Stewart et al disclose a device comprising an elongate member (either 192 or

196 in Figure 8) having a proximal section, a distal section and a rail section (portion

Application/Control Number: 17/474,415                                                   Page 4
Art Unit: 3794

located in the catheter 198). There is an active tip on each member, each tip having an

electrode (194 or 210). Element 192 is an ablation catheter, and the electrodes are

used to ablate tissue, and the examiner maintains the device is inherently capable of

puncturing tissue. Element 196 contains mapping electrodes (210). The examiner

again notes that applicant does not claim an energy source and the examiner maintains

the mapping electrodes (210) are inherently capable of puncturing tissue if they were

connected to an ablation source. The rail section of each device (192,196) is

configured to both act as a rail to support a tubular member (198) as well as to enable

maneuverability to a tissue site.

Regarding claim 2, guidewire (196) has a distal curved section and a straight

section distal to the curved section (Figure 8). Regarding claims 4 and 5, the distal

section of element (192) forms a distal coil in a deployed state such that the active tip

curves away from the axis of advancement (Figure 8). Regarding claim 8, the distal coil

forms a double pigtail curve (Figure 8). Regarding claim 12, the active tip is

substantially atraumatic (Figure 8). Regarding claim 16, the active tip comprises an

electrode (210 or 194). Regarding claim 17, the distal electrode is dome shaped

(Figure 8). Regarding claim 19, the device delivers RF energy.


Claims 1, 2, 4-8, 16, 17 and 19 are rejected under 35 U.S.C. 102(a)(1) as being

anticipated by Imran (5,680,860).

Imran provides a medical device for puncturing tissue comprising an elongate

member (106) having a proximal section, a distal section (116) and a rail section (that

extends through catheter 107). There is an active tip at the distal end (i.e. plurality of

Application/Control Number: 17/474,415                                                    Page 5
Art Unit: 3794

mapping and ablation electrodes) and the electrodes are operable to deliver energy to

create a puncture.  It is again noted that applicant has not claimed an energy source,

and the limitation of delivering energy to create a puncture is deemed intended use.

The rail section serves to support installation of a tubular member (107) as well as to be

maneuverable to enable access to a tissue site.

Regarding claim 2, the distal section includes a curved portion (Figure 9, for

example) with a distal straight section (116b).  Regarding claim 4, the distal section

automatically forms a distal coil (Figures 9 and 10) for anchoring the distal section upon

puncturing tissue (as seen in Figure 8).  Regarding claim 5, the active tip curves away

from the axis of advancement to form the coil.  Regarding claim 6, see again 116b of

Figure 9.  Regarding claim 7, see column 9, lines 30-35 which discloses the spacing

between electrodes which would put the distal tip section within the claimed limits.

Regarding claim 8, the coil may have as many or as few turns as desired based on the

specific deployment amount.  Regarding claim 12, see Figure 8.  Regarding claims 16

and 17, the active tip comprises a dome shaped electrode (Figure 8).  Regarding claim

19, the device delivers RF energy  (see RF generator 66 in Figure 1).

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have
> been obvious before the effective filing date of the claimed invention to a person having
> ordinary skill in the art to which the claimed invention pertains. Patentability shall not be
> negated by the manner in which the invention was made.

Application/Control Number: 17/474,415                                              Page 6
Art Unit: 3794

Claim 3 is rejected under 35 U.S.C. 103 as being unpatentable over Stewart et al

(6,325,797) in view of the teaching of Chanduszko et al (2005/0101984).

Stewart et al discloses a guidewire (196) having an active electrode at the tip and

a curved portion proximal to the tip.  Stewart et al fails to disclose a reverse taper for the

guidewire.

Chanduszko et al disclose another guidewire device having a curved shape, and

specifically disclose a reverse-tapered that increases in diameter to provide flexibility to

the distal section of the guidewire.  See, for example, Figure 4A.

To have provided the Stewart et al guidewire with a reverse taper portion to

provide flexibility to the guidewire would have been an obvious modification for one of

ordinary skill in the art given the teaching of Chanduszko et al.


Claims 13-15 and 18 are rejected under 35 U.S.C. 103 as being unpatentable

over any one of Stewart et al ('797), Eggers et al ('443) or Imran ('860), and further in

view of the teaching of Venkatraghavan et al (2015/0245882).

Each of the primary references disclose guidewires having a distal curved shape,

but none expressly disclose radiopaque marker bands on the guidewires.

Venkatraghavan et al teach that it is generally known to provide guidewires with

radiopaque marker bands along the length of the guidewire to identify the location of the

guidewire within the body.  See, for example, Figure 2.  Several different arrangements

and types of markers are disclosed, and the examiner maintains that the use of a helical

coil marker would be an obvious alternative to the multiple ring marker bands.

Application/Control Number: 17/474,415                                                    Page 7
Art Unit: 3794

To have provided any of the Stewart et al, Eggers et al or Imran devices with radiopaque markers to assist in identifying the location of the device within the body would have been an obvious consideration for one of ordinary skill in the art since Venkatraghavan et al fairly teach it is known to provide guidewires with radiopaque marker bands at various locations for that purpose.

## Double Patenting

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See

Application/Control Number: 17/474,415                                        Page 8
Art Unit: 3794

MPEP § 717.02 for applications subject to examination under the first inventor to file

provisions of the AIA as explained in MPEP § 2159. See MPEP § 2146 *et seq.* for

applications not subject to examination under the first inventor to file provisions of the

AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The filing of a terminal disclaimer by itself is not a complete reply to a

nonstatutory double patenting (NSDP) rejection. A complete reply requires that the

terminal disclaimer be accompanied by a reply requesting reconsideration of the prior

Office action. Even where the NSDP rejection is provisional the reply must be complete.

See MPEP § 804, subsection I.B.1. For a reply to a non-final Office action, see 37 CFR

1.111(a). For a reply to final Office action, see 37 CFR 1.113(c). A request for

reconsideration while not provided for in 37 CFR 1.113(c) may be filed after final for

consideration. See MPEP §§ 706.07(e) and 714.13.

The USPTO Internet website contains terminal disclaimer forms which may be

used. Please visit www.uspto.gov/patent/patents-forms. The actual filing date of the

application in which the form is filed determines what form (e.g., PTO/SB/25,

PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal

Disclaimer may be filled out completely online using web-screens. An eTerminal

Disclaimer that meets all requirements is auto-processed and approved immediately

upon submission. For more information about eTerminal Disclaimers, refer to

www.uspto.gov/patents/apply/applying-online/eterminal-disclaimer.

Claims 1-19 are rejected on the ground of nonstatutory double patenting as being

unpatentable over claims 1-18  of U.S. Patent No. 11,154,324. Although the claims at

issue are not identical, they are not patentably distinct from each other because they

Application/Control Number: 17/474,415                                                   Page 9
Art Unit: 3794

recite the same general invention with more specific limitations and only minor, obvious

differences in the claimed limitations.

### *Conclusion*

The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure. Auth et al (8,021,359) and Keane (6,607,520) disclose other

devices having a curved distal elongate member.  Kulesa et al (2009/0093802)

discloses a device having a guidewire with an active tip for penetrating tissue.  Tu et al

(6,123,718) disclose a device with a guidewire having radiopaque markers.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MICHAEL PEFFLEY whose telephone number is

(571)272-4770. The examiner can normally be reached Mon-Fri 8 am-5 pm.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Linda Dvorak can be reached on (571) 272-4764. The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

Application/Control Number: 17/474,415                                                    Page 10
Art Unit: 3794

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/**MICHAEL F PEFFLEY**/
**Primary Examiner, Art Unit 3794**

/M.F.P/
September 1, 2023

# UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **Inventor(s):** Gareth Davies et al. | **Examiner:** MICHAEL F PEFFLEY |
| **Appln. No.:** 17/474,415 | **Group Art Unit:** 3794 |
| **Filing Date:** September 14, 2021 | **Confirmation No.:** 4560 |
| **Title:** Methods and Devices for Puncturing Tissue | **Docket No.:** 051666/12005 |

Commissioner for Patents
P. O. Box 1450
Alexandria, VA  22313-1450

I CERTIFY THAT THIS PAPER (ALONG WITH ANY REFERRED TO AS BEING ATTACHED OR ENCLOSED) IS BEING TRANSMITTED TO THE COMMISSIONER FOR PATENTS, P. O. BOX 1450, ALEXANDRIA, VA 22313-1450 ON DECEMBER 6, 2023, VIA THE USPTO-PATENT CENTER FILING SYSTEM.
        /Carmen Prince/
        CARMEN PRINCE

## AMENDMENT

Applicant responds to the Non-Final Office Action dated September 07, 2023 for the above-identified application as follows:

Amendments to the Specification begin on page 2;

Listing of the Claims begins on page 3; and

Remarks begin on page 6.

Should any fee be required, the Commissioner is authorized to charge our Deposit Account No. 50-1196.

Appln. No.: 17/474,415                                                NM Ref.: 051666.12005
Page 2                                                                BSC Ref.: 22-0558US03

## AMENDMENTS TO THE SPECIFICATION

Please amend the specification as follows:

## CROSS REFERENCED APPLICATIONS

[0001] The present application is a continuation of U.S. application 16/445,790, filed on June 19, 2019, now U.S. Patent 11,154,324, issued October 26, 2021, which is a continuation of U.S. application 14/910,525, filed on February 5, 2016, now U.S. Patent 10,368,911, issued August 6, 2019, which is a national phase entry of ~~PCT/IB2013/060286~~ PCT/IB2013/060287, filed on November 20, 2013, which claims benefit of U.S. application 61/863,265, filed on August 7, 2013 and claims benefit of U.S. application 61/863,579 filed on August 8, 2013.

Appln. No.: 17/474,415
Page 3

NM Ref.: 051666.12005
BSC Ref.: 22-0558US03

## LISTING OF THE CLAIMS

This listing of claims will replace all prior listings.

1.    (Currently Amended) A medical device for puncturing tissue at a tissue site, the medical device comprising:

> an elongate member having a proximal section, a distal section, and a rail section between the proximal and distal sections; and,

> an active tip at a distal end of the distal section, the active tip operable to deliver energy to create a puncture through the tissue; and~~,~~

> the rail section being configured to both act as a rail for supporting installation of one or more tubular members thereupon, as well as to be maneuverable for enabling access to the tissue site<u>;</u>

> <u>wherein the distal section defines a distal section curved portion and a distal section straight portion, the distal section straight portion being distal to the distal section curved portion; and</u>

> <u>further wherein the distal section straight portion has a reverse taper with an outer diameter of the distal section straight portion increases in a distal direction, such that a distal end of the distal section straight portion has a diameter greater than a proximal end of the distal section straight portion</u>.

Claims 2.-3. Canceled.

4.    (Currently Amended) The medical device of claim 1, wherein the ~~distal section defines a~~ distal section curved portion <u>is</u> configured to automatically form a distal coil in a deployed state for anchoring the distal section upon the distal section being advanced through the puncture.

Appln. No.: 17/474,415                                          NM Ref.: 051666.12005
Page 4                                                          BSC Ref.: 22-0558US03

5.   (Original) The medical device of claim 4, wherein the coil is configured such that, upon deployment from a confined state, along an axis of advancement, the active tip curves away from the axis of advancement.

6.   Canceled.

7.   (Currently Amended) The medical device of <u>claim 1</u> ~~claim 6~~, wherein the distal section straight portion has a length of about 3 mm to 10 mm.

8.   (Original) The medical device of claim 4, wherein the distal coil is configured as a double pigtail curve.

9.   (Original) The medical device of claim 1, wherein the elongate member comprises an electrically conductive guidewire.

10.  (Original) The medical device of claim 9, wherein the electrically conductive guidewire is substantially covered by a layer of electrical insulation with a distal tip of the electrically conductive guidewire exposed.

11.  (Original) The medical device of claim 10, wherein the electrically conductive guidewire further comprises an exposed portion on the proximal section, wherein the exposed portion allows for coupling to a source of electrical energy.

12.  (Original) The medical device of claim 1, wherein the active tip is substantially atraumatic.

13.  (Original) The medical device of claim 1, wherein the medical device further comprises a radiopaque marker positioned on the distal section.

14.  (Original) The medical device of claim 13, wherein the radiopaque marker comprises a helical coil surrounding the elongate member at the distal section.

15.  (Original) The medical device of claim 14, wherein the helical coil has a length of about 15 mm to about 100 mm.

Appln. No.: 17/474,415
Page 5

NM Ref.: 051666.12005
BSC Ref.: 22-0558US03

16. (Original) The medical device of claim 1, wherein the active tip comprises an electrode.

17. (Original) The medical device of claim 16, wherein the electrode is dome shaped.

18. (Original) The medical device of claim 17, wherein the active tip further comprises a radiopaque marker band.

19. (Original) The medical device of claim 1, wherein the active tip is configured to deliver radiofrequency energy.

20. (Original) The medical device of claim 1, wherein the distal section defines a J-shaped distal section.

## REMARKS

By the filing of this Response, the status of the claims presented for examination is as follows: claims 1, 4 and 7 are amended and claims 2-3 and 6 are canceled.

Claims 1-4, 5, and 7-19 are currently pending.

### Specification Objection

The disclosure stands objected to because of the following informalities: the first sentence of the specification must be updated to provide the most current status for the related application(s). The specification is hereby amended to address this objection.

### Section 102 Rejections

Claims 1, 9-12, 16, 17 and 19 stand rejected under 35 U.S.C. § 102(a)(1) as anticipated by U.S. Patent No. 5,366,443 ("*Eggers*"). Claims 1, 2, 4, 5, 8, 9, 12, 16, 17, 19 and 20 stand rejected under 35 U.S.C. § 102(a)(1) as anticipated by U.S. Patent No. 6,325,797 ("*Stewart*"). Claims 1, 2, 4-8, 16, 17 and 19 stand rejected under 35 U.S.C. § 102(a)(1) as anticipated by U.S. Patent No. 5,680,860 ("*Imran*"). Claim 3 stands rejected under 35 U.S.C. § 103 as obvious over *Stewart* in view of U.S. Publication No. 2005/0101984 ("*Chanduszko*"). Claims 13-15 and 18 stands rejected under 35 U.S.C. § 103 as obvious over *Stewart* in view of *Eggers* in view of *Imran* and further in view of U.S. Publication No. 2015/0245882 ("*Venkatraghavan*").

Independent claim 1, as amended, requires that the distal section straight portion "has a reverse taper with an outer diameter of the distal section straight portion increases in a distal direction, such that a distal end of the distal section straight portion has a diameter greater than a proximal end of the distal section straight portion." This limitation is not discloses or suggested by the references cited by the Office. Further, while the Office cites to *Chanduszko* as teaching a reduced diameter portion, *Chanduszko* specifically teaches a "waist" portion that is "more flexible or bendable than the portions of the inner needle 14 that are proximal or distal to the waist 30." (*Chanduszko*, paragraph [0048].) This disclosure is distinct from and, in fact, teaches away from the claimed reverse taper features. Thus, the skilled artisan would have no reason to modify the teachings of the primary reference as currently claims. Claim 1, along with the various claims depending therefrom, thus stand in allowable form.

Appln. No.: 17/474,415
Page 7

NM Ref.: 051666.12005
BSC Ref.: 22-0558US03

## Claim Rejections – Double Patenting

Claims 1-19 stand rejected for non-statutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 11,154,324. *Office Action*, at 8. Without acquiescing, the Applicant hereby submits a terminal disclaimer to overcome this rejection.

## Express Rescission of Any Prosecution Disclaimer

Applicant does not concede and otherwise rescinds and retracts any disclaimer of claim scope from prior amendments or characterizations of claims or referenced art made during prosecution of the parent or any other related application(s). Examination of the instant application requires renewed consideration of any references previously considered during examination of any related application(s). Any amendments to the claims are made to expedite prosecution of this application, without acquiescing to the Office's rejections or characterizations of the claims or references in the Office Action. Even if not expressly discussed above, Applicant respectfully traverses each of the rejections, assertions, and characterizations regarding the disclosure and teachings of the cited references, including the prior art status and the propriety of proposed combinations of cited references. Unless expressly and specifically stated herein, nothing in this paper should be construed as Applicant's intent to concede any issue with regard to any claim. The Office should not interpret any claim amendment or statements herein as an admission or concession of unpatentability of the subject matter claimed prior to such amendments. Applicant specifically reserves the right to prosecute the previously claimed subject matter and claims of a broader or different scope in a continuation application.

Appln. No.: 17/474,415                                NM Ref.: 051666.12005
Page 8                                                BSC Ref.: 22-0558US03

**Conclusion**

For the reasons explained above, all pending claims are now in condition for allowance. Accordingly, Applicant respectfully requests that the Office issue a *Notice of Allowance.*

Applicant has made a good faith effort to respond to all rejections set forth in the Office Action and to place the pending claims in condition for immediate allowance. If the Examiner has any questions or comments, the Examiner is requested to contact the undersigned.


Respectfully submitted,

Nelson Mullins Riley & Scarborough LLP


By:    /Jason R. Kraus/_____
       Jason R. Kraus
       Reg. No. 42,765
       Customer No.: 188636

Dated:  December 6, 2023

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION #<br>**17/474,415** | RECEIPT DATE / TIME<br>**12/06/2023 03:18:06 PM Z ET** | ATTORNEY DOCKET #<br>**051666/12005** |
|---|---|---|

## Title of Invention

Methods and Devices for Puncturing Tissue

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 4560 | FILED BY | Carmen Prince |
| PATENT CENTER # | 63510955 | FILING DATE | 09/14/2021 |
| CUSTOMER # | 188636 | FIRST NAMED INVENTOR | Gareth Davies |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Jason Kraus |

## Documents                                        TOTAL DOCUMENTS: 2

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| petition-request.pdf | 3 | Terminal Disclaimer-Filed (Electronic) | 48 KB |
| grantLetter.pdf | 1 | Terminal Disclaimer-Electronic-Approved | 19 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| petition-request.pdf | 4F8F3288B0182DAB690D8CC696B0C1FE8D08557FB1FD6374B 6504721F6EE84A2C97C2B050941918F023529934BEEBD43327 |

2339CA9D44C0A512FF208759466DB

grantLetter.pdf

A33AF54ADE6346492EA30560EE5BDE3DCF4F95B2C6AF24075
8BC4F71173201E560005AA17F3F5B023DAD17A4FA7BF13FBF
562930A0BAC101C90D230A2A867CF2

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Doc Code: DIST.E.File
Description: Electronic Terminal Disclaimer - Filed

PTO/SB/25

 UNITED STATES
PATENT AND TRADEMARK OFFICE

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# TERMINAL DISCLAIMER TO OBVIATE A PROVISIONAL DOUBLE PATENTING REJECTION OVER A PENDING "REFERENCE" APPLICATION

| APPLICATION # | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET # |
|---|---|---|---|
| 17474415 | 09/14/2021 | Gareth Davies | 051666/12005 |

## Title of Invention

Methods and Devices for Puncturing Tissue

 Filing of terminal disclaimer does not obviate requirement for response under 37 CFR 1.111 to outstanding Office Action

 This electronic Terminal Disclaimer is not being used for a Joint Research Agreement.

| Owner | Percent Interest |
|---|---|
| BOSTON SCIENTIFIC MEDICAL DEVICE LIMITED | 100% |
| Total | 100% |

The owner(s) of percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of any patent granted on pending reference Application Number(s)

| Application # | Filing Date |
|---|---|

as the term of any patent granted on said reference application may be shortened by any terminal disclaimer filed prior to the grant of any patent on the pending reference application. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and any patent granted on the reference application are commonly owned. This agreement runs with any patent granted on the

instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of any patent granted on the instant application that would extend to the expiration date of the full statutory term of any patent granted on said reference application, "as the term of any patent granted on said reference application may be shortened by any terminal disclaimer filed prior to the grant of any patent on the pending reference application," in the event that any such patent granted on the pending reference application: expires for failure to pay a maintenance fee, is held unenforceable, is found invalid by a court of competent jurisdiction, is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321, has all claims canceled by a reexamination certificate, is reissued, or is in any manner terminated prior to the expiration of its full statutory term as shortened by any terminal disclaimer filed prior to its grant.

---

The owner(s) of percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of prior patent number(s)

| Patent # |
| --- |
| 11154324 |

as the term of said prior patent is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later:

- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

---

 Terminal disclaimer fee under 37 CFR 1.20(d) included with Electronic Terminal Disclaimer request.

**Applicant claims the following entity status:**

Regular Undiscounted

I hereby declare that all statements made herein of my own knowledge are true and that all statemnts made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I certify, in accordance with 37 CFR 1.4(d)(4) that I am: An attorney or agent registered to practice before the Patent and Trademark Office who is of record in this application

| Signature | Name | Registration # |
|---|---|---|
| /Jason R. Kraus/ | Jason Kraus | 42765 |

\* Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner). Form PTO/SB/96 may be used for making this certification. See MPEP 324.

Doc code : DISQ.E.FILE
Description : Electronic Terminal Disclaimer - Approved

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# APPROVAL LETTER

**APPLICATION #**
17/474,415

**FILING DATE**
09/14/2021

**APPLICANT/PATENT UNDER REEXAMINATION**
Gareth Davies

**Title of Invention**

Methods and Devices for Puncturing Tissue

Electronic terminal disclaimer filed on 12/06/2023

☑ Approved

   This patent is subject to a Terminal Disclaimer

Approved / Disapproved by: Electronic Terminal Disclaimer automatically approved

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 188636 | 7590 | 01/31/2024 |
|---|---|---|

Nelson Mullins Riley & Scarborough LLP / BSCI
IP Department
One Wells Fargo Center, Suite 2300
301 South College Street
Charlotte, NC 28202

| EXAMINER |
|---|
| PEFFLEY, MICHAEL F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3794 | |

DATE MAILED: 01/31/2024

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/474,415 | 09/14/2021 | Gareth Davies | 051666/12005 | 4560 |

TITLE OF INVENTION: Methods and Devices for Puncturing Tissue

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 04/30/2024 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 40% the amount of undiscounted fees, and micro entity fees are 20% the amount of undiscounted fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 11/23)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via the USPTO patent electronic filing system.

By mail, send to:    Mail Stop ISSUE FEE
        Commissioner for Patents
        P.O. Box 1450
        Alexandria, Virginia 22313-1450

By fax, send to:    (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications. **Because electronic patent issuance may occur shortly after issue fee payment, any desired continuing application should preferably be filed prior to payment of this issue fee in order not to jeopardize copendency.**

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

188636        7590        01/31/2024

**Nelson Mullins Riley & Scarborough LLP / BSCI**

IP Department

One Wells Fargo Center, Suite 2300

301 South College Street

Charlotte, NC 28202

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via the USPTO patent electronic filing system or by facsimile to (571) 273-2885, on the date below.

| | |
|---|---|
| | (Typed or printed name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/474,415 | 09/14/2021 | Gareth Davies | 051666/12005 | 4560 |

TITLE OF INVENTION: Methods and Devices for Puncturing Tissue

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 04/30/2024 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PEFFLEY, MICHAEL F | 3794 | 606-047000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE          (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted:    ☐Issue Fee    ☐Publication Fee (if required)

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via the USPTO patent electronic filing system    ☐ Enclosed check    ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

PTOL-85 Part B (11/23) Approved for use through 03/31/2026    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/474,415 | 09/14/2021 | Gareth Davies | 051666/12005 | 4560 |

| | | EXAMINER |
|---|---|---|
| 188636          7590          01/31/2024 | | PEFFLEY, MICHAEL F |

Nelson Mullins Riley & Scarborough LLP / BSCI
IP Department
One Wells Fargo Center, Suite 2300
301 South College Street
Charlotte, NC 28202

| ART UNIT | PAPER NUMBER |
|---|---|
| 3794 | |

DATE MAILED: 01/31/2024

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

Page 3 of 3

PTOL-85 (Rev. 11/23)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to:

1) law enforcement, in the event that the system of records indicates a violation or potential violation of law;

2) a federal, state, local, or international agency, in response to its request;

3) a contractor of the USPTO having need for the information in order to perform a contract;

4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record;

5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record;

6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations;

7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals;

8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c));

9) the Office of Personnel Management (OPM) for personnel research purposes; and

10) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

| *Notice of Allowability* | Application No.<br>17/474,415 | Applicant(s)<br>Davies et al. | |
|---|---|---|---|
| | Examiner<br>MICHAEL PEFFLEY | Art Unit<br>3794 | AIA (FITF) Status<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the response and TD filed 12/6/2023.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1,4-5 and 7-20 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All    b) ☐ Some*    c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____ .
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/MICHAEL F PEFFLEY/
Primary Examiner, Art Unit 3794

Application/Control Number: 17/474,415                                                                Page 2
Art Unit: 3794

### Notice of Pre-AIA or AIA Status

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### Reasons for Allowance

The following is an examiner's statement of reasons for allowance: applicant's amendments and comments, filed with the response of December 6, 2023, are deemed to distinguish the claims from the prior art of record.  The examiner agrees with applicant's arguments that there is no clear motivation to provide the Stewart guidewire with a "waist" portion as taught by Chanduszko.  Applicant's acceptable terminal disclaimer has obviated the double patenting rejection thereby placing the claims in condition for allowance.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

### Conclusion

Any inquiry concerning this communication or earlier communications from the examiner should be directed to MICHAEL PEFFLEY whose telephone number is (571)272-4770. The examiner can normally be reached Mon-Fri 8 am-5 pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 17/474,415                                                    Page 3
Art Unit: 3794

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Linda Dvorak can be reached on (571) 272-4764. The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/MICHAEL F PEFFLEY/
**Primary Examiner, Art Unit 3794**

/M.F.P/
January 24, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 17/474,415 | 06/04/2024 | 11998238 | 051666/12005 | 4560 |

188636        7590        05/15/2024
Nelson Mullins Riley & Scarborough LLP / BSCI
IP Department
301 S. College Center, Suite 2300
301 S. College Street
Charlotte, NC 28202

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above. The patent will issue electronically. The electronically issued patent is the official patent grant pursuant to 35 U.S.C. § 153. The patent may be accessed on or after the issue date through Patent Center at https://patentcenter.uspto.gov/. The patent will be available in both the public and the private sides of Patent Center. Further assistance in electronically accessing the patent, or about Patent Center, is available by calling the Patent Electronic Business Center at 1-888-217-9197.

The USPTO is implementing electronic patent issuance with a transition period, during which period the USPTO will mail a ceremonial paper copy of the electronic patent grant to the correspondence address of record. Additional copies of the patent (i.e., certified and presentation copies) may be ordered for a fee from the USPTO's Certified Copy Center at https://certifiedcopycenter.uspto.gov/index.html. The Certified Copy Center may be reached at (800)972-6382.

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 297 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Center (https://patentcenter.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Patents Stakeholder Experience (OPSE), Stakeholder Support Division (SSD) at (571)-272-4200.

IR103 (Rev. 10/09)

INVENTOR(s)  (Please see PATENT CENTER site https://patentcenter.uspto.gov for additional inventors):

Gareth Davies, Toronto, CANADA;
John Paul Urbanski, Toronto, CANADA;
Ferryl Alley, Burlington, CANADA;
Bogdan Beca, Thornhill, CANADA;

APPLICANT(s)  (Please see PATENT CENTER site https://patentcenter.uspto.gov for additional applicants):

BOSTON SCIENTIFIC MEDICAL DEVICE LIMITED, BALLYBRIT, IRELAND;


The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)